## IN THE CIRCUIT COURT OF THE 7TH JUDICIAL CIRCUIT
## IN AND FOR ST. JOHNS COUNTY, FLORIDA

Case No.: _____ CA22-0117

THOMAS ANDERSON, on behalf of himself
and others similarly situated

**Class Action**

Plaintiff,

v.

UNITED AIRLINES, INC., a Delaware Corporation;
ASHLEY MOODY, in her official capacity
as Attorney General of Florida,

Defendants.

_____/

## VERIFIED CLASS ACTION COMPLAINT SEEKING
## DECLARATORY AND INJUNCTIVE RELIEF

Plaintiff, THOMAS ANDERSON ("Anderson"), on behalf of himself and

others similarly situated, bring this action pursuant to Florida Rule of Civil

Procedure 1.220 and Florida Statute §86.011 on behalf of himself and all others

similarly situated ("Plaintiffs"), against Defendants, UNITED AIRLINES, INC., a

Delaware Corporation ("United"); and ASHLEY MOODY, in her official capacity

as Attorney General of Florida ("Moody"); seeking declaratory, preliminary and

permanent injunctive, and/or mandamus relief. In support, Plaintiff states:

## NATURE OF ACTION

1.  While the Supreme Court recently emphasized how "even in a pandemic, the Constitution cannot be put away and forgotten," it has been cavalierly disregarded in the handling of COVID-19 – particularly under the current administration. *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 68 (2021).

2.  From the unlawful Executive Orders to the private employers like United requiring its employees to take harmful and oftentimes deadly COVID-19 vaccines as a condition of employment, America's identify as the "shining city on a hill[1]" appears to have become a dark shadow of its former self; and like Paul's cry to the city of Ephesus, the United States needs to "Awake" before it is too late. The Bible, Ephesians 5:14 (King James Version).

3.  There is no pandemic exception to the United States Constitution; and it is imperative that the procedural safeguards and protections contained therein be strictly followed and always serve as the country's guidepost – especially during uncertain, turbulent times. As stated by Justice Hughes in *Home Building & Loan Assn. v. Blaisdell*, 290 U.S. 398, 425-426 (1934):

> Emergency does not create power. Emergency does not
> increase granted power or remove or diminish the restrictions

---

[1] President Ronald Reagan's Farewell Address to the Nation, January 11, 1989. Available at: https://www.reaganlibrary.gov/archives/speech/farewell-address-nation (On January 14, 2022).

imposed upon power granted or reserved. The Constitution was adopted in a period of grave emergency. Its grants of power to the federal government and its limitations of the power of the states were determined in the light of emergency, and they are not altered by emergency.

4.  The Constitution enumerates those powers delegated to each branch of the federal government with all others reserved to the States (i.e., historical police powers such as health, safety, and welfare) as expressed by the Tenth Amendment.

5.  The problem here, however, are powers have been unlawfully delegated by the Federal government to the private sector toward big corporations like United; while States' or We the Peoples' rights have been trampled on and eclipsed. In short, should any behavior be curtailed in the name of health/safety, such decisions ought to be made in accordance with and pursuant to the traditions our founders intended and the Constitution – they must be left for the States. *Jacobson   v. Commonwealth of Massachusetts*, 197 U.S. 11, 22 (1905); *Cohens v. State of Virginia*, 19 U.S. 264, 313, 5 L. Ed. 257 (1821) ("All the powers not granted are retained by the States"); *See also Highland Farms Dairy v. Agnew*, 300 U.S. 608, 612 (1937) ("How power shall be distributed by a state among its governmental organs is commonly, if not always, a question for the state itself.").

6.  Within strict and heavily guarded parameters, all Americans have certain, fundamental, inalienable rights and civil liberties that cannot be abridged. These

rights – like freedom of religion[2]; privacy or "the right to be let alone—the most comprehensive of rights and the right most valued by civilized man[3]"; meaningful access to courts[4]; people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures[5]; cruel and unusual punishment[6]; or the right to earn a living by a calling for one's choice[7] are not mutually exclusive and importantly, emanate from the same source: The United States Constitution.

7. Coincidingly, The Federal Constitution generally sets the floor, not the ceiling, with regard to the extent of personal rights and freedoms afforded by the State of Florida. *State v. Kelly*, 999 So. 2d 1029 (Fla. 2008). The U.S. Constitution serves as a floor for basic freedoms whereas the State constitution, the ceiling. *State v. Washington*, 114 So. 3d 182 (Fla. 3d DCA 2012). In other words, while states may place more rigorous restraints on government intrusion than required by the Federal Constitution or statutes, states may not limit personal freedoms beyond that which the U.S. Constitution guarantees. *Id*. *See also Advisory Opinion to Atty. Gen. re Term Limits Pledge*, 718 So. 2d 798, 804 (Fla. 1998) (concurring) citing *Gray*

---

[2] U.S. Const. amend. I
[3] See *Olmstead v. United States*, 277 U.S. 438, 478 (1928) (dissent).
[4] It is beyond dispute that the right of access to the courts is a fundamental right protected by the Constitution." *Graham v. Nat'l Collegiate Athletic Ass'n*, 804 F.2d 953, 959 (6th Cir.1986).
[5] U.S. Const. amend. IV
[6] U.S. Const. amend. VIII
[7] *Truax v. Raich*, 239 U.S. 33, 41, (1915); *In re Griffiths*, 413 U.S. 717 (1973).

*v. Winthrop*, 115 Fla. 721, 156 So. 270 (1934); *Gray v. Moss*, 115 Fla. 701, 156 So. 262 (1934) (for proposition the U.S. Constitution must be taken into account and considered when addressing Florida's Constitution).

8.  The tenets of federalism have not been respected as evidenced by the decades of legislation passed and signed into law by Presidents (on both sides of the aisle) which has gone unchecked by the judiciary for *at least* the past six decades; which have whittled away at Americans' God-given rights. Through neglect and ostensibly design, the conflation of authority and illicit laws continue and remain in effect; resulting in unbridled, government and private employer actions that are seriously injuring and literally killing Americans daily.

9.  Through what appears to be some form of sleight of hand fascism or oligarchic technocracy, the current administration has sponsored large corporations' usurpation of the States' roles through its actions and sanctioned their indecency with silence.

10.  While the preamble to the Constitution may not itself be a source of power, if nothing else it memorializes our Nation's objectives and serves as a constant reminder why "WE THE PEOPLE of the United States…" have consented to be governed by our chosen electorate – not corporate overlords.

11. Americans have agreed to forgo absolute freedom in exchange "to form a more perfect Union, establish Justice, insure domestic Tranquility, provide for the common defence, promote the general Welfare, and secure the Blessings of Liberty to ourselves and our Posterity…" Preamble, U.S. Const. This social contract is codified in the Constitution and is between We the People and our government comprised of our chosen electorate. This cannot be overstated – it is the pulse of this lawsuit and the source of Plaintiffs' (if not most Americans) grievance: the Constitution outlines the contours as to how the United States will operate; and expressly delineates certain rights which the government promises to uphold and our armed forces swears to protect. This agreement is between Americans and our chosen electorate – not big tech, not big pharma, or any other corporation like United. *See e.g., Marsh v. State of Ala.*, 326 U.S. 501 (1946) (posing the question, "Can those people…be denied freedom of press and religion simply because a single company has legal title to all the town?). *Scott v. McNeal*, 154 U.S. 34, 45, 14 S. Ct. 1108, 1112, 38 L. Ed. 896 (1894); *United States v. Cruikshank*, 92 U.S. 542, 559, 23 L. Ed. 588 (1875); *Bank of Columbia v. Okely*, 17 U.S. 235, 236, 4 L. Ed. 559 (1819).

12. It is axiomatic that Plaintiffs are protected from certain rights being infringed upon by the state which they have consented to be governed by; yet

Congress, the judiciary, and apparently executive or presidential decree have held that Private Corporations cannot be found liable for the same infringements barring certain, rare exceptions[8]. Rhetorically, why would Americans be okay with having a legal vehicle to sue government "persons" who infringe their rights whose purpose exists to serve and protect them, but be deprived a legal remedy from Private Corporations who violate the same rights but whose sole purpose is to profit off their backs?  In short, United nor any other corporation is permitted to abridge Americans rights simply because they have "Inc." behind their name.

13. The Supreme Court in *Jacobson* (1905) has already held that states have the authority to decide whether to impose a vaccine mandate. This sovereign power bestowed upon the states by the Constitution to make laws regarding the health, safety, and morals have not changed in the past century. What has changed, however, are Court's recognition of these powers, the spirit of the Constitution, and the importance of individual liberty and autonomy. This suit seeks to remedy this judicial amnesia and realign the power where it belongs – with the people.

---

[8] *See e.g., Civil Rights Cases*, 109 U.S. 3, 11, 3 S.Ct. 18, 21 27 L.Ed., 835 (1883); *Shelley v. Kraemer*, 334 U.S. 1, 13, 68 S.Ct. 836, 842, 92 L.Ed. 1161 (1948). *See e.g., Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 926 (1982); *United States v. Price*, 383 U.S. 787, 794 (1966).

## JURISDICTION, PARTIES, & VENUE

14. This is a class action for declaratory and injunctive relief exclusive of attorney's fees and costs; and/or a complaint seeking mandamus relief. *See* Fla. R. Civ. P. 1.220; Fla. Stat. Ann. § 86.011.

15. At all times material, Plaintiff and Class Representative, THOMAS ANDERSON, resides or resided in St. John's County, and was employed by UNITED AIRLINES, INC. as a pilot. Anderson was placed on unpaid leave with no benefits, to be brought back at some point in the indefinite future after he submitted his religious exemption paperwork.

16. At all times material, Defendant, UNITED AIRLINES INC., regularly conducts business and maintains a large workforce throughout Florida; and is otherwise sui juris. Among other things, United has implemented mandatory COVID-19 vaccinations, masks, and PCR tests for all of its employees.

17. At all times material, Defendant, ASHLEY MOODY, was acting and serving in her capacity as Florida's Attorney General.

18. Venue is proper because the events giving rise to the claims occurred in or impacts Plaintiff in St. Johns County; and the declaratory and injunctive relief, and/or mandamus, is sought throughout Florida including St. Johns County where

United regularly conducts business. Also, the issues or questions presented to the Court relate to Florida's Constitution and statutes. *See e.g.,* Fla. Stat §381.0031.

19. All conditions precedent to the maintenance of this action have occurred, been performed, or have been waived.

## SUMMATION OF DECLARATORY ACTION SOUGHT

20. Both United States and Florida Constitutions, as well as, state and federal laws, establish that neither the federal government nor private employers can force a person to receive an EUA vaccine generally; especially an inoculation without informed consent and well-documented to cause serious injury and death. This action seeks to remedy an ongoing, present issue and controversy of Defendant, United Airlines, Inc., a private employer doing business in Florida, mandating COVID-19 vaccinations, masks, and PCR testing as a condition of employment; the actions United has taken to induce same; and Florida's Attorney General, Ashley Moody, unwillingness to enforce the law as enacted.

## STATEMENT OF FACTS

### I.   GENERAL INFORMATION & OVERVIEW

21. By mid-March 2020, the "novel coronavirus," SARS-CoV-2, which can cause the disease, COVID-19, had spread worldwide and wreaked havoc on the United States' healthcare, economy, and well-being. While SARS-CoV-2 was

called 'novel,' it was not some unrecognizable virus – just a new strain of coronavirus that resides in both humans and animals. SARS-CoV-2 behaves like SARS-CoV that emerged in China in 2002 which justifies why it was classified and named as such. SARS-CoV-2 has the same genetic structure, uses the same host cell receptor to begin the infection cycle, and causes the same disease as SARS-CoV in humans. *See* affidavit of Dr. Jennifer Smith at **Ex. C**.

22. Alarmingly, the most novel aspects of SARS-CoV-2 and COVID-19 disease were the federal and state governments' responses. Due to the growing number of COVID-19 cases, former U.S. Health and Human Services ("HHS") Secretary, Alex M. Azar, II ("Azar"), determined that a public health emergency existed and a national emergency was declared. Among others, The Public Readiness and Emergency Preparedness Act (PREP) was invoked and the Coronavirus Aid, Relief, and Economic Security Act ("CARES"), H.R. 748, was introduced to Congress and signed into law shortly thereafter.

23. Pursuant to Section 546 of the Food, Drugs and Cosmetics Act (or "FDCA"), Azar utilized 21 U.S.C. §360bbb-3, declared that the SARS-CoV-2 virus created a "public health emergency" that had significant potential to affect national security or trigger an "Emergency Declaration." Based on the Declaration, Operation Warp

Speed was set in motion permitting COVID-19 vaccines to be developed for Emergency Use Authorization ("EUA") faster than any other vaccine in the Nation's history – with never-before-seen uninhibited, lack-of accountability, and disregard for process, safety, and regulation. It should also be noted that to date, early treatment, with natural and medicinal therapeutics (ivermectin, hydroxychloroquine, vitamin D, etc…) that have shown significant efficacy against the disease COVID 19, have been unconscionably suppressed by the government, all federal, state and world health agencies, corporate media, and corporations like United.   This suppression, along with the forced mass vaccination campaign, has cost American lives and lives around the world. All this while disregarding science and natural immunity. At no time was the fact addressed that the actual and documented survivability of the disease COVID-19 was over 98% for all age groups. This in itself should give pause to any attempt at a forced mass vaccination campaign at all.

24. Anderson and his colleagues work for United and are presently being subjected to their unlawful and dangerous COVID-19 vaccine mandates; as well as, their discriminatory PCR test and mask requirements.

25. On August 06, 2021, United announced a vaccine mandate for all its employees – predating President Biden's media proclamations and Executive Orders (i.e., No. 14042 and 14043 requiring COVID-19 inoculations for all federal employees and contractors). As pronounced, the mandate required all employees to be vaccinated no later than five (5) weeks after FDA vaccine approval, or five (5) weeks after September 20, 2021, whichever comes first. Employees not vaccinated by October 25, 2021, will be terminated.

26. United's mandate is absolute insomuch as there is no alternative for periodic testing, mask wearing, or social distancing. Even employees who have already had Covid and still enjoy immunity, such as Anderson himself, from the disease were lumped into this irresponsible mandate. In short, United is telling its employees to "take the jab to keep your job." And while United portrays the notion they are willing to accommodate those for religious and health reasons, as noted by Anderson mentioned earlier and further below, there is no real meaningful option as unpaid leave without benefits is, by any other name, terminated or fired.

27. While the Supreme Court has held that OSHA as the enforcement arm is unlikely to be successful, the executive orders and employer mandates remain.

28. Plaintiffs have been given an unconscionable ultimatum which violates numerous provisions of the United States and Florida Constitutions: choose between their jobs which afford them the ability to feed, clothe, and house their families – or – take an experimental, life-threatening vaccine.

29. The statistics regarding the COVID-19 vaccines are shocking. For the Court's consideration, five (5) highly qualified experts or doctors have provided affidavits or sworn statements stating in their opinions, the COVID-19 vaccines which the government and employers are forcing upon the American workforce (Plaintiffs included) can cause significant harm or death. *See* affidavits/statements attached of Dr. Jennifer Smith (**Ex. C**), Dr. Jane Ruby (**Ex. D**), Dr. Ben Edwards (**Ex. E**), Dr. Peter McCullough (**Ex. F**), and Lieutenant Colonel Theresa Long (**Ex. G**).

30. Coincidingly, the January 07, 2022, OpenVaers.com data shows 1,033,992 Reports of adverse reactions and issues, which among other things, includes: 21,745 deaths, 11,754 hospitalizations, 112,235 requiring urgent care, 3,594 miscarriages, 11,055 heart attacks, and leaving 37,937 people permanently disabled. *See* https://openvaers.com/covid-data (and graphic below). This is particularly concerning as the total safety reports in VAERS for all vaccines up to 2019 was 16,320. By comparison, from 1999, until December 31, 2019, VAERS

received 3167 death reports (158 per year) for all vaccines combined. And a 2011 report by Harvard Pilgrim Healthcare for DHHS[9] showed that fewer than 1% of all vaccine adverse events are reported to VAERS, suggesting the actual number of COVID-19 vaccine-related injuries is significantly higher.



31. This is supported by the World Health Organization's reporting of *over two million nine-hundred and sixty thousand* (2,961,255), adverse reactions to the vaccines have been reported to the WHO[10] including:

> Blood and lymphatic system disorders (127397); Cardiac disorders (170756); Congenital, familial and genetic disorders (1843); Ear and labyrinth disorders (96812); Endocrine disorders (5158); Eye disorders (108473); Gastrointestinal disorders (577561); General disorders and administration site conditions (1760957); Hepatobiliary disorders (6425); Immune system disorders (48112); Infections and infestations (246728); Injury, poisoning and procedural complications (169832); Investigations

---

[9] Harvard Pilgrim Health Care, Inc. Electronic System for Public Health Vaccine Adverse Events Reporting System *AHRQ* 2011 https://www.nvic.org/CMSTemplates/NVIC/Pdf/FDA/ahrq-vaers-report-2011.pdf

[10] http://www.vigiaccess.org/ (searching covid-19 vaccine)

(425507); Metabolism and nutrition disorders (64251); Musculoskeletal and connective tissue disorders (819934); Neoplasms benign, malignant and unspecified (incl cysts and polyps) (5363); Nervous system disorders (1229284); Pregnancy, puerperium and perinatal conditions (7683); Product issues (4420); Psychiatric disorders (138417); Renal and urinary disorders (25124); Reproductive system and breast disorders (146941); Respiratory, thoracic and mediastinal disorders (317029); Skin and subcutaneous tissue disorders (393138); Social circumstances (21665); Surgical and medical procedures (45958); Vascular disorders (156191).

32.  Additionally, a healthcare data analyst with access to Medicare/Medicaid data provided sworn testimony in a July 19, 2021, lawsuit[11] that the number of deaths occurring within just 3 days of injection with the COVID vaccines is *at least* 45,000.  There is no reasonable alternate cause for these deaths – these vaccines are killing Americans. This data is compulsory and verified; ergo, more accurate than VAERS or the World Health Organization's (vigiaccess.org).

33. Shockingly, just 2 ½ months after the FDA's issuance of the Comirnaty EUA, **according to Pfizer's own studies and documentation**, from December 01, 2021 – February 2021, there was a total of 42,086 case reports (25,379 medically confirmed and 16,707 non-medically confirmed) containing 158,893 'events':

> …in the overall dataset, were General disorders and administration site conditions (51,335 AEs), Nervous system disorders (25,957),

---

[11] *America's Frontline Doctors et al. Plaintiffs vs Xavier Becerra*, Secretary of the U.S. Department of Health and Human Services. Civil Action No. 2:21-cv-00702-CLM.  In the United States District Court for the Northern District of Alabama. Plaintiffs Motion for Preliminary Injunction. Filed 07/19/2021.

Musculoskeletal and connective tissue disorders (17,283), Gastrointestinal disorders (14,096), Skin and subcutaneous tissue disorders (8,476), Respiratory, thoracic and mediastinal disorders (8,848), Infections and infestations (4,610), Injury, poisoning and procedural complications (5,590), and Investigations (3,693).

34. Notably, emerging data from Israel, one of the most heavily vaccinated countries in the world, illustrates that hospitalizations and deaths are primarily of the vaccinated. Dr. Kobi Haviv, Israel's center for respiratory care director, reported on August 07, 2021, that 85-90% of hospitalizations are vaccinated individuals and that 95% of severe cases are vaccinated individuals[12]. This data indicates that vaccinated people are 4-times more likely to get Covid, get very sick, or even die than the unvaccinated. Furthermore, as reflected below, the vaccines do not work as advertised, purported, or represented:

THE SCALE OF THE COVID-19 INJECTION
# EFFICACY LIE

| Jab Type | What they told you it did | What it actually does |
|---|---|---|
| | THE MARKETING LIE | THE LANCET STUDY |
| | Relative Risk Reduction | Absolute Risk Reduction from Jab |
| Pfizer/BioNtech | 95.03% | 0.84% |
| Moderna (NIH) | 94.08% | 1.24% |
| Janssen | 66.62% | 1.19% |
| AstraZeneca/Oxford | 66.84% | 1.28% |

Source: www.thelancet.com/journals/lanmic/article/PIIS2666-5247(21)00069-0/fulltext
For more information please visit: doctors4covidethics.org

---

[12] https://13news.co.il/?utm_source=Reshet&utm_medium=bar_nivut_elyon_new13

35. Meanwhile, the government or the Centers for Disease Control and Prevention ("CDC") espouses or promotes the following information[13]:

**What You Need to Know**

- Everyone ages 5 and older can get vaccinated against COVID-19. Learn how to find a COVID-19 vaccine.
- COVID-19 vaccines are effective at helping protect against severe disease and death from the virus that causes COVID-19, including known variants currently circulating (e.g., Delta variant).
- The benefits of COVID-19 vaccination outweigh the known and potential risks, which are rare.
- As with other routine vaccines, side effects may occur after vaccination. These are normal and should go away within a few days.
- People who are fully vaccinated can resume many activities they did before the pandemic. However, people should wear a mask indoors in public if they are in an area of substantial or high transmission.
- If you received a Pfizer-BioNTech (ages 12 and older) or Moderna (ages 18 and older) mRNA COVID-19 vaccine primary series and have a moderately or severely compromised immune system, you should receive an additional primary dose of the same mRNA COVID-19 vaccine at least 28 days after the second dose.
- Everyone ages 16 years and older can get a booster shot. Pfizer-BioNTech or Moderna (mRNA COVID-19 vaccines) are preferred in most situations. Although mRNA vaccines are preferred, J&J/Janssen COVID-19 vaccine may be considered in some situations.
- Unlike many medications, COVID-19 vaccine dosage does not vary by patient weight but by age on the day of vaccination.
- People can get a COVID-19 vaccine and other vaccines, including flu vaccine, at the same time.

---

[13] https://www.cdc.gov/coronavirus/2019-ncov/vaccines/keythingstoknow.html#:~:text=People%20can%20get%20a%20COVID,at%20the%20same%20time. (last accessed January 15, 2022).

36. Plaintiffs have real, substantial, and legitimate concerns about taking one of the COVID-19 vaccines in light of the known injuries and deaths; as well as, those harms and dangers which are unknown. Coincidingly, Plaintiffs do not want to be treated differently in the workplace based on their vaccination status or asked about same; and maintain it is unlawful for the employer to do so.

37. Similarly, Plaintiffs do not want to take PCR tests which are inaccurate and whose EUA has been revoked; or have to wear their vaccination status on their face with masks which cannot thwart or block the transmission of the SARS-CoV-2 virus or COVID-19 disease as noted in a National Center for Biotechnology Information, U.S. National Library of Medicine study: "while surgical masks provide a barrier against large respiratory particles, they are ineffective at providing protection from smaller particles. Surgical masks also do not prevent leakage around the mask when the user inhales. Therefore, surgical masks are ineffective and do not provide enough protection when performing direct care for patients with COVID.[14]"

38. The effectiveness of masks in stopping the spread of SARS-COV-2 and/or COVID-19 is not supported by sound, scientific data; and studies have shown that

---

[14] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7831687/

wearing a mask for extended periods of time can actually be injurious to overall health. As such, masks would not be a reasonable alternative and would not serve a compelling interest of preserving public health because they cannot prevent infection or transmission of SARS-COV-2 or COVID-19. In fact, over a decade's worth of scientific studies regarding masks' use and their efficacy concluded they do not prevent the spread of viruses like the flu:

- In 2009, the American Journal of Infection Control concluded "face mask use in health care workers was not demonstrated to provide benefit in terms of cold symptoms or getting colds." https://pubmed.ncbi.nlm.nih.gov/19216002/

- A year later, a study in Epidemiology and Infection entitled "Face masks to prevent transmission of influenza virus: A systematic review" found that "none of the studies reviewed showed a benefit from wearing a mask, in either health care workers or community members in households." https://www.cambridge.org/core/journals/epidemiology-and-infection/article/face-masks-to-prevent-transmission-of-influenza-virus-a-systematic-%20review/64D368496EBDE0AFCC6639CCC9D8BC05

- In 2012, researchers published a study called "The use of masks and respirators to prevent transmission of influenza: a systematic review of the scientific evidence" and found "There were 17 eligible studies. … None of the studies established a conclusive relationship between mask/respirator use and protection against influenza infection." https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5779801/

- In 2016, a study in the Canadian Medical Association Journal "found no significant difference between N95 respirators and surgical masks in associated risk of (a) laboratory-confirmed respiratory infection, (b) influenza-like illness, or (c) reported work-place absenteeism." https://www.cmaj.ca/content/188/8/567

- A 2019 study in the Journal of the American Medical Association determined that "among outpatient health care personnel, N95 respirators vs medical masks as worn by participants in this trial resulted in no significant difference in the incidence of laboratory-confirmed influenza." https://jamanetwork.com/journals/jama/fullarticle/2749214

- And even a study published in the Journal of Evidence-Based Medicine on February 12, 2020, a month before America's COVID panic set in, concluded that "there were no statistically significant differences in preventing laboratory-confirmed influenza, laboratory-confirmed respiratory viral infections, laboratory-confirmed respiratory infection, and influenza-like illness using N95 respirators and surgical masks." https://onlinelibrary.wiley.com/doi/epdf/10.1111/jebm.12381

## II.   FDA APPROVAL

39. The FDA issued EUAs for Pfizer, Moderna, and J&J – the PfizerBioNTech Covid Vaccine on December 11, 2020[15], a week later the Moderna Vaccine[16], and most recently, the Johnson & Johnson Vaccine[17] ("vaccines"). Numerous memoranda and petitions, however, have been sent to the Government and

---

[15] Pfizer-BioNtech Vaccine FAQ, FDA, bit.ly/3i4Yb4e (last visited August 27, 2021).
[16] Moderna, About Our Vaccine, bit.ly/2Vl4lUF (last visited August 27, 2021).
[17] EUA for Third COVID-19 Vaccine, FDA, bit.ly/3xc4ebk (last visited August 27, 2021).

20

private corporations concerning the approval/regulations of the COVID-19 vaccines and those laws and rules that have been usurped surrounding the COVID-19 vaccines. *See e.g.* December 15, 2021, addressed to Defendant and other entities attached as **Exhibit A**.

40. Doctors from around the world, as well as, scientists, virologists, epidemiologists, and vaccine researchers have flooded the scientific community with data and studies exposing the dangers of these vaccines, their ineffectiveness, the unnecessary nature of them, and suitable, effective, alternative treatments for treating the SARS-CoV-2 virus and COVID-19 disease. This data alone should have prohibited the issuance and subsequent re-issuances of the EUA and/or Comirnaty's "full approval;" yet remarkably, the vaccines were not only authorized and renewed but the boosters that followed as well.

A. FDA Guidance on Testing and Review of COVID-19 Vaccines

41. In June 2020, HHS, FDA, and the Center for Biologics Evaluation and Research ("CBER") issued guidance to vaccine developers on clinical and non-clinical testing and the procedures the FDA intended to apply in evaluating and

approving COVID-19 vaccines[18]. The state-managed FDA did not follow standard procedures or industry recommendations. The June 2020 Industry Guidance included a number of recommendations that ultimately were not followed; in particular: (1) the inclusion in clinical trials of individuals with previous Covid infections; (2) the inclusion of pregnant women; and (3) the use of clinical trials lasting "*at least one to two years*."

42. Notably, many of Plaintiffs contentions and concerns above are shared by others as evidenced by the Citizen Petition submitted by the Coalition Advocating for Adequately Licensed Medicines on July 23, 2021 in Docket No. FDA-2021-P-0786. ("Citizen Petition"). *See also Exhibit A*. The FDA *denied* the Citizen Petition on August 23, 2021; which coincidently was the same day the FDA approved Comirnaty. See Comirnaty approval letter attached as **Exhibit B** (BLA).

B.   Citizen Petition & FDA Response

43. On August 23, 2021, the FDA approved the May 18, 2021, Comirnaty application for individuals 16 years or older; and re-issued the EUA for the BioNTech Vaccine for individuals 16 years or older and for children aged 12 to 15

---

[18] *See* HHS, FDA & CBER, Development and Licensure of Vaccines to Prevent COVID-19: Guidance for Industry (June 2020) ("June 2020 Industry Guidance"), available at: https://www.fda.gov/media/139638/download (last visited October 11, 2021).

years, and expanded the EUA to cover a third "booster" shot for certain groups. The FDA Comirnaty Approval and BioNTech EUA Expansion thus licensed a vaccine and continued an existing EUA for the same group (individuals 16 years or older). In other words, the FDA has incorrectly asserted that the EUA BioNTech Vaccine and the conditionally approved Comirnaty Vaccine can be used "interchangeably." As explained above, this statement is contradictory and incorrect insofar as it suggests that an EUA Vaccine, manufactured and labeled in accordance with the EUA, may be treated as a licensed product. Conversely, it submits that the Comirnaty Vaccine can be used for "off-label" uses under the EUA, e.g., for a child under 16 or for a third "booster" dose for which there is no clinical trial data available.

44. The FDA appears to acknowledge that the EUA BioNTech Vaccine and the conditionally licensed Comirnaty are not in fact "interchangeable." The Comirnaty Approval Letter approves the sale of Comirnaty Vaccine, as well as, the specific manufacturing facilities, processes, ingredients, storage, and distribution requirements that were not addressed in the EUA.

45. For example, the Comirnaty Approval Letter requires FDA approval for release of Comirnaty lots manufactured in accordance with the terms of the

license. Given the differences in manufacturing between EUA and licensed vaccines, the FDA also required BioNTech to identify specific lots of EUA-labeled and manufactured BioNTech Vaccines that BioNTech deemed BLA-compliant for FDA review and release. The identification, however, of these specific lots for FDA review did not occur.

46. The Comirnaty Vaccine is not widely available due to limited supply as supported by various reports[19]; buttressing the conclusion that an employer-mandated vaccine is using an EUA inoculation (BioNTech Vaccine) and not the licensed Comirnaty Vaccine.

C.    Procedural and Substantive Deficiencies in FDA Review and Approval

47. The FDA claims that the Comirnaty Vaccine approval followed its "standard process for reviewing the quality, safety, and effectiveness of medical products,[20]" but this statement is belied by its contemporaneous statements and the deficient process it followed by their own admission.

---

[19] https://www.oecd.org/coronavirus/policy-responses/access-to-covid-19-vaccines-global-approaches-in-a-global-crisis-c6a18370/ (last accessed October 16, 2021).
[20] FDA, *FDA Approves First COVID-19 Vaccine,* (Aug. 23, 2021) ("FDA ComirnatyPress Release"), available at https://www.fda.gov/news-events/press- announcements/fda-approves-first-covid-19-vaccine (last visited Sept. 22, 2021).

48. In its August 23, 2021, press conference, it was conceded that the FDA followed an "unprecedented timeline" in approving Comirnaty's application in just over three months; and did so by skipping, or failing to require the procedures and clinical trial data needed to assess Comirnaty's safety and efficacy as required by statute and law (emphasis added).[21] This confession alone raises questions regarding the scrutiny and safety of these vaccines; and the process (or lack thereof) followed.

   a.   *FDA Permitted Exclusion of "Special Populations."*

49. Neither the BioNTech Vaccine nor the Comirnaty Vaccine has been tested in clinical trials for its safety and efficacy on individuals who have recovered from COVID-19. To the contrary, the trials conducted thus far have specifically *excluded* survivors of previous Covid infections[22]. Plaintiffs contend the exclusion was an intentional act allowed by the FDA because such studies would show the futility of the vaccines.  Such studies would reveal how natural immunity is stronger and longer lasting, and would render the vaccines unnecessary. Stated differently: the

---

[21] Justine Coleman, *FDA Grants Full Approval to Pfizer's COVID-19 Vaccine*, The Hill (Aug. 23, 2021) (quoting Defendant FDA Commissioner Woodcock), available at: https://thehill.com/policy/healthcare/568980-fda-grants-full-approval-to-pfizers-covid-19-vaccine (last visited Sept. 22, 2021).
[22] *See* Fabio Angeli, *SARS-CoV-2 vaccines: Lights and Shadows*, EUROPEAN J. OF INTERNAL MEDICINE 2021;88:1-8.

FDA did not want to include studies of those naturally immune because it would end the symbiotic relationship and fraudulent, unlawful racketeering going on between the Government, vaccine companies like Pfizer, and the private sector.

50. In a similar vein, the clinical trials skipped testing for genotoxicity, mutagenicity, teratogenicity, and oncogenicity testing; and did not include participants from and/or provide sufficient data for other "special populations" such as those with autoimmune disorders, hematological conditions, children, and the elderly. Plaintiffs contend these were also intentionally excluded because the results of the study would have revealed how the vaccines cause injury or death among these persons.

51. Stated differently, it appears that the FDA wanted a vaccine with which universal inoculation could be achieved.  The FDA broke its own rules, procedures and statues in order to get this vaccine "approved," but it did not want to allow the revelation of the terrible side effects and the death the vaccine caused.  It is not unreasonable to conclude that the FDA intentionally conspired with other agencies, drug manufacturers, and private employers to affect these harms and deaths upon plaintiffs and Americans at large.  Instead, the FDA relied solely on rat studies for its approval of Comirnaty for these populations.

*b.  The FDA Relied on Interim Results for Limited and Self- Selected Sample*

52. While the Phase 3 clinical trials included a large and statistically significant number of participants, the full sample trial was truncated in unprecedented fashion. It was only followed for ***two months.***  Largely, the same trials and participants that were used to grant the initial EUA for the BioNTech Vaccine. The trial was approved regardless of the FDA's recommended period ***of at least one to two years*** as set forth in the June 2020 Industry Guidance referenced above.

53. These truncated trials produced unreliable data. The FDA does not acknowledge, however, that the results of the trials beyond the first two months are of questionable (or perhaps negligible) validity due to fundamental methodological errors that infected all trial results and undermine any conclusions that could have been drawn from them. As the axiom goes, "bad data in, bad data out" – which proved to be the case here and appears it was intentional.

54. Pfizer failed to maintain test group integrity as required by FDA procedures and statutes.  In its May 18, 2021 application[23], which included interim six-month safety and efficacy data for Phase 3 clinical trials, Pfizer- BioNTech

---

[23] *See* Stephen J. Thomas, MD, Six Month Safety and Efficacy of the BNT162b2 mRNA COVID-19 Vaccine, medRxiv Preprint (July 28, 2021), available at: https://www.medrxiv.org/content/10.1101/2021.07.28.21261159v1.full.pdf.

explained that study participants were given the option to be "unblinded" – to learn whether they had taken the experimental BioNTech Vaccine or the placebo – and if they had taken the placebo, to take the BioNTech Vaccine. As a result, roughly 7% of participants were still unaware of which shot they were given after six months. This "unblinding" transcended what should have been a randomized, controlled clinical trial into an observational, "let's just see what happens" with no informed consent as required by Federal and International law. Accordingly, the FDA's statements that the Comirnaty approval was based on "randomized, controlled, blinded ongoing clinical trial of thousands of individuals," is misleading at best. With stakes so high, there is no room for ambiguity.

   c.   *The FDA's Abdications of their Duties and Ongoing Failure to Act is Intentional*

55. Despite having been thousands of deaths and serious injuries self-reported through VAERS and the Medicare system that is run by the Government, and over two million nine-hundred thousand (2,900,000) adverse reactions to the vaccines reported to the WHO[24], the FDA has willfully, or with reckless disregard, ignored or chose to not follow its own industry guidance and historical, standards of practice which Plaintiffs opine can seemingly only be for nefarious purposes. The

_____

[24] http://www.vigiaccess.org/ (searching covid-19 vaccine)

Government, through Plaintiffs' employer, used and abused the unlawful licensing or "approval" of Comirnaty to sanction vaccine mandates and invariably the PCR test and masks policies to further their objective of universal inoculation.

56. Notably, for an EUA approval, there must be no alternative, effective treatments available for use against the disease. There are now well-studied, safe and reliable alternatives to vaccination for prevention and treatment of COVID-19, including, but not limited to Ivermectin, Methylprednisolone, Fluvoxamine, Hydroxychloroquine, Vitamin C, Vitamin D3, Zinc, Melatonin, Aspirin, corticosteroids, monoclonal antibodies, and other accessible therapies. *See e.g.* affidavits by Dr. Edwards (Ex. E) and Dr. McCullough (Ex. F).

57. This information above has been shunned, suppressed, or censored by the Government, vaccine manufacturers, and private sector – especially big media and big tech. For instance, the use of Ivermectin was rejected by the FDA despite having significantly more peer reviewed studies (forty-four (44); and thirty-two (32) double-blind clinical trials showing substantially higher efficacy than FDA promoted treatments like Pfizer's Remdesivir. Ivermectin was commonly described as an anti-parasitic drug for horses rather that the truth about its efficacy as an anti-viral prophylaxis. Remdesivir on the other hand, was discontinued amid

its trials after many deaths, but was approved by the FDA as treatment for Covid notwithstanding its direct link to kidney failure; and which causes or develops into pneumonia and/or death.

58. Since the PCR tests, masks, and vaccines were authorized under EUAs, the administration of these medical products are subject to informed consent requirements to "ensure that individuals to whom the product is administered are informed" that they have "the option to accept or refuse administration of the product." FDCA § 564(e)(1)(A)(ii)(III); 21 U.S.C. § 360bbb-3(e)(1)(A)(ii)(III).[25] The vaccines for example, in each letter granting the EUA by requiring that FDA's "Fact Sheet for Recipients and Caregivers" be made available to every potential vaccine recipient. Each Fact Sheet includes the statement that it is your choice to receive or not receive the vaccine; however, Plaintiffs are not provided a choice.

## III.   COVID-19 HEALTH RISKS AND NATURAL IMMUNITY

59. The mortality risk for those infected with the SARS-COV-2 virus which can cause the COVID-19 disease is not the same for everyone. Older patients and those

---

[25] The norms of informed consent has been "firmly embedded" in U.S. law and FDA regulations for nearly 60 years. *Adullahi v. Pfizer, Inc.*, 562 F.3d 163, 182 (2nd Cir. 2009). Congress first enacted this requirement in 1962 drawing on the Nuremberg Code and the Helsinki Declaration, "which suggests the government conceived of these sources' articulation of the norm as a binding legal obligation." *Adullahi* at 182 (citation omitted). Informed consent requirements are a cornerstone of FDA rules governing human medical experimentation. *See, e.g.*, 21 C.F.R. §§ 50.20.

with comorbidities are at significantly higher risk for death or serious health complications, while younger and healthier patients face a vanishingly small risk. The CDC's best estimate of the infection fatality rate for people ages 18-49 years is under 0.06% meaning that young adults have a 99.94% survivability rate.

60. Notably, substantial research establishes that COVID-19 infection creates immunity to the virus *at least* as robust, durable, and long-lasting as that achieved through vaccination; and many experts maintain that natural immunity far surpasses immunity gained through vaccination by as much as twenty times (20x). In other words, for those Plaintiffs who have had natural exposure and recovered, there is no legitimate scientific or medical reason to require they be inoculated, take PCR tests, or force them to wear masks.

A. Israeli Study

61. Notably, a study conducted in Israel (the "Israeli Study"), one of the most vaccinated countries on Earth and the "largest real-world observational study comparing natural immunity" gained from COVID-19 infection and "vaccine-induced immunity" from the BioNTech Vaccine[26]. The Israeli Study concluded

---

[26] "After conducting a retrospective observational study comparing: (1) SARSCoV-2-naïve individuals who received a two-dose regimen of the BioNTech/Pfizer mRNA BNT162b2 vaccine, (2) previously infected individuals who have not been vaccinated, and (3) previously infected and single dose vaccinated individuals a two-dose regimen of the BioNTech/Pfizer mRNA

that: "natural immunity confers longer lasting and stronger protection against infection, symptomatic disease and hospitalization caused by the Delta variant of SARS-CoV-2" compared to BioNTech vaccine immunity. *Id*. Specifically, fully vaccinated individuals with no previous infections had a "statistically significant 13.06-fold (95% CI, 8.08 to 21.11) increased risk for breakthrough infection [with the Delta variant] as opposed to reinfection (P<0.001)" of those previously infected. *Id*. With respect to symptomatic disease, the fully vaccinated had a "27.02-fold risk (95% CI, 12.7 to 57.5) symptomatic breakthrough infection as opposed to reinfection (P<0.001). *See Id*. Accordingly, there is an approximate 4:1 ratio of fully vaccinated to unvaccinated people being admitted to hospitals and expiring from COVID-19 in Israel.  It is the vaccinated who are at the greatest risk of infection, sickness, and death according to the Israeli Study.

B.  Cleveland Clinic Study

62. A five-month study looking at reinfection rates in employees of the Cleveland Clinic Health System previously infected with SARS-COV-2 found that none of the 1,359 previously infected subjects who remained unvaccinated were

---

vaccine, SARS-CoV-2-naïve vaccinees **had a 13.06-fold** (95% CI, 8.08 to 21.11) increased risk for breakthrough infection with the Delta variant compared to those previously infected." https://www.medrxiv.org/content/10.1101/2021.08.24.21262415v1.full.pdf

reinfected with the virus despite being surrounded by the virus and Covid disease in the hospital[27].

63. The study examined the rates of SARS-COV-2 infection in vaccinated and unvaccinated individuals which showed that "those previously infected who did not receive the vaccine had lower rates of SARS-CoV-2 infection than those previously infected who did receive the vaccine, thereby providing direct evidence that vaccination does not add protection to those who were previously infected…;" and the study concluded "individuals who have had SARS-CoV-2 infection are unlikely to benefit from COVID vaccination…"

C. Longitudinal Study

64. Natural immunity responses to mutated forms of COVID is further supported by the results of a longitudinal analysis of 254 patients over eight months[28]. This study found that SARsS-CoV-2 infection produces "broad and effective immunity" that "may persist long-term in recovered COVID-19 patients." Thus, natural immunity is robust and effective.

---

[27] https://www.medrxiv.org/content/10.1101/2021.06.01.21258176v2.full (last visited October 1, 2021)

[28] Kristen W. Cohen, et al., Longitudinal Analysis Shows Durable and Broad Immune Memory after SARS-CoV-2 Infection with Persisting Antibody Responses and Memory B and T Cells, CELL REPORTS MEDICINE 2, 100354 (July 20, 2021), available at: https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8253687/ (last visited Sept. 22, 2021).

D.   Attached Expert Opinions and Others

65. The information above algins with the attached affidavits and further demonstrates why Plaintiffs should not be subjected to President Biden's Executive Orders or employer mandates. For example, Dr. Smith attest: "If someone has immunity from natural infection, *under no circumstances would it make sense for them to get a vaccine…* Active immunity (i.e., natural exposure and recovery) *is always better and stronger than passive immunity* like through the vaccines/gene therapies." See Ex. C. Since persons like Plaintiffs have immunity and/or have naturally formed antibodies immunity, then they are past the point of infection; and even if 100% of the population is vaccinated, the virus will spread. Plaintiffs also note:

➢ Necessity of COVID-19 vaccination in previously infected individuals[29], by Nabin K. Shrestha, Patrick C. Burke, Amy S. Nowacki, Paul Terpeluk, Steven M. Gordon, MedRxiv, June 5, 2021. "Individuals who have had SARS-CoV-2 infection are unlikely to benefit from COVID-19 vaccination, and vaccines can be safely prioritized to those who have not been infected before."

➢ SARS-CoV-2 infection induces long-lived bone marrow plasma cells in humans[30], by Jackson S. Turner, Wooseob Kim, Elizaveta Kalaidina, Charles W. Goss, Adriana M. Rauseo, Aaron J. Schmitz,

---

[29] https://www.medrxiv.org/content/10.1101/2021.06.01.21258176v2
[30] https://www.nature.com/articles/s41586-021-03647-4

Lena Hansen, Alem Haile, Michael K. Klebert, Iskra Pusic, Jane A. O'Halloran, Rachel M. Presti, Ali H. Ellebedy. Nature, May 24, 2021. "This study sought to determine whether infection with SARS-CoV-2 induces antigen-specific long-lived BMPCs in humans. We detected SARS-CoV-2 S-specific BMPCs in bone marrow aspirates from 15 out of 19 convalescent individuals, and in none from the 11 control participants…. Overall, our results are consistent with SARS-CoV-2 infection eliciting a canonical T-cell-dependent B cell response, in which an early transient burst of extrafollicular plasmablasts generates a wave of serum antibodies that decline relatively quickly. This is followed by more stably maintained levels of serum antibodies that are supported by long-lived BMPCs."

➢ Natural immunity against COVID-19 significantly reduces the risk of reinfection: findings from a cohort of sero-survey participants[31], by Bijaya Kumar Mishra, Debdutta Bhattacharya, Jaya Singh Kshatri, Sanghamitra Pati. MedRxiv, July 19, 2021. "These findings reinforce the strong plausibility that development of antibody following natural infection not only protects against re-infection by the virus to a great extent, but also safeguards against progression to severe COVID-19 disease."

## IV.  FEDERAL REGULATIONS AND LICSENSING FOR EUA PRODUCTS

66.  The FDCA generally prohibits anyone from introducing or delivering for introduction into interstate commerce any "new drug" or "biological product" unless and until the FDA has approved the drug or biological product as safe and effective for its intended use. 21 U.S.C. §§ 331(a), 355(a); 42 U.S.C. § 262(a).

---

[31] https://www.medrxiv.org/content/10.1101/2021.07.19.21260302v1

Coincidingly, 42 U.S.C. § 262(a)(2)(C)(i)(I) requires approval of biological products and proven demonstration they are "safe, potent, and pure." *See also* 21 C.F.R. § 601.2(a). No such requirements are mandated for EUA products.

67. A vaccine is both a drug and a biological product and therefore subject to regulation under both the FDCA and the Public Health Service Act ("PHSA"). *See* 21 U.S.C. § 321(g); 42 U.S.C. § 262(i)(1). Pursuant to Section 351(a) of the PHSA, 42 U.S.C. § 262(a), the FDA has the authority to approve the sale and manufacture of vaccines and other biologics like the Pfizer Comirnaty Vaccine. The biologics application addresses not only the safety and efficacy of the product, but also covers specific labeling and manufacturing requirements, including the location, process, and storage. EUA products are subject to much lower standards than those required for licensed products, and they are exempt altogether from certain marketing and manufacturing requirements.

68. Notably, "interchangeable" and "interchangeability" are specifically defined terms in Section 351 of the PHS Act, 42 U.S.C. § 262[32], in relation to a

---

[32] "Interchangeable" and "interchangeability" are defined as a "biological product" that "may be substituted for the reference product" by health care providers. 42 U.S.C. § 351(i)(3). To meet the standards in 42 U.S.C. §262(k)(4) ("Safety standards for determining interchangeability"), the "interchangeable" or substitute biological product (i) must be biosimilar to the reference product and (ii) and "can be expected to produce the same clinical result as the reference product in any given patient." 42 U.S.C. § 262(k)(4).

"reference product," which is a biological product licensed under Section 351(a) of the PHSA. 42 U.S.C. § 262(a)[33]. For purposes of determining "interchangeability," the "reference product" must be an FDA-licensed product; like in this case, the FDA-licensed Pfizer, Comirnaty Vaccine. But the "interchangeable" product, the EUA BioNTech Vaccine, must be the subject of a later-filed "abbreviated" application under 42 U.S.C. § 262(k). There is no indication, however, that such application was filed by BioNTech, much less reviewed or approved by the FDA.

69. The FDCA authorizes the FDA to issue an EUA for a medical drug, device, or biologic, where certain conditions have been met: that the HHS Secretary has declared a public health emergency that justifies the use of an EUA, 21 U.S.C. §360bbb-3(b)(1), and the FDA finds that "there is no [1] adequate, [2] approved, and [3] available alternative to the product for diagnosing, preventing, or treating" the disease in question. 21 U.S.C. § 360bbb-3(c)(3).

70. There are significant differences between licensed vaccines and those subject to EUA that render them "legally distinct." First, the requirements for

---

[33] These definitions and related provisions were enacted as part of the Biologics Price Competition Act of 2009, which "amends the PHSA and other statutes to create an abbreviated licensure pathway," under Section 351(k) of the PHSA, 42 U.S.C. § 262(k), "for biological products shown to be interchangeable with an FDA-licensed biological reference product," licensed under Section 351(a) of the PHS Act, 42 U.S.C. § 262(a). *See generally* FDA, et al., Considerations in Demonstrating Interchangeability with a Reference Product: Guidance for Industry (May 2019), available at: https://www.fda.gov/media/124907/download (last visited Sept. 15, 2021).

efficacy are much lower for EUA products than for licensed products. EUAs require only a showing that, based on scientific evidence "if available," "it is reasonable to believe," the product "may be effective" in treating or preventing the disease. 21 U.S.C. §360bbb-3(c)(2)(A). Second, the safety requirements are minimal, requiring only that the FDA conclude that the "known and potential benefits … outweigh the known and potential risks" of the product, considering the risks of the disease. 21 U.S.C. §360bbb-3(c)(2)(B). Third, EUA products are exempt from certain manufacturing and marketing standards, enjoy broader product liability protections, and cannot be mandated due to informed consent laws and regulations (subject to the override procedures for service members described below). *See, e.g., Doe v Rumsfeld*, 341 F. Supp. 2d 1, 19 (D.D.C. 2004).

71. The public health emergency declaration that justifies the use of an EUA for a product "shall terminate upon the earlier of … a change in the approval status" of the EUA product. 21 U.S.C. § 360bbb-3(b)(2)(A)(ii). Thus, the approval, or licensing, of a vaccine for a given indication terminates the EUA for that vaccine. The requirements for licensing and emergency use authorization are mutually exclusive; the same product—or same vial of vaccine—cannot be concurrently subject to an EUA and licensed for the same indication or use, under distinct

regulatory regimes[34]. Yet that is precisely what the FDA has done by: (1) simultaneously licensing Comirnaty Vaccine and re-issuing the EUA for the BioNTech Vaccine for the same indication (individuals 16 years or older); (2) re-issuing and expanding the existing BioNTech Vaccine EUA for children of 12-15 years of age and permitting the licensed Comirnaty Vaccine to be used for this group; and (3) finding that the EUA BioNTech Vaccine and licensed Comirnaty Vaccine can be used "interchangeably" and may be substituted for each other.

## V.   THE TESTING AND REVIEW OF THE COVID-19 VACCINES

72.   Neither the BioNTech Vaccine nor the Comirnaty Vaccine has been tested in clinical trials for its safety and efficacy on individuals who have recovered from COVID-19. To the contrary, the trials conducted thus far have specifically *excluded* survivors of previous Covid infections[35]. Likewise, the clinical trials skipped testing for genotoxicity, mutagenicity, teratogenicity, and oncogenicity testing; and did not include participants from and/or provide sufficient data for other "special populations" such as those with autoimmune disorders, hematological conditions, children, and the elderly.

---

[34] *See, e.g., Genus Med. Techs. LLC v. FDA*, 994 F.3d 631 (D.C. Cir. 2020) (holding that the FDA's determination that it could choose to regulate a product as either a drug or a device, or both, as arbitrary and capricious and exceeding its statutory authority).
[35] *See* Fabio Angeli, SARS-CoV-2 vaccines: Lights and Shadows, EUROPEAN J. OF INTERNAL MEDICINE 2021;88:1-8.

## VI.  THE VACCINES (OR GENE THERAPIES) AND THEIR CONTENTS

73.  The vaccines are ineffective against the SARS-CoV-2 virus and its variants. Consistent between all manufactures, these vaccines *cannot prevent infection* from the SARS-COV-2 virus. They *cannot prevent the transmission* of the SARS-COV-2 virus. They *cannot prevent death* as a result of the SARS-COV-2 virus. That was never their intent. This necessarily means the vaccines at issue cannot prevent the COVID-19 disease. This is supported by the affidavits attached and even the CDC Director, Michelle Walensky, when on August 05, 2021, in a CNN interview she was clear: "Our vaccines are working exceptionally well. They continue to work well for delta with regard to severe illness and death…*But what they can't do anymore is prevent transmission*.[36]"

74. The vaccines are not vaccines in the traditional sense; but instead, gene therapies. The COVID-19 Vaccines employ novel technology, namely, mRNA delivered via nanolipids. These vaccines are produced from gene therapy molecular platforms whose safety and efficacy has not been fully assessed. This is unlike all other vaccines where there is a set amount of antigen or a live-attenuated

---

[36] https://www.cnn.com/2021/08/05/health/us-coronavirus-thursday/index.html

virus is injected into the body to allow one's natural immunity apparatus to develop natural antibodies to the antigen or virus.

75. Two of the 'vaccines' use mRNA to encode the spike protein of the SARS-CoV-2 virus and are the first of this type of approach to be granted EUA status for human use. The third (Janssen/J&J) is a recombinant, virus vector vaccine using  a human adenovirus type 26 virus that expresses the SARS-CoV-2 spike protein. Essentially, these vaccines simulate the antibody the body might naturally make. As explained by Dr. Smith (Ex. C), these 'vaccines' harness the power of basic biology to produce the spike protein of SARS-CoV-2. Messenger RNA (mRNA) is genetic material that tells your body how to make proteins. The central dogma of molecular biology states that DNA makes RNA which makes proteins. Through the processes of transcription (DNA→RNA) and translation (RNA→ protein), information from genes is used to make proteins. Some of the proteins that are formed from the genetic information are needed to fight diseases.

76. Dr. Smith's explanation aligns with FDA's own Peter Marks M.D., PH.D., Director of the Center for Biologics Evaluation and Research of FDA who states:

> The active ingredient or component in the 3 FDA authorized
> used Covid vaccines is a piece of genetic material that leads
> the body to briefly make a protein that's normally found on
> the surface of the virus that causes Covid. [37]

77.  Some of the ingredients listed in these vaccines are not safe for use in humans.  As outlined above, EUA use is not the same as an FDA approval; nor are the laws, rules, and regulations that govern same. For instance, Pfizer, Moderna, and J&J have not disclosed all the content of what is contained in the vaccines. This is particularly alarming considering Lieutenant Colonel Theresa Long ("LTC Long") stated in her sworn statement that one of the primary ingredients of the Lipid Nanoparticle delivery system is "ALC 1035."

78. Under the OSHA HCS regulations (21 CFR 1910), it includes several concerning warnings regarding ALC 1035 including: to "seek medical attention if it comes into contact with your skin; "if inhaled and if breathing is difficult, give cardiopulmonary resuscitation; and evacuate if there is an environmental spill." And both the Comirnaty (Pfizer) package insert and Moderna Fact Sheet for Recipients and Caregivers list *polyethylene glycol* as one of the vaccine primary

---

[37] https://www.fda.gov/emergency-preparedness-and-response/coronavirus-disease-2019-covid-19/covid-19-vaccines#basics (last visited September 7, 2021).

ingredients[38] -- the same, active ingredient in antifreeze – and the SDS for polyethylene glycol cautions that it is ***not advised for use in drugs or food***[39].

79.  According to the FDA, there is insufficient data to know whether the Covid Vaccines actually prevent asymptomatic infection or prevent transmission of SARS-CoV-2; and data from the U.S.[40] and abroad suggest that they do not prevent the virus or disease COVID-19 either. The protection offered from the BioNTech Vaccine drops off significantly over time, particularly after the six-month period on which the FDA relied in conditionally approving the Comirnaty Vaccine. For example, recent and well-publicized studies from Israel found that the BioNTech Vaccine's effectiveness decreased from over 90% to 39% after six months for infections and 40.5% for symptomatic cases[41].

---

[38] https://www.fda.gov/media/144638/download;
https://www.fda.gov/media/151707/download
[39]https://www.fishersci.com/store/msds?partNumber=AC418040010&productDescription=POL
YETHYLENE+GLYCOL+1450+1KG&vendorId=VN00032119&countryCode=US&language=en
[40] See Catherine M. Brown, DVM, et al., Outbreak of SARS-CoV-2 Infections, Including COVID-19 Vaccine Breakthrough available at:
https://www.cdc.gov/mmwr/volumes/70/wr/mm7031e2.htm?s_cid=mm7031e2_w#
[41]Israel Ministry of Health Presentation (July 23, 2021), available at: https://www.gov.il/BlobFolder/reports/vaccine-efficacy-safety-follow-up committee/he/files_publications_corona_two-dose-vaccination-data.pdf (summarizing six-month efficacy data for Pfizer-BioNTech vaccine in Israel); see also Rory Jones & Dov Lieber, Pfizer COVID-19 Vaccine Is Less Effective Against Delta available at: https://www.wsj.com/articles/pfizer-covid-19-vaccine-is-less-effective-against-  delta-infections-but-still-prevents-serious-illness-israel-study-shows-11627059395.

80. Notably, relevant safety data and efficacy statistics are suspect and unreliable as clinical trials for these vaccines are scheduled to continue through 2023 to 2025. Therefore, it is impossible to assess or know the safety and efficacy of these vaccines, their necessity, and whether their benefits outweigh the risks in even intermediate timeframes.

81. At the September 17, 2021 FDA Advisory Committee meeting to consider approval of booster shots, Sara Oliver MD, MSPH presented an overview of studies demonstrating the rapidly declining efficacy of the Pfizer-BioNTech vaccine, in the United States and abroad[42]. Several U.S. studies found that the efficacy of Covid vaccines dropped from over 90% to as low as 42% (with a median of roughly 65%) over an up to six-month period, with the steepest drops found in the studies with the longest study periods; the only study limited to the Pfizer-BioNTech vaccine got the low score of 42%. Dr. Oliver also presented studies finding a steep decline in efficacy 15%-35% for the pre-Delta vs. the Delta variant. *Id*. She also presented international studies showing even sharper decreases in efficacy in countries such as Qatar where the Delta variant was prevalent at an earlier date. *Id*.

---

[42] https://www.fda.gov/media/152243/download

82. Data continues to come out weekly that reports these vaccines do not work as advertised; and seemingly do more harm than good. For instance, in October 2021, for example, COVID-19 case data from Maine and Vermont, two (2) of the most heavily vaccinated states in the U.S., suggests that vaccinated individuals are likely still catching and transmitting COVID; and contributing to case numbers with the State of Vermont[43] at 72% and Maine[44] at 69%. And as John Hopkins University admits, even with high numbers of COVID-19 vaccinations: "We are unlikely to eradicate COVID-19 or even to get it to the level of something like measles in the U.S.[45]"

83. Abroad, despite having its third and fourth booster shots, the number of rising cases and deaths is growing significantly in Israel; Singapore's Ministry of Health[46] reported a major increase in COVID-19 breakthrough cases and deaths despite having 85% of their citizens vaccinated[47]; and Scottish Data released

---

[43] https://coronavirus.jhu.edu/region/us/vermont
[44] https://coronavirus.jhu.edu/region/us/maine
[45]    https://publichealth.jhu.edu/2021/what-is-herd-immunity-and-how-can-we-achieve-it-with-covid-19
[46] Ministry of Health available at: https://www.moh.gov.sg/news-highlights/details/update-on-local-covid-19-situation-(8-oct-2021)
[47]https://covid19.who.int/region/euro/country/il;https://covid19.who.int/region/wpro/country/sg

November 24, 2021, shows how 74% of the Covid hospitalizations in the past month are in the vaccinated (See Table 19, 20)[48].

84. Notably, for an EUA approval, there must be no alternative, effective treatments available for use against the disease. There are now well-studied, safe and reliable alternatives to vaccination for prevention and treatment of COVID-19, including, but not limited to Ivermectin, Methylprednisolone, Fluvoxamine, Hydroxychloroquine, Vitamin C, Vitamin D3, Zinc, Melatonin, Aspirin, corticosteroids, monoclonal antibodies, and other accessible therapies. As a treating physician, Dr. Edwards states: "Multiple published studies as well as me and my colleagues' clinical experience shows that there are exceedingly effective early outpatient therapies for Covid that can reduce hospitalization and mortality rates by 80-90%, even in an unhealthy, high-risk population." *See* affidavits attached whose opinion is supported by Dr. McCullough.

## VII. PRESIDENT BIDEN'S ORDERS AND EMPLOYER MANDATES

85. On his first day in office, President Biden signed Executive Order 13991, which established the Safer Federal Workforce Task Force whose mission is to "provide ongoing guidance to heads of agencies on the operation of the Federal

---

[48]https://publichealthscotland.scot/media/10462/21-11-24-covid19 publication_report.pdf

Government, the safety of its employees, and the continuity of Government functions during the COVID–19 pandemic." 86 Fed. Reg. 7,045–48 (Jan. 20, 2021).

86. As late as July 23, 2021, the White House announced that mandating vaccines is "not the role of the federal government[49];" only to then make oral edicts to the media that those private employers with 100 or more employees need to mandate vaccines. Then, on September 9, 2021, President Biden announced that his patience was "wearing thin" with unvaccinated Americans[50] and issued Executive Order 14042 on "Requiring Coronavirus Disease 2019 Vaccination for Federal Employees" and Executive Order 14043 "Ensuring Adequate COVID Safety Protocols for Federal Contractors." Collectively, these mandates require that all federal employees and contractors be fully vaccinated.

87. While the enforcement arm of the vaccine mandate, the Emergency Temporary Standard issued by the Occupational Safety and Health Administration ("OSHA") (published in the Federal Register on November 5, 2021 at Volume 86, pages 61402 through 61555 ("the ETS"), has been temporarily

---

[49] https://www.nytimes.com/video/us/politics/100000007884901/vaccine-mandate-not-federal-role-psaki.html (last visited December 3, 2021).
[50] Office of Public Engagement, Transcript, Remarks by President Biden on Fighting the COVID-19 Pandemic (Sept. 9, 2021), https://www.whitehouse.gov/briefingroom/ speeches-remarks/2021/09/09/remarks-by-president-biden-on-fighting-thecovid-19-pandemic-3/.

suspended by the Court then subsequently withdrawn; employers, like Plaintiffs',

continue to mandate the vaccines. *See* correspondences as composite in **Ex. H**.

88. The policies and practices are facially unlawful; as well as, discriminatory

as evidenced by the unequal treatment between the vaccinated and unvaccinated.

There are no legally permissible FDA-licensed (approved) vaccines to prevent

infection with SARS-CoV-2. Since these vaccines are Emergency Use Authorized,

they cannot be made compulsory: "When Dr. Amanda Cohn, the executive

secretary of the CDC's Advisory Committee on Immunization Practices, was

asked if Covid-19 vaccination can be required, she responded[51] that under an

EUA, "vaccines are not allowed to be mandatory. So, early in this vaccination

phase, individuals will have to be consented and they won't be able to be

mandatory." Cohn later affirmed this prohibition on requiring vaccines applies to

organizations, including hospitals[52]." Therefore, if Federal law and the CDC have

expressly prohibited forced inoculations, and the U.S. Constitution forbids same,

employer cannot require vaccine passports or require some other sort of "proof"

of vaccination as it is effectively just a talisman or guise to coerce Plaintiffs and

their colleagues into compliance.

---

[51] https://www.cdc.gov/vaccines/acip/meetings/downloads/min-archive/min-2020-08-508.pdf
[52] https://www.fda.gov/media/143982/download

89.  Additionally, the data is clear that those who had been infected with SARS-CoV-2 and developed the disease will have immunity[53]; and therefore, it is medically irrelevant to vaccinate them[54].

90. The Government, unions, employers, and vaccine manufactures like Pfizer are advancing an unlawful political narrative and destructive, health agenda by their failure to candidly and expressly disclose:

- o   The known and potential, serious risks associated with the vaccines.
- o   That the employee assumes all risk associated with the vaccine.
- o   That the long-term adverse effects are unknown.
- o   Emerging evidence and data as to the vaccine's lack of effectiveness.
- o   Multiple mRNA injections per year will likely be required – the safety of which is unknown.
- o   Vaccinated individuals can still catch and spread COVID.
- o   The fact that sick people – irrespective of their vaccination status- are the ones most likely to spread the virus.
- o   Those employees who have been injured by the vaccine.
- o   That COVID is treatable and has a survival rate of >98% for all age groups, co-morbidities, races, special populations and socio-economic classes combined (generally comparable to the flu at 99% or tuberculosis at 92% or community acquired pneumonia)[55]

---

[53] https://www.nih.gov/news-events/nih-research-matters/lasting-immunity-found-after-recovery-covid-19)
[54]https://science.sciencemag.org/content/371/6529/eabf4063.
[55] CDC COVID Data Tracker https://covid.cdc.gov/covid-data-tracker/#datatracker-home
COVID crude mortality ratio (the number of reported deaths divided by the reported cases) as of September 17, 2021:
 666,440 deaths ÷ 41,593,179 cases = 0.016 x 100 = 1.6% died
 100 – 2% = 98.4% survived.

91.   These mandates or requirements are suspect at best and appears nefarious given their unwillingness to assume liability for any short or long-term harms or deaths these gene therapy / vaccine mandates can cause; and the vaccine manufactures have immunity themselves (emphasis added). So, the vaccine manufactures are making billions of dollars and have no liability for the millions of injuries and thousands of deaths they are causing – from a virus and disease that have the same impact as the seasonal flu.

92. Vaccinated individuals who suffer one of the numerous adverse effects cannot apply for the U.S. National Vaccine Injury Compensation Program and the U.S. Countermeasures Injury Compensation Act does not adequately compensate those who are injured (this program rarely pays, caps payout, only covers vaccine injuries manifesting within one year of injection).

---

CDC. Estimated Influenza Illnesses, Medical Visits, Hospitalizations and Deaths in the United States – 2017-2018 Influenza Season.  Available from:
https://www.cdc.gov/flu/about/burden/2017-2018.htm
Flu crude mortality ratio (the number of reported deaths divided by the reported cases):
 6100 deaths ÷ 45,000,000 cases = 0.0013 x 100 = 0.13% died
100 – 0.13% = 99.8% survived
CDC Tuberculosis in the United States 2020.
https://www.cdc.gov/nchhstp/newsroom/docs/factsheets/TB-in-the-US-508.pdf
542 deaths ÷ 7,163 cases = 0.08 x 100 = 7.5% died
100-7.5% = 92.4% survived.
Community Acquired Pneumonia
https://pubmed.ncbi.nlm.nih.gov/29020164/

93. Per the FDA's own VRBPAC PowerPoint presentation, slide 16, dated October 22, 2020[56], it acknowledges numerous, possible serious adverse events that can result in permanent injuries, autoimmune diseases, chronic diseases, disabilities, and death from the COVID-19 vaccines.



FDA Safety Surveillance of COVID-19 Vaccines :
DRAFT Working list of possible adverse event outcomes
***Subject to change***

- Guillain-Barré syndrome
- Acute disseminated encephalomyelitis
- Transverse myelitis
- Encephalitis/myelitis/encephalomyelitis/ meningoencephalitis/meningitis/ encephalopathy
- Convulsions/seizures
- Stroke
- Narcolepsy and cataplexy
- Anaphylaxis
- Acute myocardial infarction
- Myocarditis/pericarditis
- Autoimmune disease

- Deaths
- Pregnancy and birth outcomes
- Other acute demyelinating diseases
- Non-anaphylactic allergic reactions
- Thrombocytopenia
- Disseminated intravascular coagulation
- Venous thromboembolism
- Arthritis and arthralgia/joint pain
- Kawasaki disease
- Multisystem Inflammatory Syndrome in Children
- Vaccine enhanced disease

Even if other sources of information are ignored, the VAERS an WHO data alone sufficiently establishes that very serious side effects from the vaccines are more common than "extremely unlikely;" and certainly not "safe."

## VIII. PLAINTIFFS' BELIEFS ABOUT THE VACCINES

94. Federal and state statutes make it unlawful for an employer to discriminate against an employee on the basis of religion. *See e.g.* Title VII which "include[s] all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate an employee's… religious observance or practice without undue hardship on the conduct of the

---

[56] https://www.fda.gov/media/143557/download

employer's business." 42 U.S.C. § 2000e(j). An employer has the statutory

obligation to make reasonable accommodations for the religious observances of its

employees so long as they do not incur undue hardship[57]; and prohibits employers

from retaliating against an employee for their beliefs. These federal laws align with

the tenets of Florida Constitution. *See e.g.* Article I, the Declaration of

Rights[58], which includes provisions pertaining to, among other things, basic

rights, religious freedom, freedom of speech and press, the right to assemble, the

right to work, the right to bear arms, due process rights… rights to access to the

courts, rights to trial by jury, and privacy rights.

95. Plaintiffs and many of their colleagues have sincere, religious beliefs that

they should not be inoculated with the COVID-19 vaccines. Plaintiffs share

common beliefs with other Christians like that life is sacred and a gift from God;

and that these vaccines alter the human cell by disrupting God's designed immune

---

[57] *See Eversley v. Mbank Dallas*, 843 F.2d 172, 175 (5th Cir. 1988). "Undue hardship" exists, as a matter of law, when an employer is required to bear more than a de minimus cost." *Weber v. Roadway Express, Inc.*, 199 F.3d 270, 272-73 (5th Cir. 2000) citing *Transworld Airlines, Inc. v. Hardison*, 432 U.S. 63 at 84 (1977); *Brener v. Diagnostic Center Hosp.*, 671 F.2d 141, 146 (5th Cir. 1982).

[58] Art. I, §§ 1 et seq., Fla. Const. Art. I, § 2, Fla. Const., providing that all natural persons, female and male alike, are equal before the law and have inalienable rights, among which are the right to enjoy and defend life and liberty, to pursue happiness, to be rewarded for industry, and to acquire, possess and protect property, except that the ownership, inheritance, disposition, and possession of real property by aliens ineligible for citizenship may be regulated or prohibited by law, and that no person shall be deprived of any right because of race, religion, national origin, or physical disability.

system with a synthetically engineered mRNA, spike protein. As previously noted, these vaccines are not vaccines by the traditional definition, but rather, gene therapies which alter cell behavior at the micro-cell biological level. These vaccines change DNA and RNA functions within the cell; and thereby modify the genetic make-up. Plaintiffs maintain they do not believe it permissible to fundamentally change the genetic design that God imparted within them.

96.  As fetal tissues were integral in the vaccines' development, this also violates many Plaintiffs' sincerely held religious beliefs. By way of further explanation, in their early development, fetal tissues were used to test that the mRNA worked as intended; ergo, but for the use of fetal tissue, the vaccines would not exist. As uncovered in Congressional investigations and hearings[59], bio-procurement companies sold fetal tissues; and numerous actors within the abortion industry had committed systemic violations of same. In short, Plaintiffs do not believe they should support or engage in a practice that relates to, or could reward an industry where the fetal tissues from unborn, human children have been monetized.

---

[59] *See* Select Investigative Panel of the Energy & Commerce Committee, FINAL REPORT (Dec. 30, 2016); Majority Staff Of S. Comm. On The Judiciary, 114TH CONG., Human Fetal Tissue Research: Context And Controversy, S. DOC. NO. 114-27 (2d Sess. 2016).

97.  Other beliefs shared by Plaintiffs common with other Christians[60] which demonstrate the sincerity of their beliefs and why Plaintiffs maintain they have the right to opt out of employer-mandated vaccines include: (i) Vaccination is not morally obligatory so therefore, such decision must be voluntary; (ii) The Lord is all powerful and can protect and heal them if that is His will;  (iii) there is a general moral duty to refuse the use of medical products, including certain vaccines, that are produced using human cells lines; (iv) a person's informed judgments about the proportionality of medical interventions are to be respected unless they contradict authoritative Christian moral teachings; and (v) a Christian is morally required to obey his or her sure conscience.

## IX.  OBSERVED DANGERS IN THE WORKPLACE

98.  Plaintiffs have witnessed and have knowledge of vaccinated co-workers who have experienced vaccine-related injuries and side effects. There have been situations where co-workers present uncharacteristically strange symptoms after taking the vaccine including brain fog or a lack of cognitive clarity, neurological disorders, or vision impairment.

---

[60] *See* other similarly shared Christian beliefs in the U.S. District Ct. for District of Colombia; Case 1:21-cv-02484

99.  Plaintiffs have first-hand knowledge of and have witnessed an increase in stress-related mistakes and errors occurring at the workplace in these critical areas due to the increased stress load that the vaccine mandate has caused among those reluctant to take the vaccine and those who were forced to take it when they otherwise would not have. These issues have been reported to Plaintiffs' employer; however, rather than taking measures to redress these safety concerns, they have refused to take any substantive, corrective action; or definitively retract its unlawful, universal vaccination mandate.

## CLASS ALLEGATIONS

100.  Plaintiff seeks relief in his individual capacity and to represent a class consisting of all others similarly situated as it would provide an economically viable means of resolving common legal and factual issues. *Johnson v. Plantation General Hosp. Ltd. Partnership*, 641 So. 2d 58, 60 (Fla. 1994).

101. The class would comprise of all United employees (or alternatively and more broadly, all employees irrespective of their employment with United) that reside in Florida who have sought vaccine exemptions from their employer according to Florida Statutes including §381.00317; but their employer is not accepting exemptions or following Florida's laws.

102. *Numerosity.* Fla. R. Civ. P. 1.220(a)(1). The potential members of the Class as defined are so numerous that joinder of all members is unfeasible and not practicable. While the precise number of Class members has not been determined at this time, Plaintiff is informed and believes there is roughly 65,000 people working for United, with hundreds who have applied for exemptions.

103. *Commonality.* Fla. R. Civ. P. 1.220(a)(2). There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class members. These common questions of law and fact include, without limitation: Whether United or companies generally have to comply with Florida's statutes on vaccine mandates and the exemptions referenced therein; and if so, the nature of the relief, including declaratory, equitable, and injunctive relief that Plaintiff and the Class members are entitled when their employer will not comply and Florida's Attorney General will not enforce the laws.

104. *Typicality.* Fla. R. Civ. P. 1.220(a)(3). Plaintiffs' claims are *typical* of the claims of the Class. Plaintiffs and all class members have been exposed to United's or their employer's COVID-19 vaccine mandates and refusing to comply with Florida's state laws regarding same.

105. *Adequacy of Representation.* Fla. R. Civ. P. 1.220(a)(4). Plaintiffs will fairly and adequately represent and protect the interests of the members of the Class. Plaintiffs' Counsel is competent and has experience in litigating class actions; and additional co-counsel on this case is anticipated.

106. A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all the members of the Class is impracticable. Furthermore, the adjudication of this controversy through a class action will avoid the possibility of inconsistent and potentially conflicting adjudication of the asserted claims. There will be no difficulty in the management of this action as it applies universally to all persons subject to private company, COVID-19 vaccine mandates. Coincidingly, the Defendants actions are uniform to all members of the Class. United and Ashley Moody have acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief or declaratory relief is appropriate with respect to the Class as a whole.

107. Subclasses are not anticipated *when* moving for class certification as Plaintiffs contend these practices are wholly unconstitutional and unlawful.

## COUNT I

### Fla. Stat Sec. 86.011

### Declaratory Judgment that Employer Mandates in Florida, Whether Private or Federal, are an Unlawful Usurpation of States' Rights and Police Power

108. Plaintiffs allege and incorporate by reference allegations 1-106 as if fully set forth herein.

109. All conditions precedent or antecedent have been satisfied or waived; or are unnecessary or not required prior to bringing this action.

110. Fla. Stat Sec. 86.011 states as follows:

> The circuit and county courts have jurisdiction within their respective jurisdictional amounts to declare rights, status, and other equitable or legal relations whether or not further relief is or could be claimed. No action or procedure is open to objection on the ground that a declaratory judgment is demanded. The court's declaration may be either affirmative or negative in form and effect and such declaration has the force and effect of a final judgment. The court may render declaratory judgments on the existence, or nonexistence:
>
> 1) Of any immunity, power, privilege, or right; or
>
> 2) Of any fact upon which the existence or nonexistence of such immunity, power, privilege, or right does or may depend, whether such immunity, power, privilege, or right now exists or will arise in the future. Any person seeking a declaratory judgment may also demand additional, alternative, coercive, subsequent, or supplemental relief in the same action.

111. As shown below, United, however, does not believe it applies to them:

**Information regarding Florida laws**                        UNITED

Dear United employee,

United has received a number of questions about the recent laws passed in the state of Florida, specifically with respect to exemptions from United's COVID-19 vaccination requirement pursuant to Florida Statue Section 381.00317 and/or Florida Department of Health Emergency Rule 64ER21-17 ("Florida Law"). **For some or all of the following reasons, the provisions of the Florida Law do not apply to you or otherwise do not support your request for an exemption (if requested).**

First, United is subject to federal Executive Order 14042, and as a covered contractor must ensure all covered contractor employees are fully vaccinated subject to only certain limited exceptions provided under federal law. The Safer Federal Workforce Task Force published guidance regarding the Executive Order stating its "requirements are promulgated pursuant to Federal 'law and supersede any contrary State or local law or ordinance." Accordingly, the Florida Law does not apply to United or any of its employees.

Second, by its terms, the Florida Law applies only to current employees who work in Florida. To the extent your work reporting location is in any other jurisdiction, you are not covered by the Florida Law, even if you choose to spend your non-work time in Florida.

Finally, even if you are a current employee and work in Florida – and even if the Florida Law were otherwise applicable – the Florida Law states that a private employer may impose a vaccine requirement so long as it provides "individual exemptions that allow an employee to opt out." As you know, United has already provided accommodations to employees under the reasonable accommodation program. Because you received an accommodation under United's vaccine policy, you have already been provided with an exemption that might otherwise be required under the Florida Law. **Again, due to United being subject to federal Executive Order 14042, the Florida Law does not apply to United or any of its employees.**

If you have any questions about this or about your approved accommodation, please submit an inquiry via Help Hub.

112. The "purpose of a declaratory judgment is to afford parties relief from insecurity and uncertainty with respect to rights, status, and other equitable or legal relations." *Santa Rosa County v. Admin. Comm'n, Div. of Admin. Hearings,* 661 So. 2d 1190, 1192 (Fla. 1995); *see also Hildebrandt v. Dept. of Nat. Res.,* 313 So.2d 73, 74 (Fla. 3d DCA 1975) ("Where, as here, the declaratory judgment act is properly invoked for a determination of rights, status or…legal relations of a party or

parties under a statute... then the nature and purpose of the Act and by its express wording, the Plaintiff is entitled to have the same determined by declaratory judgment."). The Declaratory Judgment Act should be liberally administered and broadly construed.  Fla. Stat. § 86.011; *Olive v. Mass,* 811 So. 2d 644, 648 (Fla. 2002).

113. The *Rhea* Court held that declaratory relief is authorized when the plaintiff demonstrates that "(1) a good-faith dispute exists between the parties; (2) there is presently a justiciable question concerning the existence or non-existence of a right or status, or some fact on which such right or status may depend; (3) doubt regarding rights or status [under the underlying statute or rule being construed]; and (4) a *bona-fide,* actual, present, and practical need for the declaration exists." *Rhea v. Dist. Bd. Of Trs.of Santa Fe Coll.,* 109 So.3d 851, 859 (Fla. 1st DCA 2013). All factors are satisfied here; and notably, irreparable harms have and will continue to result from Plaintiffs' ongoing, Constitutional rights being infringed emanating from the imposition of United's mandates contrary to Florida's laws and Ashley Moody's unwillingness to enforce the laws; and continues to endanger the lives of United States' employees and public-at-large.

114. There is a bona fide, actual, present practical need for this declaration as Plaintiff and his colleagues (along with many other Floridians) do not want to take

a COVID-19 vaccine; or be forced to wear a mask or be required to take a PCR test; particularly when Florida has passed laws declaring these sorts of practices unlawful and the U.S. Constitution has delegated or assigned these health issues to the states. *See Jacobson v. Massachusetts*, 197 U.S. 11 (1905).

115. The government of the United States is one of delegated powers alone. Its authority is defined and limited by the Constitution. All powers not granted to it by that instrument are reserved to the States or the people. No rights can be acquired under the Constitution or laws of the United States, except such as the government of the United States has the authority to grant or secure. All that cannot be so granted or secured are left under the protection of the States.

116. As stated in *Alden* regarding our Constitutional Republic:

> The limited and enumerated powers granted to the Legislative, Executive, and Judicial Branches of the National Government, moreover, underscore the vital role reserved to the States by the constitutional design, see, e.g., Art. I, § 8; Art. II, §§ 2–3; Art. III, § 2. Any doubt regarding the constitutional role of the States as sovereign entities is removed by the Tenth Amendment, which, like the other provisions of the Bill of Rights, was enacted to allay lingering concerns about the extent of the national power. The Amendment confirms the promise implicit in the original document: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." *U.S. Const., Amdt.* 10; see also Printz, supra, at 919, 117 S.Ct. 2365; *New York v. United States*, 505 U.S. 144, 156–159 120 (1992).

*Alden v. Maine*, 527 U.S. 706, 713–14 (1999).

61

117. The people of the United States are subject to two governments: one State, and the other National – the powers which one possesses, the other does not. They are established for different purposes, and have separate jurisdictions. Together they make one whole, and furnish the people of the United States with a complete government, ample for the protection of all their rights at home and abroad. The equality of the rights of citizens is a principle of republicanism. Every republican government is in duty bound to protect all its citizens in the enjoyment of this principle, if within its power. That duty was originally assumed by the States; and it still remains there. The only obligation resting upon the United States is to see that the States do not deny the right.

118. The Tenth Amendment to the Constitution reserves powers to the States and the people that are not delegated to the Federal Government which includes the States' police powers. *United States v. Constantine*, 296 U.S. 287, 295-96 (1935). And the Supreme Court has made clear that the Constitution does not grant the federal government "general" or "plenary" authority; but rather:

> In our federal system, the National Government possesses only limited powers; the States and the people retain the remainder. Nearly two centuries ago, Chief Justice Marshall observed that "the question respecting the extent of the powers actually granted" to the Federal Government "is perpetually arising, and will probably continue to arise, as long as our system shall exist."

*Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 533–34 (2012) quoting *McCulloch v. Maryland*, 4 Wheat. 316, 405 (1819).

119. United's mandate and unwillingness to accommodate the statutory exemptions is a flagrant affront Florida's laws, to the will of the American people, the Constitution and the Tenth Amendment and an unlawful commandeering of authority from same. *See New York v. United States*, 505 U.S. 144, 175 (1992) (the federal government violates the Tenth Amendment when it "cross[es] the line distinguishing encouragement from coercions."); *Murphy v. Nat'l Collegiate Athletic Ass'n*, 138 S. Ct. 1461, 1478, (2018) citing *Reno v. Condon*, 528 U.S. 141, 120 S.Ct. 666, 145 L.Ed.2d 587 (2000) (discussing States' sovereign authority to "regulate their own citizens." *Murphy v. Nat'l Collegiate Athletic Ass'n*, 138 S. Ct. 1461, 1479, 200 L. Ed. 2d 854 (2018)); *see also South Carolina v. Baker*, 485 U.S. 505, 108 S.Ct. 1355, 99 L.Ed.2d 592 (1988).

120. Put another way: if a power is delegated to Congress in the Constitution, then by necessary implication the Tenth Amendment expressly disclaims any reservation of that power to the States. On the flipside, it follows that if a power is an attribute of state sovereignty reserved by the Tenth Amendment, it therefore follows that it is necessarily a power the Constitution has not conferred upon

Congress – and certainly not a power reserved for the President by executive order. *United States v. Oregon*, 366 U.S. 643 (1961); *Case v. Bowles*, 327 U.S. 92 (1946); *Oklahoma ex rel. Phillips v. Guy F. Atkinson Co.*, 313 U.S. 508 (1941). Notably, nowhere in the Constitution does it permit corporations the authority to assume or take over the roles which have otherwise been delegated to the states.

121. It is in this sense that the Tenth Amendment "states but a truism that all is retained which has not been surrendered." *United States v. Darby,* 312 U.S. 100, 124, 61 S.Ct. 451, 462, 85 L.Ed. 609 (1941). Indeed, "'Being an instrument of limited and enumerated powers, it follows irresistibly, that what is not conferred, is withheld, and belongs to the state authorities.'" *New York v. United States,* 505 U.S. 144, 156, 112 S. Ct. 2408, 2417–18, 120 L. Ed. 2d 120 (1992) quoting 3 J. Story, Commentaries on the Constitution of the United States 752 (1833).

122. The Supreme Court's decision on the scope of state police powers as it pertains to vaccinations has been addressed in *Jacobson v. Massachusetts*, 197 U.S. 11 (1905). There, the Court considered an appeal from a decision of the Massachusetts' Supreme Court finding the Commonwealth's mandatory smallpox vaccination program was within its authority under the "commonly called the police power - a power which the State did not surrender when becoming a

member of the Union under the Constitution." *Id*. at 25; *accord Buchanan v. Warley*,

245 U.S. 60, 74 (1917) ("The authority of the State to pass laws in the exercise of the

police power, having for their object the promotion of the public health, safety and

welfare is very broad ....").

> The authority of the state to enact this statute is to be referred to what is commonly called the police power,—a power which the state did not surrender when becoming a member of the Union under the Constitution. Although this court has refrained from any attempt to define the limits of that power, yet it has distinctly recognized the authority of a state to enact quarantine laws and 'health laws of every description;' indeed, all laws that relate to matters completely within its territory and which do not by their necessary operation affect the people of other states. According to settled principles, the police power of a state must be held to embrace, at least, such reasonable regulations established directly by legislative enactment as will protect the public health and the public safety. *Gibbons* v. *Ogden*, 9 Wheat. 1, 203, 6 L. ed. 23, 71; *Hannibal & St. J. R. Co.* v. *Husen*, 95 U. S. 465, 470, 24 L. ed. 527, 530; *Boston Beer Co.* v. *Massachusetts*, 97 U. S. 25, 24 L. ed. 989;*New Orleans Gaslight Co.* v. *Louisiana Light & H. P. & Mfg. Co.* 115 U. S. 650, 661, 29 L. ed. 516, 520, 6 Sup. Ct. Rep. 252; *Lawson* v. *Stecle*, 152 U. S. 133, 38 L. ed. 385, 14 Sup. Ct. Rep. 499. It is equally true that the state may invest local bodies called into existence for purposes of local administration with authority in some appropriate way to safeguard the public health and the public safety.

> The mode or manner in which those results are to be accomplished is within the discretion of the state, subject, of course, so far as Federal power is concerned, only to the condition that no rule prescribed by a state, nor any regulation adopted by a local governmental agency acting under the sanction of state legislation, shall contravene the Constitution of the United States, nor infringe any right granted or secured by that instrument. A local enactment or regulation, even if based on the acknowledged police powers of a state, must always yield in case of

conflict with the exercise by the general government of any power it possesses under the Constitution, or with any right which that instrument gives or secures. *Gibbons* v. *Ogden*, 9 Wheat. 1, 210, 6 L. ed. 23, 73; *Sinnot* v. *Davenport*, 22 How. 227, 243, 16 L. ed. 243, 247; *Missouri, K. & T. R. Co.* v. *Haber*, 169 U. S. 613, 626, 42 L. ed. 878, 882, 18 Sup. Ct. Rep. 488.

Jacobson v. Commonwealth of Massachusetts, 197 U.S. 11, 24–25 (1905)

123. Moreover, the preservation of public health, safety, and morals is primarily the responsibility of state and local government. Authority to enact laws and protect public health such as those relating to vaccine mandates and exemptions derive from the states' general police powers reserved under the United States Constitution under the Tenth Amendment. *See* above. It is the chief source of authority the preservation of public health is primarily the responsibility **of state and local governments** – a tenet of the Constitution dating back more than 130 years establishes that states could exercise the power to protect the "public health, safety, and morals." *Mugler v. Kansas*, 123 U.S. 623, 661 (1887).

124. Indeed, the Constitution under provisions including the Tenth and Fourteenth Amendment principally entrusts "the safety and the health of the people" to the "politically accountable officials of the states to guard and protect" *Jacobson* v. *Massachusetts*, 197 U.S. 11, 38 (1905). While the federal government has limited jurisdiction over public health matters under the Public Health Service Act

(42 U.S.C. Ch. 6A), there are currently no mandatory vaccination programs authorized at the federal level nor any regulation germane to the implementation of mandated vaccines during a public health emergency.

125. Here, Congress has not enacted any legislation authorizing a mandate nor granted any agency the authority to enact a federal mandate – and there is no indication that it intends to do so. Florida, however, has passed Fla. Stat. §381.00317 which states in part:

> (1) A private employer may not impose a COVID-19 vaccination mandate for any full-time, part-time, or contract employee without providing individual exemptions that allow an employee to opt out of such requirement on the basis of medical reasons, including, but not limited to, pregnancy or anticipated pregnancy; religious reasons; COVID-19 immunity; periodic testing; and the use of employer-provided personal protective equipment. For purposes of this section, the term "COVID-19" means the novel coronavirus identified as SARS-CoV-2; any disease caused by SARS-CoV-2, its viral fragments, or a virus mutating therefrom; and all conditions associated with the disease which are caused by SARS-CoV-2, its viral fragments, or a virus mutating therefrom. Employers shall use forms adopted by the Department of Health, or substantially similar forms, for employees to submit exemption statements.

> (b) To claim an exemption based on religious reasons, the employee must present to the employer an exemption statement indicating that the employee declines COVID-19 vaccination because of a sincerely held religious belief.

126. Plaintiff and his colleagues have adhered to the statute and sought religious exemptions from United; however, United has been unwilling to accommodate and has either fired or placed their employees on unpaid leave.

127. The principle that Congress cannot delegate away its vested powers exists to protect liberty and our Constitution; and by careful design, prescribes a process for making law and within that process there are accountability checkpoints. *See e.g., Department of Transp. v. Association of American Railroads*, 575 U.S. 43, 61 (2015); *INS v. Chadha*, 462 U.S. 919, 959 (1983). If Congress could give its power away to an entity that is not constrained by those checkpoints, the whole purpose of the Constitution's stubborn, deliberative process could be eclipsed: *Id.; see also Carter v. Carter Coal Co.*, 298 U.S. 238 (1936). Thus, the authority to enact laws protecting public health like mandated COVID-19 vaccines and other EUA products like the PCR test and masks is the responsibility of and belongs to the state and local governments – the United States nor the President can supplant a states' duties in maintaining and regulating the health and safety of its citizens; nor is this possible

128. In a similar vein, employer mandates like United's are patent usurpations of authority reserved for the States under the guise of presumably workplace safety; notwithstanding the overwhelming amount of evidence that these vaccines

do not help stop the infection or transmission of SARS-CoV-2 virus or COVID-19 disease, but can cause serious bodily harm and even death.

129. These employer-mandates are carving out police powers they do not have the authority to exercise as they are reserved to the states or to "We the People." Plaintiffs' employer, like many others, have given Plaintiffs and their colleagues an unconscionable ultimatum which among other things, grossly violates numerous provisions of the Constitution: choose between their jobs[61] which afford them the ability to feed, clothe, and house their families – or – take an experimental, life-threatening vaccine which evidence suggests not only does more harm than good, but poses greater risks to those in the airline industry (emphasis added). And remarkably, federal agencies like the Department of Transportation and Federal Aviation Administration, Florida's Attorney General, nor any other agency has made an effort to stop these harms necessitating the Court's intervention.

130. While a state's police power is to yield if it is in conflict with the powers of the federal government as granted to it by the Constitution, such is not the case in this instance. Here, however, the Federal Government and employer-imposed

---

[61] Or "the right to earn a living by a calling for one's choice." *Truax v. Raich,* 239 U.S. 33, 41, (1915).

mandates are the exact sort of activity the Constitution memorializes is improper and in place to thwart – it is tyrannical and must stop.

131. Plaintiffs have suffered and will continue to suffer damage from Defendants' conduct without the Court's intervention as there is no adequate remedy at law that can compensate Plaintiffs for the deprivation of their constitutional rights.

WHEREFORE, Plaintiff, on behalf of himself and all others similarly situated, respectfully pray for the following relief:

A. That the Court issue a temporary restraining order and/or preliminary injunction, followed by a permanent injunction, restraining and enjoining United and their officers, agents, employees, and attorneys, and all other persons in active concert or participation with them, from enforcing, threatening to enforce, attempting to enforce, or requiring compliance with its COVID-19 vaccine mandates without adhering to Florida's exemptions prescribed in Florida Statute §381.00317, or using other medical products and procedures like discriminatory PCR testing or masks as a means to coerce compliance, and declare such practices as impermissible, unlawful, and/or contrary to Constitutional and common law[62];

---

[62] The common law **baseline** is also a relevant touchstone out of which grew the relevant constitutional law. *See, e.g., Cruzan v. Dir., Mo. Dep't of Public Health,* 497 U.S. 261, 278 (1990) ("'At common law, even the touching of one person by another without consent and without legal justification was a battery'); *Schloendorff v. Society of N.Y. Hosp.,* 211 N.Y. 125, 129-130 (1914)

B.   Order that Plaintiff and those employees who were unlawfully terminated, forced to quit, or coerced into retirement be reinstated if they choose and compensated accordingly to statute and equitable principals;

C.   Invoke its mandamus authority and require Florida's Attorney General, Ashley Moody, to enforce Florida's laws regarding vaccine mandates properly;

D.   That this Court adjudge, decree, and declare the rights and other legal obligations and relations within the subject matter here in controversy so that such declaration shall have the full force and effect of final judgment;

E.   That this Court grant such other and further relief it deems just, proper, and equitable under the circumstances.

---

(Cardozo, J.) ('Every human being of adult years and sound mind has a right to determine what shall be done with his own body; and a surgeon who performs an operation without his patient's consent commits an assault, for which he is liable in damages.'). Subsequent Supreme Court decisions have made explicit that the Constitution protects a person's right to "refus[e] unwanted medical care." Cruzan, 497 U.S. at 278; *King v. Rubenstein*, 825 F.3d 206, 222 (4th Cir. 2016) (recognizing same). This right is "so rooted in our history, tradition, and practice as to require special protection under the Fourteenth Amendment." *Washington v. Glucksberg*, 521 U.S. 702, 722 n.17 (1997). The Court has explained that the right to refuse medical care derives from the "well-established, traditional rights to bodily integrity and freedom from unwanted touching." *Vacco v. Quill*, 521 U.S. 793, 807 (1997). Coercing employees to receive an EUA vaccine for a virus that presents a near-zero risk of illness or death to them and which they are exceedingly unlikely to pass on to others, violates the liberty and privacy interests that the Ninth and Fourteenth Amendments. *Washington v. Harper*, 494 U.S. 210, 229 (1990) (A "forcible injection … into a nonconsenting person's body represents a substantial interference with that person's liberty[.]").

Respectfully Submitted,

**FERGUSON LAW, P.A**.
Attorney for Plaintiffs
1 East Broward Blvd. Suite #700
Fort Lauderdale, Florida 33301
T – (954) 256 – 5646
F – (954) 256 – 5655
Service: Service@FergusonLawPA.com
E-Mail: Wayne@FergusonLawPA.com

*/s/ Kenneth W. Ferguson*
Kenneth W. Ferguson, Esq.
Fla Bar No.: 98950

~Psalm 23~

IN THE CIRCUIT COURT OF THE 7TH JUDICIAL CIRCUIT
IN AND FOR ST. JOHNS COUNTY, FLORIDA

Case No.: _____

THOMAS ANDERSON, on behalf of himself
and others similarly situated

                                                           **Class Action**

       Plaintiff,

v.

UNITED AIRLINES, INC., a Delaware Corporation;
ASHLEY MOODY, in her official capacity
as Attorney General of Florida,

       Defendants.

_____/

## DECLARATION OF THOMAS ANDERSON

1. I, Thomas Anderson, am over the age of eighteen years, of sound mind, and one of the Plaintiffs in this action. The statements and allegations that pertain to me or which have been made in Plaintiffs' Verified Complaint ("Complaint") are true and correct and based upon my personal knowledge (unless otherwise indicated) as I understand them. If called upon to testify to their truthfulness, I would and could do so competently on those matters. I declare under penalty of perjury, under the laws of the United States, that the foregoing statements are true and correct to the best of my knowledge.

1

DocuSign Envelope ID: 505D1F55-74EA-4C83-A75B-154FEA4A29E6

2.  I have serious, grave concerns about my life, health, and safety; as well as those of my colleagues and the public's regarding the harmful effects of the COVID-19 vaccines (known and unknown).  Specifically, on those to whom they have been administered, and especially how these vaccines impact those of us in the airline industry. Likewise, I am very concerned about the employment practices United Airlines, Inc. ("United") have implemented in effort to coerce, force, and intimidate us into taking them for the reasons provided in the Complaint, this Motion for a Preliminary Injunction, and in my statement set forth.

3.  I am a former combat veteran having been deployed 14 times as a DoD contract pilot (6 to Iraq, 8 to Afghanistan) with over 3,000 hours of combat mission flying. I worked under the same rules, regulations, and mission profiles as any deployed active-duty fixed wing combat pilot. I cannot emphasize to the Court how extraordinary, and concerning it is for a Lieutenant Colonel to ground all active-duty flight personnel who received a COVID-19 vaccination as described in Lieutenant Colonel Theresa Long's statement provide in our Complaint. While it is my opinion that her experience and qualifications are impressive and unassailable, I know based on first-hand knowledge, training, and experience that grounding active-duty flight personnel based on a vaccine or medical procedure

DocuSign Envelope ID: 50BD1F55-74EA-4C83-A759-154FEA4A29E6

is an anomalous event, and one that I have never experienced or heard of happening. What LTC Long described as to those who were once fit and capable pilots for duty, then took the vaccine, and subsequently became unfit to fly are the same concerns that I have for myself and my colleagues.

4.  I have also read the other affidavits provided in the complaint including those of Dr. Jennifer Smith, Dr. Ben Edwards, and Dr. Peter McCullough who are highly qualified experts and/or doctors who share similar concerns about the COVID-19 vaccines as LTC Long. Notably, the concerns of these doctors or professionals corroborate with the concerns and experiences me and my colleagues are seeing, or have seen first-hand on the job and why we are seeking the Court's help and immediate intervention before more people get hurt.

5.  I have seen first-hand and/or spoken with colleagues who share similar experiences, whereby we have witnessed vaccinated co-workers show injuries or side effects shortly after receiving their COVID-19 vaccinations which not only is alarming for their own health, but these side-effects negatively impact the ability to perform our job. I have heard of situations where co-workers present uncharacteristically strange symptoms after taking one of the COVID-19 vaccines including brain fog or a lack of cognitive clarity, neurological disorders,

DocuSign Envelope ID: 59BD1F55-74EA-4C83-A759-154FEA4A29E6

uncharacteristic "quirkiness", or vision impairment – all of which are side-effects that negatively impact one flying an aircraft and cause me concern. There has been an extremely serious situation where a "Pilot Monitoring" had to take control of the aircraft from the "Pilot Flying" who became incapacitated during flight which is believed to be caused from the vaccine; and not being properly reported. United posted pilot bulletin 21-260 effective September 14-December 3 that warned all pilots to watch out for any pilot incapacitation event. Some of these events were described as: persistent chest discomfort, severe pain, loss of consciousness, difficulty speaking, difficulty walking, seizures or any injury, illness or medical issue which renders the pilot unable to safely operate the aircraft or perform assigned duties. Any or all of these described events could be a result from taking the COVID vaccine. The alarming thing is, a pilot bulletin is usually disseminated to all flight crews because of events that have happened already in the operation.

6.  I have personally experienced intense stress from the ultimatum United has given us: choose between the vaccine (which could possibly kill me or cause paralysis or some other adverse reaction) or lose my job which is how I provide for my wife and kids. I struggle to understand why United would mandate this vaccine and the other employment practices like the mandated, discriminatory

DocuSign Envelope ID: E0BD1F55-74EA-4C83-A758-154FEA4A29E6

PCR testing requirements; proof of COVID-19 inoculation or vaccine passports; mask policies; and the unlawful dissemination of our private, medical information – when **there is so much data and information** that shows these vaccines are futile; and seem to do more harm than good. By way of example and further explanation, to justify the mandate, our CEO Scott Kirby stated that "Over the last nine months though, we have learned a lot about this disease, including how vaccines are - by far - the most effective way to protect people from COVID-19. In fact, we know now that an unvaccinated person is about 50 times more likely to be hospitalized for COVID-19 than a vaccinated person and nearly 300 times more likely to die." Yet as the affidavits provided show, the most recent data from openVAERS.com (January 07, 2022) (see below) tell an entirely different story – the differences of which are not subtle but literally a matter of life and death:



5

DocuSign Envelope ID: 59BD1F55-74EA-4C83-A759-154FEA4A29E6

7.   Therefore, for the reasons explained in our Complaint, the affidavits, the motion(s) filed, and my statement for this verification, I am respectfully asking/pleading that the Court enter a preliminary injunction against Defendant, United Airlines, Inc., a Delaware Corporation including all its officers, managers, or anyone else from United (a) enforcing the COVID-19 vaccine mandate as it is dangerous and unlawful; and for the immediate cessation of United's discriminatory and coercive employment practices of (b) repeated EUA or any PCR testing requirements; (c) proof of COVID-19 inoculation or vaccine passports; (d) mask policies; and (e) the unlawful dissemination of our private, medical information – all of which is to induce or coerce COVID-19 vaccination.

8.   In respect to the form or amount of the security that ought to be provided from the Plaintiffs, I truly believe that an injunction bond of any amount is not warranted in these circumstances. United is not losing anything of value at all if the COVID-19 mandate is not enforced or imposed (upon information and belief, it is my understanding that United should not be profiting from the sales of the COVID-19 vaccines). Likewise, there is no harm to United if the Court enjoins the company from the repeated PCR testing requirements; proof of COVID-19 inoculation or vaccine passports; its discriminatory, abusive mask policies; or the

DocuSign Envelope ID: 50BD1F55-74EA-4C83-A759-154FEA4A29E6

unlawful dissemination of our private, medical information. To the contrary, the only people who are losing in this situation are the Plaintiffs/employees; and for that reason, I believe the bond or security amount should be zero as there is no evidence United will suffer damages from the injunction.

9. In sum, I am respectfully asking that the Court enjoin United from (a) enforcing the COVID-19 vaccine mandate; and the immediate cessation of United's discriminatory and coercive employment practices of (b) repeated EUA or any PCR testing requirements; (c) proof of COVID-19 inoculation or vaccine passports; (d) mask policies; and (e) the unlawful dissemination of our private, medical information – all of which is to induce or coerce COVID-19 vaccination and violative of Florida and federal law; *at least* until the science or medicine is more clear and better understood; or alternatively, until we are afforded the opportunity to ask Scott Kirby questions under oath as to what studies or data he used to impose the COVID-19 mandate, why proven alternative treatments were suppressed, shunned and censored, and why other employment practices referenced were used to coerce the inoculations. And given there are no harms United will endure from the suspension of these practices, the bond or security that Plaintiffs should be required to post is zero.

## **Jurat Page**

I declare under penalty of perjury, under the laws of the United States, that

the foregoing statements are true and correct to the best of my knowledge.

Thomas Anderson

1/27/2022

_____

# EXHIBIT A

December 15, 2021

Stephen M. Dickson, FAA Administrator
Chris Rocheleau, Acting Head, FAA Aviation Safety
Mark Bury, FAA Chief Counsel
Federal Aviation Agency
800 Independence Ave SW
Washington, DC 20591

U.S. Department of Transportation
1200 New Jersey Ave. NE
Washington, DC 20003

U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington DC, 20530

cc:  AIG, Global Aerospace, Starr Aviation,
Phoenix Aviation Mgrs., Chubb, USAIG
AOPA Insur. Svcs., Old Repubic (formerly Falcon Insur.),
Travers & Associates

Doug Parker, CEO & Priya Aiyar, Esq. CLO, American Airlines
4333 Amon Carter Boulevard
Fort Worth, TX, 76155

Ed Bastian, CEO & Pete Carter, Esq., CLO, Delta Airlines
1030 Delta Boulevard
Atlanta, GA  30354-6001

Scott Kirby, CEO & Bob Rivkin, Esq., CLO, United Airlines
233 S. Wacker Drive
Chicago, IL  60606

Gary Kelly, CEO & Mark Shaw, Esq., CLO, Southwest Airlines
2702 Love Field
Dallas, TX  75235

Ben Minicucci, CEO & Kyle Levine, Esq., CLO Alaska Airlines
19300 International Boulevard
Seattle, WA  98188

Re:  (1) Notice to FAA That Pilots Are Operating Commercial Aircraft in Contravention of Do-Not-Fly Regulations – Title 14 Code of Federal Regulations §61.53 (also known as Federal Aviation Regulation 61.53) and Associated Guidance – Which Disallow Medical Clearance of Pilots Who Have Injected Non-FDA Approved Medical Products, such as COVID-19 Vaccinations;

(2) Notice to FAA That Pilots Have Suffered Death and Serious Injury Post-COVID-Vaccinations;

(3) Notice to FAA that Signors Are Aware That Complaints Were Made to FAA Concerning this Issue;

(4) Notice That Pilots Flying with Abnormal D-Dimer Values, Which Indicate Active Blood Clotting, Are at Elevated Risk for Pulmonary Embolism, Stroke, Arrhythmias, Cardiac Arrest & Death While In-Flight;

(5) Notice That Pilots Flying with Abnormal Troponin Values and/or New ECG Changes/Cardiac MRI Changes – Which Indicate Active Heart Damage and Possible Acute Myocarditis – Are at Elevated Risk for Arrhythmias, Cardiac Arrest, and Death While In-Flight;

(6) Given That Both the FAA & Commercial Airline Industry Appear to Have Violated Long-Standing CFR Regulations Which Disallow Medical Clearance of Pilots Who Have Received Non-FDA Approved Products – Lest "Aeromedically Significant Adverse Effects Manifest" – and Further Given the Wholesale Disregard of Evidence Indicating That Such Aeromedically Significant Effects Are In Fact Currently Occurring In Pilot Populations, Signors Hereto Request that the FAA Immediately Adopt a Proactive Screening Program Requiring All Vaccinated Pilots to Undergo Medical Re-Certification Within Four Weeks of the Date of this Letter to Include D-Dimer, Troponin and ECG Tests, as well as Cardiac MRIs, and Medically Clear ONLY Vaccinated Pilots Who Can Show a Clean Bill of Health on ALL Tests;

(7) Notice to the FAA, All Commercial Airline Companies, and All Carriers Insuring Commercial Airlines That a Failure to Immediately Investigate this Issue, Correctly Apply Federal Do-Not-Fly Regulations – and Ground All Vaccinated Pilots Who Cannot Show Clean D-Dimer, Troponin, ECG and Cardiac MRI Tests – Could Lead to a Catastrophic Event Involving Mass Fatalities, Causing At-Fault Parties to Suffer Monetary Liability Potentially Extending to USD Hundreds of Millions.

**VIA HAND DELIVERY, U.S. MAIL (RETURN RECEIPT REQUESTED), FACSIMILE & E-MAIL**

Gentlepersons:

The attorneys, medical doctors, and other experts who authored this letter have become aware of the fact that the commercial airline industry, pilots, and Federal Aviation Administration ("FAA") appear to be putting both pilots and the general public at risk of death and/or serious injury by

operating in contravention of Title 14 of the Code of Federal Regulations §61.53 (also known as Federal Aviation Regulation 61.53) and Related Guidance which together operate to disallow medical clearance of pilots who have injected or ingested non-FDA approved products – like the COVID-19 inoculation – which federal framework quite clearly states to Aviation Medical Examiners (AMEs) under the heading "Do Not Issue – Do Not Fly" the following prohibition: "Do Not Issue. AME's should not issue airmen medical certificates to applicants who are using these classes of medications:  FDA (Food and Drug Administration) approved less than 12 months ago .... This observation period allows time for uncommon, but aeromedically significant adverse effects to manifest themselves."  We lead with our conclusion, and ask that the FAA immediately take action to remedy this problem by:

  1)  Medically flagging all vaccinated pilots.

  2)  Within four weeks of this letter, having these pilots undergo thorough medical re-examinations to include D-Dimer tests (to check for blood clotting problems), Troponin tests (to check for Troponin in the blood, which is a protein that is released when the heart muscle has been damaged), post-vaccination ECG analysis (also known as EKG, which checks the electrical signals that determine cardiac health), and cardiac MRI and PULS Test (to determine heart health).  Inclusion of the cardiac MRI as a screening test for pilots is critical, as a recent study showed that using only ECG results and symptoms to screen patients resulted in a 7.4 under-diagnosing of actual myocarditis,[1] while the PULS Test is also critical as a study published last month showed that "Mrna COVID Vaccines dramatically increase ... inflammatory markers" and that the risk of **Acute Coronary Syndrome more than doubled in those vaccinated**, leading the authors to conclude that "the mRNA COVID-19 vaccines dramatically increase inflammation ... on the endothelium and T cell infiltration of cardiac muscle, and may account for the observations of increased thrombosis, cardiomyopathy, and other vascular events following vaccination."[2]

  3)  Medically de-certifying and grounding all pilots who fail any one of the above tests or who otherwise show symptoms indicative of possible blood-clotting issues or myocarditis (such as chest pain, shortness of breath, decreased exercise tolerance, or new heart palpitations) – and re-testing said pilots at six week intervals until all subjective and objective findings return to levels that are aeromedically acceptable (including D-dimer, Troponin, ECG and cardiac MRI findings in aeromedically acceptable ranges) and until clean bills of health issue.

  4)  From this point forward, only allowing commercial aircraft to be operated by pilots who can show D-Dimer and Troponin tests – as well as cardiac MRIs, ECGs and PULS tests – at aeromedically acceptable levels, and a clean medical examination undertaken a minimum of five (5) days *after* each COVID-19 vaccine and after each COVID "booster" shot, as a review of reporting systems such as the Vaccine Adverse Event Reporting System ("VAERS") indicates that the current FAA wait time of two (2) days is insufficient to detect a significant number of blood clotting and myocarditis cases (which are manifesting more than 48 hours post-inoculation).

---

[1]  Prevalence of Clinical and Subclinical Myocarditis in Competitive Athletes With Recent SARS-CoV-2 InfectionResults From the Big Ten COVID-19 Cardiac Registry, (May 27, 2021) https://jamanetwork.com/journals/jamacardiology/fullarticle/2780548.
[2]  mRNA COVID Vaccines Dramatically Increase Endothelial Inflammatory Markers and ACS Risk as Measured by the PULS Cardiac Test: a Warning, Steven R Gundry, originally published 8 Nov 2021Circulation. 2021;144:A10712. https://www.ahajournals.org/doi/10.1161/circ.144.suppl_1.10712.

Note that in an affidavit authored earlier this year by a Lieutenant Colonel in the U.S. Army by the name of Theresa Long, who is a Flight Surgeon, Aerospace Medicine Specialist, and an Aviation Officer Course & Mishap Training Specialist with a Master's Degree in Public Health – who collaborated in turn with "renowned cardiologist Dr. Peter McCullough and a **Senior Medical Examiner-Federal Air Surgeon's Cardiology Consultant to the Federal Aviation Administration**" – all concluded that:

> ➤ the risk of "post-vaccination myocarditis was not trivial,"

> ➤ that the "aviation population is comprised of individuals with demographics that the CDC and FDA established (on June 25, 2021) was at greatest risk for developing post-vaccination induced myocarditis,"

> ➤ that the "unpredictable and potential serious complications thereof present an ... unacceptable level of aeromedical risk,"

> ➤ that "risk-stratification, screening and diagnostic testing is necessary for continued safety of flight," and

> ➤ that "immunizations with COVID vaccinations should be immediately suspended until further aviation specific studies can be conducted."

### Federal Aviation Regulatory Guidance Disallows Medical Clearance of Pilots Who Have Consumed Non-FDA Approved Products Like COVID Vaccines – Precisely To Ensure That Aeromedically Significant Adverse Events Do Not Manifest – As They Have Here

As context for this discussion, it is clear that the "FAA has the responsibility for investigating possible violations of Federal regulations, orders, or standards relating to aviation safety."[3]  An AIR21 Whistleblower Complaint may be filed by anyone, confidentially.  We are aware that complaints have been filed on this topic, and that FAA is now required, under applicable regulations, to thoroughly investigate all such complaints.

Title 14 of the Code of Federal Regulations §61.53 states that "no person who holds a medical certificate issued under part 67 of this chapter may act as pilot in command, or in any other capacity as a required pilot flight crewmember, while that person... [is] receiving treatment for a medical condition that results in the person being unable to meet the requirements for the medical certificate necessary for the pilot operation."  In interpreting this provision, the Guide for Aviation Medical Examiners states:

---

[3]  Federal Aviation Administration, "How to File an AIR21 Whistleblower Complaint."
https://www.faa.gov/about/initiatives/whistleblower/complaint#:~:text=The%20FAA%20has%20the%20responsibility,likelihood%20that%20a%20violation%20occurred.

**Pharmaceuticals (Therapeutic Medications)**

**Do Not Issue - Do Not Fly**

The information in this section is provided to advise Aviation Medical Examiners (AMEs) about two medication issues:

Medications for which they should not issue (DNI) applicants without clearance from the Federal Aviation Administration (FAA), AND

**Medications for which they should advise airmen to not fly (DNF)** and provide additional safety information to the applicant. The lists of medications in this section are **not meant to be all-inclusive** or comprehensive, but rather address the most common concerns.

**Do Not Issue. AMEs should not issue airmen medical certificates to applicants** who are using these classes of medications or medications.

- Angina medications
  - o nitrates (nitroglycerin, isosorbide dinitrate, imdur), nolazine (Ranexa)....

- Cancer treatments including chemotherapeutics, biologics, radiation therapy, etc., whether used for induction, "maintenance," or suppressive therapy.

- Controlled Substances (Schedules I - V). An open prescription for chronic or intermittent use of any drug or substance....

- **FDA** (Food and Drug Administration) **approved less than 12 months ago.** The FAA generally requires at least one-year of post-marketing experience with a new drug before consideration for aeromedical certification purposes. This **observation period allows time for uncommon, but aeromedically significant, adverse effects to manifest themselves....**

Guide for Aviation Medical Examiners (emphasis added) ("Guide for AMEs").[4]

As the recipients are likely aware, **the FDA has not approved any of the COVID-19 shots currently available in the United States**. On August 23, the FDA granted BioNTech Manufacturing GmbH's Biologics Licensing Application to distribute the Comirnaty vaccine in the United States once certain conditions are met; however, the Comirnaty vaccine is not currently available in the United States – and will not be until the supply of the Pfizer-BioNTech vaccine is first exhausted. See https://www.fda.gov/media/151710/download. The Pfizer-BioNTech vaccine is currently available only under an EUA, which the FDA extended on August 23, 2021. See https://www.fda.gov/media/150386/download. It is also important to note that the approved vaccine, Comirnaty, cannot be said to be interchangeable with unapproved inoculations.[5]

---

[4] https://www.faa.gov/about/office_org/headquarters_offices/avs/offices/aam/ame/guide/pharm/dni_dnf/ (emphasis added).

[5] The concept that unapproved COVID inoculations should be considered "interchangeable" was recently adjudged to be incorrect by a federal court examining the argument. *See* Doe et al v. Austin et al, (USDC Northern Dist. Florida) (October 6, 2021). In this decision relating to the DOD and vaccine mandates for military members, a federal judge began by noting that,

4

Put simply, any pilot flying right now who has been vaccinated in the United States has almost certainly NOT received an FDA-approved vaccine, as the available J&J, Pfizer and Moderna shots are not yet FDA-approved. And even were such pilots to have received an FDA-approved vaccine, under relevant federal regulations, the pilots should still not be flying for 12 more months – until such time as at "least one year of post-marketing experience" has occurred *after* the FDA's initial approval. Guide for AMEs.

The reason for this cannot be overstated: history and common sense evince that significant time must elapse post-FDA approval to ensure that new medical products do not end up causing adverse effects (as did Thalidomide and Glyphosate). This is particularly true when the individuals who are receiving such new, experimental medical products are spending significant amounts of time at high altitude, and are in control of large vehicles carrying hundreds of other passengers, who could all die or be severely injured should the operator suffer an adverse health event.

Currently, not only have all pilots flying commercial airplanes ***not*** had at least one year of post-marketing time elapse post-FDA approval of the agent injected into their bodies, these pilots are flying with an entirely UNAPPROVED product in their systems, that is now unfortunately proving to cause all manner of clotting, embolic and thrombosis-related side effects (which side effects are known to occur with greater frequency and severity when at altitude). Additionally, across all populations, the inoculations are resulting in significant increases in myocarditis and subsequent heart failure, arrhythmias, cardiac arrests, and deaths. This is especially true in the younger male cohort, to which many pilots belong.

Indeed, we are aware of pilots who have died post vaccination. We are also aware of other pilots who are suffering side effects, many of whom have been afraid to report them for fear of being grounded, but some of whom have been forced to seek medical care and report them due to the significance of the vaccine-related adverse event, like pilot Cody Flint:

> I am a 33 year old husband and father of two young boys. I am an agricultural pilot by profession, with over 10,000 flight hours. I have been very healthy my whole life, with no underlying conditions. I received my first dose of the Pfizer Covid Vaccine on February 1. Within thirty minutes, I developed a **severe stabbing headache, which later became a burning sensation in the back of my neck**. Two days after vaccination, I got in my airplane to do a job that would only take a few hours.

> Immediately after taking off, I knew that something was not right with me. I was starting to **develop tunnel vision, and my headache was getting worse**. Approximately two hours into flying, I pulled my airplane up to turn around and felt an extreme burst of pressure in my ears.

---

under the relevant EUA statute, recipients of EUA drugs must be "informed … of the option to accept or refuse administration of the product." The court went on to explain that "DOD's guidance documents explicitly say only FDA-licensed COVID-19 vaccines are mandated" and that while such a mandate would be applicable to the Comirnaty vaccine since it was FDA-approved, the "plaintiffs have shown that the DOD is requiring injections from vials **not** labeled 'Comirnaty' and that "defense counsel could not even say whether vaccines labeled 'Comirnaty' exist at all." In considering the DOD's argument that it was okay to interchange vaccine vials because allegedly "the contents of EUA-labeled vials are chemically identical to the contents of vials labeled 'Comirnaty'" the judge noted that such argument was entirely "unconvincing" and went on to further state that "FDA licensure does not retroactively apply to vials shipped before BLA approval" and that EUA provisions suggest "drugs mandated for military personnel be actually BLA-approved, not merely chemically similar to a BLA-approved drug." Id.

**Instantly, I was nearly blacked out, dizzy, disoriented, nauseous and shaking uncontrollably**.  By the grace of God, I was able to land my plane without incident – **although I do not remember doing this.**

My initial diagnosis of vertigo and severe panic attacks – although I've never had a history of either of these – was later replaced with **left and right peri-lymphatic fistulas, Eustachian tube dysfunction, and elevated intra-cranial pressure due to brain swelling.**  My condition continued to decline, and my doctors told me that only an adverse reaction to the vaccine or a major head trauma could have caused this much spontaneous damage.

I've had six spinal taps over eight months to monitor my intra-cranial pressure, and two surgeries, eight weeks apart, to repair the fistulas.  I have missed nearly an entire year of my life – and my children's lives.  Days of baseball games, playing in the backyard, and just picking up my kids to hug them have been replaced with living in a sick body, doctor's visits, and more questions than answers.  I don't know if I'll ever be able to fly again.

This vaccine has taken my career from me, and the future I have worked so hard to build. I've used all of my savings just to pay my medical bills:  my family and I are on the verge of losing everything we have.  **I was and still am pro-science and pro-vaccine.**  The main issue rests squarely on the fact that **the FDA, CDC and NIH refuse to acknowledge that real lives are being absolutely destroyed by this vaccine....**

U.S. Senate Press Briefing on COVID-19 Vaccine Injuries, November 2021, Testimony of Cody Flint, *https://rumble.com/voz514-cody-flint-i-have-missed-an-entire-year-of-my-life-trapped-in-vaccine-injur.html.*

**The Intent of Federal Aviation Regulations Requires – Given the Adverse Events That Have Now Manifested Post-COVID Vaccinations – That the FAA Medically Re-Test Vaccinated Pilots to Ensure Cardiovascular & Circulatory Health and Prevent Catastrophic Fatalities**

While we understand the hesitancy to do what morality and the law requires given the current situation, here's the upshot:  should the FAA fail to ground and medically de-certify all pilots who have received experimental and non-FDA approved COVID-19 vaccines in accordance with CFR §65.13 and related Guidance that require this result – and bar reinstatement of such pilots until such time as they can show aeromedically acceptable D-Dimer, Troponin, ECGs, cardiac MRIs, PULS tests and clean bills of health – the FAA will be putting many innocent airline passengers' lives in harm's way in the event a pilot loses control of his aircraft after suffering a major blood-clotting event (pulmonary embolism, stroke, etc.) or a myocarditis-related event, either of which can result in incapacitation, cardiac arrest, and death.

In the case of a major seizure, which is apparently what affected American Airline pilot Wil Wolfe post-COVID-vaccination and prior to his death (albeit not while in an airplane), the adverse event may cause untold devastation:  a seizure that creates massive muscle stiffening and jerking of large muscle groups could be catastrophic if the pilot were on approach for landing, and actively flying the plane only a few hundred feet above the runway.  A vaccinated pilot who suffers such a full-blown tonic-clonic seizure while on approach – such that the pilot could not maintain level control of the plane a few hundred feet above the tarmac, and uncontrollably and inadvertently dipped a wing thus causing the plane to cartwheel down the runway at landing – would likely cause not just massive injury and death to innocent passengers, but also create shocking monetary liability for the airline

6

company and insurance carriers, potentially extending into the hundreds of millions USD.  Indeed, as noted in a recent article in an insurance publication concerning a 2019 plane crash:

> Calculations by Reuters based on the Montreal convention [estimated]... initial compensation costs for all 157 passengers who died on the flight [at] ... around $25 million...

<div align="center">***</div>

> [But] **legal compensation payments for crash victims could run around $2 million to $3 million per person in the US.**

See article entitled "Insurers Face Tens of Millions in Claims after Ethiopian Airlines Crash," published in Insurance Business America (Alicja Grzadkowska, March 12, 2019).  Using the above math, if a large plane carrying between 250 and 450 Americans crashes because a pilot suffered a major vaccine-related health event one week after, *e.g.*, his second Pfizer jab, which event then results in the death of every American on board, the liability could easily run – given that the airlines and FAA were on notice as to the issue herein – an astounding $750 million at the low end to $1.35 billion+ USD at the high end.

Many of the undersigned are trial attorneys, and we believe the potential liability from this issue would be truly staggering, given the following:  (1) nearly all players in the aviation industry appear to be acting in concert to ignore the Code of Federal Regulations/Federal Aviation Regulations §61.53 and associated Guidance which disallow pilots from being cleared to fly if they have non-FDA approved products in their systems; (2) said aviation players appear to further be in lockstep agreement to turn a blind eye to airlines like United, Alaska and Jet Blue which have mandated the COVID vaccine in defiance of black-letter federal law (the Emergency Use Authorization Act) that prohibits the mandate of any medical product while it is still in the experimental phase; and  (3) the industry has not course-corrected, despite receiving reports of pilots suffering adverse events post-vaccination, both in-air and at-home (*see data* involving death of pilot Wil Wolfe; *see also* Calgary Herald article from last week involving Canadian pilot (all Canadian pilots are vaccinated) stating "West Jet Flight Diverted Back to Calgary after Pilot Passes Out"[6] and noting that a "plane flying from Calgary to Atlanta Monday was forced to turn around due to a medical emergency involving the pilot....").[7]

It bears mention that decisions to "conceal[] material information" or "engage[] in an effort to cover up deception" by aviation giants are not taken lightly, and indeed were primary factors in the $2.5 billion assessment against Boeing reported earlier this year over its 737 Max:

> Boeing will pay a total criminal monetary amount of over $2.5 billion, composed of a criminal monetary penalty of $243.6 million, compensation payments to Boeing's 737 MAX airline customers of $1.77 billion, and the establishment of a $500 million crash-victim beneficiaries fund to compensate the heirs, relatives, and legal beneficiaries of the 346

---

[6] https://calgaryherald.com/news/local-news/westjet-flight-diverted-back-to-calgary-after-pilot-passes-out

[7] The FAA and all airlines should also be on notice regarding any pilot who may avail himself of the Americans with Disabilities Act and later amendments of the following: Each of the EUA Covid Injectables ("vaccines") are designed to genetically program (modify) the user's cardiovascular cells to produce unnatural synthetic spike proteins (prions), which is prospectively prohibited where the user is or may become availed to the Rehabilitation Act of 1973 and/or the Americans with Disabilities Act, 2008 amendment per 42 U.S.C. § 12102(a)(2)(B) because it interferes in the Major Bodily Function of "normal cell growth."

passengers who died in the Boeing 737 MAX crashes of Lion Air Flight 610 and Ethiopian Airlines Flight 302.

See "Boeing Charged with 737 Max Fraud Conspiracy and Agrees to Pay Over $2.5 Billion" (January 7, 2021), *https://www.justice.gov/opa/pr/boeing-charged-737-max-fraud-conspiracy-and-agrees-pay-over-25-billion.*

In arriving at this multi-billion dollar penalty, Department of Justice personnel, investigators and attorneys cited the "misleading statements, half-truths, and omissions" on the part of Boeing as the linchpins in the above damages calculation, and further noted that while colluding to hide facts should never be countenanced, such is especially true "in industries where the stakes are this high." The attorneys concluded by holding that Boeing's "lack of candor" was untenable – and that the multi-billion dollar hit against Boeing was designed to deter such conduct on the part of aviation players in future, whilst restoring public confidence:

> The substantial penalties and compensation Boeing will pay demonstrate **the consequences of failing to be fully transparent**.... The public should be confident that government regulators are effectively doing their job, and those they regulate are being truthful and transparent.... This landmark [] agreement will forever serve as a **stark reminder of the paramount importance of safety** in the commercial aviation industry, and that **integrity and transparency may never be sacrificed....**

Note that we have confined our focus for the time being, among many known adverse effects of the vaccines, to only those that would result in immediate incapacitation of the pilot. That said, we urge the FAA to create a database to track pilot adverse events in a manner similar to VAERS, as we fear that medical adverse events post-vaccination in pilot populations are occurring at greater rates than have been tracked or monitored in either civilian or military populations, based on, *inter alia,* the following Senate Testimony of U.S. Army Lieutenant Colonel Theresa Long, M.D., Master's Degree in Public Health, Army Aerospace Medicine Specialist and Aviation Officer Course & Mishap Training Specialist:[8]

> Last May, I attended the Senior Preventative Leadership Program for the Army. When we were given an opportunity to ask the senior leaders questions, I simply asked:

---

[8] We are aware of a memo which sought to end-run the rather strict prohibitions under Title 14 CFR §65.13 (aka FAR 61.53) and its associated DNF Guidance which prohibit pilots from flying with medical products that are NOT FDA approved in their systems, by stating that pilots should simply not fly for 48 hours post-vaccination, based on the fact that the Agency believes the vaccine to be "safe." Given that multiple years of Phase 2 and Phase 3 clinical trials were skipped, and that no significant human testing was done in connection with this vaccine, the undersigned authors of this letter would like to know on exactly what scientific studies or other basis the designation of "safe" was predicated? Put simply, how did the FAA determine safety – given the wholesale absence of any significant studies on humans – including the absence of any studies on pilots, who often undertake long-haul flights which put their cardiac and vascular systems under significant stress and can thus magnify the cardiac and vascular side-effects from experimental medical products? It appears to the undersigned that the determination of "safe" was not issued in good faith nor after actual due diligence, and that the only relevant clinical trial of note is the one being conducted on the pilots as we speak – which is to say: the pilots **are** the lab rats from which safety data or lack thereof will be generated. On a related note, in that same memo, the agency indicated it would "monitor the patient response to each vaccine." Please provide the undersigned with all reporting protocols, testing and other evidentiary measures the FAA or its sub-agencies have adopted to "monitor the patient response to EACH vaccine" – because per this statement – it appears that the FAA represented it would be actively collecting data on pre- and post-objective tests and subjective symptoms that pilots are reporting before and after *each* COVID vaccine, and *each* booster.

"So we skipped two years of Phase 2 trials, and three years of Phase 3 trials?  We only lost 12 active duty soldiers to COVID – yet we're going to risk the health of the entire fighting force, on a vaccine we only had two months of safety data on?"

The response was:

"You're damn right Colonel.  And you're going to` get every soldier you can to take the vaccine so I can get enough data points to determine if the vaccine is safe."

***

Numerous soldiers told me of threats and intimidation to get the vaccines that were still under the EUA.  This violated medical ethics, specifically the Nuremberg Code.  When I emailed Army Public Health Command... they told me they were <u>not</u> tracking, tracing or monitoring adverse events.

***

I saw five patients in clinic, two of which presented with chest pain, days to weeks after vaccination, and were subsequently diagnosed with pericarditis, and then worked up to rule out myocarditis.  The third pilot had been vaccinated and felt like he was drunk, chronically fatigued within 24 hours after vaccination. The pilot told me he did not know what to do, so he drank a lot of coffee to "try and wake himself up," and continued to fly, until he realized the problem wasn't going away.  After I reported to my command my concerns that – in one morning – **I'd had to ground 3 out of 3 pilots due to vaccine injuries,** the next day my patients were cancelled, my charts were pulled for review, and I was told that **I would not be seeing acute patients anymore,** just healthy pilots there for their flight physical."

US Senate Press Briefing on COVID-19 Vaccine Injuries (Nov 2021), Testimony of Dr. Theresa Long, MD, MPH, *https://rumble.com/voz7ik-theresa-long-md-mph-the-vaccine-is-a-greater-threat-to-soldiers-and-defense.html.*

Attached to this letter is a list of pilots in VAERS who have suffered adverse events.  It is by no means an exhaustive list.  Rather, it represents a sampling of ten individuals, aged 30 to 70, fairly evenly split between Moderna and Pfizer inoculations (with one Janssen), who were otherwise healthy – many were athletic and the list boasts one triathlete.  But within a short period of time after their vaccinations, these pilots suffered vaccine-related adverse health events that were nothing short of bone-chilling:

➢ Myocardial Infarction (heart attack)

➢ Atrial Fibrillation

➢ Pericarditis

➢ Brain Swelling

➢ Elevated Intra-Cranial Pressure affecting Spinal Cord and Brain Stem

➢ Sub-Arachnoid Hemorrhages (brain bleed)

➢ Blindness

9

Half had cardiac issues, the other half had brain issues, and in a majority of the ten cases, VAERS listed their injures as "life threatening," "permanently disabling" or both. The upshot? Not only were the large majority of these individuals suffering life-ruining injuries, they were not the specimens of pilot health required by aviation industry regulators in order to ensure passenger safety.

**Conclusion**

In sum, neither the law nor common sense countenances that federal agencies charged with *ensuring* public safety ignore concerning data and thereby *jeopardize* public safety. Nor do law and common sense countenance ignoring information that evinces that both pilots and the passengers they serve are at risk of severe injury and possibly death. Finally, neither precept countenances killing a plane full of hundreds of Americans because a commercial pilot loses control of his or her aircraft after suffering a major blood clot, seizure, or myocarditis-related event, which in turn causes his jet to be involved in a fatal catastrophic crash... before regulators decide to finally act.

Quite the opposite: both federal regulations and good sense require that all commercial pilots who have received a COVID-19 vaccine, and are thus flying with a **non**-FDA approved medical product in their bodies, be immediately flagged and medically re-certified only after showing aeromedically acceptable D-Dimer, Troponin, ECGs, cardiac MRIs and PULS tests, and otherwise clean bills of health.

Sincerely,

Leigh Taylor Dundas
Leigh Taylor Dundas, Esq.
Advocates for Citizens' Rights

Robert F. Kennedy Jr.
Robert F. Kennedy, Jr., Esq.
Children's Health Defense

Mary Holland
Mary Holland, Esq.
Children's Health Defense

Peter Mc Cullough
Dr. Peter McCullough, M.D. *(CV attached)*

Reiner Fuellmich
Reiner Fuellmich, Esq.

Ryan Cole
Dr. Ryan Cole, M.D. *(CV attached)*

Tom Renz
Tom Renz, Esq.

Theresa Long
LTC Colonel Theresa Long, M.D., MPH
Aerospace Occupational Medicine Specialist
*(CV attached)*

Cody Flint
Pilot Cody Flint

Peter Chambers
LTC, D.O.,
Special Forces Flight Surgeon - Green Beret
Purple Heart, Meritorious Service Medal
Bronze Star *(CV attached)*

VAERS Event Details                              https://wonder.cdc.gov/controller/datarequest/D8;jsessionid=6D4B...

# CDC WONDER    FAQs    Help    Contact Us    WONDER Search

## VAERS Event Details

### Details for VAERS ID: 1026783-1

| Event Information | | | |
|---|---|---|---|
| Patient Age | 33.00 | Sex | Male |
| State / Territory | Mississippi | Date Report Completed | 2021-02-12 |
| Date Vaccinated | 2021-02-01 | Date Report Received | 2021-02-12 |
| Date of Onset | 2021-02-01 | Date Died | |
| Days to onset | 0 | | |
| Vaccine Administered By | Private | Vaccine Purchased By | Not Applicable * |
| Mfr/Imm Project Number | NONE | Report Form Version | 2 |
| Recovered | No | Serious | Yes |

\* VAERS 2.0 Report Form Only
\*\* VAERS-1 Report Form Only
"Not Applicable" will appear when information is not available on this report form version.

| Event Categories | |
|---|---|
| Death | No |
| Life Threatening | Yes |
| Permanent Disability | Yes |
| Congenital Anomaly / Birth Defect * | No |
| Hospitalized | No |
| Days in Hospital | None |
| Existing Hospitalization Prolonged | No |
| Emergency Room / Office Visit ** | N/A |
| Emergency Room * | No |
| Office Visit * | Yes |

\* VAERS 2.0 Report Form Only
\*\* VAERS-1 Report Form Only
"N/A" will appear when information is not available on this report form version.

| Vaccine Type | Vaccine | Manufacturer | Lot | Dose | Route | Site |
|---|---|---|---|---|---|---|
| COVID19 VACCINE | COVID19 (COVID19 (PFIZER-BIONTECH)) | PFIZER\BIONTECH | NONE | UNK | SYR | LA |

| Symptom |
|---|
| ACOUSTIC STIMULATION TESTS |
| BALANCE TEST |
| BURNING SENSATION |
| COMPUTERISED TOMOGRAM |
| CONFUSIONAL STATE |
| CSF PRESSURE INCREASED |
| DISORIENTATION |
| DIZZINESS |
| HEAD DISCOMFORT |
| HEADACHE |
| HYPERSENSITIVITY |
| INNER EAR DISORDER |
| MAGNETIC RESONANCE IMAGING |
| NAUSEA |
| PARAESTHESIA |
| PRESYNCOPE |
| TREMOR |
| VERTIGO |
| VISION BLURRED |
| VISUAL FIELD TESTS |

| Adverse Event Description |
|---|

I noticed a headache in the very top of my head within an hour of getting the vaccine. I thought it was normal because everyone I know said they got a headache from it. Over the next few hours, the pain moved down the back of my neck and became a burning sensation at the bottom of my skull. The pain was not excruciating but was constant. I thought it would eventually go away. I'm a pilot and fly for a living. Two days after receiving the vaccine I flew my plane and immediately noticed something was wrong with me. I was having a very hard time focusing. Approximately 2 hours into my flying I felt sudden and extreme pressure in my head and nearly blacked out. I immediately landed and stopped flying. Two days later I tried flying again and the exact same thing happened again after 20 minutes. The burning in my neck intensified and was now accompanied by dizziness, nausea, disorientation, confusion, uncontrollable shaking, and tinkling in my toes and fingers. I immediately went to my hometown doctor and he diagnosed me with vertigo. He prescribed me meclizine on Friday 02/05/2021. I took the medicine as prescribed all weekend with no relief. Monday 02/08/2021 I made an appointment for that Wednesday at the Institute. During Wednesday 02/10/2021-02/11/2021 I had roughly 10-15 test performed on me including balance, eye and hearing test, CT scan, MRI, and measured my spinal fluid pressure. The physician determined on 02/11/2021 that I had an allergic reaction to the Pfizer COVID vaccine the severely increased the pressure in my spinal cord and brain stem. That pressure causes my vision problems and ultimately ruptured my left inner ear breaking off several crystals in the process. I cannot fly with this condition. I'm currently taking Diamox to reduce the pressure in my spinal cord and brain stem.

| Lab Data | Current Illness | Adverse Events After Prior Vaccinations |
|---|---|---|
| Over a dozen test including balance, vision, hearing, spinal cord pressure, ct scan, and mri. All performed on 02/10/2021 and 02/11/2021. | None | |

| Medications At Time Of Vaccination | History/Allergies |
|---|---|
| None | None,None |

## CDC WONDER    FAQs    Help    Contact Us    WONDER Search

### VAERS Event Details

Details for VAERS ID: 1651301-1

| Event Information | | | |
|---|---|---|---|
| Patient Age | 69.00 | Sex | Male |
| State / Territory | New Hampshire | Date Report Completed | 2021-08-28 |
| Date Vaccinated | 2021-01-12 | Date Report Received | 2021-08-28 |
| Date of Onset | 2021-03-15 | Date Died | |
| Days to onset | 62 | | |
| Vaccine Administered By | Private | Vaccine Purchased By | Not Applicable * |
| Mfr/Imm Project Number | NONE | Report Form Version | 2 |
| Recovered | No | Serious | Yes |

\* VAERS 2.0 Report Form Only
\*\* VAERS-1 Report Form Only
"Not Applicable" will appear when information is not available on this report form version.

| Event Categories | |
|---|---|
| Death | No |
| Life Threatening | No |
| Permanent Disability | Yes |
| Congenital Anomaly / Birth Defect * | No |
| Hospitalized | No |
| Days in Hospital | None |
| Existing Hospitalization Prolonged | No |
| Emergency Room / Office Visit ** | N/A |
| Emergency Room * | Yes |
| Office Visit * | Yes |

\* VAERS 2.0 Report Form Only
\*\* VAERS-1 Report Form Only
"N/A" will appear when information is not available on this report form version.

| Vaccine Type | Vaccine | Manufacturer | Lot | Dose | Route | Site |
|---|---|---|---|---|---|---|
| COVID19 VACCINE | COVID19 (COVID19 (MODERNA)) | MODERNA | 011L20A | 1 | IM | LA |
| COVID19 VACCINE | COVID19 (COVID19 (MODERNA)) | MODERNA | 012M20A | 2 | IM | LA |

| Symptom |
|---|
| BLINDNESS UNILATERAL |
| MACULAR OEDEMA |
| RETINAL VEIN OCCLUSION |

| Adverse Event Description |
|---|
| On the morning of March 15, 2021 I got up and noted that I had no vision in my right eye. As a commercial pilot I considered this an emergency and sought specialist care from a retina specialist near our winter home. That specialist diagnosed an episode of macular edema, caused by an occlusion of a vein behind my right eye. I was treated with injections of Avastin, an off label drug that has been effective in patients with this problem. I received one injection on March 15, 2021 and a second by the same doctor on April 12, 2021, before returning to my home. My course of treatment has continued at Medical Center also with injections of Avastin. My vision is now 20/50 in my right eye. After |

| Lab Data | Current Illness | Adverse Events After Prior Vaccinations |
|---|---|---|
| | None. | |

| Medications At Time Of Vaccination | History/Allergies |
|---|---|
| "1. An ""over 50"" multi vitamin 2. A pro-biotic" | None.,None. |

# CDC WONDER      FAQs    Help    Contact Us    WONDER Search

## VAERS Event Details

### Details for VAERS ID: 1743012-1

| Event Information | | | |
|---|---|---|---|
| Patient Age | 30.00 | Sex | Male |
| State / Territory | Arizona | Date Report Completed | 2021-09-29 |
| Date Vaccinated | 2021-06-18 | Date Report Received | 2021-09-29 |
| Date of Onset | 2021-06-22 | Date Died | |
| Days to onset | 4 | | |
| Vaccine Administered By | Military | Vaccine Purchased By | Not Applicable * |
| Mfr/Imm Project Number | NONE | Report Form Version | 2 |
| Recovered | No | Serious | Yes |

\* VAERS 2.0 Report Form Only
\*\* VAERS-1 Report Form Only
"Not Applicable" will appear when information is not available on this report form version.

| Event Categories | |
|---|---|
| Death | No |
| Life Threatening | No |
| Permanent Disability | Yes |
| Congenital Anomaly / Birth Defect * | No |
| Hospitalized | Yes |
| Days in Hospital | 3 |
| Existing Hospitalization Prolonged | No |
| Emergency Room / Office Visit ** | N/A |
| Emergency Room * | Yes |
| Office Visit * | Yes |

\* VAERS 2.0 Report Form Only
\*\* VAERS-1 Report Form Only
"N/A" will appear when information is not available on this report form version.

| Vaccine Type | Vaccine | Manufacturer | Lot | Dose | Route | Site |
|---|---|---|---|---|---|---|
| COVID19 VACCINE | COVID19 (COVID19 (PFIZER-BIONTECH)) | PFIZER\BIONTECH | NONE | UNK | | |

| Symptom |
|---|
| AORTITIS |
| ASTHENIA |
| BLOOD TEST |
| CHEST PAIN |
| COMPUTERISED TOMOGRAM |
| DIZZINESS |
| DYSPNOEA |
| ELECTROCARDIOGRAM ABNORMAL |
| ELECTROENCEPHALOGRAM |
| GASTROOESOPHAGEAL REFLUX DISEASE |
| PAIN |
| PERICARDITIS |
| PULMONARY VASCULITIS |

| Adverse Event Description |
|---|
| Symptoms began almost immediately as constant dizziness, body aches, overall weakness. Two months later I woke up with severe chest pain and difficulty breathing. As a military pilot, my flight doctor took an EKG (abnormal results) and instructed me to visit the ER. I was diagnosed with inflammation of the heart cavity and pulmonary arteries. Upon being admitted to a local Medical Center, I was later diagnosed with vasculitis, specifically aortitis. During this timeframe I was also diagnosed with gastroesophageal reflux disease. I was completely healthy prior to the vaccination and there is not a single member of my family with any of the listed conditions. Presently, I am on a high dosage of prednisone and methotrexate to deal with the inflammation. I am also awaiting a medical evaluation board with the military group to determine if I'm allowed to remain on flying status and in the military. |

| Lab Data | | Current Illness | Adverse Events After Prior Vaccinations |
|---|---|---|---|

| Blood tests, CT Scans, EKGs, aEEG, etc. | None |

| Medications At Time Of Vaccination | History/Allergies |
|---|---|
| None | None,None |

# CDC WONDER    FAQs    Help    Contact Us    WONDER Search

## VAERS Event Details

### Details for VAERS ID: 1245452-1

| Event Information | | | |
|---|---|---|---|
| Patient Age | 37.00 | Sex | Male |
| State / Territory | California | Date Report Completed | 2021-04-21 |
| Date Vaccinated | 2021-03-19 | Date Report Received | 2021-04-23 |
| Date of Onset | 2021-03-21 | Date Died | |
| Days to onset | 2 | | |
| Vaccine Administered By | Unknown | Vaccine Purchased By | Not Applicable * |
| Mfr/Imm Project Number | USMODERNATX, INC.MOD20210 | Report Form Version | 2 |
| Recovered | Unknown | Serious | No |

\* VAERS 2.0 Report Form Only
\*\* VAERS-1 Report Form Only
"Not Applicable" will appear when information is not available on this report form version.

| Event Categories | |
|---|---|
| Death | No |
| Life Threatening | No |
| Permanent Disability | No |
| Congenital Anomaly / Birth Defect * | No |
| Hospitalized | No |
| Days in Hospital | None |
| Existing Hospitalization Prolonged | No |
| Emergency Room / Office Visit ** | N/A |
| Emergency Room * | Yes |
| Office Visit * | No |

\* VAERS 2.0 Report Form Only
\*\* VAERS-1 Report Form Only
"N/A" will appear when information is not available on this report form version.

| Vaccine Type | Vaccine | Manufacturer | Lot | Dose | Route | Site |
|---|---|---|---|---|---|---|
| COVID19 VACCINE | COVID19 (COVID19 (MODERNA)) | MODERNA | 045A21A | 1 | OT | |

| Symptom |
|---|
| ATRIAL FIBRILLATION |
| BLOOD THYROID STIMULATING HORMONE |
| ELECTROCARDIOGRAM |
| STRESS ECHOCARDIOGRAM |
| THYROID HORMONES DECREASED |

### Adverse Event Description

Atrial fibrillation; Thyroid hormone (TSH) goes down; This spontaneous case was reported by a consumer (subsequently medically confirmed) and describes the occurrence of ATRIAL FIBRILLATION (Atrial fibrillation) in a 37-year-old male patient who received mRNA-1273 (Moderna COVID-19 Vaccine) (batch no. 045A21A) for COVID-19 vaccination. The occurrence of additional non-serious events is detailed below. The patient's past medical history included No adverse event (No reported medical history). On 19-Mar-2021, the patient received first dose of mRNA-1273 (Moderna COVID-19 Vaccine) (Intramuscular) 1 dosage form. On 21-Mar-2021, the patient experienced ATRIAL FIBRILLATION (Atrial fibrillation) (seriousness criterion medically significant) and THYROID HORMONES DECREASED (Thyroid hormone (TSH) goes down). At the time of the report, ATRIAL FIBRILLATION (Atrial fibrillation) and THYROID HORMONES DECREASED (Thyroid hormone (TSH) goes down) outcome was unknown. Not Provided DIAGNOSTIC RESULTS (normal ranges are provided in parenthesis if available): On 21-Mar-2021, Blood thyroid stimulating hormone: low (Low) low. On 21-Mar-2021, Electrocardiogram: atrial fibrillation (abnormal) Atrial fibrillation. On 21-Mar-2021, Stress echocardiogram: atrial fibrillation (abnormal) Atrial fibrillation. The action taken with mRNA-1273 (Moderna COVID-19 Vaccine) (Intramuscular) was unknown. For mRNA-1273 (Moderna COVID-19 Vaccine) (Intramuscular), the reporter did not provide any causality assessments. Concomitant medications were not provided. The patient was in emergency room for few hours and was given 3 doses of apixaban (Eliquis) for treatment for the events. The patient reported, his thyroid level comes near normal after one and half weeks. Based on the current available information and temporal association between the use of the product and the start date of the events, a causal relationship cannot be excluded. He is pilot and kept off the duty for Atrial fibrillation.; Sender's Comments: Based on the current available information and temporal association between the use of the product and the start date of the events, a causal relationship cannot be excluded.

| Lab Data | | Current Illness | Adverse Events After Prior Vaccinations |
|---|---|---|---|

Case 3:22-cv-00107-TJC-LLL   Document 1-3   Filed 01/31/22   Page 98 of 267 PageID 146

| | | |
|---|---|---|
| Test Date: 20210321; Test Name: TSH; Result Unstructured Data: Low; Test Date: 20210321; Test Name: EKG; Result Unstructured Data: Atrial fibrillation; Test Date: 20210321; Test Name: Echo stress test; Result Unstructured Data: Atrial fibrillation | | |

| Medications At Time Of Vaccination | History/Allergies |
|---|---|
| | Medical History/Concurrent Conditions: No adverse event (No reported medical history), |

# CDC WONDER     FAQs     Help     Contact Us     WONDER Search

## VAERS Event Details

### Details for VAERS ID: 1358033-1

| Event Information | | | |
|---|---|---|---|
| Patient Age | 70.00 | Sex | Male |
| State / Territory | Utah | Date Report Completed | 2021-05-28 |
| Date Vaccinated | 2021-04-22 | Date Report Received | 2021-05-28 |
| Date of Onset | 2021-04-24 | Date Died | |
| Days to onset | 2 | | |
| Vaccine Administered By | Pharmacy * | Vaccine Purchased By | Not Applicable * |
| Mfr/Imm Project Number | NONE | Report Form Version | 2 |
| Recovered | Unknown | Serious | Yes |

* VAERS 2.0 Report Form Only
** VAERS-1 Report Form Only
"Not Applicable" will appear when information is not available on this report form version.

| Event Categories | |
|---|---|
| Death | No |
| Life Threatening | Yes |
| Permanent Disability | No |
| Congenital Anomaly / Birth Defect * | No |
| Hospitalized | Yes |
| Days in Hospital | 2 |
| Existing Hospitalization Prolonged | No |
| Emergency Room / Office Visit ** | N/A |
| Emergency Room * | Yes |
| Office Visit * | Yes |

* VAERS 2.0 Report Form Only
** VAERS-1 Report Form Only
"N/A" will appear when information is not available on this report form version.

| Vaccine Type | Vaccine | Manufacturer | Lot | Dose | Route | Site |
|---|---|---|---|---|---|---|
| COVID19 VACCINE | COVID19 (COVID19 (MODERNA)) | MODERNA | 007C21A | 2 | SYR | LA |

| Symptom |
|---|
| JOINT RANGE OF MOTION DECREASED |
| MYOCARDIAL INFARCTION |
| THROMBOSIS |

| Adverse Event Description |
|---|
| 2 days after second shot blood clot in left arm. Hit while walking in my home. Could not lift my arm. 5 days later heart attack. Pilot with EKG yearly. Last EKG less than one month from my heart attack on April 29, 2021 |

| Lab Data | Current Illness | Adverse Events After Prior Vaccinations |
|---|---|---|
| On going | None | |

| Medications At Time Of Vaccination | History/Allergies |
|---|---|
| None | None,None |

# CDC WONDER    FAQs    Help    Contact Us    WONDER Search

## VAERS Event Details

### Details for VAERS ID: 1702509-1

| Event Information | | | |
|---|---|---|---|
| Patient Age | | Sex | Male |
| State / Territory | Foreign | Date Report Completed | 2021-09-13 |
| Date Vaccinated | 2021-06-14 | Date Report Received | 2021-09-16 |
| Date of Onset | 2021-06-22 | Date Died | |
| Days to onset | 8 | | |
| Vaccine Administered By | Other | Vaccine Purchased By | Not Applicable * |
| Mfr/Imm Project Number | NLPFIZER INC202101120866 | Report Form Version | 2 |
| Recovered | Yes | Serious | Yes |

* VAERS 2.0 Report Form Only
** VAERS-1 Report Form Only
"Not Applicable" will appear when information is not available on this report form version.

| Event Categories | |
|---|---|
| Death | No |
| Life Threatening | No |
| Permanent Disability | No |
| Congenital Anomaly / Birth Defect * | No |
| Hospitalized | Yes |
| Days in Hospital | Unknown |
| Existing Hospitalization Prolonged | No |
| Emergency Room / Office Visit ** | N/A |
| Emergency Room * | Yes |
| Office Visit * | No |

* VAERS 2.0 Report Form Only
** VAERS-1 Report Form Only
"N/A" will appear when information is not available on this report form version.

| Vaccine Type | Vaccine | Manufacturer | Lot | Dose | Route | Site |
|---|---|---|---|---|---|---|
| COVID19 VACCINE | COVID19 (COVID19 (PFIZER-BIONTECH)) | PFIZER\BIONTECH | FC3143 | 1 | | |

| Symptom |
|---|
| ALANINE AMINOTRANSFERASE |
| ANGIOGRAM |
| ASPARTATE AMINOTRANSFERASE |
| BLOOD CHOLESTEROL |
| BLOOD CREATINE PHOSPHOKINASE |
| BLOOD CREATININE |
| BLOOD GLUCOSE |
| BLOOD LACTATE DEHYDROGENASE |
| BLOOD POTASSIUM |
| BLOOD PRESSURE MEASUREMENT |
| BLOOD SODIUM |
| BLOOD TRIGLYCERIDES |
| C-REACTIVE PROTEIN |
| CARDIAC FUNCTION TEST |
| COMPUTERISED TOMOGRAM |
| ECHOCARDIOGRAM |
| ELECTROCARDIOGRAM |
| GLOMERULAR FILTRATION RATE |
| HAEMATOCRIT |
| HAEMOGLOBIN |
| HIGH DENSITY LIPOPROTEIN |
| LDL/HDL RATIO |

| LIPOPROTEIN (A) |
| LOW DENSITY LIPOPROTEIN |
| MEAN CELL HAEMOGLOBIN |
| MEAN CELL VOLUME |
| PERICARDITIS |
| PHYSICAL EXAMINATION |
| PLATELET COUNT |
| RED BLOOD CELL COUNT |
| TOTAL CHOLESTEROL/HDL RATIO |
| TROPONIN |
| WHITE BLOOD CELL COUNT |

**Adverse Event Description**

Pericarditis/chest pressure and irregular heartbeat; This is a spontaneous report from a contactable consumer downloaded from the regulatory authority, regulatory authority number NL-LRB-00665454. A 38-year-old male patient received bnt162b2 (COMIRNATY), via an unspecified route of administration on 14Jun2021 (Lot Number: FC3143) as DOSE, 1 SINGLE for COVID-19 immunization. Medical history included not smoking, alcohol and drugs, hypertension, hypercholesterolaemia, diabetes and vascular disease from an unknown date. Family history of cardiovascular disease (father had a myocardial infarction at age 36). The patient's concomitant medications were not reported. The patient experienced pericarditis on 22Jun2021and recovered from pericarditis two weeks after onset on 14Jul2021. The patient experienced pericarditis following administration of COMIRNATY treated with in ambulance: nitrospray, ascal; rest and 3 days ibuprofen 3dd400mg. The patient is a pilot and an athlete (triathlons). During a training week, patient after the patient woke up, he experienced chest pain with radiating pain to his neck and jaw. Ambulance came and gave him nitrospray and Ascal, which reduced his pain. The patient underwent tests: CTa: no coronary stenosis, ECG: showed diffuse ST elevation compared to his ECG in 2020. Echo cor showed observations fitting with an athlete's heart. The patient had no previous COVID-19 infection. The event occurred on the sixth day after a hard week of training (cycling). Woke up with chest pressure and irregular heartbeat. Finally picked up by ambulance and presented to cardiologist. The patient had diagnostic procedures: EKGs, CT, blood. The patient was admitted on 22Jun2021 to - in the Cardiology department in connection with thoracic pain. As conclusion: VG familial burden for cardiovascular disease: Observation of thoracic pain, coronary artery disease was excluded by CTa coronaries; Slightly dilated heart with slight eccentric left ventricular hypertrophy consistent with sports heart in tall athlete; and Diffuse ST elevation increase compared to EKG 2020. Diagnosis: pericarditis based on sports heart. The patient takes ibuprofen 3dd400mg for 3 days and Poli for 3 weeks + EKG. The patient was instructed to return earlier in case of fever, dyspnea, dizziness, increase in pain. The patient had referral to sports cardiologist. Check-up appointment: 3 weeks, outpatient clinic after admission. The patient woke up around 5:30 this morning to go to the toilet. No trouble getting up yet. When lying back in bed, a feeling of pressure in the chest. Couldn't walk anymore, vas 6/7. Radiated to jaw and neck. Is a pilot and has never noticed any heart problems during major inspections. No palpitation complaints, dyspnea or dyspnea of effort. No edema or nocturia. No vegetative phenomena. In the ambulance nitro spray and charged with ascal. After the chest complaints dropped to VAS 1. Per physical examination: BP: 121/76 mmHg, HR 55/min, cor: ≤1 ≤2 grade 1/6 ejection promptle, no pericardial rub, pulm: VAG; EKG: 22Jun2021: Sinus bradycardia 44/min, intermediate cardiac axis PQ 0.17 QRS 0.10 QT 0.45, diffuse ST elevation in all leads. Echo sound. Per quality and rhythm: the image quality of the examination is good. Sinus bradycardia around 46 bpm. LV: The left ventricle is slightly dilated. Eccentric LVH, RWT 0.37 at a mass of 130 gr/m2. Left ventricular systolic function is good. The left ventricular EF measured 65%. Combination of findings is consistent with normal LV diastolic function. RV: The right ventricle is moderately dilated. The systolic function of the RV is normal. Atria: The left atrium is slightly dilated (15-41 ml/m2). The right atrium is severely dilated. Floppy atrial septum. AoV: The aortic valve is tricuspid and opens well. Edges of the aortic valve thickened. Track ADI. MV: The mitral valve is normal. MINOR mitral insufficiency, TV: The tricuspid valve is normal. Minor tricuspid valve insufficiency. PV: The pulmonary valve is normal. Physiological pulmonary valve insufficiency. Great vessels: undilated ascending aorta. VCI is dilated, collapses 29% on sniff. CTA Coronaries 22Jun2021, 12:16, Calcium score 0, heart rate 52/min. Prospective scan protocol. No coronary stenoses. No mass or lymphadenopathy in the mediastinum. Depicted lung fields clear. No indication of current pathology in the scanned trajectory. Conclusion: no coronary stenoses. Lab Collection date: 22Jun2021. Hemoglobin 8.9 mmol/L Hematocrit 0.42 L/L Erythrocytes: 4.7 x10^12/L Leukocytes: 4.0x10^9/L MCV 90 fL MCH: 1.88 fmol Thrombytes 212 x10^9/L Sodium : 138 mmol/l Potassium: 3.5 mmol/l Creatinine 84 u!mol/L eGFR CKD epi >90 ml/min AST: 41 U/L (H) ALT 36 U/L LD: 327 U/l (H) CK : 712 U/l (H) Cholesterol 4.1 mmol/l HDL cholesterol 1.4 mmol/l Cholesterol-HDL ratio: 3.0 LDL cholesterol: 2.4 mmol/l Triglycerides 0.7 mmol/l (L) Glucose 6.6 mmol/l HS troponin I: <10 mg/l Lipoprotein a follows CRP <5 mg/l. The patient was seen on 15Jul2021 at the Cardiology Outpatient Clinic for check-up after a recent visit to first heart aid. As conclusion, VG familial burden for cardiovascular disease. On 1. 22Jun2021, the patient visit emergency room for pericarditis. Now completely complaint-free; Slightly dilated heart with slight eccentric left ventricular hypertrophy consistent with sports heart in endurance athlete. No further outpatient monitoring indicated. The patient is referred back to the general practitioner. Anamnesis, Had no more complaints. Per her physical examination; BP 142/75 mmHg, cor: ≤1≤2 no prompt; ECG: SR 44/min, intermediate heart axis, PQ 0.17 QRS 0.10 QTc 0.41, decrease ST elevation compared to 22-6-'21 0.5 mm ST elevation I, aVL, V5, V6 and 2 mm ST elevation V3-V4. The patient had no medication in use. The outcome of pericarditis was recovered on 14Jul2021. No follow-up attempts are possible. No further information is expected.

| Lab Data | | Current Illness | Adverse Events After Prior Vaccinations |
| --- | --- | --- | --- |

Test Date: 20210622; Test Name: alt; Result Unstructured Data: Test Result:36 IU/l; Test Date: 20210622; Test Name: CT coronary; Result Unstructured Data: Test Result:No coronary stenoses; Test Date: 20210622; Test Name: ASAT; Result Unstructured Data: Test Result:41 IU/l; Test Date: 20210622; Test Name: choletserol; Result Unstructured Data: Test Result:4.1 mmol/L; Test Date: 20210622; Test Name: CK; Result Unstructured Data: Test Result:712 IU/l; Comments: high; Test Date: 20210622; Test Name: creatinine; Result Unstructured Data: Test Result:84 umol/l; Test Date: 20210622; Test Name: glucose; Result Unstructured Data: Test Result:6.6 mmol/L; Test Date: 20210622; Test Name: LD; Result Unstructured Data: Test Result:327 IU/l; Test Date: 20210622; Test Name: potassium; Result Unstructured Data: Test Result:3.5 mmol/L; Test Date: 20210622; Test Name: BP; Result Unstructured Data: Test Result:123/76 mmHg; Test Date: 20210715; Test Name: BP; Result Unstructured Data: Test Result:142/75 mmHg; Test Date: 20210622; Test Name: HR; Result Unstructured Data: Test Result:55; Comments: Units:{beats}/min; Test Date: 20210622; Test Name: sodium; Result Unstructured Data: Test Result:138 mmol/L; Test Date: 20210622; Test Name: triglycerides; Result Unstructured Data: Test Result:0.7 mmol/L; Comments: low; Test Name: heart examination; Result Unstructured Data: Test Result:Slightly dilated heart; Test Date: 20210622; Test Name: CT coronary; Result Unstructured Data: Test Result:Observation of thoracic pain, coronary artery disc; Comments: Observation of thoracic pain, coronary artery disease was excluded. No coronary stenoses. No mass or lymphadenopathy in the mediastinum. Depicted lung fields clear. No indication of current pathology in the scanned trajectory.; Test Date: 20210622; Test Name: CRP; Result Unstructured Data: Test Result:less than 5 mg/l; Test Date: 20210622; Test Name: echocardiogram; Result Unstructured Data: Test Result:Measurement values appropriate to sports heart in; Comments: Measurement values appropriate to sports heart in endurance athlete. Does entire triathlons!; Test Name: ECG; Result Unstructured Data: Test Result:Diffuse ST elevation increase compared to EKG 2020; Test Date: 20210622; Test Name: ECG; Result Unstructured Data: Test Result:Sinus bradycardia 44/min, intermediate cardiac axi; Comments: Sinus bradycardia 44/min, intermediate cardiac axis PQ 0.17 QRS 0.10 QT 0.45, diffuse ST elevation in all leads; Test Date: 20210715; Test Name: ECG; Result Unstructured Data: Test Result:SR 44/min, intermediate heart axis PQ 0.17 QRS 0.1; Comments: SR 44/min, intermediate heart axis PQ 0.17 QRS 0.10 QTc 0.43, decrease ST elevation from 22Jun2021. 0.5 mm ST elevation I, aVL, V5, V6 and 2 mm ST elevation V3-V4; Test Date: 20210622; Test Name: eGFR CKD epi; Result Unstructured Data: Test Result:greater than 90; Comments: units: ml/min; Test Date: 20210622; Test Name: hematocrit; Result Unstructured Data: Test Result:0.42; Comments: units: l/l; Test Date: 20210622; Test Name: hemoglobin; Result Unstructured Data: Test Result:8.9 mmol/L; Test Date: 20210622; Test Name: HDL; Result Unstructured Data: Test Result:1.4 mmol/L; Test Date: 20210622; Test Name: LD; Result Unstructured Data: Test Result:327 IU/l; Comments: high; Test Date: 20210622; Test Name: lipoprotein a; Result Unstructured Data: Test Result:less than 5 mg/l; Test Date: 20210622; Test Name: LDL cholesterol; Result Unstructured Data: Test Result:2.4 mmol/L; Test Date: 20210622; Test Name: MCH; Result Unstructured Data: Test Result:1.88 fmol; Test Date: 20210622; Test Name: MCV; Result Unstructured Data: Test Result:90; Comments: units: fL; Test Name: physical examination; Result Unstructured Data: Test Result:BP 121/76 mmHg, HR 55/min, cor: s1 s2 grade 1/6 ej; Comments: BP 121/76 mmHg, HR 55/min, cor: s1 s2 grade 1/6 ejection promptle, no pericardial rub, pulm: VAG; Test Name: physical examination; Result Unstructured Data: Test Result:BP 142/75 mmHg, cor: s1s2 no prompt; Comments: RR 142/75 mmHg, cor: s1s2 no prompt; Test Date: 20210622; Test Name: thrombocyte; Result Unstructured Data: Test Result:212 ng/l; Test Date: 20210622; Test Name: erythrocytes; Result Unstructured Data: Test Result:4.7 x10 12/l; Test Date: 20210622; Test Name: cholesterol- HDL ratio; Result Unstructured Data: Test Result:3; Test Date: 20210622; Test Name: HS troponin; Result Unstructured Data: Test Result:less than 10 mg/l; Test Date: 20210622; Test Name: Leukocyte; Result Unstructured Data: Test Result:4 ng/L

| Medications At Time Of Vaccination | History/Allergies |
|---|---|
|  | Medical History/Concurrent Conditions: Abstains from alcohol; Abstains from recreational drugs; Diabetes; Hypercholesterolaemia; Hypertension; Myocardial infarction (father); Non-smoker; Vascular disorder; |

# CDC WONDER

FAQs     Help     Contact Us     WONDER Search

## VAERS Event Details

### Details for VAERS ID: 1768479-1

| Event Information | | | |
|---|---|---|---|
| Patient Age | 32.00 | Sex | Male |
| State / Territory | California | Date Report Completed | 2021-10-07 |
| Date Vaccinated | 2021-06-01 | Date Report Received | 2021-10-07 |
| Date of Onset | 2021-06-01 | Date Died | |
| Days to onset | 0 | | |
| Vaccine Administered By | Private | Vaccine Purchased By | Not Applicable * |
| Mfr/Imm Project Number | NONE | Report Form Version | 2 |
| Recovered | No | Serious | Yes |

* VAERS 2.0 Report Form Only
** VAERS-1 Report Form Only
"Not Applicable" will appear when information is not available on this report version.

| Event Categories | |
|---|---|
| Death | No |
| Life Threatening | No |
| Permanent Disability | Yes |
| Congenital Anomaly / Birth Defect * | No |
| Hospitalized | No |
| Days in Hospital | None |
| Existing Hospitalization Prolonged | No |
| Emergency Room / Office Visit ** | N/A |
| Emergency Room * | No |
| Office Visit * | No |

* VAERS 2.0 Report Form Only
** VAERS-1 Report Form Only
"N/A" will appear when information is not available on this report form version.

| Vaccine Type | Vaccine | Manufacturer | Lot | Dose | Route | Site |
|---|---|---|---|---|---|---|
| COVID19 VACCINE | COVID19 (COVID19 (JANSSEN)) | JANSSEN | 201A21A | 1 | SYR | LA |

| Symptom |
|---|
| AMNESIA |
| ARRHYTHMIA |
| COGNITIVE LINGUISTIC DEFICIT |
| DIZZINESS |
| FATIGUE |
| FEELING ABNORMAL |
| GAIT DISTURBANCE |
| HEAD DISCOMFORT |
| IMPAIRED WORK ABILITY |
| MENTAL IMPAIRMENT |
| MOTION SICKNESS |
| MUSCLE TWITCHING |
| STRESS |
| VERTIGO |

**Adverse Event Description**

Morning following injection, I experienced extreme dizziness and brain discomfort. Dizziness was bad enough to make walking difficult and even created motion sickness. 5 months later the dizziness has eased but still present, flying, driving, elevators, anything seems to trigger some form of dizziness. Hights of about 10 feet give bad vertigo, I am a pilot and aircraft mechanic and this creates an issue working on jets and I do not want to possibly loose my pilots medical. Brain fog is also long lasting still and makes mental clarity difficult which was never an issue until the day after the shot. My heart has created irregular heart rhythms, I have physical stress and tire easily and my muscles will shake and twitch after minimal effort. Biggest concern is dizziness and clarity and loss of short term memory, talking in front of large audiences for work has become difficult since my cognitive skills seem to have diminished from the lasting brain fog.

| Lab Data | Current Illness | Adverse Events After Prior Vaccinations |
|----------|-----------------|------------------------------------------|
| None yet | None | |

| Medications At Time Of Vaccination | History/Allergies |
|-------------------------------------|-------------------|
| None | None,None |

# CDC WONDER          FAQs      Help      Contact Us      WONDER Search

## VAERS Event Details

### Details for VAERS ID: 1144388-1

| Event Information | | | |
|---|---|---|---|
| Patient Age | 71.00 | Sex | Male |
| State / Territory | Maine | Date Report Completed | 2021-03-29 |
| Date Vaccinated | 2021-02-22 | Date Report Received | 2021-03-29 |
| Date of Onset | 2021-03-08 | Date Died | |
| Days to onset | 14 | | |
| Vaccine Administered By | Other | Vaccine Purchased By | Not Applicable * |
| Mfr/Imm Project Number | NONE | Report Form Version | 2 |
| Recovered | No | Serious | No |

* VAERS 2.0 Report Form Only
** VAERS-1 Report Form Only
"Not Applicable" will appear when information is not available on this report form version.

| Event Categories | |
|---|---|
| Death | No |
| Life Threatening | No |
| Permanent Disability | No |
| Congenital Anomaly / Birth Defect * | No |
| Hospitalized | No |
| Days in Hospital | None |
| Existing Hospitalization Prolonged | No |
| Emergency Room / Office Visit ** | N/A |
| Emergency Room * | No |
| Office Visit * | No |

* VAERS 2.0 Report Form Only
** VAERS-1 Report Form Only
"N/A" will appear when information is not available on this report form version.

| Vaccine Type | Vaccine | Manufacturer | Lot | Dose | Route | Site |
|---|---|---|---|---|---|---|
| COVID19 VACCINE | COVID19 (COVID19 (PFIZER-BIONTECH)) | PFIZER\BIONTECH | EN5313 | 1 | IM | LA |

| Symptom |
|---|
| BALANCE DISORDER |
| DIZZINESS |
| FATIGUE |

| Adverse Event Description |
|---|
| Dizziness, balance issues began @ weeks after1st shot. most pronounced when first getting up in the morning. continued fatigue throughout the period. I healthy and have never had balance issue. (retired military and airline pilot. Meclizine of on help. |

| Lab Data | Current Illness | Adverse Events After Prior Vaccinations |
|---|---|---|
| none | none | |

| Medications At Time Of Vaccination | History/Allergies |
|---|---|
| NONE | none,NONE |

# CDC WONDER    FAQs    Help    Contact Us    WONDER Search

## VAERS Event Details

### Details for VAERS ID: 1376453-1

| Event Information | | | |
|---|---|---|---|
| Patient Age | 45.00 | Sex | Male |
| State / Territory | Colorado | Date Report Completed | 2021-06-06 |
| Date Vaccinated | 2021-06-03 | Date Report Received | 2021-06-06 |
| Date of Onset | 2021-06-04 | Date Died | |
| Days to onset | 1 | | |
| Vaccine Administered By | Pharmacy * | Vaccine Purchased By | Not Applicable * |
| Mfr/Imm Project Number | NONE | Report Form Version | 2 |
| Recovered | No | Serious | No |

\* VAERS 2.0 Report Form Only
\*\* VAERS-1 Report Form Only
"Not Applicable" will appear when information is not available on this report form version.

| Event Categories | |
|---|---|
| Death | No |
| Life Threatening | No |
| Permanent Disability | No |
| Congenital Anomaly / Birth Defect * | No |
| Hospitalized | No |
| Days in Hospital | None |
| Existing Hospitalization Prolonged | No |
| Emergency Room / Office Visit ** | N/A |
| Emergency Room * | No |
| Office Visit * | No |

\* VAERS 2.0 Report Form Only
\*\* VAERS-1 Report Form Only
"N/A" will appear when information is not available on this report form version.

| Vaccine Type | Vaccine | Manufacturer | Lot | Dose | Route | Site |
|---|---|---|---|---|---|---|
| COVID19 VACCINE | COVID19 (COVID19 (PFIZER-BIONTECH)) | PFIZER\BIONTECH | EW0178 | 2 | SYR | RA |

| Symptom |
|---|
| VERTIGO |

| Adverse Event Description |
|---|
| Severe vertigo experienced for four days and counting. Early morning symptoms are the worst, but symptoms continue throughout the day and evening. As a professional helicopter pilot, I cannot perform my job with these symptoms. |

| Lab Data | Current Illness | Adverse Events After Prior Vaccinations |
|---|---|---|
| No tests performed yet | None | |

| Medications At Time Of Vaccination | History/Allergies |
|---|---|
| None | None,Penicilin |

VAERS Event Details                    https://wonder.cdc.gov/controller/datarequest/D8;jsessionid=E8D42...

# CDC WONDER          FAQs    Help    Contact Us    WONDER Search

## VAERS Event Details

### Details for VAERS ID: 1388581-1

| Event Information | | | |
|---|---|---|---|
| Patient Age | 47.00 | Sex | Male |
| State / Territory | Ohio | Date Report Completed | 2021-06-10 |
| Date Vaccinated | 2021-04-27 | Date Report Received | 2021-06-10 |
| Date of Onset | 2021-04-28 | Date Died | |
| Days to onset | 1 | | |
| Vaccine Administered By | Pharmacy * | Vaccine Purchased By | Not Applicable * |
| Mfr/Imm Project Number | NONE | Report Form Version | 2 |
| Recovered | Yes | Serious | Yes |

* VAERS 2.0 Report Form Only
** VAERS-1 Report Form Only
"Not Applicable" will appear when information is not available on this report form version.

| Event Categories | |
|---|---|
| Death | No |
| Life Threatening | Yes |
| Permanent Disability | No |
| Congenital Anomaly / Birth Defect * | No |
| Hospitalized | Yes |
| Days in Hospital | 10 |
| Existing Hospitalization Prolonged | No |
| Emergency Room / Office Visit ** | N/A |
| Emergency Room * | Yes |
| Office Visit * | Yes |

* VAERS 2.0 Report Form Only
** VAERS-1 Report Form Only
"N/A" will appear when information is not available on this report form version.

| Vaccine Type | Vaccine | Manufacturer | Lot | Dose | Route | Site |
|---|---|---|---|---|---|---|
| COVID19 VACCINE | COVID19 (COVID19 (MODERNA)) | MODERNA | 046B21A | 1 | IM | AR |

| Symptom |
|---|
| ANGIOGRAM CEREBRAL NORMAL |
| ARACHNOID CYST |
| COMPUTERISED TOMOGRAM HEAD ABNORMAL |
| HEADACHE |
| IMPAIRED WORK ABILITY |
| NAUSEA |
| PHOTOPHOBIA |
| SUBARACHNOID HAEMORRHAGE |
| ULTRASOUND DOPPLER |
| VOMITING |

**Adverse Event Description**

Vaccine information (brand name, dosage, lot number) Date, time, and location administered: Date: 4/27/2021; Time: ? m; Location: Pharmacy Date and time when adverse event(s) started: Date: 4/28/2021; Time: afternoon Description of the adverse event, including medical treatment and diagnosis: Description: Symptoms include: Worst headache of life Exam Findings include: No focal neurologic findings but given history, CT head ordered.

| Lab Data | | Current Illness | Adverse Events After Prior Vaccinations |
|---|---|---|---|
| | | | |

| | | None | | |
|---|---|---|---|---|
| Results of medical tests and laboratory tests: CT head showed subarachnoid hemorrhage with full information below. Outcome of the adverse event (for example: doctor office visit, emergency room visit, hospitalization, etc.) Hospital Course: 47 y/o Male with Hx of HTN who presented 4/28/21 with worst headache of life while doing pushups with associated nausea, vomiting, and photophobia. Pt states he has had this type of headache a few times in the past several weeks but it usually went away. CT head showed prepontine subarachnoid hemorrhage; Incidental cerebellar arachnoid cyst. 4/29/21 Cerebral angio negative for aneurysm; Daily TCD's monitored. 5/7/21 Repeat Cerebral angio negative for aneurysm. PT/OT eval with no needs. Patient was discharged to home in satisfactory condition with scheduled follow up. Whether the patient has recovered from the adverse event: Patient seems to be normal neurologically but remains off work pending FAA evaluation as he is a commercial airline passenger pilot. | | None | | |

| Medications At Time Of Vaccination | History/Allergies |
|---|---|
| None | Patient Active Problem List: Essential hypertension [I10] Need for prophylactic vaccination and inoculation against influenza [Z23] Hyperlipidemia with target LDL less than 130 [E78.5] Overweight [E66.3] Routine general medical examination at a health care facility [Z00.00] Chronic or long-standing health conditions Past Medical History: Diagnosis Date ? BMI 27.0-27.9,adult 10/15/2016 ? Elevated cholesterol ? Lower urinary tract symptoms (LUTS) 11/29/2011 ? Overweight 3/3/2019 Diagnosed and Discussed with patient. Complications include htn and high cholesterol. On personal lifestyle changes only . ? Rhabdomyolysis 1992 in college and resolved ? Routine general medical examination at a health care facility ? Seborrhea 10/22/2002 ? Unspecified essential hypertension 2007 diet controlled,None |

◑  ⊕  https://www.ahajournals.org/doi/10.1161/circ.144.suppl_1.10712

🔓 FREE ACCESS
ABSTRACT

ARTERIOSCLEROSIS, THROMBOSIS, VASCULAR BIOLOGY
SESSION TITLE: DAMPS, INFECTION AND CARDIOVASCULAR METABOLISM

🔧 Tools   ⪡ Share

**Jump to**

Abstract

Footnotes

ⓘ Details     A Related     🔗 References

## Abstract 10712: Mrna COVID Vaccines Dramatically Increase Endothelial Inflammatory Markers and ACS Risk as Measured by the PULS Cardiac Test: a Warning

Steven R Gundry

Originally published 8 Nov 2021 | Circulation. 2021;144:A10712

This article has an expression of concern ⌄



## Abstract

Our group has been using the PLUS Cardiac Test (GD Biosciences, Inc, Irvine, CA) a clinically validated measurement of multiple protein biomarkers which generates a score predicting the 5 yr risk (percentage chance) of a new Acute Coronary Syndrome (ACS). The score is based on changes from the norm of multiple protein biomarkers including IL-16, a proinflammatory cytokine, soluble Fas, an inducer of apoptosis, and Hepatocyte Growth Factor (HGF)which serves as a marker for chemotaxis of T-cells into epithelium and cardiac tissue, among other markers. Elevation above the norm increases the PULS score, while decreases below the norm lowers the PULS score. The score has been measured every 3-6 months in our patient population for 8 years. Recently, with the advent of the mRNA COVID 19 vaccines (vac) by Moderna and Pfizer, dramatic changes in the PULS score became apparent in most patients. This report summarizes those results. A total of 566 pts, aged 28 to 97, M:F ratio 1:1 seen in a preventive cardiology practice had a new PULS test drawn from 2 to 10 weeks following the 2nd COVID shot and was compared to the previous PULS score drawn 3 to 5 months previously pre- shot. Baseline IL-16 increased from 35=/-20 above the norm to 82 =/- 75 above the norm post-vac; sFas increased from 22+/- 15 above the norm to 46+/-24 above the norm post-vac; HGF increased from 42+/-12 above the norm to 86+/-31 above the norm post-vac. These changes resulted in an increase of the PULS score from 11% 5 yr ACS risk to 25% 5 yr ACS risk. At the time of this report, these changes persist for at least 2.5 months post second dose of vac. We conclude that the mRNA vacs dramatically increase inflammation on the endothelium and T cell infiltration of cardiac muscle and may account for the observations of increased thrombosis, cardiomyopathy, and other vascular events following vaccination.



🖾

November 16, 2021
Vol 144, Issue
Suppl_1

## Article Information

**Metrics**

See more details

📰 Picked up by 18 news outlets
📝 Blogged by 8
🐦 Tweeted by 63294
📘 On 17 Facebook pages
📖 Referenced in 2 Wikipedia pages
🔴 Reddited by 81
📹 On 4 videos
Download: 0

## Footnotes

Author Disclosures: For author disclosure information, please visit the AHA Scientific Sessions 2021 Online Program Planner and search for the abstract title.

VAERS COVID Vaccine
## Adverse Event Reports

Reports from the Vaccine Adverse Events Reporting System. Our default data
reflects all VAERS data including the "nondomestic" reports. @



946,461 Reports
Through December 3, 2021 @



| 19,886 DEATHS | 102,857 HOSPITALIZATIONS | 104,217 URGENT CARE |

| 148,181 DOCTOR OFFICE VISITS | 8,432 ANAPHYLAXIS | 11,896 BELL'S PALSY |

| 3,230 Miscarriages | 9,977 Heart Attacks | 16,918 Myocarditis/Pericarditis | 32,644 Permanently Disabled |

| 4,717 Thrombocytopenia/ Low Platelet | 22,422 Life Threatening | 35,009 Severe Allergic Reaction | 10,946 Shingles |



All Deaths Reported to VAERS By Year



VAERS COVID Vaccine Reports of Deaths by Days to Onset-All Ages



**THERESA MARIE LONG, MD, MPH, FS LTC, MEDICAL CORPS, U.S. Army**

**Medical Education**

United States Army School of Aviation Medicine Aerospace/Occupational Medicine Residency University of West Florida
Graduate Student -MPH

06/2019-6/2021

Carl R. Darnall Army Medical Center, Fort Hood, Texas Family Medicine Internship
06/2008-11/2010
Unrestricted Medical License, IN

09/2003 - 06/2008
University of Texas Medical School at Houston, Houston, Texas 06/2008 M.D.

08/2001 - 08/2004
Undergraduate - University of Texas at Austin, Austin, TX 05/2004 B.S. Neurobiology

**Research Experience**

08/2018 – 5/2020
School of Aviation Medicine
University of West Florida MPH program
https://tml526.wixsite.com/website
Performed a cross-sectional study on Intervertebral Disc Disease Among Army Aviators and Air Crew

**08/2002 - 05/2003**

University of Texas at Austin, Texas
Research Assistant, Dr. Dee Silverthorn
Performed academic research in effort to update medical facts and the latest research information for the publication of the fourth edition of Human Physiology

**09/2000 - 11/2000**

Neuropharmacology Research, Texas
Lab Tech, Dr. Silverthorn
Acquisition of rat cerebellums for research in gene sequencing. The focus of the project was to determine the DNA sequence of the receptor in the developing fetal brain that binds to ethanol and induces apoptosis leading to fetal alcohol syndrome.

**Publications/Presentations/Poster Sessions Presentations/Posters**

Poster: Intervertebral Disc Disease Among Army Aviators and Air Crew, presented during the 2021 American Occupational Healthcare Conference.
Long, Theresa M., Sorensen, Christian, Victoria Zumberge. (2003, May). Sodium dependent transport of Chlorophenol red uptake by Malpighian tubules of acheta domesticus. Poster presented at: University of Texas at Houston; Austin, TX.

**Volunteer Experience**

08/ 2005 - 09/2005
University of Texas - Houston, Health Science Ctr, Texas
Medical Student -Provided medical aid and support for Acute Care and triage of Hurricane Katrina evacuees.

**Work Experience**

**06/2021- Present**
**1st Aviation Brigade TOMS Surgeon**
Serve as the Medical Advisor to the 1st Aviation Brigade Commander regarding health and fitness of over 3600 officers, warrant officers and Soldiers. The Brigade is comprised of three aviation training battalions, responsible for initial entry rotary wing/ fixed wing flight training, advanced aircraft training. as well as Specific duties include ensuring safety of flight in Army Aviation operations by functioning as Flight Surgeon, while ensuring the health and fitness of military police, firefighters and military working dogs that support Ft. Rucker. Tasked with conducting epidemiological and biostatistical analysis of injuries and illnesses (SARs CoV-2) and medical trends that occur during training and identify and implement strategies to mitigate delays or lost training time.

**05/2018-06/2021**
**Aerospace and Occupational Medicine Resident**

Graduate Medical Education training in Aerospace and Occupational Medicine while obtaining a Master's in Public Health. Specialty training included the Flight surgeon course, The Instructor/Trainer course, Space Cadre Course, Medical Effects of Ionizing Radiation, Medical Management of Chemical and Biological Casualties course at USAMIIRD, Ft. Detrick, NASA, 7th Special Forces, Aviation Safety Officer Course, Global Medicine Symposium, OSHA, Dept of Transportation, Textron Bell Helicopters, Brigade Healthcare Course, Preventative Medicine Senior Leaders Course, Joint Enroute Critical Care Course, Army Aeromedical Activity, research on Intervertebral Disc Disease.

05/2015-05/2018

**Department of Rehabilitation Services**
**General Medical Officer**
Assigned to Carl R. Darnall Army Medical Center Physical Medicine clinic with special duties Function as General Medical Officer, to mitigate the number of high risk patients get referred off-post to Pain management and PM&R clinics. Functioned as the Performance Improvement officer for PM&R, the Chiropractic Clinic OIC, and the MEB/IDES Subject Matter Expert to IPMC multi-disciplinary team. Significantly increased access to care to the Physical Medicine clinic. Was instrumental in leading the hospital transition for the Chiropractic clinic, contributing to the subsequent successful Joint Commission inspection. Increased access to care in the Chiropractic clinic by 500%.

9/2013- 5/2015

**Department of Pediatrics/ Department of Deployment & Operational Medicine**
**General Medical Officer**
Assigned to the Carl R. Darnall Army Medical center Pediatric Clinic with special duties within the Department of Deployment & Operational Medicine. Provided acute and routine medical care for newborn to age 18 and collaborated with Lactation Team Leader to develop research matrix to ensure effective use of resources to meet Perinatal Core Measures PC-05 for Joint Commission Accreditation. Demonstrated initiative by providing emergency medical care to one of the victims of the April 2, 2014 FT Hood shooting.

10/2012-9/2013

**Department of Deployment Medicine/ Emergency Medicine**
**General Medical Officer**
Assigned to the Department of Deployment & Operational Medicine at Carl R Darnall Army Medical Center (CRDAMC) with specific duties directed by the CRDAMC DCCS. Supported soldier deployment/redeployment from combat, while also performing clinical rotations within the Emergency and Internal Medicine Departments to increase access to care for acutely ill patients. Improved productivity of the SMRC by conducting ETS, Chapter, Special Forces, Airborne, Ranger, SERE, and OCS/WOCS physicals. Ensured DODM success with 90% CRDAMC staff compliance of their annual PHA's. Selected to become an ACLS instructor.

06/2012-10/01/2012

**Department of the Army Inspector General Agency**
**Disability Medicine Subject Matter Expert (SME) – Temporary Dept of the Army Inspector General**
Assistant Inspector General on Medical Disability (Subject Matter Expert)
Selected above my peers, from across the Army AMEDD as one of three medical NARSUM Subject Matter Experts to function as a temporary assistant Inspector General, in a SECARMY directed inspection of the MEB/IDES system. Planed, coordinated, and conducted inspections of agencies/commands and to gather required data and

perspectives relevant to the inspection topic. Developed inspection concepts, objectives, methodologies while coordinating inspection site requirements with major Army Commands ASCC, DRUs, Installations and Components. Identified trends, analyzed root causes to systemic problems and proposed solutions to the IG, Army Chief of Staff and Secretary of the Army for service-wide implementation.

06/2011-06/2012

**Carl R. Darnall Army Medical Center**
**Integrated Disability Evaluation System**
Increased patient access to care by conducting 203 acute care appointments in four months. Increased productivity by 25% by completing 202 NARSUMs, 12 TDRLs, 42 Psychiatric addendums in nine months with only a single case returned from the PEB. Performed duties of MEB chief and QA physician in their absence by performing QA on seven NARSUMS, and reviewing 13 cases for initial intake. Functioned as IDES Physician Training officer, applying PDA training to develop a comprehensive training program for new MEB/IDES NARSUM physicians.

11/2010-05/2011

**Carl R. Darnall Army Medical Center, Hospital Operations, Clinical Plans and Medical Operations Officer**

Served as Clinical Plans and Medical Operations Officer for Hospital Operation (HOD), responsible for the synchronization of external and internal MEDCEN operations supporting over 3,000 MEDCEN employee as well as the DoD's largest military installation and surrounding civilian population; assisted in development and execution of medical plans supporting Installation, Garrison, MEDCEN and Civilian AT/FP and MASCAL events

06/2005 - 07/2005

**United States Army, Texas, Officer Basic Course - Class 1st Sergeant**

Supervised 306 medical, dental, and veterinarian HPSP scholarship recipients for Officer Basic training. 10/2002 - 08/2003

**United States Army - Texas National Guard, Texas Flight Medic** –EMT/BCLS Instructor Training

10/2001 - 10/2002

**United States Army Reserve, Texas, Instructor/Trainer**

# Curriculum Vitae

# Peter Constantine Chambers

PO Box 670 Madill, OK 73446 / 580-677-0792
EMSLLC2017@Gmail.com / peter.c.chambers.mil@mail.mil
Physician / Flight Surgeon / Green Beret / Civilian LE (Reserve)

## EDUCATION

**November 1997 – May 2000** * Residency Family Practice Medicine * Oklahoma State University
**July 1996 – October 1997** * Rotation – Cosmetic Surgery
**June 1995 – June 1996** * Rotating Internship - Columbia University General Hospital
**September 1990 – August 1995** * Doctorate of Osteopathic Medicine * University of New England

## LICENSURE

Oklahoma State Medical License / License Number: 3712 / Expires: 30 June 2022
DEA / Reg. No: BC 6554251 / Expires: September 2021

## LANGUAGES

› Persian Farsi
› Dari
› Greek

## WORK EXPERIENCE

- **February 2016 – Present** * Sole Proprietor EMS LLC * Worldwide Operations
- **July 2015 – February 2016** * Physician – Convenient Care Clinic * Ardmore, OK
- **March 2013 – May 2015** * Battalion Surgeon - 2nd BN, 3rd SFG(A) * FT Bragg, NC
- **July 2012 – March 2013** * ER Physician / Integris Marshall County Medical Center * Madill, OK
- **June 2004 – October 2010** * ER Physician / Integris Marshall County Medical Center * Madill, OK
- **December 2006 – December 2007** * FP Physician - Family Practice Clinic of Atoka, Inc. * Atoka, OK
- **May 2003 – January 2004** * Emergency Medicine * (Purcell, Ada, Paul's Valley, Holdenville) OK
- **August 2000 – May 2003** * Integris Marshall Memorial Hospital * Family Practice Clinic * Madill, OK
- **April 2001 – February 2004** * Director – Marshall County EMS * Marshall County, OK
- **February 2000 – Present** * Reserve LE / SWAT / Crisis Negotiator * Marshall County, OK
- **June 1995 – May 2000** * Internship / Residency * Noted Above
- **September 1983 – June 1990** * United States Army / Army Reserve * Honorable Discharge

## DEPLOYMENTS / ASSIGNMENTS

- Flintlock '20 – January '20 (SOD-A) * West Africa
- Operation Enduring Freedom '19 (Joint Task Force GTMO) * Guantanamo Bay, Cuba
- Flintlock '19 – January '19 (SOD-A) * West Africa
- OIR * May – October '16 (XO - AOB 9530) * Jordan
- JCET June '15 (C Co. 5/19th SFG) * Greece
- OEF XXI – '14 (SOTF-NE, 2/3 SFG) * Afghanistan
- Foal Eagle '10 (1/19 SFG) * S. Korea
- Operation Enduring Freedom '08 (TF PHX – ETT 2/2/207) * Afghanistan
- Balance Nail '08 (19th SFG) * Nepal
- Balanced Nail '07 (19th SFG) * Nepal
- Earthquake Relief '05 (NGO) * Pakistan / NWFP
- Hurricane Katrina Relief / Hurricane Rita Relief '05 * Gulf Coast
- Talisman Sabre '05 (19th SFG) * Australia
- Operation Iraqi Freedom '04 (2/5 SFG) * Iraq
- Balanced Nail '03(19th SFG) * Nepal
- Unified Endeavor '03 (19th SFG) * Puerto Rico
- First Responder to Twin Towers 09/11/01 * New York City
- Team Spirit '85 (25th Infantry Division) * S. Korea

## MILITARY

- December 2018 – Present * Special Operations Detachment – Africa * SURG * Austin, TX
- January 2018 – December 2018 * 176th ENG BDE (TX-ARNG) * BDE SURG * Camp Mabry, TX
- May 2015 – January 2018 * C/5/19 SFG(A) * TRNG DET CDR * Camp Bullis, TX
- May 2014 – May 2015 * 2nd BN 3rd SFG(A) * Battalion Surgeon, FT Bragg, North Carolina
- October 2013 – May 2014 * SOTF-NE SURGEON * Afghanistan
- March 2013 – October 2013 * 2nd BN 3rd SFG(A) * Battalion Surgeon, FT Bragg, North Carolina
- 2012 – 2013 * 1st BN 19th SFG(A) * National Guard, Camp Williams, Utah
- 2012 * Special Forces Qualification Course * Fort Bragg, NC
- 2009 – 2012 * 1st BN 19th SFG(A) * National Guard, Camp Williams, Utah
- 2008 * Embedded Training Team (ETT) Executive Officer * Afghanistan
- 2003 - 2004 * Task Force 161 Surgeon * Iraq
- 2002 - 2003 * Deputy Group Surgeon, 19th SFG(A) * Draper, Utah
- 1995 – 2003 * General Medical Officer * Reserves
- 1983 – 1990 * U.S. Army Infantry * Enlisted Soldier * Honorable Discharge

## EXPERIENCE / COURSES

- Combat Tactical Medical Care Course
  * Fort Sam Houston, San Antonio, TX
- SWAT Operational Team Physician (Commissioned CIV LE)
- Tactical Medicine Instructor
  * DEA Counter-Narcotics and Interdiction Course
- Certified Peace Officer * CLEET Certified
- Hyperbaric Medicine * University of Texas Medical Branch
- FBI Crisis Negotiator Course
- Combat Tracker Course (FLETTC)
- Special Forces Qualification Course (18A) * Ft Bragg, NC
- Survival Evasion Resistance and Escape (SERE) Course
- Concealed Weapons Training (w/ yearly Quals)
- Driving Training OTC (Urban and Off Road)
- Source Operations / Real World Operations
- Surveillance OTC / Real World Operations
- HTM Course Instructor / Real World Operations
- Flight Surgeon Course

## AWARDS / BADGES

Purple Heart * Meritorious Service Medal * Bronze Star *
Army Commendation Medal (6) * Army Achievement Medal
(2) * GWOT Expeditionary Medal * Good Conduct Medal *
Iraq Service Medal * Afghan Service Medal * NATO Ribbon *
Overseas Service Ribbon * Combat Medical Badge *

## DUTY STATIONS

- December 2018 – Present * Special Operations Detachment – Africa * SURG * Austin, TX
- January 2018 – December 2018 * 176th ENG BDE (TX-ARNG) * BDE SURG * Camp Mabry, TX
- May 2015 – January 2018 * C/5/19 SFG(A) * TRNG DET CDR * Camp Bullis, TX
- May 2014 – May 2015 * 2nd BN 3rd SFG(A) * Battalion Surgeon, FT Bragg, North Carolina
- October 2013 – May 2014 * SOTF-NE SURGEON * Camp Montrond, Afghanistan
- March 2013 – October 2013 * 2nd BN 3rd SFG(A) * Battalion Surgeon, FT Bragg, North Carolina
- 2012 – 2013 * 1st BN 19th SFG(A) * National Guard, Camp Williams, Utah
- 2012 * Special Forces Qualification Course * Fort Bragg, NC
- 2009 – 2012 * 1st BN 19th SFG(A) * National Guard, Camp Williams, Utah
- 2008 * Task Force Phoenix Surgeon / Embedded Training Team (ETT) Executive Officer * Afghanistan
- 2003 - 2004 * Task Force 161 Surgeon * Iraq
- 2002 - 2003 * Deputy Group Surgeon, 19th SFG(A) * Draper, Utah
- 1995 – 2003 * General Medical Officer * Reserves
- 1983 – 1990 * U.S. Army Infantry * Honorable Discharge



## UNITS / AGENCIES TRAINED
### (EMS LLC and MIL OPS)

- USASOC / USSF
- US ARMY INFANTRY
- USMC RAIDER FORCE
- FBI HRT
- BRITISH 22 SAS
- OHP TAC TEAM
- DEA FAST TEAMS
- DALLAS SWAT
- OGA TIER ONE
- AUSSIE 4TH RAR (RGR)
- CAPITOL POLICE (D.C.) and USSS
- OKLAHOMA and TEXAS National Guard
- USMC GTMO
- USCG GTMO

- OTHER PARTNER NATIONS (FID)
  - ANA CDO'S
  - NEPALESE RANGERS
  - THAI SF
  - IRAQI CDO'S
  - BURKINA FASO CT FORCES
  - POLISH GROM (SF)
  - ROMANIAN SF
  - GREEK CT FORCES
  - MALI CT FORCES
  - NIGER RANGER FORCES
  - JORDANIAN CT and SF
  - FRENCH COMMANDOS

Tuesday, October 6, 2021
**CURRICULUM VITAE**


**PETER A. McCULLOUGH, MD, MPH, FACC, FCCP, FAHA, FNKF, FNLA, FCRSA**

Business

HeartPlace
3409 Worth Street, #500
Dallas TX  75246
Desk:  214-841-2000
Cell:  248-444-6905
e-mail: PeterAMcCullough@gmail.com

Home                          5231 Richard Avenue
                              Dallas, TX  75206

Birth date                    December 29, 1962
Birthplace                    Buffalo, NY, USA


## EDUCATION

1) Certificate of Graduate Liberal Arts Studies:  Southern Methodist University, December 17, 2016, principal faculty Dr. Anthony Picchioni, PhD, Adjunct Professor in Human Development, P.O. Box 750181, Dallas, TX 75275, 214-768-3417, www.smu.edu
   - Graduated with Honor

2) Master of Public Health:  University of Michigan School of Public Health, August 19, 1994, Dean Noreen M. Clark, PhD, 109 Observatory Street, Ann Arbor, MI  48109-2029, phone 734-764-5454, www.sph.umich.edu
   - Major:  General Epidemiology

3) Doctor of Medicine:  University of Texas Southwestern Medical School, June 4, 1988, Dean Bryan M. Williams, MD, 5323 Harry Hines Boulevard, Dallas, TX  75235-9070, 214-648-3111, http://www.utsouthwestern.edu/education/medical-school/
   - Clinical year rank of 1 in 199, overall rank in class of 12 in 199
   - Alpha Omega Alpha Texas Gamma Chapter, installed March 17, 1988

4) Bachelor of Science:  Baylor University, May 18, 1984, Chancellor Abner McCall, PhD, Office of the Registrar, Waco, TX  76798-7056, 254-710-1181, http://www.baylor.edu/
   - Double-major:  Biology and Psychology
   - Graduated with Honor, degree rank of 29 in 131, university rank of 127 in 1,152

Peter A. McCullough, M.D., M.P.H.

- Alpha Lambda Delta Freshman Honorary, installed March 19, 1981

**POSTGRADUATE TRAINING**

1) Cardiovascular Diseases Fellowship:  William Beaumont Hospital (WBH) (presently Oakland University William Beaumont School of Medicine), Division of Cardiology, 3601 W. Thirteen Mile Rd, Royal Oak, MI  48073, 248-551-4198, 7-1-94 to 6-30-97, Chief Cardiovascular Fellow for 1996-97, William W. O'Neill, MD, Program Director and Division Chief

2) Internal Medicine Residency:  University of Washington School of Medicine, Department of Internal Medicine, 1959 NE Pacific, Seattle, WA  98195, (206) 543-3239, 3-year traditional track, 7-1-88 to 6-30-91, James F. Wallace, MD, Program Director, Paul G. Ramsey, MD, Chairman of Medicine

**PROFESSIONAL EXPERIENCE**

HeartPlace , 3409 Worth Street, Suite 500, Dallas TX  75246, March 1, 2021.

Positions Held:    1)  Attending Physician

Baylor Scott and White Health, Baylor Health Care System, Baylor University Medical Center (BUMC), Baylor Heart and Vascular Institute, Baylor Jack and Jane Hamilton Heart and Vascular Hospital, Dallas TX, Texas A & M University College of Medicine, Department of Medicine, Division of Cardiology, Baylor Heart and Vascular Institute, 621 N. Hall St., #H030, Dallas, TX 75226, February 3, 2014 to February 25, 2021.   Cardiovascular Governance Council, Kevin Wheelan, MD, Cardiology Division Chief and Chief Medical Officer, Heart Institute Office (214) 820-7500

Positions Previously Held:
   1) Professor in the Principal Faculty, Non-Tenure Track in the Department of Internal Medicine, Texas A & M University Health Sciences Center (2016-2021)
   2)  Chief of Cardiovascular Research (2014-2021)
   3)  Program Director, BUMC Cardiovascular Diseases Fellowship Program (2014-2021)
   4)  Vice Chief, BUMC Internal Medicine (2016-2021)

St. John Providence Health System, Providence Park Heart Institute, Department of Medicine, Cardiology Section, 47601 Grand River Avenue, Suite B-125, Novi, MI  48374, September 1, 2010 to July 19, 2013.  Department of Medicine Chair, Anibal Drelichman, MD: 248-849-3152, Cardiology Section Chief:  Shukri David, MD, 248-465-5955

Positions Previously Held:

Peter A. McCullough, M.D., M.P.H.

1) Chief Academic and Scientific Officer (Academic Dean Equivalent), St. John Providence Health System, (2010 to 2013)

2) Medical Director, Clinical Lipidology, Department of Medicine, Cardiology Section (2010 to 2013)

William Beaumont Hospital, Department of Internal Medicine, Divisions of Nutrition and Preventive Medicine, Department of Cardiology, 3601 West Thirteen Mile Road, Royal Oak, MI 48073, October 1, 2002 to 2010. Department of Medicine Chair: Michael A. Maddens, M.D., 248-551-0622, Department of Cardiology Chair: David E. Haines, M.D., 248-858-0404

Oakland University William Beaumont School of Medicine, 472 O'Dowd Hall 2200 N. Squirrel, Rochester, MI 48309, Robert Folberg, MD, Medical School Dean, Kenneth Hightower, PhD, Dean of Allied Health Sciences, 248-370-3562. Clinical Professor of Health Sciences and Medicine (2007 to 2010)

Positions Previously Held:

1) Consultant Cardiologist and Chief, Division of Nutrition and Preventive Medicine (2002 to 2010), Department of Internal Medicine

2) Medical Director, Preventive Cardiology (2002 to 2010)

3) Medical Director, Lipid Apheresis Program (2007 to 2010)

4) Medical Director, Weight Control Center (2002-2005)

University of Missouri-Kansas City (UMKC) School of Medicine, Truman Medical Center, Department of Medicine, Cardiology Section, 2301 Holmes St., Kansas City, MO 64108. August 18, 2000-September 30, 2002. Department of Medicine Chair: George R. Reisz, M.D, 816-556-3450

Positions Previously Held:

1) Associate Professor of Medicine (Tenure Track) and Cardiology Section Chief (2000-2002)

Henry Ford Health System (HFHS), Henry Ford Heart and Vascular Institute, 2799 W. Grand Blvd., K-14, Detroit, MI 48202, July 1, 1997 to August 16, 2000. Cardiovascular Division Head: W. Douglas Weaver, M.D, 800-653-6568

Positions Previously Held:

1) Assistant Professor of Medicine (Tenure Track), Case Western Reserve University School of Medicine, and HFHVI Senior Staff Cardiologist Medical Director, Preventive Cardiology, 1999-2000

2) Program Director, Cardiovascular Diseases Fellowship Training Program, 1999-2000

3) Director of Cardiovascular Informatics Section, 1997-2000

4) Associate Director of the Center for Clinical Effectiveness, 1997-99

3

Peter A. McCullough, M.D., M.P.H.

        5) Associate Director of the Cardiovascular Diseases Fellowship Program, 1998-99

Emergency Physicians Medical Group, PC, 2000 Green Road, Suite 300, Ann Arbor, MI  48105, 800-466-3764.  Emergency medicine attending at Mission Health McPherson Hospital, Howell, 1991-1997; Oakwood Beyer Hospital Center, Ypsilanti 1991-1997, and Mercy Hospital, Grayling 1991-1992

Positions Previously Held:
        1) Associate Member
        2) Washtenaw County Human Services Deputy Medical Examiner, 1995-1996

Mercy Internal Medicine Associates, 308 Michigan Avenue, Grayling, MI   49738, Mercy Hospital-Grayling, 1100 Michigan Avenue, Grayling, MI   49738, 517-348-5461.   Internal medicine attending at Mercy Hospital, Grayling, MI, 1991-1992

Positions Previously Held:
        1) Coronary Care Unit Director
        2) Physician Director of Cardiopulmonary Services

## SPECIAL TRAINING

1) The Healthcare Forum Cardiovascular Health Fellowship, 1998-99
2) American Heart Association (AHA), 23rd 10-Day U.S. Seminar on the Epidemiology and Prevention of Cardiovascular Disease, July-August, 1997
3) University of Michigan Summer Session in Epidemiology, 1997-99
4) Stanford University Course on Medical Informatics, Palo Alto, CA, June, 1997
5) Current Practice of Vascular Ultrasound 3-Day Course, Chicago, IL, April, 1997
6) Advanced Pacemaker Concepts Course, CPI, Inc., Lansing, MI, 1995
7) Pacesetter Comprehensive Pacemaker 4-Day Course, Santa Fe, NM, 1997
8) Medtronic Bakken Education Tutorial and Medtronic Applied Physiological Research Laboratory Lead Implantation Training and Biventricular Implantation Training (2 sessions), Minneapolis, MN, 2001-2002
9) 2004 ASCeXAM Review Course, American Society of Echocardiography, San Francisco, CA, April 22-24, 2004
10) National Lipid Association Masters Course in Clinical Lipidology, Hilton Head, SC, August 21-23, 2008

## CERTIFICATION AND LICENSURE

1) Licensed in the State of Washington 1988-1997 (#MD00027562), Michigan expires January 31, 2022 (#4301058147), and New York 1992 to present (#189283 inactive status), Missouri 2000-2002 (#2000165365 inactive status) and Texas expires May 31, 2022 (#P9222)

4

Peter A. McCullough, M.D., M.P.H.

2) FLEX passed April 4, 1990, State of Washington, Department of Health, Board of Medical Examiners

3) Diplomate, American Board of Internal Medicine, Candidate #136084, September, 25, 1991, recertified May 1, 2001, recertified June 10, 2011, recertified April 6, 2021, valid through 2031, 510 Walnut Street, Suite 1700, Philadelphia, PA 19106-3699

4) Diplomate, American Board of Internal Medicine, Cardiovascular Diseases Subspecialty, Candidate #136084, November, 1997, valid through 2007, recertified October 1, 2007, valid through 2017, recertified September 28, 2017, valid through 2027, 510 Walnut Street, Suite 1700, Philadelphia, PA 19106-3699

5) Diplomate, American Board of Clinical Lipidology, September 27, 2008, 6816 Southpoint Parkway, Suite 1000, Jacksonville, FL 32216. Fellow, National Lipid Association

6) National Board of Echocardiography (NBE), Examination of Special Competence in Adult Echocardiography, 2004-2014 expired

7) Diplomate, American Board of Forensic Examiners, July 16, 1996, no expiration date

## RECOGNITION

Teaching:
1. Henry Ford Hospital, 1999 Chief Medical Resident's Best Teacher Award

Research:
1. Chest Foundation Young Investigator Award 2001, Philadelphia, PA, November 7, 2001, President's International Awards Ceremony

2. National Kidney Foundation (NKF) of Michigan, Innovations in Health Care Award Finalist 2008, East Lansing, MI, April 17, 2008

3. American College of Cardiology (ACC) Simon Dack Award for Scholarly Excellence by the Journal of the American College of Cardiology, March 5, 2009

4. 11th International Vicenza Award in Critical Care Nephrology, International Renal Research Institute, Vicenza, Italy, June 11, 2013

Postgraduate:
1. Founding Fellow, Cardiorenal Society of America, March 2016
2. Fellow, National Lipid Association, January, 2013
3. Fellow, National Kidney Foundation, January, 2012
4. Fellow, American College of Chest Physicians, February, 2001
5. Fellow, American College of Physicians, January, 2001 to September, 2021
6. Fellow, American College of Cardiology, February, 1999

## AFFILIATIONS

1) Alpha Omega Alpha, National Honor Medical Society, 1988 to present

Peter A. McCullough, M.D., M.P.H.

2) American College of Emergency Physicians, Member, 1992-1994
3) American College of Forensic Examiners, Member 1996 to present
4) AHA, Council on Epidemiology and Prevention, 1995 to present
5) AHA, Grassroots Network, 1998-2000.
6) Central Society for Clinical Research, Member, 1999-2000
7) Council on Geriatric Cardiology, Member 1996-1997
8) Michigan Chapter of the ACC, Chair, Annual Cardiology Board Review, 1999-2000
9) Michigan State Medical Society, Member, 1997-2000, 2004 to 2009
10) The American Medical Informatics Association, 1997-2000
11) The Health Forum, Charter Cardiovascular Health Charter Alumni Representative, 1998 to 2002
12) Cardiorenal Society of America, Founding Executive Board Member, 2013 to present, Vice President 2014-2016, President 2016 to present
13) Dallas County Medical Society, 2014 to present
14) Texas Medical Association, 2014 to present
15) Baylor Alumni Association, 2015 to present
16) New York Academy of Sciences, 2016 to present
17) Truth for Health Foundation, Founding Executive Board Member, Chief Medical Advisor, 2021 to present

**EDITORIAL RESPONSIBILITIES**

1) *Advances in Chronic Kidney Disease,* Editorial Board Member, 2003-present. [referenced through Elsevier Bibliographic Database, EMBASE/Excerpta Medica, MEDLINE]
2) *American Journal of Cardiology,* Associate Editor, 2014 to present
3) *American Journal of Kidney Disease,* [referenced through Elsevier Bibliographic Database, EMBASE/Excerpta Medica, MEDLINE] Associate Editor, 2006 to 2019, Guest Editor, 2011, 2012
4) *Arquivos Brasileiros de Cardiologia*, International Editorial Board, 2006 to present
5) *Biocritique*, Editorial Board, 2001 to 2013, www.biocritique.com
6) *Blood Purification, Editorial Board 2018 to present*
7) *Cardiovascular Clinician,* Editorial Board, 2011 to 2013, internet site, CARDIOVASCULARClinician.com™
8) *Cardiovascular Diagnosis and Therapy (CDT),* Editorial Board (Print ISSN: 2223-3652; Online ISSN: 2223-3660, 2012 to present
9) *Cardiovascular Innovations and Applications (CVIA),* Editorial Board 2015 to present
10) *Cardiorenal Medicine,* Associate Editor, 2016-2017, Editor-in-Chief 2018 to 2021
11) *Circulation,* Editorial Board, 2016 to present
12) *Circulation Heart Failure,* Editorial Board, 2008 to present, Associate Editor, 2008 to 2016, Guest Editor 2010, 2011, 2012
13) *Clinical Exercise Physiology,* Clinical Consultant to the Editorial Board, 1998-2002.
14) *Cochrane Renal Group Module*, 2008, Editorial Contributor, Centre for Kidney Research, The Children's Hospital at Westmead, Westmead NSW, Australia

Peter A. McCullough, M.D., M.P.H.

15)     *Expert Review of Cardiovascular Therapy*, Editorial Advisory Panel, 2002 to present, www.future-drugs.com

16)     *Journal of the American College of Cardiology,* Editorial Consultant, 2003-present. "Elite Reviewer" Recognition, 2004, 2005, 2006, 2007, 2008, 2011, 2014, 2016 (DeMaria AN.  The elite reviewer.  J Am Coll Cardiol 2003;41(1):157-8.)

17) *Journal of Geriatric Cardiology,* Editorial Board Member, 2003-present.  The Institute of Geriatric Cardiology, Chinese PLA Hospital, Beijing. [Joint China-U.S.A. publication]

18) *Journal of Biorepository Science for Applied Medicine,* Honorary Editorial Board, 2012 to 2018

19) *Journal of Clinical & Experimental Cardiology*, OMICS Publishing Group, Open Access, CrossRef, PubMed, DOAJ, Index Copernicus, Scientific Commons, EBSCO, 2010 to 2017

20) *Journal of Diabetes & Metabolism,* OMICS Publishing Group, Open Access, 2010 to 2017

21) *Journal of Interventional Cardiology,* "News and Views", Section Editor, 2000-2003. Editorial Board Member, 2003 to present

22) *Journal of Nephrology and Therapeutics,* Editorial Board, OMICS Publishing Group, Editorial Board, 2010 to 2017

23) *Reviews in Cardiovascular Medicine, MedReviews, LLC,* www.medreviews.com "Cardiorenal Function," Section Editor, 2001-2002, Associate Editor, 2003-2009, Co-Editor, 2009 to present

24) *The American College of Cardiology Foundation ACCEL Audio Journal,* Editorial Board 2008 to present

25) *The Open Atherosclerosis & Thrombosis Journal,* [referenced through Bentham Open, PubMed, Google and Google Scholar] Editorial Board, 2008 to 2012

26) *The Open Heart Failure Journal,* [referenced through Bentham Open, PubMed, Google and Google Scholar] Editorial Board, 2008 to 2010

27) *Therapy,* [referenced through Elsevier Bibliographic Database, EMBASE/Excerpta Medica, MEDLINE], Editorial Board, 2008 to 2010

**Manuscript Reviewer**

1) *Advances in Chronic Kidney Disease,* 2004 to present (18)
2) *Advances in Medical Sciences*, 2012 to present (2)
3) *Advances in Therapy,* 2008 to present (1).
4) *American Family Physician,* 2004 to present (2)
5) *American Journal of Cardiovascular Drugs*, 2002 to present. (2)
6) *American Heart Journal (AHJ),* 1998 to present (22)
7) *American Journal of Cardiology (AJC),* 1999 to present (60)
8) *American Journal of Human Biology,* 2014 to present (1)
9) *American Journal of Hypertension,* 2011 to present (1)
10) *American Journal of Kidney Diseases (AJKD),* 2002 to present (30)
11) *American Journal of Medicine (AJM)*, 1997 to present (7)
12) *American Journal of the Medical Sciences (AJMS),* 2006 to present (3)
13) *American Journal of Nephrology,* 2004 to present (24)
14) *American Journal of Physiology:  Renal Physiology,* 2006 to present (2)

7

Peter A. McCullough, M.D., M.P.H.

15) *American Journal of Transplantation,* 2004 to present (1)

16) *Annals of Epidemiology,* 2004 to present (1)

17) *Annals of Internal Medicine,* 2008 to present (3)

18) *Annals of Noninvasive Electrocardiology,* 2009 to present (1)

19) *Antimicrobial Agents and Chemotherapy,* 2020 to present (1)

20) *Archives of Internal Medicine,* 2004 to present (2)

21) *Archives of Pathology and Laboratory Medicine,* 2007 to present (1)

22) *Arteriosclerosis, Thrombosis, and Vascular Biology,* 2010 to present (2)

23) *Autonomic Neuroscience: Basic and Clinical,* 2007 to present (1)

24) *BUMC Proceedings,* 2012 to present (3)

25) *Biochemia Medica,* 2012 to present (1)

26) *Biomed Central (BMC) Medical Imaging,* 2010 to present (1)

27) *Blood Purification,* 2010 to present (2)

28) *BMC Medicine,* 2007 to present (1)

29) *BMC Nephrology,* 2011 to present (1)

30) *BMJ Clinical Evidence,* 2008 to present (1)

31) *British Medical Journal (BMJ)*, 2009 to present (1)

32) *Canadian Medical Association Journal (CMAJ),* 2006 to present (3)

33) *Cardiac Failure Review,* 2015 to present (1)

34) *Cardiology,* 2007 to present (1)

35) *Cardiorenal Medicine;* 2013 to present (10)

36) *Cardiovascular Innovations and Applications,* 2016 to present (1)

37) *Cardiovascular Therapeutics,* 2010 to present (1)

38) *Catheterization and Cardiovascular Interventions*, 2000 to present (6)

39) *Chest,* 2000 to present (6)

40) *Circulation*, 1998 to present (100)

41) *Circulation Cardiovascular Interventions,* 2012 to present (1)

42) *Circulation Cardiovascular Quality and Outcomes,* 2010 to present (1)

43) *Circulation Heart Failure,* 2009 to present (4)

44) *Circulation Imaging,* 2012 to present (1)

45) *Cleveland Clinic Journal of Medicine,* 2008 to present (1)

46) *Clinica Chimica Acta,* 2013 (1)

47) *Clinical Cardiology,* 2001 (3)

48) *Clinical Chemistry and Laboratory Medicine,* 2010 to present (2)

49) *Clinical Exercise Physiology,* 2000-2002 (4)

50) *Clinical Journal of the American Society of Nephrology* 2008 to present (3)

51) *Clinical Kidney Journal,* 2012 to present (1)

52) *Clinical Medicine and Research,* 2008 to present (1)

53) *Clinical Nephrology,* 2008 to present (2)

54) *Clinical Physiology and Functional Imaging,* 2010 to present (1)

55) *Clinical Researcher*, 2002 to present (1)

56) *Clinics,* 2010 to present (1)

57) *Cochrane Collaboration,* 2009 to present (2)

58) *Congestive Heart Failure,* 2005 to present (4)

Peter A. McCullough, M.D., M.P.H.

59) *Coronary Artery Disease,* 2005 to present (1)

60) *Critical Care Medicine,* 2008 to present (2)

61) *Current Medical Research and Opinion,* 2005 to present (1)

62) *Diabetes Care,* 2011 to present (2)

63) *Diabetes and Vascular Disease Research*, 2011 to present (1)

64) *Diabetes, Obesity, and Metabolism,* 2019 to present (1)

65) *Diabetic Medicine,* 2008 to present (1)

66) *Drug Benefit Trends,* 1999 (1)

67) *Drugs,* 2000 (2)

68) *European Heart Journal*, 1995 (12)

69) *European Journal of Cardiovascular Prevention and Rehabilitation*, 2006 (1)

70) *European Journal of Heart Failure,* 2012 (4)

71) *Expert Opinion on Pharmacotherapy,* 2003 to present (3)

72) *Expert Opinion Therapeutic Patents,* 2004 to present (1)

73) *Expert Review of Cardiovascular Therapy,* 2008 to present (2)

74) *Global Heart*, 2012 (1)

75) *Heart,* 2004 (2)

76) *Heart and Vessels,* 2007 (2)

77) *Hemodialysis International* 2013 (2)

78) *Internal Medicine Journal (Australasia),* 2009 to present (1)

79) International Journal of Infectious Diseases 2020 to present (2)

80) *International Journal of Nephrology,* 2010 to present (2)

81) *Journal of Biomarkers,* 2013 (1)

82) *Journal of Geriatric Cardiology,* 2017 (1)

83) *International Journal of Infectious Diseases,* 2021 to present (3)

84) *Journal of Internal Medicine,* 2009 to present (1)

85) *Journal of Interventional Cardiology (JIC),* 1996 to present (9)

86) *Journal of the American College of Cardiology (JACC)*, 1998 to present (228)

87) *Journal of the American College of Cardiology:  Heart Failure (JACC Heart Fail)*, 2014 to present (12)

88) *Journal of the American College of Cardiology:  Imaging (JACC Imag)*, 2014 to present (6)

89) *Journal of the American College of Cardiology:  Interventions (JACC Interv)*, 2010 to present (10)

90) *Journal of the American Medical Association (JAMA),* 2002 to present (60)

91) *Journal of the American Medical Association Cardiology (JAMA Cardiology),* 2016 to present (20)

92) *Journal of the American Society of Echocardiography (JASE)*, 2009 to present (1)

93) *Journal of the American Society of Nephrology (JASN)* 2005 to present (14)

94) *Journal of Cardiac Failure,* 2003 to present (10)

95) *Journal of Clinical Outcomes Management*, 2011 to present (1)

96) *Journal of Critical Care,* 2011, to present (1)

97) *Journal of General Internal Medicine,* 2008 to present (1)

98) *Journal of Human Hypertension,* 2010 to present (1)

Peter A. McCullough, M.D., M.P.H.

99) *Journal of Inherited Metabolic Disease,* 2014 to present (2)
100)     *Journal of Lipid Research,* 2010 to present (1)
101)     *Journal of Managed Care,* 2004 to present (1)
102)     *Journal of Physiology and Pathophysiology*, 2009 to present (1)
103)     *Kidney and High Blood Pressure Research,* 2008 to present (1)
104)     *Kidney International,* 2004 to present (8)
105)     *Medical Science Monitor,* 2008 to present (1)
106)     *Medicine & Science in Sports and Exercise,* 2005 to present (3)
107)     *Nature Clinical Practice Cardiovascular Medicine*, 2004 to present (4)
108)     *Nature Clinical Practice Nephrology*, 2008 to present (1)
109)     *Nature Reviews Nephrology,* 2009 to present (3)
110)     *Nephron,* 2005 to present (1)
111)     *Nephrology,* 2009 to present (1)
112)     *Nephrology, Dialysis, and Transplantation,* 2005 to present (7)
113)     *New England Journal of Medicine,* 2006 to present (8)
114)     *Pharmacological Research (Italy),* 1999 (1)
115)     *Pharmaceutical Sciences,* 2011 (1)
116)     *PLoS Medicine,* 2005 (1)
117)     *PLOS ONE,* 2013 (1)
118)     *Prehospital Emergency Care*, 2015 (1)
119)     *Preventive Medicine,* 2008 (1)
120)     *Rejuvenation Research,* 2007 (1)
121)     *Renal Failure*, 2011 (2)
122)     *The Lancet,* 1999 to present (11)
123)     *The Lancet Diabetes,* 2013 to present (5)
124)     *The Lancet Global Health,* 2015 to present (2)

**Major Meeting Abstract Grader**

1) ACC Scientific Sessions 2001 to present (10)
2) ACC I2 Summit, 2006 to present (2)
3) American Diabetes Association, 2008 to present (13)
4) AHA Scientific Sessions, 1997 to present (8)
5) American Medical Informatics Association, Annual Symposium, 1998-2001 (3)
6) International Academy of Cardiology World Congress on Heart Disease, Academy of Cardiology Annual Scientific Sessions—Mechanisms and Management, 2002-present (3)
7) Transcatheter Therapeutics (TCT), 2004 (1)

**Grant Reviewer**

1. National Medical Research Council, Singapore, 2003-2004
2. National Institutes of Health, National Institute of Diabetes and Digestive and Kidney Diseases, Special Emphasis Panel/Initial Review Group 2006/01 ZDK1 GRB-9, 2005

Peter A. McCullough, M.D., M.P.H.

3. National Institutes of Health, National Institute of Diabetes and Digestive and Kidney Diseases, Special Emphasis Review Group, 1 R01 DK070033-01A2, 2006
4. National Institutes of Health, National Heart Lung and Blood Institute, Study Section, ZHL1 CSR-H (M1), March 6-7, 2006, Heart Failure Network
5. Diabetes UK, The British Diabetic Association, Macleod House, 10 Parkway, London NW1 7AA. December 24, 2008
6. National Institutes of Health National Institute of Diabetes and Digestive and Kidney Diseases, Special Review Panel, Chronic Renal Insufficiency Cohort Study (CRIC) and A Prospective Cohort Study of Kidney Disease in Children (CKiD) Study, February 23-25, 2012, March 6, 2013
7. National Institutes of Health National Institute of Diabetes and Digestive and Kidney Diseases, Special Review Panel, ZDK1 GRB-7 (O3)S in response to PAR-DK-09-247: Ancillary Studies to Major Ongoing Clinical Research Studies to Advance Areas of Scientific Interest within the Mission of the NIDDK (R01), July 11, 2012
8. Alberta Innovates Health Solutions Collaborative Research & Innovation Opportunities (CRIO) Grant Review, September, 2012
9. Health Research Board of Ireland, Health Research Awards, 2013
10. National Institutes of Health National Institute of Diabetes and Digestive and Kidney Diseases 2017/01 ZRG1 DKUS-R (55) Study Section 2016

**Guidelines Reviewer**

1. Kidney Disease Improving Global Outcome (KDIGO) Guidelines Review
   a. Prevention, Diagnosis, Evaluation and Treatment of Hepatitis C in Chronic Kidney Disease, Published April, 2008
   b. Diagnosis, Evaluation, Prevention and Treatment of Chronic Kidney Disease related Mineral and Bone Disorders (CKD-MBD), Published August, 2009
   c. Acute Kidney Injury (AKI), published March, 2012

**CLINICAL TRIAL AND STUDY RESPONSIBILITIES**

**Overall Study Responsibilities:  Steering and Executive Committees**

1) Study Principal Investigator, Medicine vs Angiography for Thrombolytic Exclusion Patients (M.A.T.E.), 1994-1997, (multicenter, U.S., randomized controlled trial [RCT]).  Status: closed.

2) Study Principal Investigator, The Resource Utilization Among Congestive Heart Failure Study (R.E.A.C.H.), 1998-2000, (single-center, prospective cohort study). Status:  closed.

3) Study Principal Investigator, The Asthma, Beta-Agonists, and Congestive Heart Failure Study, (A.B.C.H.F.), 1998-1999, (single-center, case-control study). Status:  closed.

11

Peter A. McCullough, M.D., M.P.H.

4) Study Co-Principal Investigator, The Prevention of Radiocontrast Induced Nephropathy Clinical Evaluation (P.R.I.N.C.E.) Study, 1995-1998, (single-center, RCT). Status: closed.

5) Study Co-Principal Investigator, BNP Multinational Study, Principal Investigator, Alan Maisel, MD, Biosite Diagnostics, Inc., 2000-2006, (multicenter, international, prospective cohort study). Status: closed.

6) Study Co-Investigator, Prophylactic Oral Amiodarone Compared to Placebo for Prevention of Atrial Fibrillation Following Coronary Artery Bypass Graft Surgery (P.A.P.A.C.A.B.G.), 1996-1998, (single-center, RCT). Status: closed.

7) Study Co-Investigator, Rapid Early Bedside Markers of Myocardial Injury, 1998-1999, HFHS and Biosite Diagnostics, Inc. (prospective cohort study). Status: closed.

8) Member, Steering Committee, Clinical Study Protocol No. 2000-025:   A Phase IIIb, Multicenter, Randomized, Double-Blind, Placebo-Controlled Study to Determine the Safety, Efficacy, and Tolerability of Fenoldopam Mesylate in Subjects Undergoing Interventional Cardiology Procedures (CONTRAST), William W. O'Neill, MD and Gregg Stone, MD, Co-Principal Investigators, Abbott Laboratories, Inc., 2000-2003 (multicenter, US, RCT). Status: closed.

9) Chair, National Steering Committee, Kidney Early Evaluation Program (KEEP) NKF, Member 2000-2005, Co-Chair 2005-2010, Chair 2010-present (multicenter, U.S., prospective cohort study).   Annual budget ~ 1,325,198 (2009), ~ 1,233,832 (2010), ~ 1,614,953.00 (2011), ~ 989,500 (2012), ~ 1,217,000 (2013).   Status: inactive.

10) Member, Steering Committee, Protocol No. 704.351 Evaluation of Synergy between Natrecor and Furosemide on Renal and Neurohormone Responses in Chronic Heart Failure: A Phase IV Study, Scios Inc., 2003-2005 (multicenter, U.S., randomized cross-over trial). Status: closed.

11) Member, Steering Committee, Protocol No. CCIB002FUS12.  A Multicenter, Double-blind, Randomized, Parallel Group Study to Evaluate the Effects of Lotrel and Lotensin HCT on Microalbuminuria in Mild to Moderate Hypertensive Subjects with Type 2 Diabetes Mellitus, Novartis Pharmaceuticals, Inc., 2003-2006.  Status: closed.

12) Rotating Executive Committee Principal Investigator Member, NIH HF-ACTION Trial (Exercise Training Program to Improve Clinical Outcomes in Individuals With Congestive Heart Failure), HL63747 01A2, 2006-2009.  Principal Investigator, David Whellan, MD, status: closed.

Peter A. McCullough, M.D., M.P.H.

13) Overall Study Principal Investigator, Neutrophil Gelatinase-Associated Lipocalin: A Novel Blood Marker for Risk of Developing Contrast Induced Nephropathy (ENCINO), multicenter, prospective, blinded cohort study, 2006-2009, status:  closed.

14) Member, Steering Committee, VA NEPHRON-D: Diabetes iN Nephropathy Study, 2008 to 2013, trial stopped early for safety cardiovascular and acute kidney safety concerns in angiotensin converting enzyme inhibitor plus losartan arm, status:  closed.

15) Member, External Expert Panel, National Institutes of Health, National Institute of Digestive and Diabetes and Kidney Diseases, Chronic Renal Insufficiency Cohort Study, status open, 2010 to present.

16) Member, Optimal Medical Management Subcommittee, National Institutes of Health, National Heart Lung and Blood Institute, International Study of Comparative Health Effectiveness with Medical and Invasive Approaches (ISCHEMIA), status:  open, 2011 to present.

17) Member, Steering Committee, National Institutes of Health, National Heart Lung and Blood Institute, International Study of Comparative Health Effectiveness with Medical and Invasive Approaches (ISCHEMIA) in patients with Chronic Kidney Disease (ISCHEMIA-CKD), status: open, 2012 to present.

18) Member, Steering Committee, Thrasos Innovation, Inc, A Phase II Multi-Center, Parallel-Group, Randomized, Double Blind, Proof-of-Concept, Adaptive Study Investigating the Safety and Efficacy of THR-184 Administered via Intravenous Infusion in Patients at Increased Risk of Developing Cardiac Surgery Associated-Acute Kidney Injury (CSA-AKI), status:  closed, 2012 to 2015.

19) Overall Principal Investigator, AbbVie, Inc, Clinical Study Protocol M13-796, A Phase 2b, Randomized, Double-Blind, Placebo-Controlled, Safety and Efficacy Trial of Multiple Dosing Regimens of ABT-719 for the Prevention of Acute Kidney Injury in Subjects Undergoing High Risk Cardiac Surgery, status:  closed, 2013 to 2014.

20) Overall Principal Investigator, Bioporto, Inc, The NGAL Test™ As An Aid in the risk assessment for AKI stage II and III in an Intensive Care Population, status: open 2017 to present.

21) Member, Global Expert Panel, Novo Nordisk, Inc, A Research Study to See How Semaglutide Works Compared to Placebo in People With Type 2 Diabetes and Chronic Kidney Disease (FLOW), status:  open.

**Overall Study Responsibilities:  Endpoint Committees**

13

**Peter A. McCullough, M.D., M.P.H.**

1) Member, Critical Endpoints Committee, Treat Angina with Aggrastat and Determine Cost of Therapy with an Invasive or Conservative Strategy, TACTICS-TIMI 18 (Protocol 019-00), 1998-2000, (multicenter, international, RCT). Status: closed

2) Member, Study Endpoints Committee, A Phase II, Escalation Trial of Vasoflux™ in Patients Undergoing Thrombolysis with Streptokinase for Acute Myocardial Infarction, Protocol CLN-P-V18-07001, Parexel International Corporation,1998, (multicenter, international, RCT). Status: closed

3) Member, Safety Endpoint Evaluation Committee, A Phase III, Single-Blind Controlled Study to Evaluate the Clinical Effects of a Hemoglobin-based Oxygen Carrier (HBOC-210) Given as a Transfusion Alternative in Patients Undergoing Orthopedic Surgery. (Protocol HEM-0115), Biopure Corporation with Quintiles, Inc., Clinical Event and Adjudication Services, 2000-2001. (multicenter, international, RCT). Status: closed

4) Member, Critical Endpoints Committee, Cerivastatin Heart Outcomes in Renal Disease: Understanding Survival (C.H.O.R.U.S.), Barry Brenner, MD and William F. Keane, MD, Co-Principal Investigators, Bayer Inc., 2000-2003 (multicenter, international, RCT). Status: study terminated early due to drug withdrawal from market

5) Member, Clinical Events Classification Committee, Correction of Hemoglobin and Outcomes in Renal Insufficiency (CHOIR), Ajay Singh, MD, Donal Reddan, MBBS, Principal Investigators, Ortho Biotech Inc., 2001-2004 (multicenter, international, RCT). Status: closed

6) Member, Critical Endpoint Committee, A Randomised, Double-blind, Parallel Group, Phase 3, Efficacy and Safety Study of AZD6140 (Ticagrelor) Compared with Clopidogrel for Prevention of Vascular Events in Patients with Non-ST or ST Elevation Acute Coronary Syndromes (ACS) [PLATO – A Study of PLATelet inhibition and Patient Outcomes.], AstraZeneca, Inc., Duke Clinical Research Institute, 2008, status: closed

7) Chair, Clinical Endpoints Committee, Alere San Diego, Inc, Alere Prospective Blinded Study of a Novel Troponin Assay (PEARL), status: closed 2015

8) Chair, Adjudication Committee, Myeloperoxidase In the Diagnosis of Acute coronary Syndromes (MIDAS) study, Alere, Inc., status: closed 2012

9) Independent Endpoint Adjudicator, BioPorto Diagnostics, The NGAL test as an aid for the Diagnosis of AKI in an Intensive Care Population, Code of the Study: KLIN 12-005, status closed, 2015

10) Independent Endpoint Adjudicator, Ischemix, Inc., Safety and Efficacy of CMX-2043 for Protection of the Heart and Kidneys in Subjects Undergoing Coronary Angiography (CARIN), status: closed 2016

14

Peter A. McCullough, M.D., M.P.H.

11) Chair, Data Adjudication Committee, Estimating versus Measuring Plasma Volume and Kidney Function in Acute Decompensated Congestive Heart Failure, Eudra-CT Number 2018-002638-18, Sponsor: Charite-Unversitatsmedizin Berlin, FAST Biomedical, Inc, 2018-present

**Overall Study Responsibilities: Data Safety Monitoring Committees**

1) Member, External Advisory Committee/Data Safety Monitoring Board, National Institutes of Health, National Institute of Diabetes and Digestive and Kidney Diseases, Polycystic Kidney Disease (PKD) Clinical Trials Network HALT-PKD Trial, Robert Schrier, MD, Principal Investigator, Committee Chair:  William Henrich, MD, 2004-2008, Data Safety Monitoring Board, status: closed 2014

2) Chairman, Data Safety Monitoring Committee, Clinical Trials Program CS0011-A-U301, Daiichi Sankyo Pharma Development (DSPD) CS-011, Seven Core Trials of Rivoglitazone in Type 2 Diabetes: 1) A 26-week placebo-controlled trial of  1.0 and 1.5 mg rivoglitazone vs. 45 mg pioglitazone, as monotherapy in type 2 diabetics (CS0011-A-U301); 2) A 26-week placebo-controlled trial of 0.5, 1.0 and 1.5 mg rivoglitazone vs. 15, 30 and 45 mg pioglitazone, as monotherapy in type 2 diabetics (CS0011-A-U302); 3) A 26-week placebo-controlled trial of 1.0 and 1.5 mg rivoglitazone vs. 45 mg pioglitazone, in type 2 diabetics on metformin therapy, followed by a 26-week pioglitazone-controlled continuation period (CS0011-A-U303); 4) A 26-week placebo-controlled trial of 0.5 and 1.0 rivoglitazone vs. 30 mg pioglitazone, in type 2 diabetics on sulfonylureas therapy,  followed by a 26-week pioglitazone-controlled continuation period (CS0011-A-U304); 5) A 26-week placebo-controlled trial of 0.5 and 1.0 mg rivoglitazone vs. 15 mg pioglitazone in type 2 diabetics on insulin therapy (CS0011-A-U305); 6) A long-term (12-24 months) randomized, general efficacy and safety study of rivoglitazone vs. pioglitazone, as monotherapy or add-on therapy, in type 2 diabetics (CS0011-A-U306); 7) A 26-week placebo-controlled trial of rivoglitazone and metformin, in type 2 diabetics (CS0011-A-U307), USFDA Special Protocol Assessment Agreement granted, status: closed, 2009 trials program terminated

3) Member, Data Safety Monitoring Committee, A Multicenter, Randomized, Double-Blind, Placebo-Controlled Study to Evaluate Cardiovascular Outcomes Following Treatment with Alogliptin in Addition to Standard of Care in Subjects with Type 2 Diabetes and Acute Coronary Syndrome SYR322_402, EXAMINE Trial Takeda Global Research and Development Center, Inc. (US) Takeda Global Research and Development Centre, Ltd. (Europe), status: 2009  trial stopped early for non-inferiority but futility on superiority outcome

4) Chair, Data Safety Monitoring Committee, Protocol D9120C00019, A randomised, double-blind, placebo controlled, multi-centre phase IIb dose finding study to assess the effect on GERD symptoms, safety and tolerability during four weeks treatment with AZD3355 in doses 60 mg, 120 mg, 180 mg and 240 mg bid as add-on treatment to a PPI in patients with GERD that are partial responders to PPI treatment, AstraZeneca, status:  closed 2009, trials program terminated for safety

Peter A. McCullough, M.D., M.P.H.

5) Member, Data Safety Monitoring Committee, Protocols: AMAG-FER-IDA-301, A Phase III, Randomized, Double-Blind, Placebo-Controlled Trial of Ferumoxytol for the Treatment of Iron Deficiency Anemia, Protocol: AMAG-FER-IDA-302, A Phase III, Randomized, Open-Label, Active Controlled Trial Comparing Ferumoxytol with Iron Sucrose for the Treatment of Iron Deficiency Anemia, Protocol: AMAG-FER-IDA-303, A Phase III, Open-Label Extension, Trial of the Safety and Efficacy of Ferumoxytol for the Episodic Treatment of Iron Deficiency Anemia, AMAG Pharmaceuticals, Inc., status: closed 2010, trial completed in 2013 without safety concerns

6) Chair, Independent Data Monitoring Committee, Protocol 402-C-0903 Bardoxolone Methyl Evaluation in Patients with Chronic Kidney Disease and Type 2 Diabetes: the Occurrence of Renal Events (BEACON), Reata Pharmaceuticals, Inc., status: trial stopped in 2012 early for cardiovascular and mortality safety concerns

7) Member, Independent Safety Council, Affymax Inc and Takeda Pharmaceutical Co., Omontys (peginesatide), status: closed, post-marketing surveillance led to voluntary drug withdrawal from market in 2013 for serious and fatal allergic reactions

8) Chair, Independent Data Monitoring Committee, AbbVie, Inc, Clinical Study Protocol M11-352 A Randomized, Multicountry, Multicenter, Double Blind, Parallel, Placebo-Controlled Study of the Effects of Atrasentan on Renal Outcomes in Subjects with Type 2 Diabetes and Nephropathy SONAR:  Study Of Diabetic Nephropathy with Atrasentan, status closed 2018

9) Chair, Independent Data Monitoring Committee, AbbVie, Inc., Clinical Study Protocol M13-958 A Phase 2b, Randomized, Double-Blind, Placebo-Controlled, Safety and Efficacy Trial of Multiple Dosing Regimens of ABT-719 for the Prevention of Acute Kidney Injury in Subjects Undergoing High Risk Major Surgery, status:  closed 2015

10) Member, Data Monitoring Committee, Akebia Therapeutics, Inc., AKB-6548-CI-0007, Phase 2b Randomized, Double-Blind, Placebo-Controlled Study to Assess the Pharmacodynamic Response, Safety, and Tolerability to 20 Weeks of Oral Dosing of AKB-6548 in Subjects with Anemia Secondary to Chronic Kidney Disease (CKD), GFR Categories G3a-G5 (Stages 3, 4, and 5) (Pre-Dialysis), status:  closed 2015

11) Member, Study Monitoring Team, Akebia Therapeutics, Inc., AKB-6548-CI-0011, Phase 2a Open-Label Study to Assess the Efficacy, Safety, and Tolerability of AKB-6548 in Subjects with Anemia Secondary to End Stage Renal Disease (ESRD), Undergoing Chronic Hemodialysis, status:  closed 2016

12) Member, Data Monitoring Committee, Merck, Inc., Pfizer, Inc, Clinical Trials Program, Ertugliflozin (MK-8835/PF-04971729) Phase 2 and Phase 3 Development Program, status closed, 2012 to 2020

Peter A. McCullough, M.D., M.P.H.

13) Member, Steering Committee, Medtronic, Inc., Monitoring in Dialysis, status:  closed 2016

14) Member, Data Safety and Monitoring Board, St. Jude Medical, EnligHTN IV Multi-center, randomized, single-blind, sham controlled clinical investigation of renal denervation for uncontrolled hypertension, status:  2013 trial terminated before recruitment started

15) Chair, Data Safety Monitoring Board, Neumedicines, Inc., A Phase 2, Single-Dose, Randomized, Double-Blind, Placebo-Controlled Study to Evaluate the Safety, Tolerability, Pharmacokinetics, and Pharmacodynamics of HemaMax™ (rHuIL-12) in Healthy Subjects, status:  closed 2016

16) Chair, Data Safety Monitoring Board, Reata Pharmaceuticals, Inc., A Phase 2 Study of the Safety, Efficacy, and Pharmacodynamics of RTA 408 in the Treatment of Friedreich's Ataxia, 2014 to 2019, status:  closed

17) Chair, Data Safety Monitoring Board, Reata Pharmaceuticals, Inc., A Phase 2 Study of the Safety, Efficacy, and Pharmacodynamics of RTA 408 in the Treatment of Mitochondrial Myopathy, 2015 to 2019, status:   closed

18) Member, Patient Safety Review Committee, Reata Pharmaceuticals, Inc, A dose-ranging study of the efficacy and safety of Bardoxolone Methyl in patients with pulmonary arterial hypertension (402-C-1302), 2014 to 2018, status:  closed

19) Chair, Data Safety Monitoring Board, Reata Pharmaceuticals, Inc., A Study of the Efficacy and Safety of Bardoxolone Methyl in Patients with Connective Tissue Disease-Associated Pulmonary Arterial Hypertension (CATALYST), 2016 to present, status:  closed

20) Chair, Data Safety Monitoring Board, Reata Pharmaceuticals, Inc., A Phase 2/3 of Efficacy and Safety of Bardoxolone Methyl in Patients with Alport Syndrome (CARDINAL), 2017 to present, status: closed

21) Chair, Data Safety Monitoring Board, Sanfit, Inc., A double-blind, randomised, placebo-controlled study to assess the effect of SNF472 on progression of cardiovascular calcification on top of standard of care in end-stage-renal-disease (ESRD) patients on haemodialysis (HD) SNFCT2015-05, 2017 to 2019, status:  closed

22) Chair, Data Monitoring Committee, Renew Research, KAI Research, A Randomized Pivotal Study of RenewTM NCP-5 for the Treatment of Mild Cognitive Impairment due to Alzheimer's Disease or Mild Dementia of the Alzheimer's Type, 2018 to present, status: closed

23) Chair, Data Safety Monitoring Committee, Sanofi, Inc, Multicenter, randomized, double-blind, placebo-controlled two stage study to characterize the efficacy, safety, tolerability and pharmacokinetics of GZ/SAR402671 in patients at risk of rapidly progressive Autosomal

# EXHIBIT B

 **U.S. FOOD & DRUG** ADMINISTRATION

Our STN:  BL 125742/0                                    **BLA APPROVAL**

BioNTech Manufacturing GmbH                             August 23, 2021
Attention:  Amit Patel
Pfizer Inc.
235 East 42nd Street
New York, NY 10017

Dear Mr. Patel:

Please refer to your Biologics License Application (BLA) submitted and received on May 18, 2021, under section 351(a) of the Public Health Service Act (PHS Act) for COVID-19 Vaccine, mRNA.

**LICENSING**

We are issuing Department of Health and Human Services U.S. License No. 2229 to BioNTech Manufacturing GmbH, Mainz, Germany, under the provisions of section 351(a) of the PHS Act controlling the manufacture and sale of biological products.  The license authorizes you to introduce or deliver for introduction into interstate commerce, those products for which your company has demonstrated compliance with establishment and product standards.

Under this license, you are authorized to manufacture the product, COVID-19 Vaccine, mRNA, which is indicated for active immunization to prevent coronavirus disease 2019 (COVID-19) caused by severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2) in individuals 16 years of age and older.

The review of this product was associated with the following National Clinical Trial (NCT) numbers:  NCT04368728 and NCT04380701.

**MANUFACTURING LOCATIONS**

Under this license, you are approved to manufacture COVID-19 Vaccine, mRNA drug substance at Wyeth BioPharma Division of Wyeth Pharmaceuticals LLC, 1 Burtt Road, Andover, Massachusetts.  The final formulated product will be manufactured, filled, labeled and packaged at Pfizer Manufacturing Belgium NV, Rijksweg 12, Puurs, Belgium and at Pharmacia & Upjohn Company LLC, 7000 Portage Road, Kalamazoo, Michigan.  The diluent, 0.9% Sodium Chloride Injection, USP, will be manufactured at Hospira, Inc., (b) (4)                              and at Fresenius Kabi USA, LLC, (b) (4)                    .

Page 2 – STN BL 125742/0 – Elisa Harkins

You may label your product with the proprietary name, COMIRNATY, and market it in 2.0 mL glass vials, in packages of 25 and 195 vials.

We did not refer your application to the Vaccines and Related Biological Products Advisory Committee because our review of information submitted in your BLA, including the clinical study design and trial results, did not raise concerns or controversial issues that would have benefited from an advisory committee discussion.

## DATING PERIOD

The dating period for COVID-19 Vaccine, mRNA shall be 9 months from the date of manufacture when stored between -90ºC to -60ºC (-130ºF to -76ºF).  The date of manufacture shall be no later than the date of final sterile filtration of the formulated drug product (at Pharmacia & Upjohn Company LLC in Kalamazoo, Michigan, the date of manufacture is defined as the date of sterile filtration for the final drug product; at Pfizer Manufacturing Belgium NV in Puurs, Belgium, it is defined as the date of the (b) (4) Following the final sterile filtration, (b) (4) , no reprocessing/reworking is allowed without prior approval from the Agency.  The dating period for your drug substance shall be (b) (4) when stored at (b) (4) We have approved the stability protocols in your license application for the purpose of extending the expiration dating period of your drug substance and drug product under 21 CFR 601.12.

## FDA LOT RELEASE

Please submit final container samples of the product in final containers together with protocols showing results of all applicable tests.  You may not distribute any lots of product until you receive a notification of release from the Director, Center for Biologics Evaluation and Research (CBER).

## BIOLOGICAL PRODUCT DEVIATIONS

You must submit reports of biological product deviations under 21 CFR 600.14.  You should identify and investigate all manufacturing deviations promptly, including those associated with processing, testing, packaging, labeling, storage, holding and distribution.  If the deviation involves a distributed product, may affect the safety, purity, or potency of the product, and meets the other criteria in the regulation, you must submit a report on Form FDA 3486 to the Director, Office of Compliance and Biologics Quality, electronically through the eBPDR web application or at the address below. Links for the instructions on completing the electronic form (eBPDR) may be found on CBER's web site at https://www.fda.gov/vaccines-blood-biologics/report-problem-center-biologics-evaluation-research/biological-product-deviations:

> Food and Drug Administration
> Center for Biologics Evaluation and Research
> Document Control Center

Page 3 – STN BL 125742/0 – Elisa Harkins

10903 New Hampshire Ave.
WO71-G112
Silver Spring, MD 20993-0002

**MANUFACTURING CHANGES**

You must submit information to your BLA for our review and written approval under 21 CFR 601.12 for any changes in, including but not limited to, the manufacturing, testing, packaging or labeling of COVID-19 Vaccine, mRNA, or in the manufacturing facilities.

**LABELING**

We hereby approve the draft content of labeling including Package Insert, submitted under amendment 74, dated August 21, 2021, and the draft carton and container labels submitted under amendment 63, dated August 19, 2021.

**CONTENT OF LABELING**

As soon as possible, but no later than 14 days from the date of this letter, please submit the final content of labeling (21 CFR 601.14) in Structured Product Labeling (SPL) format via the FDA automated drug registration and listing system, (eLIST) as described at http://www.fda.gov/ForIndustry/DataStandards/StructuredProductLabeling/default.htm.  Content of labeling must be identical to the Package Insert submitted on August 21, 2021.  Information on submitting SPL files using eLIST may be found in the guidance for industry *SPL Standard for Content of Labeling Technical Qs and As* at http://www.fda.gov/downloads/Drugs/GuidanceComplianceRegulatoryInformation/Guidances/UCM072392.pdf.

The SPL will be accessible via publicly available labeling repositories.

**CARTON AND CONTAINER LABELS**

Please electronically submit final printed carton and container labels identical to the carton and container labels submitted on August 19, 2021, according to the guidance for industry *Providing Regulatory Submissions in Electronic Format — Certain Human Pharmaceutical Product Applications and Related Submissions Using the eCTD Specifications* at https://www.fda.gov/regulatory-information/search-fda-guidance-documents/providing-regulatory-submissions-electronic-format-certain-human-pharmaceutical-product-applications.

All final labeling should be submitted as Product Correspondence to this BLA STN BL 125742 at the time of use and include implementation information on Form FDA 356h.

**ADVERTISING AND PROMOTIONAL LABELING**

Page 4 – STN BL 125742/0 – Elisa Harkins

You may submit two draft copies of the proposed introductory advertising and promotional labeling with Form FDA 2253 to the Advertising and Promotional Labeling Branch at the following address:

> Food and Drug Administration
> Center for Biologics Evaluation and Research
> Document Control Center
> 10903 New Hampshire Ave.
> WO71-G112
> Silver Spring, MD 20993-0002

You must submit copies of your final advertising and promotional labeling at the time of initial dissemination or publication, accompanied by Form FDA 2253 (21 CFR 601.12(f)(4)).

All promotional claims must be consistent with and not contrary to approved labeling. You should not make a comparative promotional claim or claim of superiority over other products unless you have substantial evidence or substantial clinical experience to support such claims (21 CFR 202.1(e)(6)).

**ADVERSE EVENT REPORTING**

You must submit adverse experience reports in accordance with the adverse experience reporting requirements for licensed biological products (21 CFR 600.80), and you must submit distribution reports at monthly intervals as described in 21 CFR 600.81. For information on adverse experience reporting, please refer to the guidance for industry *Providing Submissions in Electronic Format —Postmarketing Safety Reports for Vaccines* at https://www.fda.gov/regulatory-information/search-fda-guidance-documents/providing-submissions-electronic-format-postmarketing-safety-reports-vaccines. For information on distribution reporting, please refer to the guidance for industry *Electronic Submission of Lot Distribution Reports* at http://www.fda.gov/BiologicsBloodVaccines/GuidanceComplianceRegulatoryInformation/Post-MarketActivities/LotReleases/ucm061966.htm.

**PEDIATRIC REQUIREMENTS**

Under the Pediatric Research Equity Act (PREA) (21 U.S.C. 355c), all applications for new active ingredients, new indications, new dosage forms, new dosing regimens, or new routes of administration are required to contain an assessment of the safety and effectiveness of the product for the claimed indication in pediatric patients unless this requirement is waived, deferred, or inapplicable.

We are deferring submission of your pediatric studies for ages younger than 16 years for this application because this product is ready for approval for use in individuals 16 years of age and older, and the pediatric studies for younger ages have not been completed.

Page 5 – STN BL 125742/0 – Elisa Harkins

Your deferred pediatric studies required under section 505B(a) of the Federal Food, Drug, and Cosmetic Act (FDCA) are required postmarketing studies.  The status of these postmarketing studies must be reported according to 21 CFR 601.28 and section 505B(a)(4)(C) of the FDCA.  In addition, section 506B of the FDCA and 21 CFR 601.70 require you to report annually on the status of any postmarketing commitments or required studies or clinical trials.

Label your annual report as an "**Annual Status Report of Postmarketing Study Requirement/Commitments**" and submit it to the FDA each year within 60 calendar days of the anniversary date of this letter until all Requirements and Commitments subject to the reporting requirements under section 506B of the FDCA are released or fulfilled.  These required studies are listed below:

1.  Deferred pediatric Study C4591001 to evaluate the safety and effectiveness of COMIRNATY in children 12 years through 15 years of age.

    Final Protocol Submission:  October 7, 2020

    Study Completion:  May 31, 2023

    Final Report Submission:  October 31, 2023

2.  Deferred pediatric Study C4591007 to evaluate the safety and effectiveness of COMIRNATY in infants and children 6 months to <12 years of age.

    Final Protocol Submission:  February 8, 2021

    Study Completion:  November 30, 2023

    Final Report Submission:  May 31, 2024

3.  Deferred pediatric Study C4591023 to evaluate the safety and effectiveness of COMIRNATY in infants <6 months of age.

    Final Protocol Submission:  January 31, 2022

    Study Completion:  July 31, 2024

    Final Report Submission:  October 31, 2024

Submit the protocols to your IND 19736, with a cross-reference letter to this BLA STN BL 125742 explaining that these protocols were submitted to the IND.  Please refer to the PMR sequential number for each study/clinical trial and the submission number as shown in this letter.
Submit final study reports to this BLA STN BL 125742.  In order for your PREA PMRs to be considered fulfilled, you must submit and receive approval of an efficacy or a labeling

Page 6 – STN BL 125742/0 – Elisa Harkins

supplement.  For administrative purposes, all submissions related to these required pediatric postmarketing studies must be clearly designated as:

- **Required Pediatric Assessment(s)**

We note that you have fulfilled the pediatric study requirement for ages 16 through 17 years for this application.

**POSTMARKETING REQUIREMENTS UNDER SECTION 505(o)**

Section 505(o) of the Federal Food, Drug, and Cosmetic Act (FDCA) authorizes FDA to require holders of approved drug and biological product applications to conduct postmarketing studies and clinical trials for certain purposes, if FDA makes certain findings required by the statute (section 505(o)(3)(A), 21 U.S.C. 355(o)(3)(A)).

We have determined that an analysis of spontaneous postmarketing adverse events reported under section 505(k)(1) of the FDCA will not be sufficient to assess known serious risks of myocarditis and pericarditis and identify an unexpected serious risk of subclinical myocarditis.

Furthermore, the pharmacovigilance system that FDA is required to maintain under section 505(k)(3) of the FDCA is not sufficient to assess these serious risks.

Therefore, based on appropriate scientific data, we have determined that you are required to conduct the following studies:

4. Study C4591009, entitled "A Non-Interventional Post-Approval Safety Study of the Pfizer-BioNTech COVID-19 mRNA Vaccine in the United States," to evaluate the occurrence of myocarditis and pericarditis following administration of COMIRNATY.

   We acknowledge the timetable you submitted on August 21, 2021, which states that you will conduct this study according to the following schedule:

   Final Protocol Submission:  August 31, 2021

   Monitoring Report Submission:  October 31, 2022

   Interim Report Submission:  October 31, 2023

   Study Completion:  June 30, 2025

   Final Report Submission:  October 31, 2025

5. Study C4591021, entitled "Post Conditional Approval Active Surveillance Study Among Individuals in Europe Receiving the Pfizer-BioNTech Coronavirus

Page 7 – STN BL 125742/0 – Elisa Harkins

Disease 2019 (COVID-19) Vaccine," to evaluate the occurrence of myocarditis and pericarditis following administration of COMIRNATY.

We acknowledge the timetable you submitted on August 21, 2021, which states that you will conduct this study according to the following schedule:

Final Protocol Submission:  August 11, 2021

Progress Report Submission:  September 30, 2021

Interim Report 1 Submission:  March 31, 2022

Interim Report 2 Submission:  September 30, 2022

Interim Report 3 Submission:  March 31, 2023

Interim Report 4 Submission:  September 30, 2023

Interim Report 5 Submission:  March 31, 2024

Study Completion:  March 31, 2024

Final Report Submission:  September 30, 2024

6. Study C4591021 substudy to describe the natural history of myocarditis and pericarditis following administration of COMIRNATY.

We acknowledge the timetable you submitted on August 21, 2021, which states that you will conduct this study according to the following schedule:

Final Protocol Submission:  January 31, 2022

Study Completion:  March 31, 2024

Final Report Submission:  September 30, 2024

7. Study C4591036, a prospective cohort study with at least 5 years of follow-up for potential long-term sequelae of myocarditis after vaccination (in collaboration with Pediatric Heart Network).

We acknowledge the timetable you submitted on August 21, 2021, which states that you will conduct this study according to the following schedule:

Final Protocol Submission:  November 30, 2021

Study Completion:  December 31, 2026

Page 8 – STN BL 125742/0 – Elisa Harkins

    Final Report Submission:  May 31, 2027

8. Study C4591007 substudy to prospectively assess the incidence of subclinical myocarditis following administration of the second dose of COMIRNATY in a subset of participants 5 through 15 years of age.

    We acknowledge the timetable you submitted on August 21, 2021, which states that you will conduct this assessment according to the following schedule:

    Final Protocol Submission:  September 30, 2021

    Study Completion:  November 30, 2023

    Final Report Submission:  May 31, 2024

9. Study C4591031 substudy to prospectively assess the incidence of subclinical myocarditis following administration of a third dose of COMIRNATY in a subset of participants 16 to 30 years of age.

    We acknowledge the timetable you submitted on August 21, 2021, which states that you will conduct this study according to the following schedule:

    Final Protocol Submission:  November 30, 2021

    Study Completion:  June 30, 2022

    Final Report Submission:  December 31, 2022

Please submit the protocols to your IND 19736, with a cross-reference letter to this BLA STN BL 125742 explaining that these protocols were submitted to the IND.  Please refer to the PMR sequential number for each study/clinical trial and the submission number as shown in this letter.

Please submit final study reports to the BLA.  If the information in the final study report supports a change in the label, the final study report must be submitted as a supplement to this BLA STN BL 125742.  For administrative purposes, all submissions related to these postmarketing studies required under section 505(o) must be submitted to this BLA and be clearly designated as:

- **Required Postmarketing Correspondence under Section 505(o)**
- **Required Postmarketing Final Report under Section 505(o)**
- **Supplement contains Required Postmarketing Final Report under Section 505(o)**

Section 505(o)(3)(E)(ii) of the FDCA requires you to report periodically on the status of any study or clinical trial required under this section.  This section also requires you to periodically report to FDA on the status of any study or clinical trial otherwise

Page 9 – STN BL 125742/0 – Elisa Harkins

undertaken to investigate a safety issue. In addition, section 506B of the FDCA and 21 CFR 601.70 require you to report annually on the status of any postmarketing commitments or required studies or clinical trials.

You must describe the status in an annual report on postmarketing studies for this product. Label your annual report as an **Annual Status Report of Postmarketing Requirements/Commitments** and submit it to the FDA each year within 60 calendar days of the anniversary date of this letter until all Requirements and Commitments subject to the reporting requirements of section 506B of the FDCA are fulfilled or released. The status report for each study should include:

- the sequential number for each study as shown in this letter;
- information to identify and describe the postmarketing requirement;
- the original milestone schedule for the requirement;
- the revised milestone schedule for the requirement, if appropriate;
- the current status of the requirement (i.e., pending, ongoing, delayed, terminated, or submitted); and,
- an explanation of the status for the study or clinical trial. The explanation should include how the study is progressing in reference to the original projected schedule, including, the patient accrual rate (i.e., number enrolled to date and the total planned enrollment).

As described in 21 CFR 601.70(e), we may publicly disclose information regarding these postmarketing studies on our website at http://www.fda.gov/Drugs/Guidance ComplianceRegulatoryInformation/Post-marketingPhaseIVCommitments/default.htm.

We will consider the submission of your annual report under section 506B of the FDCA and 21 CFR 601.70 to satisfy the periodic reporting requirement under section 505(o)(3)(E)(ii) provided that you include the elements listed in section 505(o) and 21 CFR 601.70. We remind you that to comply with section 505(o), your annual report must also include a report on the status of any study or clinical trial otherwise undertaken to investigate a safety issue. Failure to periodically report on the status of studies or clinical trials required under section 505(o) may be a violation of FDCA section 505(o)(3)(E)(ii) and could result in regulatory action.

## POSTMARKETING COMMITMENTS SUBJECT TO REPORTING REQUIREMENTS UNDER SECTION 506B

We acknowledge your written commitments as described in your letter of August 21, 2021 as outlined below:

10. Study C4591022, entitled "Pfizer-BioNTech COVID-19 Vaccine Exposure during Pregnancy: A Non-Interventional Post-Approval Safety Study of Pregnancy and Infant Outcomes in the Organization of Teratology Information Specialists (OTIS)/MotherToBaby Pregnancy Registry."

Final Protocol Submission: July 1, 2021

Page 10 – STN BL 125742/0 – Elisa Harkins

Study Completion:  June 30, 2025

Final Report Submission:  December 31, 2025

11. Study C4591007 substudy to evaluate the immunogenicity and safety of lower dose levels of COMIRNATY in individuals 12 through <30 years of age.

Final Protocol Submission:  September 30, 2021

Study Completion:  November 30, 2023

Final Report Submission:  May 31, 2024

12. Study C4591012, entitled "Post-emergency Use Authorization Active Safety Surveillance Study Among Individuals in the Veteran's Affairs Health System Receiving Pfizer-BioNTech Coronavirus Disease 2019 (COVID-19) Vaccine."

Final Protocol Submission:  January 29, 2021

Study Completion:  June 30, 2023

Final Report Submission:  December 31, 2023

13. Study C4591014, entitled "Pfizer-BioNTech COVID-19 BNT162b2 Vaccine Effectiveness Study - Kaiser Permanente Southern California."

Final Protocol Submission:  March 22, 2021

Study Completion:  December 31, 2022

Final Report Submission:  June 30, 2023

Please submit clinical protocols to your IND 19736, and a cross-reference letter to this BLA STN BL 125742 explaining that these protocols were submitted to the IND.  Please refer to the PMC sequential number for each study/clinical trial and the submission number as shown in this letter.

If the information in the final study report supports a change in the label, the final study report must be submitted as a supplement.  Please use the following designators to prominently label all submissions, including supplements, relating to these postmarketing study commitments as appropriate:

- **Postmarketing Commitment – Correspondence Study Update**
- **Postmarketing Commitment – Final Study Report**
- **Supplement contains Postmarketing Commitment – Final Study Report**

Page 11 – STN BL 125742/0 – Elisa Harkins

For each postmarketing study subject to the reporting requirements of 21 CFR 601.70, you must describe the status in an annual report on postmarketing studies for this product.  Label your annual report as an **Annual Status Report of Postmarketing Requirements/Commitments** and submit it to the FDA each year within 60 calendar days of the anniversary date of this letter until all Requirements and Commitments subject to the reporting requirements of section 506B of the FDCA are fulfilled or released.  The status report for each study should include:

- the sequential number for each study as shown in this letter;
- information to identify and describe the postmarketing commitment;
- the original schedule for the commitment;
- the status of the commitment (i.e., pending, ongoing, delayed, terminated, or submitted); and,
- an explanation of the status including, for clinical studies, the patient accrual rate (i.e., number enrolled to date and the total planned enrollment).

As described in 21 CFR 601.70(e), we may publicly disclose information regarding these postmarketing studies on our website at http://www.fda.gov/Drugs/Guidance ComplianceRegulatoryInformation/Post-marketingPhaseIVCommitments/default.htm.

**POST APPROVAL FEEDBACK MEETING**

New biological products qualify for a post approval feedback meeting.  Such meetings are used to discuss the quality of the application and to evaluate the communication process during drug development and marketing application review.  The purpose is to learn from successful aspects of the review process and to identify areas that could benefit from improvement.  If you would like to have such a meeting with us, please contact the Regulatory Project Manager for this application.

Sincerely,

Mary A. Malarkey
Director
Office of Compliance
  and Biologics Quality
Center for Biologics
  Evaluation and Research

Marion F. Gruber, PhD
Director
Office of Vaccines
  Research and Review
Center for Biologics
  Evaluation and Research

# EXHIBIT C

## <u>AFFIDAVIT OF DR. JENNIFER SMITH</u>

BEFORE ME, the undersigned person, duly authorized to administer oaths in the State of Hawaii, personally appeared, Dr. Jennifer Smith, to me well-known, who, after being first duly cautioned and sworn, deposed and stated as follows:

### Preface

I am over eighteen (18) years of age, and I am not suffering under any mental disability and am competent to give this sworn affidavit. I am able to read and write; and to give this affidavit voluntarily and on my own free will and accord. No one has used any threats, force, pressure, or intimidation to make me sign this affidavit. I understand that I am swearing or affirming under oath to the truthfulness of the claims made in this affidavit under penalties of perjury; that I have read these statements in this affidavit; that these statements are my understanding of the facts; and that my expert opinion provided below is based on a reasonable degree of medical and scientific certainty. I have first-hand knowledge and understanding of these matters; and make this affidavit in support of the truth of the contents contained herein.

### Qualifications and Experience

My name is Jennifer Smith, Ph.D.; and because of my background, training, and experience, I am one of the most qualified people to discuss and explain coronavirus SARS-CoV-2 which can cause COVID-19 ("Covid"); and the vaccines at issue in this case. As an epidemiologist, I have taken what I learned in the lab and research, and put my knowledge and skillsets to action by applying public health principles to health disparities in local communities. I have been instrumental in the outbreak response to COVID-19 by identifying and investigating 700+ individual cases and close contacts, contact tracing, monitoring travelers and developing case investigation, contact tracing protocols and case report forms. In fact, at the onset of the Covid outbreak, I single-handedly had the greatest number of contract tracing up until the end of July 2020.

I received a Bachelor of Science degree in Microbiology from University of Arizona, as well as, a Master's of Science in Medical Microbiology from the University of Georgia. My Master's thesis project was development of a quantitative-competitive PCR assay to differentiate field strains from vaccine strains for a virus that causes severe respiratory illness in poultry. I then went on to obtain a PhD in Microbiology and Molecular Cell Sciences from the University of Memphis. I worked under world renowned virologist Dr. Robert Webster at St. Jude Children's Research Hospital in Memphis, Tennessee. Dr. Webster's laboratory was a World Health Organization Collaborating Center for Studies on the Ecology of Influenza in Lower Animals and Birds.

Surveillance, important for influenza pandemic preparedness, was a major aspect of the research studies in his laboratory as was vaccine development. My research focused on studies of both low and highly pathogenic avian and human influenza isolates. An aspect of these studies was to evaluate vaccine efficacy in animal models, an essential step required by the FDA and USDA in the vaccine approval process. During these studies, as part of my role as the research team leader, I managed and performed avian influenza virus studies in the Animal Biosafety Level 3 laboratory (ABSL3).

My efforts and those of the team were rewarded by the development of an efficacious H5N3 poultry vaccine, as well as, an influenza vaccine against the H5N1 subtype of influenza to be stockpiled for potential use in immunizing humans against this potentially lethal strain of virus. My dissertation studies were on the ecology and evolution of influenza A viruses in poultry in live animal markets. The findings of my studies had a role in changing the policies regarding the sale of minor poultry in live animal markets in Hong Kong and elsewhere.

After completion of my doctoral degree, I joined the Center of Excellence for Influenza Research and Surveillance at the University of Georgia. In a collaborative project with the Centers for Disease Control and Prevention ("CDC"), I assessed methods for improved delivery of vaccines for mass vaccination

campaigns. I also worked collaboratively with other research scientists on the development of PIV5 as a novel vaccine vector for influenza, rabies, and mumps viruses. From there, I moved on to serve as a contracting office representative for a government contract testing candidate vaccines against viral hemorrhagic fever viruses. I have over 12 years of experience in vaccine development and testing. I have written 14 high-impact research articles; with 7 first-author publications in peer-reviewed scientific journals. I have a first-authored chapter in a textbook entitled "Human Respiratory Viral Infections."

<u>**Expert Opinion**</u>

**1. The virus that causes the disease called 'COVID-19' is not new and is nearly identical to Severe Acute Respiratory Distress Syndrome Coronavirus from 2002 (SARS-CoV-1).**

In December 2019 there were reports of a mysterious, pneumonia-like illness in Wuhan, China associated with an outbreak at a local seafood market. In early January 2020 it was determined that the mysterious illness was being caused by a coronavirus similar to the 2002 Severe Acute Respiratory Syndrome (SARS-CoV-1) virus. On February 11, 2020, the International Committee on Taxonomy of Viruses officially named the virus Severe Acute Respiratory Syndrome Coronavirus-2 (SARS-CoV-2).

***2. SARS-CoV-2 was called 'novel' but it is not a new type of virus. SARS-Cov-2 is just a new strain of coronavirus.***

Coronaviruses are the cause of about 30% of 'common colds' each year, and the majority of Americans have strong immunity against coronaviruses.

SARS-CoV-2 looks like and behaves like SARS-CoV-1 and that is why it was classified and named as such. SARS-



CoV-2 has a nearly identical genetic structure, uses the same host cell receptor to begin the infection cycle and causes the same types of symptoms and disease as SARS-CoV-1 in humans. SARS-CoV-2 has minor genetic modifications, but is still very similar to SARS-CoV-1. As a single-stranded RNA virus, SARS-CoV-2 is a very unstable virus making infection of and replication in humans no easy task. Research scientists have studied SARS-CoV-1 for the last 17+ years. We can use what we have learned from the many years of in depth research on SARS-CoV-1 and apply it to SARS-CoV-2.

**3. The three Emergency Use Authorization (EUA) COVID-19 injections, including the FDA approved COMIRNATY, are not vaccines. The EUA COVID-19 injections, including COMIRNATY, are gene therapies.**

Vaccines are the primary approach to prevent infection with a virus that causes a communicable disease by training the body's immune system to fight the virus before a person becomes infected through means of 'natural transmission,' i.e. other infected humans repeatedly cough, sneeze, and/or breath around them in a closed area environment. A vaccine is legally defined as any substance designed to be administered to a human being for ***prevention*** of one or more diseases. The U.S. Patent office stipulated that a vaccine must induce an immune response that is protective and not merely some immune response.

There are many approaches to develop a vaccine and each approach does not work equally as well for every infectious disease. Common approaches to making a vaccine include attenuating (weakening) pathogens or inactivating (killing) them and then injecting humans with a small amount of the weakened or inactivated virus to teach the body to produce neutralizing antibodies in order to fight off the virus when exposed in a natural environment. These approaches have been used most successfully to prevent diseases in humans.

Of the three EUA COVID-19 injections, two 'vaccines', Pfizer and Moderna, use mRNA to encode spike proteins similar to the spike protein of the SARS-CoV-2 virus. The Pfizer and Moderna 'vaccines' are the first mRNA 'vaccines' ever approved for human use. The third one (Janssen/J&J) is a recombinant virus vector vaccine using a human adenovirus type 26 virus that expresses the SARS-CoV-2 spike protein:

| Vaccine Manufacturer | Ages | Dose Volume | Number of Doses/Series | Interval Between Doses |
|---|---|---|---|---|
| Pfizer-BioNTech | > 16 years | 0.3 mL | 2 | 3 weeks (21 days) |
| Moderna | > 18 years | 0.5 mL | 2 | 1 month (28 days) |
| Janssen (J&J) | > 18 years | 0.5 mL | 1 | N/A |



These 'vaccines' harness the power of basic biology to produce the pathogenic (disease causing) SARS-CoV spike proteins in those who are injected with it. Messenger RNA (mRNA) is genetic material that tells your body how to make proteins. The central dogma of molecular biology states that DNA makes RNA which makes proteins. Through the genetic processes of transcription (DNA→RNA) and translation (RNA→protein), information from genes is used to make proteins.

Upon receiving the first injection of the EUA COVID-19 mRNA, the foreign gene (mRNA) is translated into a SARS-CoV-2 spike protein by the host cells. The spike protein has been shown to be detectable as early as one day post injection in study participants who were injected with the Moderna COVID-19 'vaccine'. "S1 antigen was detected as early as day 1 post-vaccination, and peak levels were detected on average 5 days after the first injection. S1 in all participants declined and became undetectable by day 14." "Spike protein was detectable in 3 of 13 participants an average of 15 days after the first injection." "For one individual (participant 8), spike was detected at day 29, 1 day after the second injection and was undetectable 2 days later." (https://academic.oup.com/cid/advance-article/doi/10.1093/cid/ciab465/6279075).

Gene therapies that treat rare genetic diseases can also be used for generating robust immune responses. **Robust immune responses can either prevent disease and symptoms or cause disease and symptoms.** ***According to the HHS, FDA, and CBER August 2015 document entitled "Design and Analysis of Shedding Studies for Virus or Bacteria-Based Gene Therapy and Oncolytic Products," the EUA COVID-19 injections are not 'vaccines,' but rather Virus-Based Gene Therapies, per the FDA's and CBER's own definition.***

**The COVID-19 'vaccines' introduce a gene that encodes for a protein not found in humans. The spike protein is then produced for at least two weeks**

**after injection and is identified as a foreign 'invader' by the immune system causing a robust autoimmune response that can sometimes be highly inflammatory resulting in permanent injury or death.** The introduction of a foreign gene into a cell is known as gene delivery. Gene delivery is a necessary step in gene therapy to produce a biological outcome in human subjects. Gene delivery can also be done using vectors such as recombinant viruses which is the case of the Janssen/J&J 'vaccine'. In the case of the three EUA COVID-19 'vaccines' the biological outcome is merely an immune response which is not protective and does not stop or suppress SARS-CoV-2 infection or transmission therefore they are operationally 'treatments'.

### 4. The harmful and long-term effects of the EUA COVID-19 mRNA injections, including COMIRNATY, are unknown.

While the use of mRNA as a potential vaccine platform has been explored since the 1990s, mRNA has never been successfully used to reduce the incidence of infectious disease in the history of man. In animal studies, mRNA 'vaccines' or products have not only repeatedly failed as viable therapies for the prevention or treatment of infectious disease, but have resulted in alarming organ injuries, systemic harm, and rapid death in animal subjects. The EUA COVID-19 'vaccines' are first-in-human biological agents. The majority of animal trials required to determine if these products would be safe for human use were skipped under the FDA's emergency use authorization. Neither we, nor the FDA, have any idea if the mRNA vaccines are safe for humans or what the long-term side effects will be.

Per the FDA's own August 23, 2021, approval letter of the Pfizer-BioNTech COVID-19 Vaccine, COMIRNATY, the FDA is requiring the manufacturer to complete TEN (10) additional studies for adults to assess the risks of COMIRNATY, including but not limited to the risks of myocarditis (heart inflammation, congestive heart failure, and death), immunogenicity (unwanted immune responses that may result in permanent injuries, disease and/or death), and harm to babies who were EXPOSED to vaccinated individuals while inside their mother's womb, resulting in birth defects, autoimmune disease, or death. For any new FDA approved product used in humans, safety testing always takes years before a new product is brought to market. The FDA typically requires these type of safety studies to be completed prior to FDA approval.

**5. Per the VAERS database and independent clinical studies, the EUA COVID-19 injections, including COMIRNATY, are proven to be toxic and harmful with an unreasonably high-risk for permanent injuries and death.**

mRNA is highly unstable and can easily disintegrate making transfection, introduction into a cell, difficult. The Pfizer and Moderna 'vaccines' consist of mRNA encapsulated in a protective lipid biosphere known as lipid nanoparticles, or LNPs. The LNPs are made of cholesterol, phospholipids, ionized lipids, and PEGylated lipids to protect the mRNA and facilitate its delivery to and penetration into T-cells for production of the spike proteins. The mRNA LNPs are highly inflammatory resulting in cytokine storms that can lead to permanent lung and heart damage, cancer, and/or death.

In general, mRNA is highly unstable and easily degradable thus modification with psueudouridine for uridine can increase translational capacity however, these unnatural nucleosides are themselves toxic. "The clinical adverse effects have included myopathy (caused by mitochondrial toxicity), lactic acidosis, pancreatitis, lipodystrophy, liver steatosis, and nerve damage; certain ones have been fatal." Liver toxicity was especially predominant in clinical trials with mRNA therapeutics especially when repeat dosing was used. "Nevertheless, this observed toxicity may be concerning for vaccines as well, since even live replicating viruses and viral vector vaccines (which generally are more immunogenic than subunit vaccines) need repeat dosing" (https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6631684/#B34-vaccines-07-00037).

mRNA alone is highly inflammatory given that double-stranded RNA stimulates the innate immune response via Toll-like receptors (TLR3, TLR7 and TLR8). Stimulation of these pathways can act to inhibit mRNA replication. In addition, mRNA 'vaccines' elicit an inflammatory type I interferon (IFN) response which is a standard immune response to viral infection. However, type I interferon responses can have a negative impact for mRNA 'vaccines' in that IFN can impair vaccine elicited adaptive immunity and thus their efficacy. This can lead to unwanted and harmful autoimmune responses to the mRNA via the induction of type I interferon. It is well-known that autoimmune disease occurs in some percentage subjects injected with traditional vaccines and is expected to be in much higher percentages with the new, first-in-human mRNA biological agents.

Furthermore, given the immune activation by mRNA...."Some of these various activities could decrease the potency of the mRNA by a net decreased protein production, as was seen pre-clinically for an HIV mRNA vaccine complexed in cationic lipids. This also raises the issue of how effective repeat dosing of mRNA will be if previous injections result in an environment with decreased translation or increased RNA degradation, although simply changing an injection site may potentially circumvent this particular issue."

**\*\*This information MUST NOT be ignored in light of the desire for repeat dosing with mRNA in the form of 'booster shots'.**

**6. The EUA COVID-19 injections, including COMIRNATY, are directly correlated with adverse events and severe adverse events after administration.**

An Adverse Event (AE) is defined as any unfavorable medical occurrence in a human study participant, including any abnormal physical exam or laboratory finding, symptom, or disease, temporally associated with the participants' involvement in the research, whether or not it is considered related to participation in the research. A Serious or Severe Adverse Event (SAE) is defined as any adverse event that results in death, is life threatening, or places the participant at immediate risk of death. As of September 9, 2021 there are 675,591 reports of adverse events in Open VAERS with 14,506 deaths, 18,400 permanently disabilities, 27,300 severe allergic reactions PLUS 5,700 anaphylaxis, 7,900 Bell's Palsy cases (paralysis), 11,700 heart attacks/myocarditis/pericarditis, 7,800 shingles, and 58,400 hospitalizations. This is more reports than for all other vaccines combined over the past 30 years. Because the Vaccine Adverse Events Reporting System (VAERS) is a voluntary reporting system, we know that this number is underreported by anywhere from 10-fold to nearly 100-fold.

An analysis of data reported in VAERS from December 17, 2020 through April 1, 2021 concluded there is a direct correlation of adverse events and the 'vaccines'. About 70% of Individuals had 'symptoms' within 48 hours of being injected with either the first or second dose which shows that the events are causally linked to the injections. "Analysis suggests that the vaccines are likely the cause of reported deaths, spontaneous abortions, anaphylactic reactions and cardiovascular, neurological and immunological AEs" (http://www.mailaz.com/COVID-19/PDF%20Documents/2021-05-IPAK%20-%20Report%20on%20VAERS%20of%20COVID-19.pdf).



\* https://openvaers.com/covid-data

**7. After intramuscular injection with mRNA 'vaccines', the lipid nanoparticles (LNPs) do not stay localized in the injection site muscle cells, but can be found in fluids and tissues throughout the body.**

Once the LNP encapsulated mRNA is injected into the muscle of an individual, some LNPs fuse with muscle cells (myocytes) where the LNPs are taken into the cells. Once inside the cell, the mRNA is released and the cellular machinery of the myocyte starts to translate the mRNA into spike proteins. The spike proteins then present on the outer surface of the muscle cells for presentation to cells of the immune system. Some of the LNPs are automatically picked up by the blood and circulated throughout the body to different organs and tissues.

Encapsulation of the mRNA inside LNPs showed that the mRNA could be protected from degradation and thereby increased the efficacy of delivery of the mRNA to cells. The LNP technology also enabled the mRNA vaccine to reach a broad range of cell types. Intramuscular injection is preferred because muscle cells have high vascularity so injected materials can easily reach the systemic bloodstream and lymphatic systems. *The problem with mRNA reaching a broad range of cell types is that any cell type which then expresses the spike protein would be subject to attack by immune cells.* For example, brain cells that express the spike protein might be marked as foreign by the immune system and cytotoxic T-cells, which kill virus-infected and cancerous cells, might see the spike protein-expressing brain cells as a threat. Studies investigating the cellular localization of LNPs carrying mRNA have shown localization of mRNA in the liver, muscle, spleen and lungs after intramuscular injection. One study showed traces of mRNA in the heart, bone marrow, kidney, lung, stomach, rectum, intestines,

testes and brain of mice following injection of a LNP encapsulated mRNA vaccine (https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5475249/).

A biodistribution study performed by the Japanese regulatory agency has shown that a substantial amount of the Pfizer mRNA vaccine settled in the liver, spleen, adrenal glands, and ovaries of rats at 48 hours following intramuscular injection. Another biodistribution study performed by Moderna that was submitted to the European Medicines Agency (EMA) in February 2021 found that besides the injection site [muscle] and lymph nodes [proximal and distal], increased mRNA concentrations (compared to plasma levels) were found in the spleen and eye. "Low levels of mRNA could be detected in all examined tissues except the kidney (https://www.ema.europa.eu/en/documents/assessment-report/spikevax-previously-covid-19-vaccine-moderna-epar-public-assessment-report_en.pdf). This included heart, lung, testis and brain tissues, indicating that the mRNA/LNP platform crossed the blood/brain barrier, although to very low levels (2-4% of the plasma level). Liver distribution of mRNA-1647 is also evident in this study, consistent with the literature reports that liver is a common target organ of LNPs." No dedicated studies on absorption, metabolism, and excretion for mRNA-1273 were submitted. When studying the bio distribution of free mRNA it was found that "Only a relatively small fraction of the administered mRNA-1647 dose distributed to distant tissues, and the mRNA constructs did not persist past 1 to 3 days in tissues other than the injection site, lymph nodes, and spleen." Therefore, naked mRNA can also be found in tissues distant from the injection site.

## 8. The spike proteins of SARS coronaviruses cause the COVID-19 disease and tissue damage similarly, the production of spike protein by the injections causes the adverse events resulting in organ and tissue damage.

The spike protein of SARS-CoV-2 interacts with and binds to angiotensin converting enzyme 2 (ACE2), a key component of the renin-angiotensin system to initiate the viral infection cycle. ACE2 catalyzes the cleavage of angiotensin II (Ang II) (a vasoconstrictor peptide) into angiotensin 1-7 [Ang-(1-7)] (a vasodilator), thereby reducing blood pressure.

High ACE2 expression in the endothelium of blood vessels facilitates the high-affinity binding of SARS-CoV-2 using spike protein, causing infection and internal injury inside the vascular wall of blood vessels. This viral associated injury may directly/indirectly initiate activation of coagulation and clotting cascades forming internal blood clots (https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7644431/). In

early April 2021, the government recommended pausing administration of the J&J vaccine after six women who received it developed rare blood clots—and one woman died. These dangerous blood clots in the brain are known as cerebral venous sinus thrombosis (CVST), because it appears in the brain's venous sinuses. In addition there have been many reports of myocarditis (inflammation of the heart) after people have received the 'vaccines' with a majority of reports seen in young men and boys.



The cell bound form of ACE2 can be shed from the cell surface into various body fluids; cerebrospinal, serum and urine. Interestingly, both *in vivo* and *in vitro* SARS-CoV infections resulted in virus-induced shedding of cell bound ACE2. Soluble ACE2 and SARS-CoV-2 form antigen/antibody complexes which the immune system responds to and triggers a faulty immune response. This can occur both in disease in and after the injections where spike protein production is induced.

The spike protein from SARS-CoV-1 (2002) was shown to interact with hormone production. Leong et. al. performed a microarray analysis of cells infected with SARS-CoV-1 and found that "Seventy mRNA transcripts belonging to various functional classes exhibited significant alterations in gene expression" (https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7110627/). One of the genes that was upregulated almost 6-fold (Z-score 5.8) was sex hormone-binding globulin (SHBG). This protein binds to androgens, estrogens and other steroid hormones inhibiting the functioning of these hormones. Thus, bioavailability of sex hormones is influenced by the level of SHBG and can be altered by the spike protein.

**9. The majority of Americans are not at a meaningful risk for severe disease. Statistically speaking, healthy adults under the age of 40 are at 0% risk for hospitalization or death from SARS-CoV-2.**

We know what groups of people are at most risk for severe disease and complications after infection with SARS-CoV-2; the elderly, smokers and those with MULTIPLE comorbid medical conditions (diabetes, hypertension and obesity). Given that the virus uses ACE2 to gain entry into cells and initiate the infection cycle, levels of expression of ACE2 are key for understanding those who would be

at most risk of severe disease. Knowing that the 'vaccines' are only meant to decrease the length and severity of disease, it does not make sense to vaccinate every single person.

Key points about ACE2 expression:

- ACE2 is regulated by a gene which maps on the X chromosome
- ACE2 is ubiquitous and expressed in 72 tissues: heart, vessels, kidney, testes, lungs, intestines, brain, etc
- Differences may exist in the expression of ACE2 between men and women
- ACE2 levels decrease with age and seem to be higher in young people
- ACE2 expression is upregulated by estrogen and androgen and downregulated in type II diabetes
- Several other factors, such as genetics, demographics, lifestyle, co-morbidities and drugs usage could have a potential impact on ACE2 expression and activity

"Its expression level is high in Asian females and young people (Figure 1 and Table 1), those who are known to be less susceptible, and even less inflicted by severe or fatal outcome, while it is low in males, further decrease with age and T2D, those who are most susceptible to bad outcome (Figures 1 and 3), suggesting at a population level a negative correlation between ACE2 expression and COVID-19 severity and fatality." (https://onlinelibrary.wiley.com/doi/pdfdirect/10.1111/acel.13168)

**Genetics and demographic characteristics, lifestyle, comorbidities, and medication usage have an impact on ACE2 expression and activity in SARS-CoV-2 cellular infection.**

**10. The EUA COVID-19 'vaccines' do not prevent infection with SARS-CoV-2 and they were ever meant to prevent infection or transmission.**

The correlates of protection, the type of immune response needed to prevent infection with SARS-CoV-2, are still unknown. We do not know whether it is antibodies, what type of antibodies or what level is necessary to provide protection or whether cell-mediated immunity is an important measure of protection. There is also a big difference between total antibodies and neutralizing antibodies. Neutralizing antibodies, antibodies that bind to the virus and prevent infection, cannot be measured with a point of care test. In general scientists study how

infection programs the immune response after natural infection to inform the development of a vaccine that will mimic that same response.

A vaccine that provides *sterilizing* immunity prevents the vaccinated from being able to catch or transmit a virus. The EUA COVID-19 'vaccines' were not designed to induce sterilizing immunity. They are merely a tool designed to teach the immune system to attack the spike protein, thereby priming the immune system to *allegedly* reduce the length and *severity* of infection. Both CDC and Dr. Fauci have acknowledged this point and that is why they recommended people should continue to follow recommendations for preventing infection even after vaccination because 'breakthrough' infections are expected. There have been many reports of people having gotten 'vaccinated' and contracting COVID-19 not just in the United States but all over the world. A total of 10,262 SARS-CoV-2 vaccine 'breakthrough' infections had been reported from 46 U.S. states and territories as of April 30, 2021. As of May 1, 2021, CDC transitioned from publicly reporting the passive surveillance of all vaccine breakthrough cases on the website to focus on hospitalized or fatal vaccine breakthrough cases due to any cause. As of September 13, 2021 15,790 patients with COVID-19 'vaccine breakthrough' infections who have were hospitalized or died have been reported to the CDC from 49 U.S. states and territories. This supports the fact that the 'vaccines' are not preventing severe disease or hospitalizations.

Both the 'vaccinated' and unvaccinated are equally capable of being infected and transmitting the virus. A study has shown that immunity after injection with COVID-19 'vaccines' wanes over a period of 3 to 10 weeks (https://www.thelancet.com/journals/lancet/article/PIIS0140-6736(21)01642-1/fulltext). **Because EUA COVID-19 'vaccination' only offers temporary short-term protection, as soon as immunity fades, the vaccinated themselves are also equally at risk of more severe outcomes.**



Figure. Levels of antibody against the spike glycoprotein of SARS-CoV-2 (S-antibody) at defined time points after second dose of vaccination (with extended dose intervals) in individuals with no previous infection, stratified by vaccine type.

## 11. Natural immunity to a virus is always more effective and longer lasting than a vaccine.

Active immunity (i.e., natural exposure and recovery) is always better and stronger than passive immunity (i.e., vaccines/gene therapies). People who have a disease and recover will have broader and more robust immunity that is long-lasting. SARS-CoV-2 is no different in this regard. Because SARS-CoV-2 is the same as SARS-CoV-1 we can use information from those who recovered from that virus in 2003 to inform us about lasting immunity. A recent study showed that "….patients ($n$ = 23) who recovered from SARS (the disease associated with SARS-CoV-1 infection) possess long-lasting memory T cells that are reactive to the N-protein of SARS-CoV-1 *17 years* after the outbreak of SARS in 2003." "We also detected SARS-CoV-2-specific T cells in individuals with no history of SARS, COVID-19 or contact with individuals who had SARS and/or COVID-19 ($n$ = 37)" (https://www.nature.com/articles/s41586-020-2550-z). What this tells us is that people who have had symptomatic COVID-19 will have lasting immunity after recovery. In addition, there are people who also have protection from infection with SARS-CoV-2 because they have been infected with other coronaviruses. We know that 90% of adults over the age of 50 have immunity to all 4 common human coronaviruses. This cross protective immunity is most likely why some people experience only mild symptoms upon exposure to SARS-CoV-2.

More studies are being published now showing that those who recovered from COVID-19 have more robust immunity than the immunity induced from the 'vaccines.' Scientists have shown that immune memory to SARS-CoV-2 lasted up to at least 8 months after infection in 95% of those tested (https://www.nih.gov/news-events/nih-research-matters/lasting-immunity-found-after-recovery-covid-19). "This study demonstrated that natural immunity confers longer lasting and stronger protection against infection, symptomatic disease and hospitalization caused by the Delta variant of SARS-CoV-2, compared to the BNT162b2 two-dose vaccine-induced immunity" (https://www.medrxiv.org/content/10.1101/2021.08.24.21262415v1). ***If someone has immunity from natural infection, under no circumstances would it make sense for them to get a vaccine.*** In fact, vaccinating people with pre-existing immunity puts them at risk for an adverse event and it has been shown that those who had COVID-19 and recovered were three times more likely to experience an adverse event after vaccination. The EUA COVID-19 vaccination strategy should be about mitigation of risk and protecting the most vulnerable, not about vaccinating the entire 'vaccine eligible' population of the US.

## 12. Even if 100% of the global population is vaccinated, SARS-CoV-2 will continue to spread.

Given the rate of transmission for the delta variant (R0=5), there is no way to stop it even with a 100% vaccination rate. The virus will continue to spread. As with most viruses, as they interact more with a new host and mutate they will invariably produce higher morbidity (make more people sick) but will generally have lower mortality (fewer people die). This delta is one step in that direction.



*CDC Delta Data

"If a miraculous vaccine could be developed that could give us all 100% sterilizing immunity today. The length of time it takes to manufacture and ship 8 billion doses (and then make vaccination appointments for 8 billion people) ensures that by the time the last person gets their last dose, the never-ending conveyor belt of mutations will have already rendered the vaccine partially ineffective. True sterilizing immunity simply won't ever happen with coronaviruses. It was 100% certain, from day one, that by the time the last dose is administered, the rapid evolution of the virus would ensure that it would already be time to start thinking about booster shots." (https://www.juliusruechel.com/2021/09/the-snake-oil-salesmen-and-covid-zero.html?showComment=1631572262160#c6301318684731234375)

## 13. The EUA COVID-19 injections are responsible for the emergence of SARS-CoV-2 variants and prolonging the pandemic.

What is most troubling is that all this human intervention has done is made the situation far worse and is doing things that prolong it. Vaccine escape is the term used to describe the process of a virus mutating to form a variant that evades the immune response induced by vaccination. The sub optimal immunity induced from vaccination is driving the emergence of SARS-CoV-2 variants. Because the 'vaccines' do not provide sterilizing immunity, those who are vaccinated and exposed to the virus can still become infected. The incomplete immunity puts pressure on the virus and selects for virus particles which have the advantage to still attach to a cell and initiate the replication cycle. This is akin to Darwin's theory of survival of the fittest.

## 14. The sub optimal immunity from the COVID-19 injections increase the risk for antibody dependent enhancement, a robust response that results in serious disease and death.

This serious consequence of suboptimal immunity is the potential for Antibody Dependent Enhancement (ADE). Binding of a virus to suboptimal antibodies enhances its entry into host cells, followed by its replication. Non-neutralizing antibodies help the virus to gain entry into a cell in a more efficient manner. ADE causes enhanced respiratory disease and acute lung injury after respiratory virus infection. This is well documented with dengue fever virus and other coronaviruses and one reason why vaccines have yet to be developed for human coronaviruses. The antibodies that are produced against SARS-CoV spike glycoprotein increase the binding of the virus to FcgRII-receptors and therefore increase uptake by the

host cells. ADE was a problem in animal trials with vaccines for SARS-CoV-1 and that's why no vaccine ever made it past the pre-clinical testing phase. Cats that were vaccinated with feline coronavirus spike proteins for protection against disease showed ADE following natural infection and died. Vaccination protects you only until new variants arise, then the training that your previous vaccination gave your immune system becomes a liability as your immune system switches from protecting you to increasing your risk from the disease.

It is difficult to differentiate between ADE and what has been classified as 'COVID-19 breakthrough cases'. However, the signal for ADE is that the delta variant has a higher viral load in the vaccinated. Those injected with boosters are playing Russian roulette all over again with increased risks for ADE, as well as 'standard' serious adverse events, including autoimmune diseases, reactivation of dormant viruses, neurological damage, lung damage, heart damage, blood clotting, and death.

**15. The PCR test is a genetic test that is well-known to be an unreliable medical test for detection of active viral infection.**

Detection of genetic material is done using a test called polymerase chain reaction (PCR). PCR is used to amplify small segments of DNA, genetic material. This test is used for forensics, cloning, genome projects for mapping genes and DNA sequencing. For genetic tests, the first step is extraction of genetic material from a human specimen, either blood, hair or an oral swab. ***Genetic test*** means a test that analyzes DNA, RNA or chromosomes for purposes such as the prediction of disease or vertical transmission risks, or monitoring, diagnosis or prognosis.

This same process is used in order to detect the genetic material of SARS-CoV-2. The first step is to collect a specimen via a nasopharyngeal or nasal swab. This swab will scrape cells from inside the nasal cavity. This specimen therefore will have the genetic material for the person for which the specimen was collected. Detection of genetic material does not mean that a person is infectious or contagious.

Dr. Jennifer Smith

17

## JURAT AND VERIFICATION

STATE OF _Hawaii_

COUNTY OF _Honolulu_

The foregoing instrument was acknowledged before me by means of ☒ physical presence
or ☐ online notarization, this September _23_, 2021 by _Dr. Jennifer Smith_, who
is personally known to me: _Christina Oh_

_____
Notary Seal / Notary Public

Name typed, printed or stamped      **CHRISTINA OH**
                                    Notary Public, State of Hawaii
                                    My commission expires March 13, 2024

My Commission Expires: _____

Doc. Date: _09/23/2021_      # Pages: _18_
Name: _Christina Oh_        _First_ Circuit
Doc. Description: _Affidavit of Dr._
_Jennifer Smith_
_____  _09/23/2021_
Notary Signature            Date
**NOTARY CERTIFICATION**



18

# EXHIBIT D

I, **Dr. Jane Ruby**, being duly sworn, depose and state as follows:

1.      I make this affidavit in support of the above-referenced MOTION as expert testimony in support thereof.  I understand that I am swearing or affirming under oath to the truthfulness of the claims made in this affidavit under penalties of perjury. I have read these statements in this affidavit, these statements are my understanding of the facts and my opinion provided is based upon a reasonable degree of medical and pharmaceutical industry processes certainty. I am providing this affidavit as I have serious, grave concerns for the United States military and the public-at-large.

2.      The expert opinions expressed here are my own and arrived at from my personal, professional and educational experiences taken in context, where appropriate, by scientific data, publications, treatises, opinions, documents, reports and other information relevant to the subject matter.

## Experience & Credentials

3.      I am competent to testify to the facts and matters set forth herein.  A true and accurate copy of my *curriculum vitae* is attached hereto as **Exhibit A**.

4.      I have personal knowledge and understanding of these matters and I make this affidavit in support of the truth of the contents contained herein.

5.      After receiving a bachelor's degree from Alfred University, I completed my master's degree as a Sigma Theta Tau, cum laude graduate from the University of Rochester, Rochester, NY. I went on to complete my nurse practitioner residency at the University of Rochester, Internal Medicine, with a sub-specialty in Medical and Surgical Cardiology. My clinical experiences include being on the staffs of Rochester General Hospital and the University of Rochester Medical Center.

6.      I taught undergraduate and graduate nursing curricula at Nazareth College of Rochester. I served on the faculty of the Margaret Warner Graduate School of Education and Human Development of the University of Rochester where I taught doctoral research methods. I hold a second master's degree in International Health Economics and Pharmacoeconomics from Universitat Pompeu Fabra in Barcelona, Spain. I have two earned doctorates, an EdD and a PhD.

7.      I was the managing Director of the Scharf Institute for Neuroscience and Sleep Research in Rochester, New York. In that capacity I managed all personnel including medical doctors, psychologists, medical technicians, polysomnographers, and nurses. My main role was to oversee the execution of multicenter pharmaceutical Phase 2 and Phase 3 human research studies with approved protocols and to follow a patient informed consent process as directed by any number of Institutional Review Boards (IRB), some of which were privately based and others that

were situated in universities and colleges, both certified by the federal government. I also created and wrote original research protocols and informed consent documents for industry and IRB review and approval, as I am highly trained in the requisite elements of a human study protocol. I am also familiar with human subjects' safety during clinical trials.

8.      I have over twenty years of experience in pharmaceutical drug development and medical affairs, including the prior experience described as a principal investigator for multi-center randomized, placebo-controlled trials in the United States and ROW. My experience extends to interfacing with FDA guidance documents, regulations, and submission reviews. My experience in the pharmaceutical industry extends to medical affairs functions, regulatory functions, animal and human subjects research study methodology and health economic and patient outcomes research.

**Opinion**

9.      Since the outset of the pandemic, I have been an advocate of good health and health practices and evaluated the health effects of these products that I believe have been authorized and approved prematurely. I believe within a reasonable degree of medical certainty that the COVID-19 vaccines available and under mandate in the United States are not safe generally; and particularly dangerous for military personnel. It is my belief, based upon a reasonable degree of medical certainty, that the injection could cause serious and permanent injury and the deaths of military personnel in the course of their duties to protect the American people, the American homeland and the U.S. Constitution.

10.     I believe within a reasonable degree of medical certainty that the data upon which Department of Defense has based its mandate is flawed and/or inaccurate; and imposing these injections is dangerous and could cause harm to military members.

11.      It is my opinion that the processes undertaken for all of the Emergency Use Authorizations and specifically for the recent FDA approval of the Comirnaty (including the Pfizer-BioNTech Covid 19 Vaccine injections deemed by both the FDA and the Pfizer Inc., to be "the same formulation" and "interchangeable," – please see https://www.fda.gov/vaccines-blood-biologics/qa-comirnaty-covid-19-vaccine-mrna and https://www.pfizer.ca/COMIRNATY-Now-Health-Canada-Approved ) are incomplete and missing key standard study data, FDA required data to establish safety and efficacy, and all safety surveillance and pharmacovigilance processes.

**COVID-19 Vaccine Research and Development –   Inherent Dangers and Omission of Standard Safety Structures for Investigational Trials**

12.      In the Pfizer COMIRNATY and Pfizer-BioNTech Covid 19 Vaccination Series package insert, (See Exhibit B), the label states that on December 11, 2020, during the randomized, placebo-controlled pivotal trial (the research design required for FDA approval), "participants were "unblinded to offer placebo participants COMIRNATY," which in my expert opinion, immediately transformed the study (as the company itself indicated in its registry on ClinicalTrials.gov, NCT04368728) into **a modified-open label, observational, variable dose trial with <u>no informed consent</u>** as to the status change, the exact dosage, or full disclosure of ingredients and completely compromised the requisite data for license application and that should render the study data insufficient and inappropriate to file for or be considered for review for FDA approval. What resulted was the distribution of an incomplete marketing label out to the public. In my expert opinion this is an egregious and fraudulent misrepresentation of the **Safe and Effective** statements made to the public.

13. The COVID-19 genetic modification injections (Pfizer, Moderna, J&J) failed to test for standard parameters in human studies.  The areas missing critical study results include genotoxicity, mutagenicity, teratogenicity, and oncogenicity. In other words, it is not certain if these products will permanently change human genetic material, cause birth defects, reduce fertility, or cause cancer. Pfizer and Moderna claim to use similar mRNA technology and Moderna has stated that the mRNA does indeed intermingle and modify the recipient's genetic code, characterizing it as the patient's "operating system," (see https://www.modernatx.com/mrna-technology/mrna-platform-enabling-drug-discovery-development ). Of concern, the manufacturer publicly declares on their website that the mechanism of action of their mRNA is as follows: "[g]enerally, the only thing that changes from one potential mRNA medicine to another is the coding region – the actual genetic code that instructs ribosomes to make protein. Utilizing these instruction sets gives our investigational mRNA medicines a software-like quality. We also have the ability to combine different mRNA sequences encoding for different proteins in a single mRNA investigational medicine." (Source: https://www.modernatx.com/mrna-technology/mrna-platform-enabling-drug-discovery-development ). To my knowledge, there is no informed consent, nor anything stamped with the approval of a human subjects' review board, to the public advising that they are submitting to <u>a permanent change in their native genetic sequencing or any of their natural genetic material.</u>

14.      When compared to other, standard package inserts/labeling of FDA approved drugs, biologics, and medical devices, there is also an absence of a description of the molecular structure of the biologic. This is a further failure to disclose to medical prescribers, the formula and molecular weight. These disclosures are critical because they determines the fate of a

compound regarding molecular interactions in the body generally and in the presence of concomitant medication therapy.

15.     In the human trial for Comirnaty / Pfizer-BioNTech Covid-19, the protocol lists a significant number of exclusions whereby subpopulations of people and those with certain medical comorbidity or conditions could not enter the trial; this results in the absence of controlled trial data for both safety and efficacy.  In my expert opinion, this should render any mandates for those populations as **contraindications.** These populations or conditions are missing from the final Approval label (See **Exhibit B**).  Taken from the Pfizer protocol for Comirnaty / Pfizer-BioNTech Covid Vaccine protocol ( Clinicaltrials.gov, see Study NCT04368728)  are as follows:

   a.  Medical or psychiatric condition including recent (within the past year) or active suicidal ideation/behavior or laboratory abnormality that may increase the risk of study participation or, in the investigator's judgment, make the participant inappropriate for the study.
   b.  Known infection with human immunodeficiency virus (HIV), hepatitis C virus (HCV), or hepatitis B virus (HBV).
   c.  History of severe adverse reaction associated with a vaccine and/or severe allergic reaction (e.g., anaphylaxis) to any component of the study intervention(s).
   d.  Receipt of medications intended to prevent COVID 19.
   e.  Previous clinical (based on COVID-19 symptoms/signs alone, if a SARS-CoV-2 NAAT result was not available) or microbiological (based on COVID-19 symptoms/signs and a positive SARS-CoV-2 NAAT result) diagnosis of COVID 19.
   f.  Individuals at high risk for severe COVID-19, including those with any of the following risk factors:
       i.    Hypertension
       ii.   Diabetes mellitus
       iii.  Chronic pulmonary disease
       iv.   Asthma
       v.    Current vaping or smoking
       vi.   History of chronic smoking within the prior year
       vii.  BMI >30 kg/m2
   g.  Anticipating the need for immunosuppressive treatment within the next 6 months.
   h.  Individuals currently working in occupations with high risk of exposure to SARS-CoV-2 (e.g., healthcare worker, emergency response personnel).
   i.  Immunocompromised individuals with known or suspected immunodeficiency, as determined by history and/or laboratory/physical examination.

j.  Individuals with a history of autoimmune disease or an active autoimmune disease requiring therapeutic intervention.

k.  Bleeding diathesis or condition associated with prolonged bleeding that would, in the opinion of the investigator, contraindicate intramuscular injection.

l.  **Women who are pregnant or breastfeeding**.

m.  Previous vaccination with any coronavirus vaccine. *(These did not exist at the time).*

n.  Individuals who receive treatment with immunosuppressive therapy, including cytotoxic agents or systemic corticosteroids, e.g., for cancer or an autoimmune disease, or planned receipt throughout the study.

o.  Regular receipt of inhaled/nebulized corticosteroids.

p.  Receipt of blood/plasma products or immunoglobulin, from 60 days before study intervention administration or planned receipt throughout the study.

q.  Participation in other studies involving study intervention within 28 days prior to study entry through and including 6 months after the last dose of study intervention, with the exception of non-Pfizer interventional studies for prevention of COVID 19, which are prohibited throughout study participation.

r.  Previous participation in other studies involving study intervention containing lipid nanoparticles.

s.  Positive serological test for SARS-CoV-2 IgM and/or IgG antibodies at the screening visit.

t.  Any screening hematology and/or blood chemistry laboratory value that meets the definition of a $\geq$ Grade 1 abnormality.

u.  Positive test for HIV, hepatitis B surface antigen (HBsAg), hepatitis B core antibodies (HBc Abs), or hepatitis C virus antibodies (HCV Abs) at the screening visit.

v.  SARS-CoV-2 NAAT-positive nasal swab within 24 hours before receipt of study intervention.

w.  Less than 12 years of age. *this is particularly significant because Pfizer-BioNTech companies have requested EUA for <12 years of age, including 2-11 year olds with no randomized, controlled study data and no proof of Human Subjects Review Board evaluation and approval.*

16.     The COVID-19 genetic modification vaccines (Pfizer, Moderna, J&J) failed to disclose or conduct and/or include any study results for standard pre-licensing safety that would adequately and at a minimum, inform prescribers and patients of serious considerations. These findings are, by good standard practices, included in the Prescriber's Information / Package Insert, commonly referred to as the Label. The missing studies and results include key information such as:

    a.  Pharmacokinetics – studies on the fate of the drug after administration:
           i.  Drug Half Life
         ii.  Drug-Drug Interactions (against standard metric drugs)
       iii.  Absorption
       iv.  Elimination
         v.  Receptor Affinity
       vi.  Tissue and Body Fluid Mass and Volume
      vii.  Drug Metabolism
     viii.  Maximum Drug Concentration
       ix.  Time to Concentration
        x.  CYP450 Isoenzyme Impact on Liver and Drug:  Identification of the microsomes in this system that are affected by this biologic and how that may interfere with or enhance effect on liver function. Interaction with this human enzyme system of concern can increase or decrease the mechanism of action of other medications or endogenous hormones and enzymes.

    b.  Pharmacodynamics – the entity's actions on the body
           i.  Receptor Binding – a critical component for drug-drug interactions and safety issues related to mechanism of action.
         ii.  Drug Effect at Receptor Binding, *particularly Angiotensin Converting Enzyme-2 Receptors, the key receptor for the resulting Subunit 1 pathogen, the Spike Protein resulting from the Pfizer, Moderna, and J&J self-proclaimed mechanism of action (MOA)*.
       iii.  Concentration of the Drug at the Receptor Sites

17.  There are four phases to human trials in drug development and Phase 3 is most critical as it comprises the last phase of testing to be completed before the drug's details and clinical trial results are submitted to the regulatory authorities for approval of the drug's release on the open market. See Exhibit C, Phases of Human Trials).  While Phase 1 focuses on tolerability and safety in a small number of healthy subjects and Phase 2 establishes efficacy and optimal dosing regimen, Phase 3 should demonstrate and confirm the preliminary evidence gathered in the previous trials that the entity is, a safe, beneficial and effective treatment for the intended indication. The absence of findings from this part of the study as well as from the missing elements enumerated in Sections 15 and 16 violate FDA Guidance Expectations for proper review submission and approval.

18.    The COVID-19 genetic vaccines (Pfizer, Moderna, J&J) are currently conducting Phases 1, 2 & 3 simultaneously which is dangerous and unprecedented in drug development. My expert position is that this departure from standard human trial phases conduct whereby FDA is allowing Phases 1/2/3 of human trials to run consecutively,

(without Subjects' Informed Consent), is a serious departure from standard human trial phases, which should run ***consecutively***, because each Phase must incorporate the results in order to inform the subsequent Phase on next steps for safety and efficacy. See Exhibit C, Phases of Clinical Drug Trials)

19. The COVID-19 genetic vaccines (Pfizer, Moderna, J&J) failed to study the following standard good practice subpopulations for the effects enumerated in the exclusion criteria sufficiently with a placebo control arm:
   a. Age
   b. Gender
   c. Race
   d. Liver Impairment
   e. Kidney/Renal Impairment

20.     The COVID-19 genetic vaccines (Pfizer) claim in the labeling (See **Exhibit B,** page 6, section 6.1) that "because clinical trials are conducted under widely varying conditions, adverse reaction rates observed in the clinical trials of a vaccine cannot be directly compared to rates in the clinical trials of another vaccine and may not reflect the rates observed in practice." The manufacturer uses this unorthodox proclamation to justify failure to conduct safety evaluation that it had planned to do in the manufacturer's own protocol and in its Pharmacovigilance Plan, both submitted to the FDA and that currently sits on ClinicalTrials.gov, the U.S. government website repository for trial registration. (https://clinicaltrials.gov/ct2/show/NCT04368728?cond=NCT04368728&draw=2&rank=1).
   a. Prior to COMIRNATY's full FDA approval, the FDA issued a Warning regarding the rates of heart inflammation and heart failure in teenagers; but that Warning did not translate equally to the product labeling, no Black Box Warning transferred to the Label, and in fact did not even translate to Contraindications Section for these products.
   b. It is good standard practice to include studies for any entity administered concomitantly with monoamine oxidase inhibitors (MAOIs) and/or include a contraindication for simultaneous use.
   c. Prescribers and medical providers are not only not discouraged, but they are affirmatively encouraged, to proceed with injecting this series into populations that were either excluded in the study or who subsequently reported serious life-threatening adverse events as reported by the federal government's tracking sites Vaccine Adverse Reporting System (VAERS) and V-Safe.
   d. In direct contradiction to the FDA/CDC Safety meeting in October 2020, prior to the vaccination roll out program, there are no warning or precautions included in the Label relative to the FDA's known and prior warnings.

e. The Serious Adverse Event Section in the Label is devoid of data already known to the public through the VAERS and V-SAFE reporting systems, both the only sources for the public to be informed of risks. This raises the question as to why the reported rates of cardiac injury, sudden cardiac death, blood clot caused strokes, teen heart attacks, paralysis and serious permanent motor impairment and blood dyscrasias (as demonstrated by numerous scientists including UK physician Dr. Philipe VanWelbergen, Dr. Barbel Ghitalla, and Dr. Robert Young among others) are absent from the Label. Dr. Robert Young has provided recent evidence that vials of Pfizer, Moderna, Johnson & Johnson, & AstraZeneca properly constituted for individual use per the manufacturers' instructions yielded visual microscopy evidence of lethal parasites, stainless steel aggregations, graphene oxide, and "nanoparticles of bismuth, titanium, vanadium, iron, copper, silicon, aluminum embedded in Pfizer vials."
(See **Exhibit D**, Blood smears, Dr. VWB & Dr. BG); Source: https://www.drrobertyoung.com/post/transmission-electron-microscopy-reveals-graphene-oxide-in-cov-19-vaccines

f. Teratogenicity is a primary concern in all experimental medical interventions and drugs under review, and unless it is studied (after human subjects' review board approval), it is a de facto contraindication to give, much less mandate, any medical intervention to a woman of child bearing years, a pregnant woman, or newborn baby. In fact, the reason there is no guidance in the Label for use in pregnant women is because pregnant women were not studied. Women of child-bearing age were also excluded; therefore, no safety data is included in the Label and the Label only indicates that "Available data on COMIRNATY administered to pregnant women is insufficient to inform vaccine-associated risks in pregnancy." If the data is insufficient by the Companies' and the P-B Label, then it should be contraindicated in that population.

   i. Similarly, the Label states, "It is not known whether COMIRNATY is excreted in human milk." Pursuant to good and standard clinical research practices this would constitute a de facto contraindication.

g. There is no information or data to guide prescribers on whether to use this and what the degree of safety would be for use in those with concomitant illnesses, otherwise known as medical comorbidity.

h. There is no information on how to consider dose adjustment for special populations and those already medically compromised.

i. The Label is missing data and guidance information on Carcinogenesis, Mutagenesis, and Impairment on Fertility – despite the disclosure by Pfizer that researchers during the trial were warned to avoid contact between people of child-bearing age and those who have gotten this entity. (See **Exhibit E**, Pfizer Protocol, page 132).

21.     The COMIRNATY product that has been deemed (https://www.pfizer.com/news/press-release/press-release-detail/pfizer-biontech-covid-19-vaccine-COMIRNATYr-receives-full) to "have the same formulation [as the Pfizer-BioNTech Covid-19 Vaccine] and can be used interchangeably to provide the Covid-19 vaccination series," was granted full FDA approval, licensed, and labeled with the Indication "to prevent Covid-19 in individuals 16 years of age and older." This is in contrast to the a priori primary endpoint in the study protocol (See **Exhibit E**). The primary endpoint is the measure used to validate the entity's separation from placebo which indicates the degree of efficacy and if the entity statistically separates from placebo, this constitutes the basis for the FDA approved indication or otherwise known as the legal marketing authorization. In the Pfizer protocol NCT04368728 on Clinicaltrials.gov, the primary endpoint was less severe symptoms and lower rates of hospitalizations. Upon FDA approval on August 23, 2021, both the company and the FDA announced the approval of Comirnaty/ Pfizer-BioNTech Covid 19 Vaccine for the indication "to prevent Covid 19." See Label Exhibit B)

22.     The companies declare that the COMIRNATY product, while the same formulation, is currently "unavailable," in direct contradiction to Pfizer's statement that COMIRNATY was used in over 20,000 people in 2021. (See **Exhibit B**, Pfizer Package Insert).

23.     The FDA approval letter for COMIRNATY, dated August 23, 2021, from RADM Denise Hinton to Pfizer that has been used by the Department of Defense to claim that there is now a "fully licensed vaccine", constitutes a "deceptive or misleading statement" about a product as that term is used in regards to marketing or labeling a drug or vaccine. Until a vaccine has shown the requisite safety, efficacy, and potency requirements by rigorous scientific studies designed according to FDA's established standard criteria, the vaccine, in my expert opinion has not been shown to meet the FDA's own standards for FDA approval.

24.     The FDA's approval letter clearly states that a different vaccine, manufactured by BioNTech Manufacturing GmbH in Germany and known as COMIRNATY, is being approved as a fully licensed vaccine. In this same letter, RADM Hinton also extends the Emergency Use Authorization for the Pfizer BioNtech vaccine. Later in the same letter, RADM Hinton states that the BioNtech vaccine is the equivalent to the COMIRNATY vaccine, while they are "legally distinct", that no safety or efficacy concerns are present, and that because of the lack of availability of the COMIRNATY vaccine that the Pfizer BioNtech is allowed to be substituted in place of the approved COMIRNATY vaccine. This is all done without any evidence as to how the BioNtech vaccine can be declared safe or effective when it has not even completed a successful Phase III trial. (See Exhibit F for FDA Guidance Document on requirements for Phase 3 trials; https://www.fda.gov/media/87621/download. Furthermore, in the Pfizer protocol (See Exhibit E) three formulations are enumerated, with no disclosures on the distinctions:

    a.  BNT 162b1

b. BNT 162b2
c. BNT 162SA
d. The protocol indicates that injectees will randomly be injected with any one of at least 8 doses including one dose 100mcg, which is essentially >3 times the approved dose, 30 mcg in Comirnaty.

25.     The COVID-19 genetic vaccine companies (Pfizer, Moderna, J&J) have not provided complete FDA or the public disclosure on their vaccine boxes, package inserts or labels for all of the ingredients within these injection vials. Vis a vis fundamental human rights, governed by International Law and the Nuremberg Code of 1947, the vaccine-specific ingredient information is critical, required and necessary to know so that any human can make an informed decision whether or not to consent to inoculation.

26.     The Pfizer, Moderna, and J&J vaccines are considered "genetic vaccines", or vaccines produced from gene therapy molecular platforms which, according to US FDA regulatory guidance, are classified as gene delivery therapies and should be under a **fifteen-year** regulatory cycle with annual visits for safety evaluation by the research sponsors. (*Long Term Follow-up After Administration of Human Gene Therapy Products. Guidance for Industr*y. FDA-2018-D-2173. 2020. Accessed July 13, 2021, at https://www.fda.gov/regulatory-information/search-fda-guidance-documents/long-term-follow-after-administration-human-gene-therapy-products.

27.     The FDA has "advised sponsors to observe subjects for delayed adverse events for as long as fifteen years following exposure to the investigational gene therapy product, specifying that the long-term follow-up observation should include a minimum of five years of annual examinations, followed by ten years of annual queries of study subjects, either in person or by questionnaire." (emphasis added). Thus, the administration of the Moderna, Pfizer, and J&J vaccines should not be undertaken without the proper consent and arrangements for long-term follow-up which are currently not offered in the US. (See, EUA briefing documents for commitments as to follow up: Moderna, Pfizer, J&J).

28.     Because the US FDA and CDC have offered no methods of risk mitigation or proof of continued safety surveillance for these serious adverse effects which can lead to permanent disability or death, no one should be pressured, coerced, receive the threat or reprisal, or be mandated to receive one of these investigational products against their will.

29.     It is never good, nor standard, nor reasonable research practice to perform a large-scale clinical investigation without the necessary structures in place to ensure the safety and protection of human subjects. These structures include a critical event committee, data safety monitoring board and human ethics committee. These groups in large studies work to objectively assess the safety of the investigational product and research integrity. The goal is to mitigate risk

and protect human subjects. It is my understanding that the COVID-19 vaccine program sponsored by the CDC and FDA has implemented none of these crucial safety structures which, to my knowledge, have never before been omitted from any large-scale clinical investigation, not to mention that the subject clinical investigation is of far greater and unprecedented magnitude and complexity than any of its predecessors. It is my assessment that the COVID-19 clinical investigation has provided no meaningful risk mitigation for subjects (restricting groups, a special assessment of side effects, or follow-up visits) to ensure or improve the safety of the program.

30.     According to expert medical opinion, there are emerging trends demonstrating that any Covid-19 vaccine is especially risky for those in the 12 – 29 year-old demographic, with resulting complications in the cardiovascular, neurological, hematologic, and immune systems. *(See,* Rose J, et al). Increasingly, the medical community is acknowledging the possible risks and side effects inclusive of myocarditis, Bell's Palsy, Pulmonary Embolus, Pulmonary Immunopathology and severe allergic reaction causing anaphylactic shock. *See* Chien-Te Tseng, Elena Sbrana, Naoko Iwata-Yoshikawa, Patrick C Newman, Tania Garron, Robert L Atmar, Clarence J Peters, Robert B Couch, *Immunization with SARS coronavirus vaccines leads to pulmonary immunopathology on challenge with the SARS virus,* https://pubmed.ncbi.nlm.nih.gov/22536382/ (last visited June 21, 2021); Centers for Disease Control and Prevention, *Allergic Reactions Including Anaphylaxis After Receipt of the First Dose of Pfizer-BioNTech COVID-19 Vaccine*—United States, December 14–23, 2020 (Jan 15, 2021), https://www.cdc.gov/mmwr/volumes/70/wr/mm7002e1.htm (last visited June 26, 2021).

31.     The Centers for Disease Control has held emergency meetings on this issue and the medical community is responding to the crisis. It is known that myocarditis causes injury to heart muscle cells and may result in permanent heart damage culminating in heart failure, arrhythmias, and cardiac death. These conditions could call for a lifetime need for multiple medications, implantable cardio defibrillators, and heart transplantation. Heart failure has a five-year 50% survival and would markedly reduce the lifespan of a child or young adult who develops this complication after vaccine-induced myocarditis (McCullough PA, Philbin EF, Spertus JA, Kaatz S, Sandberg KR, Weaver WD; Resource Utilization Among Congestive Heart Failure (REACH) Study. Confirmation of a heart failure epidemic: findings from the Resource Utilization Among Congestive Heart Failure (REACH) study. J Am Coll Cardiol. 2002 Jan 2;39(1):60-9. doi: 10.1016/s0735-1097(01)01700-4.

32.     COVID-19 vaccine-induced myocarditis has a predilection for young males below age 30 years, a substantial demographic of the US military. The Centers for Disease Control has held emergency meetings on this issue, the medical community is responding to the crisis, and the US FDA has issued a warnings on the Pfizer and Moderna vaccines "Fact Sheet for Patients and Caregivers," the apparent substitute for an official, and comprehensive Informed Consent

document, for myocarditis. Given the prevalence of this event in younger males, no individual under age 30 under any set of circumstances should feel obliged to take this risk with the current genetic vaccines, particularly the Pfizer and Moderna products. https://www.fda.gov/news-events/press-announcements/coronavirus-COVID-19-update-june-25-2021.

33.    Multiple recent studies and news reports detail young adults, ages 18-29, dying from myocarditis after receiving the COVID-19 vaccine. According to the CDC, 475 cases of pericarditis and myocarditis have been identified in vaccinated citizens aged 30 and younger. See FDA, *Vaccines and Related Biological Products Advisory Committee June 10, 2021, Meeting Presentation*, https://www.fda.gov/media/150054/download#page=17    (last visited June 21, 2021).

34.    The FDA found that young people ages 12-24 account for 8.8% of the vaccines administered; yet this demographic comprises 52% of the cases of myocarditis and pericarditis reported through May 31, 2021. **_Id._**

*Table 5: VAERS Report*



Preliminary myocarditis/pericarditis reports to VAERS following dose 2 mRNA vaccination, Exp. vs. Obs. (data thru May 31, 2021)

| Age groups | Doses admin | Crude reporting rate* | Expected†,‡ Myocarditis/ pericarditis cases | Observed† Myocarditis/ pericarditis reports | |
|---|---|---|---|---|---|
| 12–15 yrs | 134,041 | 22.4 | 0–1 | 2 | n=277 reports |
| 16–17 yrs | 2,258,932 | 35.0 | 2–19 | 79 | 52.5% of total reports |
| 18–24 yrs | 9,776,719 | 20.6 | 8–83 | 196 | |
| 25–39 yrs | 26,844,601 | 5.0 | 23–228 | 124 | |
| 40–49 yrs | 19,576,875 | 3.0 | 17–166 | 51 | |
| 50–64 yrs | 36,951,538 | 1.3 | 31–314 | 39 | |
| 65+ yrs | 42,124,078 | 0.9 | 36–358 | 26 | |
| NR | — | — | — | 11 | |

(8.8% of doses admin)

35.    Furthermore, the CDC announced on June 24, 2021, that the vaccine is "likely linked" to myocarditis. "Advisory Board, CDC panel reports 'likely association' of heart inflammation and mRNA COVID-19 vaccines in young people," (June 24, 2021) https://www.advisory.com/daily-briefing/2021/06/24/heart-inflammation.

36.    On July 12, 2021 the US FDA sent out an additional warning for Guillain-Barre Syndrome or ascending paralysis for the J&J vaccine which is not predictable and, when it occurs, can result in ascending paralysis, respiratory failure, the need for critical care and death. Not all

cases completely resolve, and some vaccine victims may require long term mechanical ventilation, or become quadra- or paraplegics. Prolonged neurological rehabilitation is commonly required, and this will call for time away from school and studies for those children injured from the J&J vaccine with Guillain-Barre Syndrome.    https://www.fda.gov/media/150723/download

### Risks of COVID-19 Vaccines for Those Recovered from COVID-19

37.    There is recent research demonstrating that the COVID-19 vaccine is dangerous for those who have already had COVID-19 and recovered with inferred robust, complete, and durable immunity. These patients were excluded from the FDA-approved clinical trials performed by Pfizer, Moderna, and J&J. From these trials the safety profile was unknown when the products were approved for Emergency Use Authorization in 2020.  There has been no study demonstrating clinical benefit with COVID-19 vaccination in those who have well documented or even suspected prior COVID-19 illness.

38.    To my knowledge, there are no studies that demonstrate the clinical benefit of COVID-19 vaccination in COVID-19 survivors or those with suspected COVID-19 illness or subclinical disease who have laboratory evidence of prior infection.

### Conclusion

I have reviewed the Complaint For Declaratory and Injunctive Relief which delineates the aforementioned significant departures from standard procedures, protocols and safety measures and conclude as follows:

39.    It is my expert medical opinion that it is not good, nor standard, nor reasonable professional research or clinical practice to widely utilize these never-before-tested-in-human beings, biologic therapy (mRNA, adenoviral DNA COVID-19 vaccines) in populations where there is no information generated from fully completed, controlled registrational trials with the FDA, specifically COVID-19 survivors, suspected COVID-19-recovered, pregnant or women who could become pregnant at any time after investigational vaccines; and especially our military.

40.    In my expert opinion, the risks associated with the investigational COVID-19 vaccines far outweigh any theoretical benefits, are not minor or unserious, and many of those risks are unknown and have not been adequately quantified; nor the duration of their consequences evaluated or shown to be calculable. Therefore, in my expert medical opinion, the Emergency Use Authorization and FDA Approval for the administration of COVID-19 vaccines creates an unethical, unreasonable, clinically unjustified, unsafe, and unnecessary risk to the military of the United States of America.

41.    The gross deviations in conducting adequate safety and efficacy studies, the lack of disclosure on product content, the absence of informative trial data in good clinical research practices for basic categories and conditions, the absence of Human Subjects Review (HSRB)

oversight, the absence of Good Manufacturing Practices oversight created by the FDA, the lack of a full human subjects' review board approval stamped, informed consent for replaced only by an abbreviated patient one-page checklist, and the deviations and omissions from protocol to Label are of great concern to me. In my expert opinion, the foregoing constitutes a lack of scientific justification for the Approval, all Emergency Use Authorizations, and any mandated administration of both the COMIRNATY and Pfizer-BioNTech vaccine formulations, both of which have been declared by the companies as one and the same.

State of Florida

County of Palm Beach

The undersigned, being duly sworn, deposes and says:

I, Jane Ruby, declare under the penalty of perjury of the laws of the United States of America, and state upon personal knowledge that:

I am an adult of sound mind, over 21 years old, and declare that the information herein is true, correct and complete and that I have voluntarily affirmed this affidavit based upon my own personal knowledge, education, and experience, and under the penalty of perjury of the laws of the United States of America.

Dr. Jane Ruby, PhD, EdD, MS, MS Economics, NP

SUBSCRIBED AND SWORN TO BEFORE ME on the 27 day of September 2021, to certify which witness my hand and official seal.

Notary Public for the State of Florida

My Commission Expires:

MARK F. WEISSMAN
Commission # HH 067532
Expires March 26, 2025
Bonded Thru Budget Notary Services

# EXHIBIT A

# DR. JANE RUBY
### PhD, EdD, MS, MS Health Economics, NP
### | Washington, DC/Palm Beach, FL

## Medical Affairs and Pharmacoeconomics Professional

Medical Affairs professional with over twenty years of experience in pharmaceutical drug development, clinical research, clinical practice, and management of field medical affairs. Medical Affairs expertise in therapeutic areas including multiple internal medicine areas such as GI, endocrinology & cardiology and neuroscience (neurology, psychiatry, addiction, sleep medicine). Strategic and tactical expert in health economics and outcomes research with evidence-based differentiation of products and a powerful portfolio of publications and economic models. Former principle investigator. Strong communication skills with stakeholders including scientific thought leaders, public and private payer KOLs, professional associations, academic investigators, legislative policy makers, and regulators.

### Core competencies include:

KOL Identification & Relationship Management * Field Team Build & Management Real World Evidence Communication * Publication Track Record * Business Acumen Scientific Education Programing & Execution

## SELECTED ACHIEVEMENTS

- Expert in Health Economic and Patient Outcomes Data Generation and Payer Communications
- Founded HEOR program for US, Canada and Europe resulting in 62 abstracts, 60 posters, 6 peer-reviewed publications, and 3 budget impact models over a 4-year period at Indivior.
- Created HEOR program for data generation and publication plan at Endo.

## PROFESSIONAL EXPERIENCE

Ruby Consulting, LLC
**DIRECTOR and CEO**                                                                 2017 – present
Consultation to pharmaceutical and biotech organizations for short and long-term projects to create infrastructure in Medical Affairs and Health Economics & Outcomes functions.

SK LifeScience                                                                       2020 - 2021
**ASSOCIATE DIRECTOR, HEOR**
Provided consultation support to create HEOR data generation research program with strategic input for prospective and retrospective studies; publication planning, and external market access KOL development.

Pear Therapeutics, Inc., Boston, MA                                                  2019 - 2020
**ASSOCIATE DIRECTOR, Medical Affairs**
Hybrid role with managed care field medical responsibility and facilitation of HEOR study program. Team Lead for health economics and outcomes data dissemination in collaboration with Market Access. Supported VP, Medical Affairs in building field Medical Team, developed on-boarding program.

Endo Pharmaceuticals, Inc., Malvern, PA                                              2016 - 2019
**NATIONAL LEAD – HEOR**
Formulated new HEOR data generation program. National Field Team Lead for Managed Care public and private stakeholder interface. Messaging and communications dissemination of scientific data for payers (public and commercial), policy makers, formulary decision makers, professional associations. HEOR consultant contributor.

Indivior, Inc., Richmond, VA                                                         2010 - 2016
**MEDICAL AFFAIRS MANAGER, US & GLOBAL HEOR PROGRAM LEAD**

**JANE RUBY, PhD, EdD, MS NURSING, MS PHARMACOECONOMICS, NP**                    **Page 2**

Founded HEOR program for US, Canada and Europe with a focus on US and global data generation programs to ensure appropriate and adequate treatment access for substance dependent patients.

- Strategic and tactical lead for the execution of retrospective/prospective studies for partial opioid agonist maintenance therapies across numerous compounds.
- Lead messaging and communications dissemination of scientific data for payers (public and commercial), policy makers, formulary decision makers, and professional associations.
- Developed and maintained cross-functional relationships with Marketing, Market Access, Strategy, Managed Care, Regulatory, Legal, and Competitive Intelligence.
- Managed large-scale publication plan with prolific record of peer-reviewed publications, abstracts, posters, manuscripts, and economic modeling tools.
- Coordinated dissemination of scientific education to external stakeholders including public and private formulary decision makers and legislative policy makers to support patient access to treatment.
- Scientific liaison to U. S. Vet Admin, State Medicare & Medicaid   payers, and criminal justice committees
- Managed scientific, pharmacoeconomic, and disease awareness information dissemination for   managed care organizations, pharmacy benefit management companies, health care systems, long term care organizations, government payers, and professionals involved with formulary decision making. Spearheaded global education program for internal business groups from North America, Europe, and Developing Markets (Asia/Africa), Barcelona, Spain

Forest Laboratories, Inc., New York, NY                                        2000 – 2010
**SENIOR MANAGED CARE MEDICAL SCIENCE LIAISON**

- Worked with external academic thought leaders in collaborative partnering in treatment of major depression and cognitive disorders.  Implemented medical strategies and lifecycle plans for Lexapro, Acamprosate, and Namenda launches.
- Supported the development of Atypical Antipsychotic Cariprazine (D2 and D3 Receptor agonists) for Schizophrenia, Bipolar Mania and Bipolar Depression.
- Managed single and multi-center Phase IV investigator-initiated study program
- Lead for $400,000 program to establish National Hispanic psychiatry treatment consensus guidelines: Publication: Delgado, P. et al. Depression and Access to Treatment Among U.S. Hispanics: Review of the Literature and Recommendations for Policy and Research. FOCUS: Jour of Lifelong Learning in Psychiatry. 2006 Jan;4(1):38-47.

**Therapeutic Areas:**

- <u>CNS Neuroscience</u>
  - Major Depression; Anxiety / General Anxiety (SSRI enantiomer)
  - Addiction Medicine (Dual NMDAr antagonist, & GABA agonist)
  - Alzheimer's Disease / Dementia / Cognitive Disorders (NMDA Receptor Antagonist)
  - Schizophrenia, Bipolar Mania, & Bipolar Depressio:  D2 and D3 Receptor Agonists
- <u>Gastrointestinal</u> – Irritable Bowel Syndrome (Guanylate Cyclasetype-C Agonist) and MSL Team Lead with Ironwood for IBS-D-C for disease state education and Phase 3 study support.
- <u>Endocrinology</u> - Diabetes Type 2 (DPP-4 Inhibitor)
- <u>Cardiopulmonary</u> - COPD (Emphysema/Chronic Bronchitis) /Asthma (PDE-4 Inhibitors)

Scharf Institute for Sleep Research, Rochester NY                                1998 – 2000
**ASSOCIATE DIRECTOR / PRINCIPAL INVESTIGATOR**

Summary:  Managed CNS experimental clinical drug study center in hypnotics, anti-depressants, anxiolytics, melatonin agonists, and GHB as orphan drug for narcolepsy/cataplexy.
**Therapeutic Areas:**  Sleep Disorders / Fibromyalgia / Depression

- Managed team of 12 research coordinators, laboratory technicians, psychiatrists, psychologists, and polysomnographic technicians

- Management of 1.5 million dollar budget across variety of CNS clinical trials as part of pharmaceutical Phase IIb/IIIa multicenter programs.
- Developed original study protocols for submission, selection and validation of new instruments

**JANE RUBY, PhD, EdD, MS NURSING, MS PHARMACOECONOMICS, NP**                    **Page 3**

University of Rochester Medical Center and Rochester General Hospital
**REGISTERED NURSE AND NURSE PRACTITIONER**                    1995 -2000
**Therapeutic Areas**: Hematology Oncology, Medicine, Surgery, Cardiac Surgical Intensive Care

## EDUCATION

UNIVRSITAT POMPEU FABRA, The Barcelona School of Management, MS Health Economics (2014)
UNIVERSITY OF ROCHESTER, EdD Higher Education (2000)
KENNEDY WESTERN UNIVERSITY, PhD Psychology (2004)
UNIVERSITY OF ROCHESTER, MS Nursing (1992)
ALFRED UNIVERSITY, BS Nursing (1988)

## PUBLICATIONS

### MANUSCRIPTS

- Zah V, Pelivanovic J, Tatovic S, Vukicevic D, Imro M, Ruby J, Hurley D. Healthcare Costs and Resource Use of Patients with Dupuytren Contracture Treated with Collagenase Clostridium Histolyticum or Fasciectomy: A Propensity Matching Analysis [Corrigendum]. *Clinicoecon Outcomes Res.* 2021;13:163-164 https://doi.org/10.2147/CEOR.S309720
- Zah, V, Pelivanovic J, Tatovic S, Vukicevic, D, Imro, M, Ruby J, Hurley, D.  Healthcare Costs and Resource Use of Patients with Dupuytren Contracture Treated with Collagenase Clostridium Histolyticum or Fasciectomy: APropensity Matching Analysis. *Clinicoecon Outcomes Res.* 2020;12:635-643 https://doi.org/10.2147/CEOR.S269957
- Kharitonova E, Khemiri A, Aballéa S, Ruby J, Zah V. Impact of buprenorphine/naloxone treatment on the cost of prescription opioid drug dependence: analysis of claims from US public health patients and extrapolation for Germany (Der Einfluss einer Buprenorphin/Naloxone-Behandlung auf die Kosten der Opioidverschreibungsabhängigkeit: Übertragung einer US-Datenbankanalyse auf Deutschland). *German Journal of ClinicoEconomics* 2016 1:25-37
- Asche, C., Clay, E., Kharitonova, E., Zah, V., Ruby, J., Aballea, S., Budgetary impact of the utilization of buprenorphine/naloxone film and tablet on Medicaid in the United States. Journal of Medical Economics 2015May 20: 1-12
- Clay, E., Zah, V., Aballea, S., Ruby, J., Asche, C. Persistence and healthcare utilization associated with the use of buprenorphine/naloxone film and tablet formulation therapy in adults with opioid dependence. Journal of Medical Economics 17(9):626-636. Sep 2014.
- Khemiri, A., Kharitonova, E., Zah, V., Ruby, J., Toumi, M. Analysis of buprenorphine/naloxone dosing impact on treatment duration, resource use and costs in the treatment of opioid dependent adults: A retrospective study of US public and private healthcare claims. Postgrad Medicine 2014 126(5):1-8.
- Ruby, J. (1999). History of higher education: Educational reform and the emergence of the nursing professoriate. Journal of Nursing Education, 38(1), 18-22.
- Ruby, J. (1998). Baccalaureate nurse educators' workload and productivity: Ascription of values and the challenges of evaluation. Journal of the New York State Nurses' Association, 29(2), 18-22.

### POSTERS

- Zah V, Matveev N, Imro M, Ruby J Dosing patterns among opioid dependent patients treated with buprenorphine in a length of treatment study Presented at the 27th Annual Meeting and   Scientific Symposium of The American Academy of Addiction Medicine, Bonita Springs, FL 8-11 December 2016
- Matveev N, Zah V, Imro M, Ruby J Patient characteristics among opioid dependent buprenorphine treated patients in a length of treatment study. Presented at the 40th Association for Medical Education and Research in Substance Abuse (AMERSA) Nov 3-5, 2016, Washington DC.   ·

JANE RUBY, PhD, EdD, MS NURSING, MS PHARMACOECONOMICS, NP                                                     Page 4

- Zah V, Matveev N, Imro M, Ruby J Adherence among opioid dependent patients treated with buprenorphine in a length of treatment study. Accepted for presentation at the Presented at the joint conference ISAM and CSAM-SMCA XXVII Annual Meeting and Scientific Conference, 20-22 October, 2016. Montreal, Canada
- Zah V, Matveev N, Imro M, Ruby J Patient characteristics among opioid dependent buprenorphine treated patients in a length of treatment study. Accepted for presentation at the joint conference ISAM and CSAM-SMCA 27th Annual Meeting and Scientific Conference, 20-22 October, 2016. Montreal, Canada
- Zah V, Matveev N, Berjan M, Ruby J Optimal minimum length of treatment with buprenorphine: An analysis of resource use and costs after medically controlled discontinuation. Presented at the 21st Annual International Meeting ISPOR, May 21-25, 2016, Washington DC, USA [SEP]
- Zah V, Matveev N, Berjan M, Ruby J Optimal minimum length of treatment with buprenorphine. Presented at the 21st Annual International Meeting ISPOR, May 21-25, 2016, Washington DC, USA [SEP]
- Zah V, Matveev N, Berjan M, Thompson S, Ruby J Overdose: a burden of illness retrospective cost analysis in the US public health population. Presented at 12th Annual European Opiate Addiction Association Conference 27-29 May 2016, Leiden, Netherlands
- Clay, E, Kharitonova, E., A, Ruby, J, Aballea, S., Zah, V. Budgetary impact of new buprenorphine/naloxone tablet formulations on private healthcare plans. Accepted for presentation at 45th Annual Medical Scientific Conference of American Society for Addiction Medicine, 10-13, April 2014, Orlando.
- Clay, E, Khemiri, A, Ruby, J, Aballea, S., Zah, V. US private insurer budget impact analysis of buprenorphine/naloxone film and tablet formulations. Poster presentation ISPOR 31 May-4 June 2014, Montreal.
- Clay, E, Kharitonova, E., A, Ruby, J, Aballea, S., Zah, V. Medicaid population budget impact analysis of buprenorphine/naloxone film and tablet formulations. Poster presentation ISPOR 31 May-4 June 2014, Montreal.
- Clay, E, Khemiri, A, Ruby, J, Aballea, S., Zah, V. A studies-based private insurance budget impact analysis of buprenorphine/naloxone film and tablet formulations. Poster presentation ISPOR 31 May- 4 June 2014, Montreal.
- Clay, E, Khemiri, A, Ruby, J, Aballea, S., Zah, V. Patient persistence with buprenorphine/naloxone film and tablet formulations in the treatment of opioid dependence in the United States: Results from a 2010-2012 privately insured retrospective database. Presented at the annual conference of International Society for Addiction Medicine, Kuala Lumpur, 21-23 November 2013. PG07
- Kharitonova, E, Clay, E, Ruby, J, Aballea, S, Zah, V. Retrospective study of persistence and healthcare costs in the US opioid-dependent Medicaid population treated with buprenorphine/naloxone film and tablet formulations. Presented at the International Society for Pharmacoeconomic and Outcomes Research 18th Annual US Meeting, May 2013, New Orleans.
- Kharitonova, E, Clay, E, Ruby, J, Aballea, S. Retrospective study of persistence and healthcare charges among opioid-dependent patients treated with buprenorphine/naloxone film and tablet formulations using a privately insured retrospective database. Presented at the American Society of Addiction Medicine 44th Annual Meeting, April 2013 Chicago.
- Kharitonova, E, Clay, E, Ruby, J, Aballea, S. Retrospective study of persistence and healthcare charges among opioid-dependent patients treated with buprenorphine/naloxone film and tablet formulations using a privately insured retrospective database. Presented at the Academy of Managed Care Pharmacy 25th Annual Meeting, April 2013 San Diego.
- Lavonas, EJ, Severtson, SG, Murrelle, EL, Ruby, J, Bucher-Bartelson, B, Dart, RC. Unintentional exposures to buprenorphine/naloxone sublingual tablets and film among children less than six years old. Presented at the American Academy of Addiction Psychiatry 23rd Annual Meeting, Dec 2012, Aventura, FL.
- Clay, E, Ruby, J, Aballea, S, Zah, V. Patient persistence with buprenorphine/naloxone film and tablet formulations in the treatment of opioid dependence in the US: Results from a privately insured retrospective database. Presented at the American Academy of Addiction Psychiatry 23rd Annual Meeting, Dec 2012, Aventura, FL.

JANE RUBY, PhD, EdD, MS NURSING, MS PHARMACOECONOMICS, NP                    **Page 5**

- Lavonas, EJ, Severtson, SG, Murrelle, EL, Ruby, J, Bucher-Bartelson, B, Dart, RC. Unintentional exposures to buprenorphine/naloxone sublingual tablets and film among children less than six years old. Presented at the Association for Medical Education and Research in Substance Abuse 36th Annual meeting, Nov 2012, Bethesda, MD
- Clay, E, Ruby, J, Aballea, S, Zah, V. Patient persistence with buprenorphine/naloxone film and tablet formulations in the treatment of opioid dependence in the US: Results from a privately insured retrospective database. Presented at the Association for Medical Education and Research in Substance Abuse 36th Annual meeting, Nov 2012, Bethesda, MD
- Clay, E, Ruby, J, Aballea, S, Zah, V. Patient persistence with buprenorphine/naloxone film and tablet formulations in the treatment of opioid dependence in the US: Results from a privately insured retrospective database. Presented International Society for Pharmacoeconomic and Outcomes Research 15th Annual EU meeting, Nov. 2012 Berlin.
- Lavonas, EJ, Severtson, SG, Murrelle, EL, Ruby, J, Bucher-Bartelson, B, Dart, RC. Unintentional exposures to buprenorphine/naloxone sublingual tablets and film among children less than six years old. Presented at the International Society for Pharmacoeconomic and Outcomes Research 15th Annual EU meeting, Nov. 2012 Berlin.
- Ruby, J. (2005). Geriatric sleep medicine: The case for the sleep management team. Doctoral dissertation. PhD. Kennedy Western University, January 2005.
- Burke, W. and Ruby, J. (2002). Safety and efficacy of escitalopram in elderly subjects. Poster presented at the annual meeting of the International Conference on Alzheimer's Disease, October 5, 2002, Barcelona, Spain.

# ORAL PRESENTATIONS

- Zah V, Matveev N, Imro M, Ruby J. Optimal minimum length of treatment with buprenorphine: An analysis of resource use and costs after medically controlled discontinuation. Oral presentation at the 79th Annual Meeting of The College on Problems of Drug Dependence June 11-16, 2016 Palm Springs, California
- Payer Preferences and Their Impact on Opioid Markets at the exL Pharma 2014 Conference on Human Abuse Liability & Abuse Deterrent Formulations. Guest Speaker, November 17-18, 2014, Washington, DC
- "Re-Evaluating Insomnia Therapy" at the Annual Meeting of the American Society of Consultant Pharmacists. Faculty Presenter, Boston, Nov 1, 2000.
- Faculty Presenter at the Desloratadine Advisory Board Meeting sponsored by Schering-Key. Nurse Practitioner/Physicians Assistants and Pharmacists, New York, NY, Sep 15-17, 2000.
- "Long-Term Efficacy, Tolerability, and Safety of Zaleplon for Primary Insomnia." Poster Presentation at the Annual Meeting of the American Academy of Physicians Assistants, Chicago, IL, May 27, 2000.

## CLINICAL RESEARCH

- Double-blind, parallel, placebo-controlled, multi-center, polysomnographic study of the effects of L-759274 and zolpidem in adult patients with chronic insomnia. (Merck L-759274)

- Fixed dose comparison of the safety and efficacy of LU 26-054, citalopram and placebo in the treatment of major depressive disorder (Forest SCT-MD-01)

- Placebo-controlled evaluation of the safety and efficacy of LU 26-054 in the prevention of depression relapse (Forest SCT-MD-03)

- A randomized, multi-center, placebo-controlled, parallel group valerian dose ranging study to evaluate sleep latency in adult patients with insomnia (Ancile ANPH 101)

**JANE RUBY, PhD, EdD, MS NURSING, MS PHARMACOECONOMICS, NP**                    **Page 6**

- Long-term efficacy, tolerability, and safety of zaleplon for primary insomnia. (Wyeth-Ayerst 1998)


**LICENSURE**

**New York State Nurse Practitioner** SEP

**New York State Registered Nurse** SEP

**Ohio State Registered Nurse** SEP

# EXHIBIT B

**HIGHLIGHTS OF PRESCRIBING INFORMATION**
**These highlights do not include all the information needed to use COMIRNATY safely and effectively. See full prescribing information for COMIRNATY.**

**COMIRNATY® (COVID-19 Vaccine, mRNA) suspension for injection, for intramuscular use**
**Initial U.S. Approval: 2021**

--------------------------- **INDICATIONS AND USAGE**---------------------------
COMIRNATY is a vaccine indicated for active immunization to prevent coronavirus disease 2019 (COVID-19) caused by severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2) in individuals 16 years of age and older. (1)

----------------------**DOSAGE AND ADMINISTRATION**----------------------
- For intramuscular injection only. (2.2)
- COMIRNATY is administered intramuscularly as a series of 2 doses (0.3 mL each) 3 weeks apart. (2.3)

--------------------- **DOSAGE FORMS AND STRENGTHS**----------------------
Suspension for injection. After preparation, a single dose is 0.3 mL. (3)

----------------------------- **CONTRAINDICATIONS** -----------------------------
Known history of a severe allergic reaction (e.g., anaphylaxis) to any component of COMIRNATY. (4)

--------------------- **WARNINGS AND PRECAUTIONS** ---------------------
- Postmarketing data demonstrate increased risks of myocarditis and pericarditis, particularly within 7 days following the second dose. (5.2)
- Syncope (fainting) may occur in association with administration of injectable vaccines, including COMIRNATY. Procedures should be in place to avoid injury from fainting. (5.4)

---------------------------- **ADVERSE REACTIONS** ----------------------------
- In clinical studies of participants 16 through 55 years of age, the most commonly reported adverse reactions (≥10%) were pain at the injection site (88.6%), fatigue (70.1%), headache (64.9%), muscle pain (45.5%), chills (41.5%), joint pain (27.5%), fever (17.8%), and injection site swelling (10.6%). (6.1)
- In clinical studies of participants 56 years of age and older, the most commonly reported adverse reactions (≥10%) were pain at the injection site (78.2%), fatigue (56.9%), headache, (45.9%), muscle pain (32.5%), chills (24.8%), joint pain (21.5%), injection site swelling (11.8%), fever (11.5%), and injection site redness (10.4%). (6.1)

**To report SUSPECTED ADVERSE REACTIONS, contact Pfizer Inc. at 1-800-438-1985 or VAERS at 1-800-822-7967 or http://vaers.hhs.gov.**

**See 17 for PATIENT COUNSELING INFORMATION.**

**Revised: 8/2021**

---

**FULL PRESCRIBING INFORMATION: CONTENTS\***

**1   INDICATIONS AND USAGE**
**2   DOSAGE AND ADMINISTRATION**
    2.1   Preparation for Administration
    2.2   Administration Information
    2.3   Vaccination Schedule
**3   DOSAGE FORMS AND STRENGTHS**
**4   CONTRAINDICATIONS**
**5   WARNINGS AND PRECAUTIONS**
    5.1   Management of Acute Allergic Reactions
    5.2   Myocarditis and Pericarditis
    5.3   Syncope
    5.4   Altered Immunocompetence
    5.5   Limitation of Effectiveness
**6   ADVERSE REACTIONS**
    6.1   Clinical Trials Experience
    6.2   Postmarketing Experience

**8   USE IN SPECIFIC POPULATIONS**
    8.1   Pregnancy
    8.2   Lactation
    8.4   Pediatric Use
    8.5   Geriatric Use
**11  DESCRIPTION**
**12  CLINICAL PHARMACOLOGY**
    12.1  Mechanism of Action
**13  NONCLINICAL TOXICOLOGY**
    13.1  Carcinogenesis, Mutagenesis, Impairment of Fertility
**14  CLINICAL STUDIES**
**16  HOW SUPPLIED/STORAGE AND HANDLING**
**17  PATIENT COUNSELING INFORMATION**

\* Sections or subsections omitted from the full prescribing information are not listed.

**FULL PRESCRIBING INFORMATION**

**1   INDICATIONS AND USAGE**

COMIRNATY is a vaccine indicated for active immunization to prevent coronavirus disease 2019 (COVID-19) caused by severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2) in individuals 16 years of age and older.

**2   DOSAGE AND ADMINISTRATION**

For intramuscular injection only.

**2.1   Preparation for Administration**

Prior to Dilution

- COMIRNATY Multiple Dose Vial contains a volume of 0.45 mL, supplied as a frozen suspension that does not contain preservative. Each vial must be thawed and diluted prior to administration.
- Vials may be thawed in the refrigerator [2ºC to 8ºC (35ºF to 46ºF)] or at room temperature [up to 25ºC (77ºF)] *[see How Supplied/Storage and Handling (16)]*.
- Refer to thawing instructions in the panels below.

Dilution

- Dilute the vial contents using 1.8 mL of sterile 0.9% Sodium Chloride Injection, USP to form COMIRNATY. Do not add more than 1.8 mL of diluent.
- ONLY use sterile 0.9% Sodium Chloride Injection, USP as the diluent. <u>Do not use bacteriostatic 0.9% Sodium Chloride Injection or any other diluent.</u>
- Vials of sterile 0.9% Sodium Chloride Injection, USP are provided but shipped separately. Use the provided diluent or another sterile 0.9% Sodium Chloride Injection, USP as the diluent.
  - Provided diluent vials are single-use only; discard after 1.8 mL is withdrawn.
  - If another sterile 0.9% Sodium Chloride Injection, USP is used as the diluent, discard after 1.8 mL is withdrawn.
  - Do not dilute more than 1 vial of COMIRNATY using the same diluent vial.
- After dilution, 1 vial of COMIRNATY contains 6 doses of 0.3 mL each.
- Refer to dilution and dose preparation instructions in the panels below.

| | |
|---|---|
| **THAWING PRIOR TO DILUTION** | |
|  | <ul><li>Thaw vial(s) of COMIRNATY before dilution either by:<ul><li>Allowing vial(s) to thaw in the refrigerator [2ºC to 8ºC (35ºF to 46ºF)]. A carton of vials may take up to 3 hours to thaw, and thawed vials can be stored in the refrigerator for up to 1 month.</li><li>Allowing vial(s) to sit at room temperature [up to 25ºC (77ºF)] for 30 minutes.</li></ul></li><li>Using either thawing method, vials must reach room temperature before dilution and must be diluted within 2 hours.</li></ul> |
|  | <ul><li>Before dilution invert vaccine vial gently 10 times.</li><li><u>Do not shake.</u></li><li>Inspect the liquid in the vaccine vial prior to dilution. The liquid is a white to off-white suspension and may contain white to off-white opaque amorphous particles.</li><li>Do not use if liquid is discolored or if other particles are observed.</li></ul> |
| **DILUTION** | |
|  | <ul><li>ONLY use sterile 0.9% Sodium Chloride Injection, USP as the diluent.</li><li>Withdraw 1.8 mL of diluent into a transfer syringe (21-gauge or narrower needle).</li><li>Add 1.8 mL of sterile 0.9% Sodium Chloride Injection, USP into the vaccine vial.</li></ul> |

3



- Equalize vial pressure before removing the needle from the vaccine vial by withdrawing 1.8 mL air into the empty diluent syringe.

- Gently invert the vial containing COMIRNATY 10 times to mix.
- <u>Do not shake</u>.
- Inspect the vaccine in the vial.
- The vaccine will be an off-white suspension. Do not use if vaccine is discolored or contains particulate matter.

- Record the date and time of dilution on the COMIRNATY vial label.
- Store between 2°C to 25°C (35°F to 77°F).
- Discard any unused vaccine 6 hours after dilution.

| PREPARATION OF INDIVIDUAL 0.3 mL DOSES OF COMIRNATY | |
|---|---|
|  | • Withdraw <u>0.3 mL</u> of COMIRNATY preferentially using low dead-volume syringes and/or needles.<br>• Each dose must contain 0.3 mL of vaccine.<br>• If the amount of vaccine remaining in a single vial cannot provide a full dose of 0.3 mL, discard the vial and any excess volume.<br>• Administer immediately. |

After dilution, vials of COMIRNATY contain 6 doses of 0.3 mL of vaccine. Low dead-volume syringes and/or needles can be used to extract 6 doses from a single vial. If standard syringes and needles are used, there may not be sufficient volume to extract a sixth dose from a single vial. Irrespective of the type of syringe and needle,

- each dose must contain 0.3 mL of vaccine.
- if the amount of vaccine remaining in the vial cannot provide a full dose of 0.3 mL, discard the vial and any excess volume.
- do not pool excess vaccine from multiple vials.

## 2.2    Administration Information

Parenteral drug products should be inspected visually for particulate matter and discoloration prior to administration, whenever solution and container permit. The vaccine will be an off-white suspension. Do not administer if vaccine is discolored or contains particulate matter.

Administer a single 0.3 mL dose of COMIRNATY intramuscularly.

## 2.3    Vaccination Schedule

COMIRNATY is administered intramuscularly as a series of 2 doses (0.3 mL each) 3 weeks apart.

There are no data available on the interchangeability of COMIRNATY with other COVID-19 vaccines to complete the vaccination series. Individuals who have received 1 dose of COMIRNATY should receive a second dose of COMIRNATY to complete the vaccination series.

## 3   DOSAGE FORMS AND STRENGTHS

COMIRNATY is a suspension for injection. After preparation, a single dose is 0.3 mL.

## 4   CONTRAINDICATIONS

Do not administer COMIRNATY to individuals with known history of a severe allergic reaction (e.g., anaphylaxis) to any component of the COMIRNATY *[see Description (11)]*.

# 5   WARNINGS AND PRECAUTIONS

## 5.1   Management of Acute Allergic Reactions

Appropriate medical treatment used to manage immediate allergic reactions must be immediately available in the event an acute anaphylactic reaction occurs following administration of COMIRNATY.

## 5.2   Myocarditis and Pericarditis

Postmarketing data demonstrate increased risks of myocarditis and pericarditis, particularly within 7 days following the second dose. The observed risk is higher among males under 40 years of age than among females and older males. The observed risk is highest in males 12 through 17 years of age. Although some cases required intensive care support, available data from short-term follow-up suggest that most individuals have had resolution of symptoms with conservative management. Information is not yet available about potential long-term sequelae. The CDC has published considerations related to myocarditis and pericarditis after vaccination, including for vaccination of individuals with a history of myocarditis or pericarditis (https://www.cdc.gov/vaccines/covid-19/clinical-considerations/myocarditis.html).

## 5.3   Syncope

Syncope (fainting) may occur in association with administration of injectable vaccines, including COMIRNATY. Procedures should be in place to avoid injury from fainting.

## 5.4   Altered Immunocompetence

Immunocompromised persons, including individuals receiving immunosuppressant therapy, may have a diminished immune response to the COMIRNATY.

## 5.5   Limitation of Effectiveness

COMIRNATY may not protect all vaccine recipients.

# 6   ADVERSE REACTIONS

In clinical studies, the most commonly reported ($\geq$10%) adverse reactions in participants 16 through 55 years of age following any dose were pain at the injection site (88.6%), fatigue (70.1%), headache (64.9%), muscle pain (45.5%), chills (41.5%), joint pain (27.5%), fever (17.8%), and injection site swelling (10.6%).

In clinical studies, the most commonly reported ($\geq$10%) adverse reactions in participants 56 years of age and older following any dose were pain at the injection site (78.2%), fatigue (56.9%), headache, (45.9%), muscle pain (32.5%), chills (24.8%), joint pain (21.5%), injection site swelling (11.8%), fever (11.5%), and injection site redness (10.4%).

## 6.1   Clinical Trials Experience

Because clinical trials are conducted under widely varying conditions, adverse reaction rates observed in the clinical trials of a vaccine cannot be directly compared to rates in the clinical trials of another vaccine and may not reflect the rates observed in practice.

The safety of COMIRNATY was evaluated in participants 16 years of age and older in 2 clinical studies conducted in Germany (Study 1), United States, Argentina, Brazil, Turkey, South Africa, and Germany (Study 2). Study BNT162-01 (Study 1) was a Phase 2-part, dose-escalation trial that enrolled 60 participants, 18 through 55 years of age and 36 participants, 56 through 85 years of age. Study C4591001 (Study 2) is a Phase 1/2/3 multicenter, multinational, randomized, saline placebo-controlled, double-blinded (Phase 2/3), dose-finding, vaccine candidate-selection and efficacy study that has enrolled approximately 44,047 participants (22,026 COMIRNATY; 22,021 placebo) 16 years of age or older (including 378 and 376 participants 16 through 17 years of age in the vaccine and placebo groups, respectively). Upon issuance of the Emergency Use Authorization  (December 11, 2020) for COMIRNATY, participants were unblinded to offer placebo participants COMIRNATY. Participants were unblinded in a phased manner over a period of months to offer placebo participants COMIRNATY. Study 2 also included 200 participants with confirmed stable human immunodeficiency virus (HIV) infection; HIV-positive participants are included in safety population disposition but are summarized separately in safety analyses. Confirmed stable HIV infection was defined as documented viral load <50 copies/mL and CD4 count >200 cells/mm$^3$ within 6 months before enrollment, and on stable antiretroviral therapy for at least 6 months.

At the time of the analysis of the ongoing Study 2 with a data cut-off of March 13, 2021, there were 25,651 (58.2%) participants (13,031 COMIRNATY and 12,620 placebo) 16 years of age and older followed for ≥4 months after the second dose.

Participants 16 years and older in the reactogenicity subset were monitored for solicited local and systemic reactions and use of antipyretic medication after each vaccination in an electronic diary. Participants are being monitored for unsolicited adverse events, including serious adverse events, throughout the study [from Dose 1 through 1 month (all unsolicited adverse events) or 6 months (serious adverse events) after the last vaccination].

Demographic characteristics in Study 2 were generally similar with regard to age, gender, race, and ethnicity among participants who received COMIRNATY and those who received placebo. Overall, among the total participants who received either COMIRNATY or placebo, 50.9% were male, 49.1% were female, 79.3% were 16 through 64 years of age, 20.7% were 65 years of age and older, 82.0% were White, 9.6% were Black or African American, 25.9% were Hispanic/Latino, 4.3% were Asian, and 1.0% were American Indian or Alaska Native.

Local and Systemic Adverse Reactions Solicited in the Study 2

Table 1 and Table 2 present the frequency and severity of reported solicited local and systemic reactions, respectively, within 7 days following each dose of COMIRNATY and placebo in the subset of participants 16 through 55 years of age included in the safety population who were monitored for reactogenicity with an electronic diary.

Table 3 and Table 4 present the frequency and severity of reported solicited local and systemic reactions, respectively, within 7 days of each dose of COMIRNATY and placebo for participants 56 years of age and older.

In participants 16 through 55 years of age after receiving Dose 2, the mean duration of pain at the injection site was 2.5 days (range 1 to 70 days), for redness 2.2 days (range 1 to 9 days), and for swelling 2.1 days (range 1 to 8 days) for participants in the COMIRNATY group. In participants 56 years of age and older after receiving Dose 2, the mean duration of pain at the injection site was 2.4 days (range 1 to 36 days), for redness 3.0 days (range 1 to 34 days), and for swelling 2.6 days (range 1 to 34 days) for participants in the COMIRNATY group.

**Table 1:**   **Study 2 – Frequency and Percentages of Participants with Solicited Local Reactions, by Maximum Severity, Within 7 Days After Each Dose – Participants 16 Through 55 Years of Age – Reactogenicity Subset of the Safety Population\***

|  | COMIRNATY Dose 1 $N^a$=2899 $n^b$ (%) | Placebo Dose 1 $N^a$=2908 $n^b$ (%) | COMIRNATY Dose 2 $N^a$=2682 $n^b$ (%) | Placebo Dose 2 $N^a$=2684 $n^b$ (%) |
|---|---|---|---|---|
| Redness[c] | | | | |
| Any (>2.0 cm) | 156 (5.4) | 28 (1.0) | 151 (5.6) | 18 (0.7) |
| Mild | 113 (3.9) | 19 (0.7) | 90 (3.4) | 12 (0.4) |
| Moderate | 36 (1.2) | 6 (0.2) | 50 (1.9) | 6 (0.2) |
| Severe | 7 (0.2) | 3 (0.1) | 11 (0.4) | 0 |
| Swelling[c] | | | | |
| Any (>2.0 cm) | 184 (6.3) | 16 (0.6) | 183 (6.8) | 5 (0.2) |
| Mild | 124 (4.3) | 6 (0.2) | 110 (4.1) | 3 (0.1) |
| Moderate | 54 (1.9) | 8 (0.3) | 66 (2.5) | 2 (0.1) |
| Severe | 6 (0.2) | 2 (0.1) | 7 (0.3) | 0 |
| Pain at the injection site[d] | | | | |
| Any | 2426 (83.7) | 414 (14.2) | 2101 (78.3) | 312 (11.6) |
| Mild | 1464 (50.5) | 391 (13.4) | 1274 (47.5) | 284 (10.6) |
| Moderate | 923 (31.8) | 20 (0.7) | 788 (29.4) | 28 (1.0) |
| Severe | 39 (1.3) | 3 (0.1) | 39 (1.5) | 0 |

Notes: Reactions were collected in the electronic diary (e-diary) from Day 1 to Day 7 after vaccination.
No Grade 4 solicited local reactions were reported in participants 16 through 55 years of age.
\*   Randomized participants in the safety analysis population who received at least 1 dose of the study intervention. Participants with chronic, stable HIV infection were excluded.
a.   N = Number of participants reporting at least 1 yes or no response for the specified reaction after the specified dose. The N for each reaction was the same, therefore, this information was included in the column header.
b.   n = Number of participants with the specified reaction.
c.   Mild: >2.0 to ≤5.0 cm; Moderate: >5.0 to ≤10.0 cm; Severe: >10.0 cm.
d.   Mild: does not interfere with activity; Moderate: interferes with activity; Severe: prevents daily activity.

**Table 2:**   **Study 2 – Frequency and Percentages of Participants with Solicited Systemic Reactions, by Maximum Severity, Within 7 Days After Each Dose – Participants 16 Through 55 Years of Age – Reactogenicity Subset of the Safety Population\***

|  | COMIRNATY Dose 1 $N^a$=2899 $n^b$ (%) | Placebo Dose 1 $N^a$=2908 $n^b$ (%) | COMIRNATY Dose 2 $N^a$=2682 $n^b$ (%) | Placebo Dose 2 $N^a$=2684 $n^b$ (%) |
|---|---|---|---|---|
| Fever | | | | |
| ≥38.0°C | 119 (4.1) | 25 (0.9) | 440 (16.4) | 11 (0.4) |
| ≥38.0°C to 38.4°C | 86 (3.0) | 16 (0.6) | 254 (9.5) | 5 (0.2) |
| >38.4°C to 38.9°C | 25 (0.9) | 5 (0.2) | 146 (5.4) | 4 (0.1) |
| >38.9°C to 40.0°C | 8 (0.3) | 4 (0.1) | 39 (1.5) | 2 (0.1) |
| >40.0°C | 0 | 0 | 1 (0.0) | 0 |
| Fatigue[c] | | | | |
| Any | 1431 (49.4) | 960 (33.0) | 1649 (61.5) | 614 (22.9) |
| Mild | 760 (26.2) | 570 (19.6) | 558 (20.8) | 317 (11.8) |
| Moderate | 630 (21.7) | 372 (12.8) | 949 (35.4) | 283 (10.5) |
| Severe | 41 (1.4) | 18 (0.6) | 142 (5.3) | 14 (0.5) |

|  | COMIRNATY Dose 1 N[a]=2899 n[b] (%) | Placebo Dose 1 N[a]=2908 n[b] (%) | COMIRNATY Dose 2 N[a]=2682 n[b] (%) | Placebo Dose 2 N[a]=2684 n[b] (%) |
|---|---|---|---|---|
| Headache[c] |  |  |  |  |
| Any | 1262 (43.5) | 975 (33.5) | 1448 (54.0) | 652 (24.3) |
| Mild | 785 (27.1) | 633 (21.8) | 699 (26.1) | 404 (15.1) |
| Moderate | 444 (15.3) | 318 (10.9) | 658 (24.5) | 230 (8.6) |
| Severe | 33 (1.1) | 24 (0.8) | 91 (3.4) | 18 (0.7) |
| Chills[c] |  |  |  |  |
| Any | 479 (16.5) | 199 (6.8) | 1015 (37.8) | 114 (4.2) |
| Mild | 338 (11.7) | 148 (5.1) | 477 (17.8) | 89 (3.3) |
| Moderate | 126 (4.3) | 49 (1.7) | 469 (17.5) | 23 (0.9) |
| Severe | 15 (0.5) | 2 (0.1) | 69 (2.6) | 2 (0.1) |
| Vomiting[d] |  |  |  |  |
| Any | 34 (1.2) | 36 (1.2) | 58 (2.2) | 30 (1.1) |
| Mild | 29 (1.0) | 30 (1.0) | 42 (1.6) | 20 (0.7) |
| Moderate | 5 (0.2) | 5 (0.2) | 12 (0.4) | 10 (0.4) |
| Severe | 0 | 1 (0.0) | 4 (0.1) | 0 |
| Diarrhea[e] |  |  |  |  |
| Any | 309 (10.7) | 323 (11.1) | 269 (10.0) | 205 (7.6) |
| Mild | 251 (8.7) | 264 (9.1) | 219 (8.2) | 169 (6.3) |
| Moderate | 55 (1.9) | 58 (2.0) | 44 (1.6) | 35 (1.3) |
| Severe | 3 (0.1) | 1 (0.0) | 6 (0.2) | 1 (0.0) |
| New or worsened muscle pain[c] |  |  |  |  |
| Any | 664 (22.9) | 329 (11.3) | 1055 (39.3) | 237 (8.8) |
| Mild | 353 (12.2) | 231 (7.9) | 441 (16.4) | 150 (5.6) |
| Moderate | 296 (10.2) | 96 (3.3) | 552 (20.6) | 84 (3.1) |
| Severe | 15 (0.5) | 2 (0.1) | 62 (2.3) | 3 (0.1) |
| New or worsened joint pain[c] |  |  |  |  |
| Any | 342 (11.8) | 168 (5.8) | 638 (23.8) | 147 (5.5) |
| Mild | 200 (6.9) | 112 (3.9) | 291 (10.9) | 82 (3.1) |
| Moderate | 137 (4.7) | 55 (1.9) | 320 (11.9) | 61 (2.3) |
| Severe | 5 (0.2) | 1 (0.0) | 27 (1.0) | 4 (0.1) |
| Use of antipyretic or pain medication[f] | 805 (27.8) | 398 (13.7) | 1213 (45.2) | 320 (11.9) |

Notes: Reactions and use of antipyretic or pain medication were collected in the electronic diary (e-diary) from Day 1 to Day 7 after each dose.

No Grade 4 solicited systemic reactions were reported in participants 16 through 55 years of age.

*   Randomized participants in the safety analysis population who received at least 1 dose of the study intervention. Participants with chronic, stable HIV infection were excluded.

a.  N = Number of participants reporting at least 1 yes or no response for the specified reaction after the specified dose. The N for each reaction or use of antipyretic or pain medication was the same, therefore, this information was included in the column header.

b.  n = Number of participants with the specified reaction.

c.  Mild: does not interfere with activity; Moderate: some interference with activity; Severe: prevents daily activity.

d.  Mild: 1 to 2 times in 24 hours; Moderate: >2 times in 24 hours; Severe: requires intravenous hydration.

e.  Mild: 2 to 3 loose stools in 24 hours; Moderate: 4 to 5 loose stools in 24 hours; Severe: 6 or more loose stools in 24 hours.

f.  Severity was not collected for use of antipyretic or pain medication.

**Table 3:** **Study 2 – Frequency and Percentages of Participants with Solicited Local Reactions, by Maximum Severity, Within 7 Days After Each Dose – Participants 56 Years of Age and Older – Reactogenicity Subset of the Safety Population\***

|  | COMIRNATY Dose 1 $N^a$=2008 $n^b$ (%) | Placebo Dose 1 $N^a$=1989 $n^b$ (%) | COMIRNATY Dose 2 $N^a$=1860 $n^b$ (%) | Placebo Dose 2 $N^a$=1833 $n^b$ (%) |
|---|---|---|---|---|
| Redness[c] |  |  |  |  |
| Any (>2.0 cm) | 106 (5.3) | 20 (1.0) | 133 (7.2) | 14 (0.8) |
| Mild | 71 (3.5) | 13 (0.7) | 65 (3.5) | 10 (0.5) |
| Moderate | 30 (1.5) | 5 (0.3) | 58 (3.1) | 3 (0.2) |
| Severe | 5 (0.2) | 2 (0.1) | 10 (0.5) | 1 (0.1) |
| Swelling[c] |  |  |  |  |
| Any (>2.0 cm) | 141 (7.0) | 23 (1.2) | 145 (7.8) | 13 (0.7) |
| Mild | 87 (4.3) | 11 (0.6) | 80 (4.3) | 5 (0.3) |
| Moderate | 52 (2.6) | 12 (0.6) | 61 (3.3) | 7 (0.4) |
| Severe | 2 (0.1) | 0 | 4 (0.2) | 1 (0.1) |
| Pain at the injection site[d] |  |  |  |  |
| Any (>2.0 cm) | 1408 (70.1) | 185 (9.3) | 1230 (66.1) | 143 (7.8) |
| Mild | 1108 (55.2) | 177 (8.9) | 873 (46.9) | 138 (7.5) |
| Moderate | 296 (14.7) | 8 (0.4) | 347 (18.7) | 5 (0.3) |
| Severe | 4 (0.2) | 0 | 10 (0.5) | 0 |

Notes: Reactions were collected in the electronic diary (e-diary) from Day 1 to Day 7 after vaccination.
No Grade 4 solicited local reactions were reported in participants 56 years of age and older.
\* Randomized participants in the safety analysis population who received at least 1 dose of the study intervention. Participants with chronic, stable HIV infection were excluded.
a. N = Number of participants reporting at least 1 yes or no response for the specified reaction after the specified dose. The N for each reaction was the same, therefore, the information was included in the column header.
b. n = Number of participants with the specified reaction.
c. Mild: >2.0 to ≤5.0 cm; Moderate: >5.0 to ≤10.0 cm; Severe: >10.0 cm.
d. Mild: does not interfere with activity; Moderate: interferes with activity; Severe: prevents daily activity.

**Table 4:** **Study 2 – Frequency and Percentages of Participants with Solicited Systemic Reactions, by Maximum Severity, Within 7 Days After Each Dose – Participants 56 Years of Age and Older – Reactogenicity Subset of the Safety Population\***

|  | COMIRNATY Dose 1 $N^a$=2008 $n^b$ (%) | Placebo Dose 1 $N^a$=1989 $n^b$ (%) | COMIRNATY Dose 2 $N^a$=1860 $n^b$ (%) | Placebo Dose 2 $N^a$=1833 $n^b$ (%) |
|---|---|---|---|---|
| Fever |  |  |  |  |
| ≥38.0°C | 26 (1.3) | 8 (0.4) | 219 (11.8) | 4 (0.2) |
| ≥38.0°C to 38.4°C | 23 (1.1) | 3 (0.2) | 158 (8.5) | 2 (0.1) |
| >38.4°C to 38.9°C | 2 (0.1) | 3 (0.2) | 54 (2.9) | 1 (0.1) |
| >38.9°C to 40.0°C | 1 (0.0) | 2 (0.1) | 7 (0.4) | 1 (0.1) |
| >40.0°C | 0 | 0 | 0 | 0 |

|  | COMIRNATY Dose 1 Nᵃ=2008 nᵇ (%) | Placebo Dose 1 Nᵃ=1989 nᵇ (%) | COMIRNATY Dose 2 Nᵃ=1860 nᵇ (%) | Placebo Dose 2 Nᵃ=1833 nᵇ (%) |
|---|---|---|---|---|
| Fatigue[c] |  |  |  |  |
|    Any | 677 (33.7) | 447 (22.5) | 949 (51.0) | 306 (16.7) |
|       Mild | 415 (20.7) | 281 (14.1) | 391 (21.0) | 183 (10.0) |
|       Moderate | 259 (12.9) | 163 (8.2) | 497 (26.7) | 121 (6.6) |
|       Severe | 3 (0.1) | 3 (0.2) | 60 (3.2) | 2 (0.1) |
|       Grade 4 | 0 | 0 | 1 (0.1) | 0 |
| Headache[c] |  |  |  |  |
|    Any | 503 (25.0) | 363 (18.3) | 733 (39.4) | 259 (14.1) |
|       Mild | 381 (19.0) | 267 (13.4) | 464 (24.9) | 189 (10.3) |
|       Moderate | 120 (6.0) | 93 (4.7) | 256 (13.8) | 65 (3.5) |
|       Severe | 2 (0.1) | 3 (0.2) | 13 (0.7) | 5 (0.3) |
| Chills[c] |  |  |  |  |
|    Any | 130 (6.5) | 69 (3.5) | 435 (23.4) | 57 (3.1) |
|       Mild | 102 (5.1) | 49 (2.5) | 229 (12.3) | 45 (2.5) |
|       Moderate | 28 (1.4) | 19 (1.0) | 185 (9.9) | 12 (0.7) |
|       Severe | 0 | 1 (0.1) | 21 (1.1) | 0 |
| Vomiting[d] |  |  |  |  |
|    Any | 10 (0.5) | 9 (0.5) | 13 (0.7) | 5 (0.3) |
|       Mild | 9 (0.4) | 9 (0.5) | 10 (0.5) | 5 (0.3) |
|       Moderate | 1 (0.0) | 0 | 1 (0.1) | 0 |
|       Severe | 0 | 0 | 2 (0.1) | 0 |
| Diarrhea[e] |  |  |  |  |
|    Any | 168 (8.4) | 130 (6.5) | 152 (8.2) | 102 (5.6) |
|       Mild | 137 (6.8) | 109 (5.5) | 125 (6.7) | 76 (4.1) |
|       Moderate | 27 (1.3) | 20 (1.0) | 25 (1.3) | 22 (1.2) |
|       Severe | 4 (0.2) | 1 (0.1) | 2 (0.1) | 4 (0.2) |
| New or worsened muscle pain[c] |  |  |  |  |
|    Any | 274 (13.6) | 165 (8.3) | 537 (28.9) | 99 (5.4) |
|       Mild | 183 (9.1) | 111 (5.6) | 229 (12.3) | 65 (3.5) |
|       Moderate | 90 (4.5) | 51 (2.6) | 288 (15.5) | 33 (1.8) |
|       Severe | 1 (0.0) | 3 (0.2) | 20 (1.1) | 1 (0.1) |
| New or worsened joint pain[c] |  |  |  |  |
|    Any | 175 (8.7) | 124 (6.2) | 353 (19.0) | 72 (3.9) |
|       Mild | 119 (5.9) | 78 (3.9) | 183 (9.8) | 44 (2.4) |
|       Moderate | 53 (2.6) | 45 (2.3) | 161 (8.7) | 27 (1.5) |
|       Severe | 3 (0.1) | 1 (0.1) | 9 (0.5) | 1 (0.1) |
| Use of antipyretic or pain medication[f] | 382 (19.0) | 224 (11.3) | 688 (37.0) | 170 (9.3) |

Notes: Reactions and use of antipyretic or pain medication were collected in the electronic diary (e-diary) from Day 1 to Day 7 after each dose.

The only Grade 4 solicited systemic reaction reported in participants 56 years of age and older was fatigue.

\*   Randomized participants in the safety analysis population who received at least 1 dose of the study intervention. Participants with chronic, stable HIV infection were excluded.

a.   N = Number of participants reporting at least 1 yes or no response for the specified reaction after the specified dose. N for each reaction or use of antipyretic or pain medication was the same, therefore was included in the column header.

b.   n = Number of participants with the specified reaction.

| | COMIRNATY Dose 1 N$^a$=2008 n$^b$ (%) | Placebo Dose 1 N$^a$=1989 n$^b$ (%) | COMIRNATY Dose 2 N$^a$=1860 n$^b$ (%) | Placebo Dose 2 N$^a$=1833 n$^b$ (%) |
|---|---|---|---|---|

c.  Mild: does not interfere with activity; Moderate: some interference with activity; Severe: prevents daily activity; Grade 4 reactions were defined in the clinical study protocol as emergency room visit or hospitalization for severe fatigue, severe headache, severe chills, severe muscle pain, or severe joint pain.

d.  Mild: 1 to 2 times in 24 hours; Moderate: >2 times in 24 hours; Severe: requires intravenous hydration; Grade 4 emergency visit or hospitalization for severe vomiting.

e.  Mild: 2 to 3 loose stools in 24 hours; Moderate: 4 to 5 loose stools in 24 hours; Severe: 6 or more loose stools in 24 hours; Grade 4: emergency room or hospitalization for severe diarrhea.

f.  Severity was not collected for use of antipyretic or pain medication.

In participants with chronic, stable HIV infection the frequencies of solicited local and systemic adverse reactions were similar to or lower than those observed for all participants 16 years of age and older.

Unsolicited Adverse Events

Overall, 11,253 (51.1%) participants in the COMIRNATY group and 11,316 (51.4%) participants in the placebo group had follow-up time between ≥4 months to <6 months after Dose 2 in the blinded placebo-controlled follow-up period with an additional 1,778 (8.1%) and 1,304 (5.9%) with ≥6 months of blinded follow-up time in the COMIRNATY and placebo groups, respectively.

A total of 12,006 (54.5%) participants originally randomized to COMIRNATY had ≥6 months total (blinded and unblinded) follow-up after Dose 2.

In an analysis of all unsolicited adverse events reported following any dose, through 1 month after Dose 2, in participants 16 years of age and older (N=43,847; 21,926 COMIRNATY group vs. 21,921 placebo group), those assessed as adverse reactions not already captured by solicited local and systemic reactions were nausea (274 vs. 87), malaise (130 vs. 22), lymphadenopathy (83 vs. 7), asthenia (76 vs. 25), decreased appetite (39 vs. 9), hyperhidrosis (31 vs. 9), lethargy (25 vs. 6), and night sweats (17 vs. 3).

In analyses of all unsolicited adverse events in Study 2 from Dose 1 up to the participant unblinding date, 58.2% of study participants had at least 4 months of follow-up after Dose 2. Among participants 16 through 55 years of age who received at least one dose of study vaccine, 12,995 of whom received COMIRNATY and 13,026 of whom received placebo, unsolicited adverse events were reported by 4,396 (33.8%) participants in the COMIRNATY group and 2,136 (16.4%) participants in the placebo group. In a similar analysis in participants 56 years of age and older that included 8,931 COMIRNATY recipients and 8,895 placebo recipients, unsolicited adverse events were reported by 2,551 (28.6%) participants in the COMIRNATY group and 1,432 (16.1%) participants in the placebo group. Among participants with confirmed stable HIV infection that included 100 COMIRNATY recipients and 100 placebo recipients, unsolicited adverse events were reported by 29 (29%) participants in the COMIRNATY group and 15 (15%) participants in the placebo group. The higher frequency of reported unsolicited adverse events among COMIRNATY recipients compared to placebo recipients was primarily attributed to events that are consistent with adverse reactions solicited among participants in the reactogenicity subset (Table 3 and Table 4).

Throughout the placebo-controlled safety follow-up period, Bell's palsy (facial paralysis) was reported by 4 participants in the COMIRNATY group and 2 participants in the placebo group. Onset of facial paralysis was Day 37 after Dose 1 (participant did not receive Dose 2) and Days 3, 9, and 48 after Dose 2. In the placebo group the onset of facial paralysis was Day 32 and Day 102. Currently available information is insufficient to determine a causal relationship with the vaccine. In the analysis of blinded, placebo-controlled follow-up, there

were no other notable patterns or numerical imbalances between treatment groups for specific categories of non-serious adverse events (including other neurologic or neuro-inflammatory, and thrombotic events) that would suggest a causal relationship to COMIRNATY. In the analysis of unblinded follow-up, there were no notable patterns of specific categories of non-serious adverse events that would suggest a causal relationship to COMIRNATY.

*Serious Adverse Events*

In Study 2, among participants 16 through 55 years of age who had received at least 1 dose of vaccine or placebo (COMIRNATY =12,995; placebo = 13,026), serious adverse events from Dose 1 up to the participant unblinding date in ongoing follow-up were reported by 103 (0.8%) COMIRNATY recipients and 117 (0.9%) placebo recipients. In a similar analysis, in participants 56 years of age and older (COMIRNATY = 8,931; placebo = 8,895), serious adverse events were reported by 165 (1.8%) COMIRNATY recipients and 151 (1.7%) placebo recipients who received at least 1 dose of COMIRNATY or placebo, respectively. In these analyses, 58.2% of study participants had at least 4 months of follow-up after Dose 2. Among participants with confirmed stable HIV infection serious adverse events from Dose 1 up to the participant unblinding date in ongoing follow-up were reported by 2 (2%) COMIRNATY recipients and 2 (2%) placebo recipients.

In the analysis of blinded, placebo-controlled follow-up, there were no notable patterns between treatment groups for specific categories of serious adverse events (including neurologic, neuro-inflammatory, and thrombotic events) that would suggest a causal relationship to COMIRNATY. In the analysis of unblinded follow-up, there were no notable patterns of specific categories of serious adverse events that would suggest a causal relationship to COMIRNATY.

**6.2   Postmarketing Experience**

The following adverse reactions have been identified during postmarketing use of COMIRNATY, including under Emergency Use Authorization. Because these reactions are reported voluntarily from a population of uncertain size, it is not always possible to reliably estimate their frequency or establish a causal relationship to vaccine exposure.

Cardiac Disorders: myocarditis, pericarditis
Gastrointestinal Disorders: diarrhea, vomiting
Immune System Disorders: severe allergic reactions, including anaphylaxis, and other hypersensitivity reactions (e.g., rash, pruritus, urticaria, angioedema)
Musculoskeletal and Connective Tissue Disorders: pain in extremity (arm)

**8   USE IN SPECIFIC POPULATIONS**

**8.1   Pregnancy**

There is a pregnancy exposure registry that monitors pregnancy outcomes in women exposed to COMIRNATY during pregnancy. Women who are vaccinated with COMIRNATY during pregnancy are encouraged to enroll in the registry by visiting https://mothertobaby.org/ongoing-study/covid19-vaccines/.

Risk Summary

All pregnancies have a risk of birth defect, loss, or other adverse outcomes. In the US general population, the estimated background risk of major birth defects and miscarriage in clinically recognized pregnancies is 2% to

4% and 15% to 20%, respectively. Available data on COMIRNATY administered to pregnant women are insufficient to inform vaccine-associated risks in pregnancy.

A developmental toxicity study has been performed in female rats administered the equivalent of a single human dose of COMIRNATY on 4 occasions; twice prior to mating and twice during gestation. These studies revealed no evidence of harm to the fetus due to the vaccine *(see Animal Data)*.

Data

*Animal Data*

In a developmental toxicity study, 0.06 mL of a vaccine formulation containing the same quantity of nucleoside-modified messenger ribonucleic acid (mRNA) (30 mcg) and other ingredients included in a single human dose of COMIRNATY was administered to female rats by the intramuscular route on 4 occasions: 21 and 14 days prior to mating, and on gestation days 9 and 20. No vaccine-related adverse effects on female fertility, fetal development, or postnatal development were reported in the study.

## 8.2   Lactation

Risk Summary

It is not known whether COMIRNATY is excreted in human milk. Data are not available to assess the effects of COMIRNATY on the breastfed infant or on milk production/excretion. The developmental and health benefits of breastfeeding should be considered along with the mother's clinical need for COMIRNATY and any potential adverse effects on the breastfed child from COMIRNATY or from the underlying maternal condition. For preventive vaccines, the underlying maternal condition is susceptibility to disease prevented by the vaccine.

## 8.4   Pediatric Use

Safety and effectiveness of COMIRNATY in individuals 16 through 17 years of age is based on safety and effectiveness data in this age group and in adults *[see Adverse Reactions (6) and Clinical Studies (14.1)]*.

The safety and effectiveness of COMIRNATY in individuals younger than 16 years of age have not been established.

## 8.5   Geriatric Use

Of the total number of COMIRNATY recipients in Study 2 as of March 13, 2021 (N = 22,026), 20.7% (n = 4,552) were 65 years of age and older and 4.2% (n = 925) were 75 years of age and older *[see Clinical Studies (14.1)]*. No overall differences in safety or effectiveness were observed between these recipients and younger recipients.

## 11   DESCRIPTION

COMIRNATY (COVID-19 Vaccine, mRNA) is a sterile suspension for injection for intramuscular use. COMIRNATY is supplied as a frozen suspension in multiple dose vials; each vial must be diluted with 1.8 mL of sterile 0.9% Sodium Chloride Injection, USP prior to use to form the vaccine. Each dose of COMIRNATY contains 30 mcg of a nucleoside-modified messenger RNA (mRNA) encoding the viral spike (S) glycoprotein of SARS-CoV-2.

Each 0.3 mL dose of the COMIRNATY also includes the following ingredients: lipids (0.43 mg ((4-hydroxybutyl)azanediyl)bis(hexane-6,1-diyl)bis(2-hexyldecanoate), 0.05 mg 2-(polyethylene glycol 2000)-N,N-ditetradecylacetamide, 0.09 mg 1,2-distearoyl-sn-glycero-3-phosphocholine, and 0.2 mg cholesterol), 0.01 mg potassium chloride, 0.01 mg monobasic potassium phosphate, 0.36 mg sodium chloride, 0.07 mg dibasic sodium phosphate dihydrate, and 6 mg sucrose. The diluent (0.9% Sodium Chloride Injection, USP) contributes an additional 2.16 mg sodium chloride per dose.

COMIRNATY does not contain preservative.

The vial stoppers are not made with natural rubber latex.

## 12  CLINICAL PHARMACOLOGY

### 12.1  Mechanism of Action

The nucleoside-modified mRNA in COMIRNATY is formulated in lipid particles, which enable delivery of the mRNA into host cells to allow expression of the SARS-CoV-2 S antigen. The vaccine elicits an immune response to the S antigen, which protects against COVID-19.

## 13  NONCLINICAL TOXICOLOGY

### 13.1  Carcinogenesis, Mutagenesis, Impairment of Fertility

COMIRNATY has not been evaluated for the potential to cause carcinogenicity, genotoxicity, or impairment of male fertility. In a developmental toxicity study in rats with COMIRNATY there were no vaccine-related effects on female fertility *[see Use in Specific Populations (8.1)]*.

## 14  CLINICAL STUDIES

Efficacy in Participants 16 Years of Age and Older

Study 2 is an ongoing, multicenter, multinational, randomized, placebo-controlled, observer-blind, dose-finding, vaccine candidate–selection, and efficacy study in participants 12 years of age and older. Randomization was stratified by age: 12 through 15 years of age, 16 through 55 years of age, or 56 years of age and older, with a minimum of 40% of participants in the ≥56-year stratum. The study excluded participants who were immunocompromised and those who had previous clinical or microbiological diagnosis of COVID-19. Participants with preexisting stable disease, defined as disease not requiring significant change in therapy or hospitalization for worsening disease during the 6 weeks before enrollment, were included as were participants with known stable infection with HIV, hepatitis C virus (HCV), or hepatitis B virus (HBV).

In Study 2, based on data accrued through March 13, 2021, approximately 44,000 participants 16 years of age and older were randomized equally and received 2 doses of COMIRNATY or placebo. Participants are planned to be followed for up to 24 months, for assessments of safety and efficacy against COVID-19.

Overall, among the total participants who received COMIRNATY or placebo, 51.4% or 50.3% were male and 48.6% or 49.7% were female, 79.1% or 79.2% were 16 through 64 years of age, 20.9% or 20.8% were 65 years of age and older, 81.9% or 82.1% were White, 9.5% or 9.6% were Black or African American, 1.0% or 0.9% were American Indian or Alaska Native, 4.4% or 4.3% were Asian, 0.3% or 0.2% Native Hawaiian or other Pacific Islander, 25.6% or 25.4% were Hispanic/Latino, 73.9% or 74.1% were non-Hispanic/Latino, 0.5% or 0.5% did not report ethnicity, 46.0% or 45.7% had comorbidities [participants who have 1 or more

comorbidities that increase the risk of severe COVID-19 disease: defined as subjects who had at least one of the Charlson comorbidity index category or body mass index (BMI) ≥30 kg/m$^2$], respectively. The mean age at vaccination was 49.8 or 49.7 years and median age was 51.0 or 51.0 in participants who received COMIRNATY or placebo, respectively.

Efficacy Against COVID-19

The population for the analysis of the protocol pre-specified primary efficacy endpoint included 36,621 participants 12 years of age and older (18,242 in the COMIRNATY group and 18,379 in the placebo group) who did not have evidence of prior infection with SARS-CoV-2 through 7 days after the second dose. The population in the protocol pre-specified primary efficacy analysis included all participants 12 years of age and older who had been enrolled from July 27, 2020, and followed for the development of COVID-19 through November 14, 2020. Participants 18 through 55 years of age and 56 years of age and older began enrollment from July 27, 2020, 16 through 17 years of age began enrollment from September 16, 2020, and 12 through 15 years of age began enrollment from October 15, 2020.

For participants without evidence of SARS-CoV-2 infection prior to 7 days after Dose 2, vaccine efficacy against confirmed COVID-19 occurring at least 7 days after Dose 2 was 95.0% (95% credible interval: 90.3, 97.6), which met the pre-specified success criterion. The case split was 8 COVID-19 cases in the COMIRNATY group compared to 162 COVID-19 cases in the placebo group.

The population for the updated vaccine efficacy analysis included participants 16 years of age and older who had been enrolled from July 27, 2020, and followed for the development of COVID-19 during blinded placebo-controlled follow-up through March 13, 2021, representing up to 6 months of follow-up after Dose 2. There were 12,796 (60.8%) participants in the COMIRNATY group and 12,449 (58.7%) in the placebo group followed for ≥4 months after Dose 2 in the blinded placebo-controlled follow-up period.

SARS-CoV-2 variants of concern identified from COVID-19 cases in this study include B.1.1.7 (Alpha) and B.1.351 (Beta). Representation of identified variants among cases in vaccine versus placebo recipients did not suggest decreased vaccine effectiveness against these variants.

The updated vaccine efficacy information is presented in Table 5.

**Table 5:   Vaccine Efficacy – First COVID-19 Occurrence From 7 Days After Dose 2, by Age Subgroup – Participants 16 Years of Age and Older Without Evidence of Infection and Participants With or Without Evidence of Infection Prior to 7 Days After Dose 2 – Evaluable Efficacy (7 Days) Population During the Placebo-Controlled Follow-up Period**

| First COVID-19 occurrence from 7 days after Dose 2 in participants without evidence of prior SARS-CoV-2 infection* | | |
|---|---|---|
| Subgroup | COMIRNATY N$^a$=19,993 Cases n1$^b$ Surveillance Time$^c$ (n2$^d$) | Placebo N$^a$=20,118 Cases n1$^b$ Surveillance Time$^c$ (n2$^d$) | Vaccine Efficacy % (95% CI$^e$) |
| All participants$^f$ | 77 6.092 (19,711) | 833 5.857 (19,741) | 91.1 (88.8, 93.1) |
| 16 through 64 years | 70 4.859 (15,519) | 709 4.654 (15,515) | 90.5 (87.9, 92.7) |
| 65 years and older | 7 1.233 (4192) | 124 1.202 (4226) | 94.5 (88.3, 97.8) |

| Subgroup | First COVID-19 occurrence from 7 days after Dose 2 in participants with or without* evidence of prior SARS-CoV-2 infection | | |
|---|---|---|---|
| | COMIRNATY $N^a$=21,047 Cases $n1^b$ Surveillance Time$^c$ (n2$^d$) | Placebo $N^a$=21,210 Cases $n1^b$ Surveillance Time$^c$ (n2$^d$) | Vaccine Efficacy % (95% CI$^e$) |
| All participants | 81 6.340 (20,533) | 854 6.110 (20,595) | 90.9 (88.5, 92.8) |
| 16 through 64 years | 74 5.073 (16,218) | 726 4.879 (16,269) | 90.2 (87.5, 92.4) |
| 65 years and older | 7 1.267 (4315) | 128 1.232 (4326) | 94.7 (88.7, 97.9) |

Note: Confirmed cases were determined by Reverse Transcription-Polymerase Chain Reaction (RT-PCR) and at least 1 symptom consistent with COVID-19 (symptoms included: fever; new or increased cough; new or increased shortness of breath; chills; new or increased muscle pain; new loss of taste or smell; sore throat; diarrhea; vomiting).

* Participants who had no evidence of past SARS-CoV-2 infection (i.e., N-binding antibody [serum] negative at Visit 1 and SARS-CoV-2 not detected by NAAT [nasal swab] at Visits 1 and 2), and had negative NAAT (nasal swab) at any unscheduled visit prior to 7 days after Dose 2 were included in the analysis.

a. N = Number of participants in the specified group.
b. n1 = Number of participants meeting the endpoint definition.
c. Total surveillance time in 1000 person-years for the given endpoint across all participants within each group at risk for the endpoint. Time period for COVID-19 case accrual is from 7 days after Dose 2 to the end of the surveillance period.
d. n2 = Number of participants at risk for the endpoint.
e. Two-sided confidence interval (CI) for vaccine efficacy is derived based on the Clopper and Pearson method adjusted to the surveillance time.

Subgroup analyses of vaccine efficacy (although limited by small numbers of cases in some subgroups) did not suggest meaningful differences in efficacy across genders, ethnic groups, geographies, or for participants with obesity or medical comorbidities associated with high risk of severe COVID-19.

Efficacy Against Severe COVID-19

Efficacy analyses of secondary efficacy endpoints supported benefit of COMIRNATY in preventing severe COVID-19. Vaccine efficacy against severe COVID-19 is presented only for participants with or without prior SARS-CoV-2 infection (Table 6) as the COVID-19 case counts in participants without prior SARS-CoV-2 infection were the same as those in participants with or without prior SARS-CoV-2 infection in both the COMIRNATY and placebo groups.

**Table 6:    Vaccine Efficacy – First Severe COVID-19 Occurrence in Participants 16 Years of Age and Older With or Without\* Prior SARS-CoV-2 Infection Based on Protocol[†] or Centers for Disease Control and Prevention (CDC)[‡] Definition From 7 Days After Dose 2 – Evaluable Efficacy (7 Days) Population During the Placebo-Controlled Follow-up**

| Vaccine Efficacy – First Severe COVID-19 Occurrence | | | |
|---|---|---|---|
| | COMIRNATY Cases n1[a] Surveillance Time[b] (n2[c]) | Placebo Cases n1[a] Surveillance Time[b] (n2[c]) | Vaccine Efficacy % (95% CI[d]) |
| 7 days after Dose 2[d] | 1 6.353 (20,540) | 21 6.237 (20,629) | 95.3 (70.9, 99.9) |
| Vaccine Efficacy – First Severe COVID-19 Occurrence Based on CDC Definition | | | |
| | COMIRNATY Cases n1[a] Surveillance Time[b] (n2[c]) | Placebo Cases n1[a] Surveillance Time[b] (n2[c]) | Vaccine Efficacy % (95% CI[d]) |
| 7 days after Dose 2[d] | 0 6.345 (20,513) | 31 6.225 (20,593) | 100 (87.6, 100.0) |

Note: Confirmed cases were determined by Reverse Transcription-Polymerase Chain Reaction (RT-PCR) and at least 1 symptom consistent with COVID-19 (symptoms included: fever; new or increased cough; new or increased shortness of breath; chills; new or increased muscle pain; new loss of taste or smell; sore throat; diarrhea; vomiting).

\*   Participants who had no evidence of past SARS-CoV-2 infection (i.e., N-binding antibody [serum] negative at Visit 1 and SARS-CoV-2 not detected by NAAT [nasal swab] at Visits 1 and 2), and had negative NAAT (nasal swab) at any unscheduled visit prior to 7 days after Dose 2 were included in the analysis.

[†] Severe illness from COVID-19 is defined in the protocol as confirmed COVID-19 and presence of at least 1 of the following:
- Clinical signs at rest indicative of severe systemic illness (respiratory rate ≥30 breaths per minute, heart rate ≥125 beats per minute, saturation of oxygen ≤93% on room air at sea level, or ratio of arterial oxygen partial pressure to fractional inspired oxygen <300 mm Hg);
- Respiratory failure [defined as needing high-flow oxygen, noninvasive ventilation, mechanical ventilation or extracorporeal membrane oxygenation (ECMO)];
- Evidence of shock (systolic blood pressure <90 mm Hg, diastolic blood pressure <60 mm Hg, or requiring vasopressors);
- Significant acute renal, hepatic, or neurologic dysfunction;
- Admission to an Intensive Care Unit;
- Death.

[‡] Severe illness from COVID-19 as defined by CDC is confirmed COVID-19 and presence of at least 1 of the following:
- Hospitalization;
- Admission to the Intensive Care Unit;
- Intubation or mechanical ventilation;
- Death.

a.   n1 = Number of participants meeting the endpoint definition.
b.   Total surveillance time in 1000 person-years for the given endpoint across all participants within each group at risk for the endpoint. Time period for COVID-19 case accrual is from 7 days after Dose 2 to the end of the surveillance period.
c.   n2 = Number of participants at risk for the endpoint.
d.   Two-side confidence interval (CI) for vaccine efficacy is derived based on the Clopper and Pearson method adjusted to the surveillance time.

# 16  HOW SUPPLIED/STORAGE AND HANDLING

COMIRNATY Suspension for Intramuscular Injection, Multiple Dose Vials are supplied in a carton containing 25 multiple dose vials (NDC 0069-1000-03) or 195 multiple dose vials (NDC 0069-1000-02). A 0.9% Sodium Chloride Injection, USP diluent is provided but shipped separately, and should be stored at controlled room temperature 20°C to 25°C (68°F to 77°F) [see USP Controlled Room Temperature]. The provided 0.9% Sodium Chloride Injection, USP diluent will be supplied either as cartons of 10 mL single-use vials manufactured by

Hospira, Inc (NDC 0409-4888-10), or 2 mL single-use vials manufactured by Fresenius Kabi USA, LLC (NDC 63323-186-02).

After dilution, 1 vial contains 6 doses of 0.3 mL.

During storage, minimize exposure to room light, and avoid exposure to direct sunlight and ultraviolet light.

Do not refreeze thawed vials.

<u>Frozen Vials Prior to Use</u>

Cartons of COMIRNATY Multiple Dose Vials arrive in thermal containers with dry ice. Once received, remove the vial cartons immediately from the thermal container and preferably store in an ultra-low temperature freezer between -90ºC to -60ºC (-130ºF to -76ºF) until the expiry date printed on the label. Alternatively, vials may be stored at -25°C to -15°C (-13°F to 5°F) for up to 2 weeks. Vials must be kept frozen and protected from light, in the original cartons, until ready to use. Vials stored at -25°C to -15°C (-13°F to 5°F) for up to 2 weeks may be returned 1 time to the recommended storage condition of -90ºC to -60ºC (-130ºF to -76ºF). Total cumulative time the vials are stored at -25°C to -15°C (-13°F to 5°F) should be tracked and should not exceed 2 weeks.

If an ultra-low temperature freezer is not available, the thermal container in which COMIRNATY arrives may be used as <u>temporary</u> storage when consistently re-filled to the top of the container with dry ice. <u>Refer to the re-icing guidelines packed in the original thermal container for instructions regarding the use of the thermal container for temporary storage</u>. The thermal container maintains a temperature range of -90°C to -60ºC (-130°F to -76ºF). Storage of the vials between -96°C to -60°C (-141°F to -76°F) is not considered an excursion from the recommended storage condition.

<u>Transportation of Frozen Vials</u>

If local redistribution is needed and full cartons containing vials cannot be transported at -90°C to -60°C (-130°F to -76°F), vials may be transported at -25°C to -15°C (-13°F to 5°F). Any hours used for transport at -25°C to -15°C (-13°F to 5°F) count against the 2-week limit for storage at -25°C to -15°C (-13°F to 5°F). Frozen vials transported at -25°C to -15°C (-13°F to 5°F) may be returned 1 time to the recommended storage condition of -90ºC to -60ºC (-130ºF to -76ºF).

<u>Thawed Vials Before Dilution</u>

*Thawed Under Refrigeration*

Thaw and then store undiluted vials in the refrigerator [2°C to 8°C (35ºF to 46ºF)] for up to 1 month. A carton of 25 vials or 195 vials may take up to 2 or 3 hours, respectively, to thaw in the refrigerator, whereas a fewer number of vials will thaw in less time.

*Thawed at Room Temperature*

For immediate use, thaw undiluted vials at room temperature [up to 25ºC (77ºF)] for 30 minutes. Thawed vials can be handled in room light conditions.

Vials must reach room temperature before dilution.

Undiluted vials may be stored at room temperature for no more than 2 hours.

Transportation of Thawed Vials

Available data support transportation of 1 or more thawed vials at 2°C to 8°C (35°F to 46°F) for up to 12 hours.

Vials After Dilution

After dilution, store vials between 2°C to 25°C (35°F to 77°F) and use within 6 hours from the time of dilution. During storage, minimize exposure to room light, and avoid exposure to direct sunlight and ultraviolet light. Any vaccine remaining in vials must be discarded after 6 hours. Do not refreeze.

## 17  PATIENT COUNSELING INFORMATION

Inform vaccine recipient of the potential benefits and risks of vaccination with COMIRNATY.

Inform vaccine recipient of the importance of completing the two dose vaccination series.

There is a pregnancy exposure registry for COMIRNATY. Encourage individuals exposed to COMIRNATY around the time of conception or during pregnancy to register by visiting https://mothertobaby.org/ongoing-study/covid19-vaccines/.

Advise vaccine recipient to report any adverse events to their healthcare provider or to the Vaccine Adverse Event Reporting System at 1-800-822-7967 and www.vaers.hhs.gov.

This product's labeling may have been updated. For the most recent prescribing information, please visit https://dailymed.nlm.nih.gov/dailymed/.



Manufactured for
BioNTech Manufacturing GmbH
An der Goldgrube 12
55131 Mainz, Germany

*Pfizer*

Manufactured by
Pfizer Inc., New York, NY 10017


LAB-1448-1.0


US Govt. License No. x

# EXHIBIT C

# Phases of Clinical Trials



### Preclinical

- The first step in development of a new drug, using tissue cultures or animal models.

- Information on mechanism of <u>action, efficacy, toxicity, PK/PD</u> obtained from these studies



### Phase I trial

- This phase emphasizes safety. It involves <u>20 to 80</u> healthy volunteers. Information on the drug's most adverse effects.

- Information on <u>mechanism of drug metabolism, and excretion</u> are obtained from phase I studies



### Phase II trial

- The goal of phase II trials is to obtain preliminary data on whether the drug works in patients who have a certain disease.

- It typically involves <u>hundreds of patients</u>.

- Information on <u>Safety continues to be evaluated, and short-term adverse effects</u> are studied.



### Phase III trial

- Phase III trials typically involve <u>hundreds or thousands</u> of patients.

- Information more concerned on <u>safety and efficacy</u>.



### Drug Application review

- If the phase III trial is successful, the sponsor applies for <u>New Drug Application</u> to the FDA.

- This process includes a review of the <u>proposed professional labeling</u> and inspection of the manufacturing.

- If the review is favorable, the <u>FDA may approve</u> the drug for marketing. Phase IV or post marketing



### FDA APPROVAL

### Phase IV Post-marketing

- This phase happen after FDA has approved the drug.

- It involves <u>thousands of participants</u> and can last for many years.

- I Information on medication's long-term safety, effectiveness, and any other benefits.

# EXHIBIT D



1 Blood Ger.jpeg
1,125×627



2 Blood Ger.jpeg
1,125×689



3 Blood Ger.jpeg
1,125×662



4 Blood Ger.jpeg
1,125×648



5 Blood Ger.jpeg
1,125×637



6 Blood Ger.jpeg
1,125×651



7 Blood Ger.jpeg
1,125×668

# EXHIBIT E



PF-07302048 (BNT162 RNA-Based COVID-19 Vaccines)
Protocol C4591001



# A PHASE 1/2/3, PLACEBO-CONTROLLED, RANDOMIZED, OBSERVER-BLIND, DOSE-FINDING STUDY TO EVALUATE THE SAFETY, TOLERABILITY, IMMUNOGENICITY, AND EFFICACY OF SARS-COV-2 RNA VACCINE CANDIDATES AGAINST COVID-19 IN HEALTHY INDIVIDUALS

| | |
|---|---|
| **Study Sponsor:** | BioNTech |
| **Study Conducted By:** | Pfizer |
| **Study Intervention Number:** | PF-07302048 |
| **Study Intervention Name:** | RNA-Based COVID-19 Vaccines |
| **US IND Number:** | 19736 |
| **EudraCT Number:** | 2020-002641-42 |
| **Protocol Number:** | C4591001 |
| **Phase:** | 1/2/3 |

**Short Title:** A Phase 1/2/3 Study to Evaluate the Safety, Tolerability, Immunogenicity, and Efficacy of RNA Vaccine Candidates Against COVID-19 in Healthy Individuals

PF-07302048 (BNT162 RNA-Based COVID-19 Vaccines)
Protocol C4591001

---

# TABLE OF CONTENTS

LIST OF TABLES ................................................................................................................8

1. PROTOCOL SUMMARY .................................................................................................9

   1.1. Synopsis ....................................................................................................................9

   1.2. Schema .....................................................................................................................17

   1.3. Schedule of Activities .............................................................................................18

      1.3.1. Phase 1 ...........................................................................................................18

      1.3.2. Phase 2/3 ........................................................................................................23

2. INTRODUCTION ............................................................................................................26

   2.1. Study Rationale ........................................................................................................26

   2.2. Background ...............................................................................................................26

      2.2.1. Clinical Overview ..........................................................................................27

   2.3. Benefit/Risk Assessment ..........................................................................................27

      2.3.1. Risk Assessment .............................................................................................29

      2.3.2. Benefit Assessment .........................................................................................31

      2.3.3. Overall Benefit/Risk Conclusion ...................................................................31

3. OBJECTIVES, ESTIMANDS, AND ENDPOINTS .......................................................31

   3.1. For Phase 1 ...............................................................................................................31

   3.2. For Phase 2/3 ...........................................................................................................33

4. STUDY DESIGN..............................................................................................................36

   4.1. Overall Design..........................................................................................................36

      4.1.1. Phase 1 ...........................................................................................................36

      4.1.2. Phase 2/3 ........................................................................................................37

   4.2. Scientific Rationale for Study Design ......................................................................39

   4.3. Justification for Dose ...............................................................................................39

   4.4. End of Study Definition ...........................................................................................40

5. STUDY POPULATION ...................................................................................................40

   5.1. Inclusion Criteria......................................................................................................40

   5.2. Exclusion Criteria.....................................................................................................41

PF-07302048 (BNT162 RNA-Based COVID-19 Vaccines)
Protocol C4591001

5.3. Lifestyle Considerations.................................................................44

    5.3.1. Contraception......................................................................44

5.4. Screen Failures.........................................................................44

5.5. Criteria for Temporarily Delaying Enrollment/Randomization/Study
Intervention Administration ...............................................................44

6. STUDY INTERVENTION...................................................................45

    6.1. Study Intervention(s) Administered ...........................................46

        6.1.1. Manufacturing Process ....................................................46

        6.1.2. Administration ...............................................................46

    6.2. Preparation/Handling/Storage/Accountability ...........................47

        6.2.1. Preparation and Dispensing .............................................48

    6.3. Measures to Minimize Bias: Randomization and Blinding................48

        6.3.1. Allocation to Study Intervention .......................................48

        6.3.2. Blinding of Site Personnel ...............................................48

        6.3.3. Blinding of the Sponsor ...................................................49

        6.3.4. Breaking the Blind .........................................................50

    6.4. Study Intervention Compliance ................................................50

    6.5. Concomitant Therapy .............................................................50

        6.5.1. Prohibited During the Study .............................................50

        6.5.2. Permitted During the Study ..............................................51

    6.6. Dose Modification ................................................................51

    6.7. Intervention After the End of the Study .....................................52

7. DISCONTINUATION OF STUDY INTERVENTION AND PARTICIPANT
DISCONTINUATION/WITHDRAWAL................................................52

    7.1. Discontinuation of Study Intervention ......................................52

    7.2. Participant Discontinuation/Withdrawal From the Study ................53

        7.2.1. Withdrawal of Consent ...................................................53

    7.3. Lost to Follow-up .................................................................54

8. STUDY ASSESSMENTS AND PROCEDURES........................................54

    8.1. Efficacy and/or Immunogenicity Assessments ...........................55

        8.1.1. Biological Samples ........................................................58

    8.2. Safety Assessments ..............................................................58

        8.2.1. Clinical Safety Laboratory Assessments (Phase 1 Participants Only) .......59

PF-07302048 (BNT162 RNA-Based COVID-19 Vaccines)
Protocol C4591001

8.2.2. Electronic Diary ..................................................................................59

    8.2.2.1. Grading Scales ..................................................................60

    8.2.2.2. Local Reactions ..................................................................60

    8.2.2.3. Systemic Events ..................................................................61

    8.2.2.4. Fever ..................................................................................62

    8.2.2.5. Antipyretic Medication ......................................................62

8.2.3. Phase 1 Stopping Rules .....................................................................62

8.2.4. Surveillance of Events That Could Represent Enhanced COVID-19
and Phase 2/3 Stopping Rule .............................................................64

8.2.5. Randomization and Vaccination After a Stopping Rule Is Met .................64

8.2.6. Pregnancy Testing ..............................................................................65

8.3. Adverse Events and Serious Adverse Events .............................................65

8.3.1. Time Period and Frequency for Collecting AE and SAE Information.......65

    8.3.1.1. Reporting SAEs to Pfizer Safety ..........................................66

    8.3.1.2. Recording Nonserious AEs and SAEs on the CRF.................66

8.3.2. Method of Detecting AEs and SAEs .....................................................66

8.3.3. Follow-up of AEs and SAEs.................................................................66

8.3.4. Regulatory Reporting Requirements for SAEs.......................................67

8.3.5. Exposure During Pregnancy or Breastfeeding, and Occupational
Exposure ..........................................................................................67

    8.3.5.1. Exposure During Pregnancy..................................................67

    8.3.5.2. Exposure During Breastfeeding ............................................69

    8.3.5.3. Occupational Exposure ........................................................69

8.3.6. Cardiovascular and Death Events .........................................................70

8.3.7. Disease-Related Events and/or Disease-Related Outcomes Not
Qualifying as AEs or SAEs.................................................................70

8.3.8. Adverse Events of Special Interest .......................................................70

    8.3.8.1. Lack of Efficacy ..................................................................70

8.3.9. Medical Device Deficiencies ...............................................................70

8.3.10. Medication Errors ............................................................................70

8.4. Treatment of Overdose ..........................................................................71

8.5. Pharmacokinetics ..................................................................................72

8.6. Pharmacodynamics................................................................................72

PF-07302048 (BNT162 RNA-Based COVID-19 Vaccines)
Protocol C4591001

8.7. Genetics ...................................................................................................72

8.8. Biomarkers ..............................................................................................72

8.9. Immunogenicity Assessments ................................................................72

8.10. Health Economics .................................................................................72

8.11. Study Procedures ..................................................................................72

8.11.1. Phase 1 ...............................................................................................72

8.11.1.1. Screening: (0 to 28 Days Before Visit 1) ..............................72

8.11.1.2. Visit 1 – Vaccination 1: (Day 1) ............................................74

8.11.1.3. Visit 2 – Next-Day Follow-up Visit (Vaccination 1): (1 to 3 Days After Visit 1) .....................................................................76

8.11.1.4. Visit 3 – 1-Week Follow-up Visit (Vaccination 1): (6 to 8 Days After Visit 1) .....................................................................78

8.11.1.5. Visit 4 – Vaccination 2: (19 to 23 Days After Visit 1) ...........79

8.11.1.6. Visit 5 – 1-Week Follow-up Visit (Vaccination 2): (6 to 8 Days After Visit 4) .....................................................................81

8.11.1.7. Visit 6 – 2-Week Follow-up Visit (Vaccination 2): (12 to 16 Days After Visit 4) .................................................................82

8.11.1.8. Visit 7 – 1-Month Follow-up Visit: (28 to 35 Days After Visit 4) .......................................................................................83

8.11.1.9. Visit 8 – 6-Month Follow-up Visit: (175 to 189 Days After Visit 4) ...............................................................................84

8.11.1.10. Visit 9 – 12-Month Follow-up Visit: (350 to 378 Days After Visit 4) ...............................................................................84

8.11.1.11. Visit 10 – 24-Month Follow-up Visit: (714 to 742 Days After Visit 4) ...............................................................................85

8.11.2. Phase 2/3 ...........................................................................................85

8.11.2.1. Visit 1 – Vaccination 1: (Day 1) ............................................85

8.11.2.2. Visit 2 – Vaccination 2: (19 to 23 Days After Visit 1) ...........88

8.11.2.3. Visit 3 – 1-Month Follow-up Visit (After Vaccination 2): (28 to 35 Days After Visit 2) ...................................................90

8.11.2.4. Visit 4 – 6-Month Follow-up Visit: (175 to 189 Days After Visit 2) ...............................................................................91

8.11.2.5. Visit 5 – 12-Month Follow-up Visit: (350 to 378 Days After Visit 2) ...............................................................................91

8.11.2.6. Visit 6 – 24-Month Follow-up Visit: (714 to 742 Days After Visit 2) ...............................................................................92

PF-07302048 (BNT162 RNA-Based COVID-19 Vaccines)
Protocol C4591001

8.12. Unscheduled Visit for a Grade 3 or Suspected Grade 4 Reaction .......................92

8.13. COVID-19 Surveillance (All Participants) ...............................................93

   8.13.1. Potential COVID-19 Illness Visit: (Optimally Within 3 Days After Potential COVID-19 Illness Onset) .............................................95

   8.13.2. Potential COVID-19 Convalescent Visit: (28 to 35 Days After Potential COVID-19 Illness Visit) ............................................96

8.14. Communication and Use of Technology.................................................96

8.15. SARS-CoV-2 NAAT Results From Visits 1 and 2 and Potential COVID-19 Illness Visits .............................................................................97

9. STATISTICAL CONSIDERATIONS ...............................................................98

9.1. Estimands and Statistical Hypotheses ...................................................98

   9.1.1. Estimands..........................................................................98

   9.1.2. Statistical Hypotheses ........................................................99

      9.1.2.1. Statistical Hypothesis Evaluation for Efficacy..........................99

      9.1.2.2. Statistical Hypothesis Evaluation for Immunogenicity..............99

9.2. Sample Size Determination ...............................................................99

9.3. Analysis Sets ................................................................................101

9.4. Statistical Analyses .......................................................................102

   9.4.1. Immunogenicity Analyses ..................................................102

   9.4.2. Efficacy Analyses ...........................................................107

   9.4.3. Safety Analyses ..............................................................109

   9.4.4. Other Analyses ..............................................................110

9.5. Interim Analyses ..........................................................................111

   9.5.1. Analysis Timing..............................................................114

9.6. Data Monitoring Committee or Other Independent Oversight Committee..........114

10. SUPPORTING DOCUMENTATION AND OPERATIONAL CONSIDERATIONS .............................................................................116

10.1. Appendix 1: Regulatory, Ethical, and Study Oversight Considerations ............116

   10.1.1. Regulatory and Ethical Considerations ................................116

      10.1.1.1. Reporting of Safety Issues and Serious Breaches of the Protocol or ICH GCP....................................................116

   10.1.2. Informed Consent Process .................................................117

   10.1.3. Data Protection .............................................................118

PF-07302048 (BNT162 RNA-Based COVID-19 Vaccines)
Protocol C4591001

10.1.4. Dissemination of Clinical Study Data ...................................................118

10.1.5. Data Quality Assurance .......................................................................119

10.1.6. Source Documents ...............................................................................120

10.1.7. Study and Site Start and Closure .........................................................121

10.1.8. Sponsor's Qualified Medical Personnel ...............................................121

10.2. Appendix 2: Clinical Laboratory Tests ....................................................123

10.3. Appendix 3: Adverse Events: Definitions and Procedures for Recording, Evaluating, Follow-up, and Reporting ...................................................125

10.3.1. Definition of AE ...................................................................................125

10.3.2. Definition of SAE ................................................................................126

10.3.3. Recording/Reporting and Follow-up of AEs and/or SAEs...................128

10.3.4. Reporting of SAEs ...............................................................................131

10.4. Appendix 4: Contraceptive Guidance .....................................................132

10.4.1. Male Participant Reproductive Inclusion Criteria ...............................132

10.4.2. Female Participant Reproductive Inclusion Criteria.............................132

10.4.3. Woman of Childbearing Potential ........................................................133

10.4.4. Contraception Methods.........................................................................134

10.5. Appendix 5: Liver Safety: Suggested Actions and Follow-up Assessments ......136

10.6. Appendix 6: Abbreviations ......................................................................138

10.7. Appendix 7: Stopping and Alert Rules for Enhanced COVID-19 .....................142

10.8. Appendix 8: Criteria for Allowing Inclusion of Participants With Chronic Stable HIV, HCV, or HBV Infection ...................................................145

11. REFERENCES ...............................................................................................146

PF-07302048 (BNT162 RNA-Based COVID-19 Vaccines)
Protocol C4591001

---

# LIST OF TABLES

Table 1.        Local Reaction Grading Scale ................................................................60

Table 2.        Systemic Event Grading Scale................................................................61

Table 3.        Scale for Fever ........................................................................................62

Table 4.        Power Analysis for Noninferiority Assessment .....................................100

Table 5.        Probability of Observing at Least 1 AE by Assumed True Event
                Rates With Different Sample Sizes .......................................................101

Table 6.        Interim Analysis Plan and Boundaries for Efficacy and Futility............112

Table 7.        Statistical Design Operating Characteristics: Probability of Success
                or Failure for Interim Analyses.............................................................113

Table 8.        Statistical Design Operating Characteristics: Probability of Success
                for Final Analysis and Overall...............................................................113

Table 9.        Laboratory Abnormality Grading Scale .................................................123

Table 10.       Stopping Rule: Enrollment Is Stopped if the Number of Severe
                Cases in the Vaccine Group Is Greater Than or Equal to the
                Prespecified Stopping Rule Value (S) ...................................................143

Table 11.       Alert Rule: Further Action Is Taken if the Number of Severe Cases
                in the Vaccine Group Is Greater Than or Equal to the Prespecified
                Alert Rule Value (A) .............................................................................144

PF-07302048 (BNT162 RNA-Based COVID-19 Vaccines)
Protocol C4591001

---

# 1. PROTOCOL SUMMARY

## 1.1. Synopsis

**Short Title:** A Phase 1/2/3 Study to Evaluate the Safety, Tolerability, Immunogenicity, and Efficacy of RNA Vaccine Candidates Against COVID-19 in Healthy Individuals

**Rationale**

A pneumonia of unknown cause detected in Wuhan, China, was first reported in December 2019. On 08 January 2020, the pathogen causing this outbreak was identified as a novel coronavirus 2019. The outbreak was declared a Public Health Emergency of International Concern on 30 January 2020. On 12 February 2020, the virus was officially named as severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2), and the WHO officially named the disease caused by SARS-CoV-2 as coronavirus disease 2019 (COVID-19). On 11 March 2020, the WHO upgraded the status of the COVID-19 outbreak from epidemic to pandemic, which is now spreading globally at high speed.

There are currently no licensed vaccines to prevent infection with SARS-CoV-2 or COVID-19. Given the rapid transmission of COVID-19 and incidence of disease in the United States and elsewhere, the rapid development of an effective vaccine is of utmost importance.

BioNTech has developed RNA-based vaccine candidates using a platform approach that enables the rapid development of vaccines against emerging viral diseases, including SARS-CoV-2. Each vaccine candidate is based on a platform of nucleoside-modified messenger RNA (modRNA, BNT162b). Each vaccine candidate expresses 1 of 2 antigens: the SARS-CoV-2 full-length, P2 mutant, prefusion spike glycoprotein (P2 S) (version 9) or a trimerized SARS-CoV-2 spike glycoprotein receptor-binding domain (RBD) (version 5). The 2 SARS-CoV-2 vaccine candidates that will be tested in this study are therefore:

BNT162b1 (variant RBP020.3): a modRNA encoding the RBD;

BNT162b2 (variant RBP020.2): a modRNA encoding P2 S.

All candidates are formulated in the same lipid nanoparticle (LNP) composition. This study is intended to investigate the safety, immunogenicity, and efficacy of these prophylactic BNT162 vaccines against COVID-19.

PF-07302048 (BNT162 RNA-Based COVID-19 Vaccines)
Protocol C4591001

## Objectives, Estimands, and Endpoints

## For Phase 1

| Objectives | Estimands | Endpoints |
|---|---|---|
| **Primary:** | **Primary:** | **Primary:** |
| To describe the safety and tolerability profiles of prophylactic BNT162 vaccines in healthy adults after 1 or 2 doses | In participants receiving at least 1 dose of study intervention, the percentage of participants reporting:<br>• Local reactions for up to 7 days following each dose<br>• Systemic events for up to 7 days following each dose<br>• Adverse events (AEs) from Dose 1 to 1 month after the last dose<br>• Serious AEs (SAEs) from Dose 1 to 6 months after the last dose | • Local reactions (pain at the injection site, redness, and swelling)<br>• Systemic events (fever, fatigue, headache, chills, vomiting, diarrhea, new or worsened muscle pain, and new or worsened joint pain)<br>• AEs<br>• SAEs |
| | In addition, the percentage of participants with:<br>• Abnormal hematology and chemistry laboratory values 1 and 7 days after Dose 1; and 7 days after Dose 2<br>• Grading shifts in hematology and chemistry laboratory assessments between baseline and 1 and 7 days after Dose 1; and before Dose 2 and 7 days after Dose 2 | Hematology and chemistry laboratory parameters detailed in Section 10.2 |
| **Secondary:** | **Secondary:** | **Secondary:** |
| To describe the immune responses elicited by prophylactic BNT162 vaccines in healthy adults after 1 or 2 doses | In participants complying with the key protocol criteria (evaluable participants) at the following time points after receipt of study intervention:<br><br>7 and 21 days after Dose 1; 7 and 14 days and 1, 6, 12, and 24 months after Dose 2 | |
| | • Geometric mean titers (GMTs) at each time point<br>• Geometric mean fold rise (GMFR) from before vaccination to each subsequent time point after vaccination<br>• Proportion of participants achieving ≥4-fold rise from before vaccination to each subsequent time point after vaccination | SARS-CoV-2 neutralizing titers |

PF-07302048 (BNT162 RNA-Based COVID-19 Vaccines)
Protocol C4591001

| Objectives | Estimands | Endpoints |
|---|---|---|
| | • Geometric mean concentrations (GMCs) at each time point<br>• GMFR from before vaccination to each subsequent time point after vaccination<br>• Proportion of participants achieving ≥4-fold rise from before vaccination to each subsequent time point after vaccination | S1-binding IgG levels and RBD-binding IgG levels |
| | • Geometric mean ratio (GMR), estimated by the ratio of the geometric mean of SARS-CoV-2 neutralizing titers to the geometric mean of binding IgG levels at each time point | • SARS-CoV-2 neutralizing titers<br>• S1-binding IgG levels<br>• RBD-binding IgG levels |

## For Phase 2/3

| Objectives[a] | Estimands | Endpoints |
|---|---|---|
| **Primary Efficacy** | | |
| To evaluate the efficacy of prophylactic BNT162b2 against confirmed COVID-19 occurring from 7 days after the second dose in participants without evidence of infection before vaccination | In participants complying with the key protocol criteria (evaluable participants) at least 7 days after receipt of the second dose of study intervention: $100 \times (1 - IRR)$ [ratio of active vaccine to placebo] | COVID-19 incidence per 1000 person-years of follow-up based on central laboratory or locally confirmed NAAT in participants with no serological or virological evidence (up to 7 days after receipt of the second dose) of past SARS-CoV-2 infection |
| To evaluate the efficacy of prophylactic BNT162b2 against confirmed COVID-19 occurring from 7 days after the second dose in participants with and without evidence of infection before vaccination | In participants complying with the key protocol criteria (evaluable participants) at least 7 days after receipt of the second dose of study intervention: $100 \times (1 - IRR)$ [ratio of active vaccine to placebo] | COVID-19 incidence per 1000 person-years of follow-up based on central laboratory or locally confirmed NAAT |
| **Primary Safety** | | |
| To define the safety profile of prophylactic BNT162b2 in the first 360 participants randomized (Phase 2) | In participants receiving at least 1 dose of study intervention, the percentage of participants reporting:<br>• Local reactions for up to 7 days following each dose<br>• Systemic events for up to 7 days following each dose<br>• AEs from Dose 1 to 7 days after the second dose<br>• SAEs from Dose 1 to 7 days after the second dose | • Local reactions (pain at the injection site, redness, and swelling)<br>• Systemic events (fever, fatigue, headache, chills, vomiting, diarrhea, new or worsened muscle pain, and new or worsened joint pain)<br>• AEs<br>• SAEs |

PF-07302048 (BNT162 RNA-Based COVID-19 Vaccines)
Protocol C4591001

| Objectives[a] | Estimands | Endpoints |
|---|---|---|
| To define the safety profile of prophylactic BNT162b2 in all participants randomized in Phase 2/3 | In participants receiving at least 1 dose of study intervention, the percentage of participants reporting:<br>• Local reactions for up to 7 days following each dose<br>• Systemic events for up to 7 days following each dose<br>• AEs from Dose 1 to 1 month after the second dose<br>• SAEs from Dose 1 to 6 months after the second dose | • AEs<br>• SAEs<br>• In a subset of at least 6000 participants:<br>  ○ Local reactions (pain at the injection site, redness, and swelling)<br>  ○ Systemic events (fever, fatigue, headache, chills, vomiting, diarrhea, new or worsened muscle pain, and new or worsened joint pain) |
| To define the safety profile of prophylactic BNT162b2 in participants 12 to 15 years of age in Phase 3 | In participants receiving at least 1 dose of study intervention, the percentage of participants reporting:<br>• Local reactions for up to 7 days following each dose<br>• Systemic events for up to 7 days following each dose<br>• AEs from Dose 1 to 1 month after the second dose<br>• SAEs from Dose 1 to 6 months after the second dose | • Local reactions (pain at the injection site, redness, and swelling)<br>• Systemic events (fever, fatigue, headache, chills, vomiting, diarrhea, new or worsened muscle pain, and new or worsened joint pain)<br>• AEs<br>• SAEs |
| Secondary Efficacy | | |
| To evaluate the efficacy of prophylactic BNT162b2 against confirmed COVID-19 occurring from 14 days after the second dose in participants without evidence of infection before vaccination | In participants complying with the key protocol criteria (evaluable participants) at least 14 days after receipt of the second dose of study intervention:<br>$100 \times (1 - IRR)$ [ratio of active vaccine to placebo] | COVID-19 incidence per 1000 person-years of follow-up based on central laboratory or locally confirmed NAAT in participants with no serological or virological evidence (up to 14 days after receipt of the second dose) of past SARS-CoV-2 infection |
| To evaluate the efficacy of prophylactic BNT162b2 against confirmed COVID-19 occurring from 14 days after the second dose in participants with and without evidence of infection before vaccination | In participants complying with the key protocol criteria (evaluable participants) at least 14 days after receipt of the second dose of study intervention:<br>$100 \times (1 - IRR)$ [ratio of active vaccine to placebo] | COVID-19 incidence per 1000 person-years of follow-up based on central laboratory or locally confirmed NAAT |
| To evaluate the efficacy of prophylactic BNT162b2 against confirmed severe COVID-19 occurring from 7 days and from 14 days after the second dose in participants without evidence of infection before vaccination | In participants complying with the key protocol criteria (evaluable participants)<br>• at least 7 days<br>and<br>• at least 14 days<br>after receipt of the second dose of study intervention:<br>$100 \times (1 - IRR)$ [ratio of active vaccine to placebo] | Confirmed severe COVID-19 incidence per 1000 person-years of follow-up in participants with no serological or virological evidence (up to 7 days and up to 14 days after receipt of the second dose) of past SARS-CoV-2 infection |

PF-07302048 (BNT162 RNA-Based COVID-19 Vaccines)
Protocol C4591001

| Objectives[a] | Estimands | Endpoints |
|---|---|---|
| To evaluate the efficacy of prophylactic BNT162b2 against confirmed severe COVID-19 occurring from 7 days and from 14 days after the second dose in participants with and without evidence of infection before vaccination | In participants complying with the key protocol criteria (evaluable participants)<br>• at least 7 days<br>and<br>• at least 14 days<br>after receipt of the second dose of study intervention:<br>$100 \times (1 - \text{IRR})$ [ratio of active vaccine to placebo] | Confirmed severe COVID-19 incidence per 1000 person-years of follow-up |
| To describe the efficacy of prophylactic BNT162b2 against confirmed COVID-19 (according to the CDC-defined symptoms) occurring from 7 days and from 14 days after the second dose in participants without evidence of infection before vaccination | In participants complying with the key protocol criteria (evaluable participants)<br>• at least 7 days<br>and<br>• at least 14 days<br>after receipt of the second dose of study intervention:<br>$100 \times (1 - \text{IRR})$ [ratio of active vaccine to placebo] | COVID-19 incidence per 1000 person-years of follow-up based on central laboratory or locally confirmed NAAT in participants with no serological or virological evidence (up to 7 days and up to 14 days after receipt of the second dose) of past SARS-CoV-2 infection |
| To describe the efficacy of prophylactic BNT162b2 against confirmed COVID-19 (according to the CDC-defined symptoms) occurring from 7 days and from 14 days after the second dose in participants with and without evidence of infection before vaccination | In participants complying with the key protocol criteria (evaluable participants)<br>• at least 7 days<br>and<br>• at least 14 days<br>after receipt of the second dose of study intervention:<br>$100 \times (1 - \text{IRR})$ [ratio of active vaccine to placebo] | COVID-19 incidence per 1000 person-years of follow-up based on central laboratory or locally confirmed NAAT |
| **Secondary Immunogenicity** | | |
| To demonstrate the noninferiority of the immune response to prophylactic BNT162b2 in participants 12 to 15 years of age compared to participants 16 to 25 years of age | GMR, estimated by the ratio of the geometric mean of SARS-CoV-2 neutralizing titers in the 2 age groups (12-15 years of age to 16-25 years of age) 1 month after completion of vaccination | SARS-CoV-2 neutralizing titers in participants with no serological or virological evidence (up to 1 month after receipt of the second dose) of past SARS-CoV-2 infection |
| **Exploratory** | | |
| To evaluate the immune response over time to prophylactic BNT162b2 and persistence of immune response in participants with and without serological or virological evidence of SARS-CoV-2 infection before vaccination | GMC/GMT, GMFR, and percentage of participants with titers greater than defined threshold(s), at baseline and 1, 6, 12, and 24 months after completion of vaccination | • S1-binding IgG levels and/or RBD-binding IgG levels<br>• SARS-CoV-2 neutralizing titers |
| To evaluate the immune response (non-S) to SARS-CoV-2 in participants with and without confirmed COVID-19 during the study | | • N-binding antibody |
| To describe the serological responses to the BNT vaccine candidate in cases of:<br>• Confirmed COVID-19<br>• Confirmed severe COVID-19<br>• SARS-CoV-2 infection without confirmed COVID-19 | | • S1-binding IgG levels and/or RBD-binding IgG levels<br>• SARS-CoV-2 neutralizing titers |

PF-07302048 (BNT162 RNA-Based COVID-19 Vaccines)
Protocol C4591001

| Objectives[a] | Estimands | Endpoints |
|---|---|---|
| To describe the safety, immunogenicity, and efficacy of prophylactic BNT162b2 in individuals with confirmed stable HIV disease | | • All safety, immunogenicity, and efficacy endpoints described above |
| To describe the safety and immunogenicity of prophylactic BNT162b2 in individuals 16 to 55 years of age vaccinated with study intervention produced by manufacturing "Process 1" or "Process 2"[b] | | • All safety endpoints described above<br>• SARS-CoV-2 neutralizing titers |

a. HIV-positive participants in Phase 3 will not be included in analyses of the objectives, with the exception of the specific exploratory objective.
b. See Section 6.1.1 for a description of the manufacturing process.


**Overall Design**

This is a Phase 1/2/3, multicenter, multinational, randomized, placebo-controlled, observer-blind, dose-finding, vaccine candidate–selection, and efficacy study in healthy individuals.

The study consists of 2 parts: Phase 1: to identify preferred vaccine candidate(s) and dose level(s); Phase 2/3: an expanded cohort and efficacy part. These parts, and the progression between them, are detailed in the schema (Section 1.2).

The study will evaluate the safety, tolerability, and immunogenicity of 2 different SARS-CoV-2 RNA vaccine candidates against COVID-19 and the efficacy of 1 candidate:

- As a 2-dose (separated by 21 days) schedule;

- At various different dose levels in Phase 1;

- In 3 age groups (Phase 1: 18 to 55 years of age, 65 to 85 years of age; Phase 2/3: ≥12 years of age [stratified as 12-15, 16-55, or >55 years of age]).

Dependent upon safety and/or immunogenicity data generated during the course of this study, or the BioNTech study conducted in Germany (BNT162-01), it is possible that groups in Phase 1 may be started at the next highest dose, groups may not be started, groups may be terminated early, and/or groups may be added with dose levels below the lowest stated dose or intermediate between the lowest and highest stated doses.

The vaccine candidate selected for Phase 2/3 evaluation is BNT162b2 at a dose of 30 µg.

PF-07302048 (BNT162 RNA-Based COVID-19 Vaccines)
Protocol C4591001

___

**Number of Participants**

Each group in Phase 1 will comprise 15 participants (12 receiving active vaccine and 3 receiving placebo). In this phase, 13 groups will be studied, corresponding to a total of 195 participants.

The vaccine candidate selected for Phase 2/3, BNT162b2 at a dose of 30 µg, will comprise 21,999 vaccine recipients. The 12- to 15-year stratum will comprise up to approximately 2000 participants (1000 vaccine recipients) enrolled at selected investigational sites. It is intended that a minimum of 40% of participants will be in the >55-year stratum. An equal number of participants will receive placebo, ie, randomized in a 1:1 ratio.

**Intervention Groups and Duration**

The study will evaluate a 2-dose (separated by 21 days) schedule of various different dose levels of 2 investigational RNA vaccine candidates for active immunization against COVID-19 in 3 age groups (Phase 1: 18 to 55 years of age, 65 to 85 years of age; Phase 2/3: ≥12 years of age [stratified as 12-15, 16-55, or >55 years of age]):

- BNT162b1 (BNT162 RNA-LNP vaccine utilizing modRNA and encoding the RBD): 10 µg, 20 µg, 30 µg, 100 µg

- BNT162b2 (BNT162 RNA-LNP vaccine utilizing modRNA and encoding the P2 S): 10 µg, 20 µg, 30 µg

The vaccine candidate selected for Phase 2/3 evaluation is BNT162b2 at a dose of 30 µg.

Participants are expected to participate for up to a maximum of approximately 26 months. The duration of study follow-up may be shorter among participants enrolled in Phase 1 dosing arms that are not evaluated in Phase 2/3.

**Data Monitoring Committee or Other Independent Oversight Committee**

The study will utilize an IRC, an internal Pfizer committee that will review data to allow dose escalation or changes to continuation of specific groups.

An external data monitoring committee (DMC) will be formed and will review cumulative unblinded data throughout the study.

**Statistical Methods**

The sample size for Phase 1 of the study is not based on any statistical hypothesis testing.

For Phase 2/3, the VE evaluation will be the primary objective. The VE is defined as $VE = 100 \times (1 - IRR)$, where IRR is calculated as the ratio of the first confirmed COVID-19 illness rate in the vaccine group to the corresponding illness rate in the placebo group. With assumptions of a true VE of 60% and 4 IAs planned, 164 COVID-19 cases will provide 90%

PF-07302048 (BNT162 RNA-Based COVID-19 Vaccines)
Protocol C4591001

power to conclude true VE >30%. This would be achieved with a total 43,998 participants (21,999 vaccine recipients), based on the assumption of a 1.3% per year incidence in the placebo group, accrual of 164 primary-endpoint cases within 6 months, and 20% of the participants being nonevaluable. If the attack rate is much higher, case accrual would be expected to be more rapid, enabling the study's primary endpoint to be evaluated much sooner. The total number of participants enrolled in Phase 2/3 may vary depending on the incidence of COVID-19 at the time of the enrollment, the true underlying VE, and a potential early stop for efficacy or futility.

VE will be evaluated using a beta-binomial model and the posterior probability of VE being >30% will be assessed.

In Phase 3, up to approximately 2000 participants are anticipated to be 12 to 15 years of age. Noninferiority of immune response to prophylactic BNT162b2 in participants 12 to 15 years of age to response in participants 16 to 25 years of age will be assessed based on the GMR of SARS-CoV-2 neutralizing titers using a 1.5-fold margin. A sample size of 200 evaluable participants (or 250 vaccine recipients) per age group will provide a power of 90.8% to declare the noninferiority in terms of GMR (lower limit of 95% CI for GMR >0.67).

The primary safety objective will be evaluated by descriptive summary statistics for local reactions, systemic events, AEs/SAEs, and abnormal hematology and chemistry laboratory parameters (Phase 1 only), for each vaccine group. A 3-tier approach will be used to summarize AEs in Phase 2/3.

Except for the objective to assess the noninferiority of immune response in participants 12 to 15 years of age compared to participants 16 to 25 years of age, the other immunogenicity objectives will be evaluated descriptively by GMT, GMC, GMFR, percentage of participants with ≥4-fold rise, percentage of participants with ≥ specified threshold, and GMC ratio, and the associated 95% confidence intervals (CIs), for SARS-CoV-2 neutralizing titers, S1-binding IgG levels, and/or RBD-binding IgG levels at the various time points.

PF-07302048 (BNT162 RNA-Based COVID-19 Vaccines)
Protocol C4591001

## 1.2. Schema



Phase 1          For each vaccine candidate         (4:1 randomization active:placebo)

Age: 18-55 y                                                         Age: 65-85 y
Low-dose-level 2-dose group (n=15)

**IRC (safety)**                 **IRC (safety after Dose 1)**       Low-dose-level 2-dose group (n=15)

Mid-dose-level 2-dose group (n=15)

**IRC (safety)**                 **IRC (safety after Dose 1)**       Mid-dose-level 2-dose group (n=15)

High-dose-level 2-dose group (n=15)

                             **IRC (safety after Dose 1)**       High-dose-level 2-dose group (n=15)

**IRC choice of group(s) for Phase 2/3
(safety & immunogenicity after Doses 1 and 2)**

*Phase 2/3*                   Single vaccine candidate         (1:1 randomization active:placebo)
*Safety and immunogenicity analysis of*         **Age: ≥12**
*Phase 2 data (first 360 participants)*     **(Stratified 12-15, 16-55, or >55)**
*by unblinded team (these participants*    BNT162b2 30 μg or placebo 2 doses
*will also be included in Phase 3*       (n~21,999 per group, total n~43.998)
*analyses)*

Abbreviation: IRC = internal review committee.

PF-07302048 (BNT162 RNA-Based COVID-19 Vaccines)
Protocol C4591001

## 1.3. Schedule of Activities

The SoA table provides an overview of the protocol visits and procedures.  Refer to the STUDY ASSESSMENTS AND PROCEDURES section of the protocol for detailed information on each procedure and assessment required for compliance with the protocol.

The investigator may schedule visits (unplanned visits) in addition to those listed in the SoA table, in order to conduct evaluations or assessments required to protect the well-being of the participant.

### 1.3.1. Phase 1

An unplanned potential COVID-19 illness visit and unplanned potential COVID-19 convalescent visit are required at any time between Visit 1 (Vaccination 1) and Visit 10 (24-month follow-up visit) that COVID-19 is suspected.

| Visit Number | Screening | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | Unplanned | Unplanned |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Visit Description | Screening | Vax 1 | Next-Day Follow-up Visit (Vax 1) | 1-Week Follow-up Visit (Vax 1) | Vax 2 | 1-Week Follow-up Visit (Vax 2) | 2-Week Follow-up Visit (Vax 2) | 1-Month Follow-up Visit | 6-Month Follow-up Visit | 12-Month Follow-up Visit | 24-Month Follow-up Visit | Potential COVID-19 Illness Visit[a] | Potential COVID-19 Convalescent Visit |
| Visit Window (Days) | 0 to 28 Days Before Visit 1 | Day 1 | 1 to 3 Days After Visit 1 | 6 to 8 Days After Visit 1 | 19 to 23 Days After Visit 1 | 6 to 8 Days After Visit 4 | 12 to 16 Days After Visit 4 | 28 to 35 Days After Visit 4 | 175 to 189 Days After Visit 4 | 350 to 378 Days After Visit 4 | 714 to 742 Days After Visit 4 | Optimally Within 3 Days After Potential COVID-19 Illness Onset | 28 to 35 Days After Potential COVID-19 Illness Visit |
| Obtain informed consent | X | | | | | | | | | | | | |
| Assign participant number | X | | | | | | | | | | | | |
| Obtain demography and medical history data | X | | | | | | | | | | | | |
| Obtain details of medications currently taken | X | | | | | | | | | | | | |
| Perform physical examination | X | X | X | X | X | X | X | | | | | | |

PF-07302048 (BNT162 RNA-Based COVID-19 Vaccines)
Protocol C4591001

| Visit Number | Screening | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | Unplanned | Unplanned |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Visit Description | Screening | Vax 1 | Next-Day Follow-up Visit (Vax 1) | 1-Week Follow-up Visit (Vax 1) | Vax 2 | 1-Week Follow-up Visit (Vax 2) | 2-Week Follow-up Visit (Vax 2) | 1-Month Follow-up Visit | 6-Month Follow-up Visit | 12-Month Follow-up Visit | 24-Month Follow-up Visit | Potential COVID-19 Illness Visit[a] | Potential COVID-19 Convalescent Visit |
| Visit Window (Days) | 0 to 28 Days Before Visit 1 | Day 1 | 1 to 3 Days After Visit 1 | 6 to 8 Days After Visit 1 | 19 to 23 Days After Visit 1 | 6 to 8 Days After Visit 4 | 12 to 16 Days After Visit 4 | 28 to 35 Days After Visit 4 | 175 to 189 Days After Visit 4 | 350 to 378 Days After Visit 4 | 714 to 742 Days After Visit 4 | Optimally Within 3 Days After Potential COVID-19 Illness Onset | 28 to 35 Days After Potential COVID-19 Illness Visit |
| Measure vital signs (including body temperature) | X | X | X | X | X | X | X | | | | | | |
| Collect blood sample for hematology and chemistry laboratory tests[b] | ~10 mL | | ~10 mL | ~10 mL | ~10 mL | ~10 mL | | | | | | | |
| Collect screening blood sample for HIV, HBsAg, HBc Ab, and HCV Ab tests | ~10 mL | | | | | | | | | | | | |
| Serological test for prior COVID-19 infection | ~20 mL | | | | | | | | | | | | |
| Perform urine pregnancy test (if appropriate) | X | X | | | X | | | | | | | | |
| Obtain nasal (midturbinate) swab(s)[c] | | X | | | X | | | | | | | X | |
| Collect nonstudy vaccine information | X | X | X | X | X | X | X | X | X | | | | |
| Confirm eligibility | X | X | | | X | | | | | | | | |
| Collect prohibited medication use | | | X | X | X | X | X | X | X | X | X | X | X |
| Review hematology and chemistry results | | X | | X | X | X | X | | | | | | |
| Review temporary delay criteria | | X | | | X | | | | | | | | |
| Confirm use of contraceptives (if appropriate) | X | X | X | X | X | X | X | X | | | | | |

PF-07302048 (BNT162 RNA-Based COVID-19 Vaccines)
Protocol C4591001

| Visit Number | Screening | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | Unplanned | Unplanned |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Visit Description | Screening | Vax 1 | Next-Day Follow-up Visit (Vax 1) | 1-Week Follow-up Visit (Vax 1) | Vax 2 | 1-Week Follow-up Visit (Vax 2) | 2-Week Follow-up Visit (Vax 2) | 1-Month Follow-up Visit | 6-Month Follow-up Visit | 12-Month Follow-up Visit | 24-Month Follow-up Visit | Potential COVID-19 Illness Visit[a] | Potential COVID-19 Convalescent Visit |
| Visit Window (Days) | 0 to 28 Days Before Visit 1 | Day 1 | 1 to 3 Days After Visit 1 | 6 to 8 Days After Visit 1 | 19 to 23 Days After Visit 1 | 6 to 8 Days After Visit 4 | 12 to 16 Days After Visit 4 | 28 to 35 Days After Visit 4 | 175 to 189 Days After Visit 4 | 350 to 378 Days After Visit 4 | 714 to 742 Days After Visit 4 | Optimally Within 3 Days After Potential COVID-19 Illness Onset | 28 to 35 Days After Potential COVID-19 Illness Visit |
| Obtain randomization number and study intervention allocation | | X | | | | | | | | | | | |
| Collect blood sample for immunogenicity assessment | | ~50 mL | | ~50 mL | ~50 mL | ~50 mL + optional[c] ~170 mL | ~50 mL + optional[c] ~170 mL | ~50 mL + optional[c] ~170 mL | ~20 mL | ~20 mL | ~20 mL | | ~20 mL |
| Administer study intervention | | X | | | X | | | | | | | | |
| Assess acute reactions for at least 30 minutes after study intervention administration[d] | | X | | | X | | | | | | | | |
| Explain participant communication methods (including for e-diary completion), assist the participant with downloading the app, or issue provisioned device, if required | | X | | | | | | | | | | | |
| Provide thermometer and measuring device | | X | | | X | | | | | | | | |
| Review reactogenicity e-diary data (daily review is optimal during the active diary period) | | ◄——————► | | | ◄——————► | | | | | | | | |
| Review ongoing reactogenicity e-diary | | | | | X | | X | | | | | | |

PF-07302048 (BNT162 RNA-Based COVID-19 Vaccines)
Protocol C4591001

| Visit Number | Screening | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | Unplanned | Unplanned |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Visit Description | Screening | Vax 1 | Next-Day Follow-up Visit (Vax 1) | 1-Week Follow-up Visit (Vax 1) | Vax 2 | 1-Week Follow-up Visit (Vax 2) | 2-Week Follow-up Visit (Vax 2) | 1-Month Follow-up Visit | 6-Month Follow-up Visit | 12-Month Follow-up Visit | 24-Month Follow-up Visit | Potential COVID-19 Illness Visit[a] | Potential COVID-19 Convalescent Visit |
| Visit Window (Days) | 0 to 28 Days Before Visit 1 | Day 1 | 1 to 3 Days After Visit 1 | 6 to 8 Days After Visit 1 | 19 to 23 Days After Visit 1 | 6 to 8 Days After Visit 4 | 12 to 16 Days After Visit 4 | 28 to 35 Days After Visit 4 | 175 to 189 Days After Visit 4 | 350 to 378 Days After Visit 4 | 714 to 742 Days After Visit 4 | Optimally Within 3 Days After Potential COVID-19 Illness Onset | 28 to 35 Days After Potential COVID-19 Illness Visit |
| symptoms and obtain stop dates | | | | | | | | | | | | | |
| Collect AEs and SAEs as appropriate | X | X | X | X | X | X | X | X | X | X | X | X | X |
| Collect e-diary or assist the participant to delete application | | | | | | | | | | | X | | |

PF-07302048 (BNT162 RNA-Based COVID-19 Vaccines)
Protocol C4591001

| Visit Number | Screening | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | Unplanned | Unplanned |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Visit Description | Screening | Vax 1 | Next-Day Follow-up Visit (Vax 1) | 1-Week Follow-up Visit (Vax 1) | Vax 2 | 1-Week Follow-up Visit (Vax 2) | 2-Week Follow-up Visit (Vax 2) | 1-Month Follow-up Visit | 6-Month Follow-up Visit | 12-Month Follow-up Visit | 24-Month Follow-up Visit | Potential COVID-19 Illness Visit[a] | Potential COVID-19 Convalescent Visit |
| Visit Window (Days) | 0 to 28 Days Before Visit 1 | Day 1 | 1 to 3 Days After Visit 1 | 6 to 8 Days After Visit 1 | 19 to 23 Days After Visit 1 | 6 to 8 Days After Visit 4 | 12 to 16 Days After Visit 4 | 28 to 35 Days After Visit 4 | 175 to 189 Days After Visit 4 | 350 to 378 Days After Visit 4 | 714 to 742 Days After Visit 4 | Optimally Within 3 Days After Potential COVID-19 Illness Onset | 28 to 35 Days After Potential COVID-19 Illness Visit |
| Collection of COVID-19–related clinical and laboratory information (including local diagnosis) | | | | | | | | | | | | X | X |

Abbreviations: e-diary = electronic diary; HBc Ab = hepatitis B core antibody; HBsAg = hepatitis B surface antigen; HCV Ab = hepatitis C virus antibody; HIV = human immunodeficiency virus; NAAT = nucleic acid amplification test; vax = vaccination.

a. The COVID-19 illness visit may be conducted as an in-person or telehealth visit.
b. Hematology: hemoglobin, complete blood count with differential, and platelets. Blood chemistry: alanine aminotransferase (ALT), aspartate aminotransferase (AST), alkaline phosphatase, total bilirubin, blood urea nitrogen (BUN), and creatinine.
c. Two swabs will be taken at Visits 1 and 4. One will be tested (if possible at the site, otherwise at the central laboratory) within 24 hours and vaccination will only proceed if it is NAAT-negative for SARS-CoV-2 genomes. The second will be sent to the central laboratory for potential later testing.
d. The first 5 participants in in each group will be observed at the site for at least 4 hours after study intervention administration. Further vaccination will commence no sooner than 24 hours after the fifth participant received his or her vaccination.
e. An optional blood draw of ~170 mL will be taken at 1 of the visits (from selected participants who consent) for exploratory COVID-19 research.

PF-07302048 (BNT162 RNA-Based COVID-19 Vaccines)
Protocol C4591001

## 1.3.2. Phase 2/3

An unplanned potential COVID-19 illness visit and unplanned potential COVID-19 convalescent visit are required at any time between Visit 1 (Vaccination 1) and Visit 6 (24-month follow-up visit) that potential COVID-19 symptoms are reported, including MIS-C.

| Visit Number | 1 | 2 | 3 | 4 | 5 | 6 | Unplanned | Unplanned |
|---|---|---|---|---|---|---|---|---|
| Visit Description | Vaccination 1 | Vaccination 2 | 1-Month Follow-up Visit | 6-Month Follow-up Visit | 12-Month Follow-up Visit | 24-Month Follow-up Visit | Potential COVID-19 Illness Visit[a] | Potential COVID-19 Convalescent Visit |
| Visit Window (Days) | Day 1[b] | 19 to 23 Days After Visit 1 | 28 to 35 Days After Visit 2 | 175 to 189 Days After Visit 2 | 350 to 378 Days After Visit 2 | 714 to 742 Days After Visit 2 | Optimally Within 3 Days After Potential COVID-19 Illness Onset | 28 to 35 Days After Potential COVID-19 Illness Visit |
| Obtain informed consent | X | | | | | | | |
| Assign participant number | X | | | | | | | |
| Obtain demography and medical history data | X | | | | | | | |
| Perform clinical assessment[c] | X | | | | | | | |
| For participants who are HIV-positive, record latest CD4 count and HIV viral load | X | | X | X | X | X | | |
| Measure height and weight | X | | | | | | | |
| Measure temperature (body) | X | X | | | | | | |
| Perform urine pregnancy test (if appropriate) | X | X | | | | | | |
| Confirm use of contraceptives (if appropriate) | X | X | X | | | | | |
| Collect nonstudy vaccine information | X | X | X | X | | | | |
| Collect prohibited medication use | | X | X | X | X | X | X | X |
| Confirm eligibility | X | X | | | | | | |
| Review temporary delay criteria | X | X | | | | | | |
| Collect blood sample for immunogenicity assessment[d] | ~20 mL/ ~10 mL | | ~20 mL/ ~10 mL | ~20 mL/ ~10 mL | ~20 mL/ ~10 mL | ~20 mL/ ~10 mL | | ~20 mL/ ~10 mL |
| Obtain  nasal (midturbinate) swab | X | X | | | | X | | |

PF-07302048 (BNT162 RNA-Based COVID-19 Vaccines)
Protocol C4591001

| Visit Number | 1 | 2 | 3 | 4 | 5 | 6 | Unplanned | Unplanned |
|---|---|---|---|---|---|---|---|---|
| Visit Description | Vaccination 1 | Vaccination 2 | 1-Month Follow-up Visit | 6-Month Follow-up Visit | 12-Month Follow-up Visit | 24-Month Follow-up Visit | Potential COVID-19 Illness Visit[a] | Potential COVID-19 Convalescent Visit |
| Visit Window (Days) | Day 1[b] | 19 to 23 Days After Visit 1 | 28 to 35 Days After Visit 2 | 175 to 189 Days After Visit 2 | 350 to 378 Days After Visit 2 | 714 to 742 Days After Visit 2 | Optimally Within 3 Days After Potential COVID-19 Illness Onset | 28 to 35 Days After Potential COVID-19 Illness Visit |
| Obtain randomization number and study intervention allocation | X | | | | | | | |
| Administer study intervention | X | X | | | | | | |
| Assess acute reactions for at least 30 minutes after study intervention administration | X | X | | | | | | |
| Explain participant communication methods (including for e-diary completion), assist the participant with downloading the app, or issue provisioned device, if required | X | | | | | | | |
| Provide/ensure the participant has a thermometer (all participants) and measuring device (reactogenicity subset participants only) | X | X | | | | | | |
| Review reactogenicity e-diary data (daily review is optimal during the active diary period)[e] | ←→ | ←→ | | | | | | |
| Review ongoing reactogenicity e-diary symptoms and obtain stop dates[e] | | X | X | | | | | |
| Collect AEs and SAEs as appropriate | X | X | X | X[f] | X[f] | X[f] | X | X[f] |
| Collect e-diary or assist the participant to delete application | | | | | | X | | |

PF-07302048 (BNT162 RNA-Based COVID-19 Vaccines)
Protocol C4591001

| Visit Number | 1 | 2 | 3 | 4 | 5 | 6 | Unplanned | Unplanned |
|---|---|---|---|---|---|---|---|---|
| Visit Description | Vaccination 1 | Vaccination 2 | 1-Month Follow-up Visit | 6-Month Follow-up Visit | 12-Month Follow-up Visit | 24-Month Follow-up Visit | Potential COVID-19 Illness Visit[a] | Potential COVID-19 Convalescent Visit |
| Visit Window (Days) | Day 1[b] | 19 to 23 Days After Visit 1 | 28 to 35 Days After Visit 2 | 175 to 189 Days After Visit 2 | 350 to 378 Days After Visit 2 | 714 to 742 Days After Visit 2 | Optimally Within 3 Days After Potential COVID-19 Illness Onset | 28 to 35 Days After Potential COVID-19 Illness Visit |
| Collection of COVID-19–related clinical and laboratory information (including local diagnosis) | | | | | | | X | X |

Abbreviations: HIV = human immunodeficiency virus; e-diary = electronic diary.

a. The COVID-19 illness visit may be conducted as an in-person or telehealth visit.
b. The visit may be conducted across 2 consecutive days; if so, all steps from assessing the inclusion and exclusion criteria onwards must be conducted on the same day.
c. Including, if indicated, a physical examination.
d. 20 mL is to be collected from participants ≥16 years of age; 10 mL is to be collected from participants 12 to 15 years of age.
e. Reactogenicity subset participants only.
f. Any AEs occurring up to 48 hours after the blood draw must be recorded (see Section 8.3.1).

PF-07302048 (BNT162 RNA-Based COVID-19 Vaccines)
Protocol C4591001

## 2. INTRODUCTION

The BNT162 RNA-based COVID-19 vaccines are currently being investigated for prevention of COVID-19 in healthy individuals.

### 2.1. Study Rationale

The purpose of the study is to rapidly describe the safety, tolerability, and immunogenicity of 2 BNT162 RNA-based COVID-19 vaccine candidates against COVID-19, and the efficacy of 1 candidate, in healthy individuals. There are currently no licensed vaccines to prevent infection with SARS-CoV-2 or COVID-19. Given the global crisis of COVID-19 and fast expansion of the disease in the United States and elsewhere, the rapid development of an effective vaccine is of utmost importance.

### 2.2. Background

In December 2019, a pneumonia outbreak of unknown cause occurred in Wuhan, China. In January 2020, it became clear that a novel coronavirus (2019-nCoV) was the underlying cause. Later in January, the genetic sequence of the 2019-nCoV became available to the World Health Organization (WHO) and public (MN908947.3), and the virus was categorized in the *Betacoronavirus* subfamily. By sequence analysis, the phylogenetic tree revealed a closer relationship to severe acute respiratory syndrome (SARS) virus isolates than to another coronavirus infecting humans, the Middle East respiratory syndrome (MERS) virus.

SARS-CoV-2 infections and the resulting disease, COVID-19, have spread globally, affecting a growing number of countries.

On 11 March 2020, the WHO characterized the COVID-19 outbreak as a pandemic.[1] The WHO Situation Update Report dated 30 March 2020 noted 693,224 confirmed cases with 33,106 deaths globally, including 142,081 confirmed cases with 2457 deaths in the Americas.[2] The United States currently has the most reported cases globally. At the time of this communication, the number of confirmed cases continues to rise globally. There are currently no vaccines or effective antiviral drugs to treat SARS-CoV-2 infections or the disease it causes, COVID-19.[3]

A prophylactic, RNA-based SARS-CoV-2 vaccine provides one of the most flexible and fastest approaches available to immunize against the emerging virus.[4,5]

The development of an RNA-based vaccine encoding a viral antigen, which is then expressed by the vaccine recipient as a protein capable of eliciting protective immune responses, provides significant advantages over more traditional vaccine approaches. Unlike live attenuated vaccines, RNA vaccines do not carry the risks associated with infection and may be given to people who cannot be administered live virus (eg, pregnant women and immunocompromised persons). RNA-based vaccines are manufactured via a cell-free in vitro transcription process, which allows an easy and rapid production and the prospect of producing high numbers of vaccination doses within a shorter time period than achieved with traditional vaccine approaches. This capability is pivotal to enable the most effective response in outbreak scenarios.

PF-07302048 (BNT162 RNA-Based COVID-19 Vaccines)
Protocol C4591001

Two SARS-CoV-2–RNA lipid nanoparticle (RNA-LNP) vaccines based on a platform of nucleoside-modified messenger RNA (modRNA, BNT162b) will be evaluated in this study. Each vaccine candidate expresses 1 of 2 antigens: the SARS-CoV-2 full-length, P2 mutant, prefusion spike glycoprotein (P2 S) (version 9) or a trimerized SARS-CoV-2 spike glycoprotein-receptor binding domain (RBD) (version 5). The 2 SARS-CoV-2 vaccine candidates that will be tested in this study are therefore:

- **BNT162b1** (variant RBP020.3): nucleoside-modified messenger RNA (modRNA) with blunted innate immune sensor–activating capacity and augmented expression encoding the RBD.

- **BNT162b2** (variant RBP020.2): nucleoside-modified messenger RNA (modRNA) as above, but encoding P2 S.

The vaccine candidate selected for Phase 2/3 evaluation is BNT162b2.

## 2.2.1. Clinical Overview

Prior to this study, given clinical data from other similarly formulated uRNA liposomal vaccines from BioNTech in oncology trials[6] and recent published results from clinical trials using modRNA influenza vaccines by Moderna,[7] the BNT162 vaccines were expected to have a favorable safety profile with mild, localized, and transient effects. BNT162 vaccines based on modRNA have now been administered to humans for the first time in this study and the BNT162-01 study conducted in Germany by BioNTech, at doses between 1 μg and 100 μg. The currently available safety and immunogenicity data are presented in the BNT162 IB.

## 2.3. Benefit/Risk Assessment

There is an ongoing global pandemic of COVID-19 with no preventative or therapeutic options available. While there were no data available from clinical trials on the use of BNT162 vaccines in humans at the outset of this study, available nonclinical data with these vaccines, and data from nonclinical studies and clinical trials with the same or related RNA components, or antigens, supported a favorable risk/benefit profile. Anticipated AEs after vaccination were expected to be manageable using routine symptom-driven standard of care as determined by the investigators and, as a result, the profile of these vaccine candidates supported initiation of this Phase 1/2/3 clinical study.

Updates as part of protocol amendment 6:

- In order for the overall Phase 3 study population to be as representative and diverse as possible, the inclusion of participants with known chronic stable HIV, HCV, or HBV infection is permitted. Individuals with chronic viral diseases are at increased risk for COVID-19 complications and severe disease. In addition, with the currently available therapies for their treatment, many individuals with chronic stable HIV, HCV, and HBV infections are unlikely to be at higher safety risk as a

participant in this vaccine study than individuals with other chronic stable medical conditions.

- All participants with chronic stable HIV disease will be included in the reactogenicity subset (see Section 8.2.2).

Updates as part of protocol amendment 7:

- The minimum age for inclusion in Phase 3 is lowered to 12 years, therefore allowing the inclusion of participants 12 to 15 years of age.

- For individuals 12 to 15 years of age, the immune responses in this age group may be higher and reactogenicity is expected to be similar to younger adults 18 to 25 years of age. Inclusion of individuals 12 to 15 years of age was based upon a satisfactory blinded safety profile in participants 18 to 25 years of age.

- All participants 12 to 15 years of age will be included in the reactogenicity subset (see Section 8.2.2).

More detailed information about the known and expected benefits and risks and reasonably expected AEs of BNT162 RNA-based COVID-19 vaccines may be found in the IB, which is the SRSD for this study.

PF-07302048 (BNT162 RNA-Based COVID-19 Vaccines)
Protocol C4591001

## 2.3.1. Risk Assessment

| Potential Risk of Clinical Significance | Summary of Data/Rationale for Risk | Mitigation Strategy |
|---|---|---|
| **Study Intervention: BNT162 RNA-Based COVID-19 Vaccine** | | |
| Potential for local reactions (injection site redness, injection site swelling, and injection site pain) and systemic events (fever, fatigue, headache, chills, vomiting, diarrhea, muscle pain, and joint pain) following vaccination. | These are common adverse reactions seen with other vaccines, as noted in the FDA Center for Biologics Evaluation and Research (CBER) guidelines on toxicity grading scales for healthy adult volunteers enrolled in preventive vaccine clinical trials.[8] | The Phase 1 study design includes the use of controlled vaccination and dose escalation to closely monitor and limit the rate of enrollment to ensure participant safety. The study employs the use of a reactogenicity e-diary to monitor local reactions and systemic events in real time. Stopping rules are also in place. The first 5 participants in each group in Phase 1 will be observed for 4 hours after vaccination to assess any immediate AEs. All other participants will be observed for at least 30 minutes after vaccination. |
| Unknown AEs and laboratory abnormalities with a novel vaccine. | This study is one of the first 2 parallel-running clinical studies with the BNT162 vaccine candidates and as such there are no clinical data available for this vaccine. | The Phase 1 study design includes the use of controlled vaccination and dose escalation to closely monitor and limit the rate of enrollment to ensure participant safety. An IRC (in Phase 1) and DMC (throughout the study) will also review safety data. Stopping rules are also in place. The first 5 participants in each group in Phase 1 will be observed for 4 hours after vaccination to assess any immediate AEs. All other participants will be observed for at least 30 minutes after vaccination. |
| Potential for COVID-19 enhancement. | Disease enhancement has been seen following vaccination with respiratory syncytial virus (RSV), feline coronavirus, and Dengue virus vaccines. | Phase 1 excludes participants with likely previous or current COVID-19. In Phase 2/3, temporary delay criteria defer vaccination of participants with symptoms of potential COVID-19. All participants are followed for any potential COVID-19 illness, including markers of severity, and have blood samples taken for potential measurement of SARS-CoV-2 antigen-specific antibody and SARS-CoV-2 neutralizing titers. |

PF-07302048 (BNT162 RNA-Based COVID-19 Vaccines)
Protocol C4591001

| Potential Risk of Clinical Significance | Summary of Data/Rationale for Risk | Mitigation Strategy |
|---|---|---|
| **Study Procedures** | | |
| Participants will be required to attend healthcare facilities during the global SARS-CoV-2 pandemic. | Without appropriate social distancing and PPE, there is a potential for increased exposure to SARS-CoV-2. | Pfizer will work with sites to ensure an appropriate COVID-19 prevention strategy. Potential COVID-19 illness visits can be conducted via telehealth, without the need for an in-person visit, if required, with the participant performing a self-swab. |
| Venipuncture will be performed during the study. | There is the risk of bleeding, bruising, hematoma formation, and infection at the venipuncture site. | Only appropriately qualified personnel would obtain the blood draw. |

PF-07302048 (BNT162 RNA-Based COVID-19 Vaccines)
Protocol C4591001

## 2.3.2. Benefit Assessment

Benefits to individual participants may include:

- Receipt of a potentially efficacious COVID-19 vaccine during a global pandemic

- Access to COVID-19 diagnostic testing

- Contributing to research to help others in a time of global pandemic

## 2.3.3. Overall Benefit/Risk Conclusion

Taking into account the measures taken to minimize risk to participants participating in this study, the potential risks identified in association with BNT162 RNA-based COVID-19 vaccine are justified by the anticipated benefits that may be afforded to healthy participants.

## 3. OBJECTIVES, ESTIMANDS, AND ENDPOINTS

## 3.1. For Phase 1

| Objectives | Estimands | Endpoints |
|---|---|---|
| **Primary:** | **Primary:** | **Primary:** |
| To describe the safety and tolerability profiles of prophylactic BNT162 vaccines in healthy adults after 1 or 2 doses | In participants receiving at least 1 dose of study intervention, the percentage of participants reporting:<br>• Local reactions for up to 7 days following each dose<br>• Systemic events for up to 7 days following each dose<br>• Adverse events (AEs) from Dose 1 to 1 month after the last dose<br>• Serious AEs (SAEs) from Dose 1 to 6 months after the last dose | • Local reactions (pain at the injection site, redness, and swelling)<br>• Systemic events (fever, fatigue, headache, chills, vomiting, diarrhea, new or worsened muscle pain, and new or worsened joint pain)<br>• AEs<br>• SAEs |
| | In addition, the percentage of participants with:<br>• Abnormal hematology and chemistry laboratory values 1 and 7 days after Dose 1; and 7 days after Dose 2<br>• Grading shifts in hematology and chemistry laboratory assessments between baseline and 1 and 7 days after Dose 1; and before Dose 2 and 7 days after Dose 2 | Hematology and chemistry laboratory parameters detailed in Section 10.2 |

PF-07302048 (BNT162 RNA-Based COVID-19 Vaccines)
Protocol C4591001

| Objectives | Estimands | Endpoints |
|---|---|---|
| **Secondary:** | **Secondary:** | **Secondary:** |
| To describe the immune responses elicited by prophylactic BNT162 vaccines in healthy adults after 1 or 2 doses | In participants complying with the key protocol criteria (evaluable participants) at the following time points after receipt of study intervention: 7 and 21 days after Dose 1; 7 and 14 days and 1, 6, 12, and 24 months after Dose 2<br><br>• Geometric mean titers (GMTs) at each time point<br>• Geometric mean fold rise (GMFR) from before vaccination to each subsequent time point after vaccination<br>• Proportion of participants achieving ≥4-fold rise from before vaccination to each subsequent time point after vaccination | SARS-CoV-2 neutralizing titers |
| | • Geometric mean concentrations (GMCs) at each time point<br>• GMFR from prior to first dose of study intervention to each subsequent time point<br>• Proportion of participants achieving ≥4-fold rise from before vaccination to each subsequent time point after vaccination | S1-binding IgG levels and RBD-binding IgG levels |
| | • Geometric mean ratio (GMR), estimated by the ratio of the geometric mean of SARS-CoV-2 neutralizing titers to the geometric mean of binding IgG levels at each time point | • SARS-CoV-2 neutralizing titers<br>• S1-binding IgG levels<br>• RBD-binding IgG levels |

PF-07302048 (BNT162 RNA-Based COVID-19 Vaccines)
Protocol C4591001

## 3.2. For Phase 2/3

| Objectives[a] | Estimands | Endpoints |
|---|---|---|
| **Primary Efficacy** | | |
| To evaluate the efficacy of prophylactic BNT162b2 against confirmed COVID-19 occurring from 7 days after the second dose in participants without evidence of infection before vaccination | In participants complying with the key protocol criteria (evaluable participants) at least 7 days after receipt of the second dose of study intervention: $100 \times (1 - \text{IRR})$ [ratio of active vaccine to placebo] | COVID-19 incidence per 1000 person-years of follow-up based on central laboratory or locally confirmed NAAT in participants with no serological or virological evidence (up to 7 days after receipt of the second dose) of past SARS-CoV-2 infection |
| To evaluate the efficacy of prophylactic BNT162b2 against confirmed COVID-19 occurring from 7 days after the second dose in participants with and without evidence of infection before vaccination | In participants complying with the key protocol criteria (evaluable participants) at least 7 days after receipt of the second dose of study intervention: $100 \times (1 - \text{IRR})$ [ratio of active vaccine to placebo] | COVID-19 incidence per 1000 person-years of follow-up based on central laboratory or locally confirmed NAAT |
| **Primary Safety** | | |
| To define the safety profile of prophylactic BNT162b2 in the first 360 participants randomized (Phase 2) | In participants receiving at least 1 dose of study intervention, the percentage of participants reporting:<br>• Local reactions for up to 7 days following each dose<br>• Systemic events for up to 7 days following each dose<br>• AEs from Dose 1 to 7 days after the second dose<br>• SAEs from Dose 1 to 7 days after the second dose | • Local reactions (pain at the injection site, redness, and swelling)<br>• Systemic events (fever, fatigue, headache, chills, vomiting, diarrhea, new or worsened muscle pain, and new or worsened joint pain)<br>• AEs<br>• SAEs |
| To define the safety profile of prophylactic BNT162b2 in all participants randomized in Phase 2/3 | In participants receiving at least 1 dose of study intervention, the percentage of participants reporting:<br>• Local reactions for up to 7 days following each dose<br>• Systemic events for up to 7 days following each dose<br>• AEs from Dose 1 to 1 month after the second dose<br>• SAEs from Dose 1 to 6 months after the second dose | • AEs<br>• SAEs<br>• In a subset of at least 6000 participants:<br>  ○ Local reactions (pain at the injection site, redness, and swelling)<br>  ○ Systemic events (fever, fatigue, headache, chills, vomiting, diarrhea, new or worsened muscle pain, and new or worsened joint pain) |
| To define the safety profile of prophylactic BNT162b2 in participants 12 to 15 years of age in Phase 3 | In participants receiving at least 1 dose of study intervention, the percentage of participants reporting:<br>• Local reactions for up to 7 days following each dose<br>• Systemic events for up to 7 days following each dose<br>• AEs from Dose 1 to 1 month after the second dose<br>• SAEs from Dose 1 to 6 months after the second dose | • Local reactions (pain at the injection site, redness, and swelling)<br>• Systemic events (fever, fatigue, headache, chills, vomiting, diarrhea, new or worsened muscle pain, and new or worsened joint pain)<br>• AEs<br>• SAEs |

PF-07302048 (BNT162 RNA-Based COVID-19 Vaccines)
Protocol C4591001

| Objectives[a] | Estimands | Endpoints |
|---|---|---|
| **Secondary Efficacy** | | |
| To evaluate the efficacy of prophylactic BNT162b2 against confirmed COVID-19 occurring from 14 days after the second dose in participants without evidence of infection before vaccination | In participants complying with the key protocol criteria (evaluable participants) at least 14 days after receipt of the second dose of study intervention: $100 \times (1 - IRR)$ [ratio of active vaccine to placebo] | COVID-19 incidence per 1000 person-years of follow-up based on central laboratory or locally confirmed NAAT in participants with no serological or virological evidence (up to 14 days after receipt of the second dose) of past SARS-CoV-2 infection |
| To evaluate the efficacy of prophylactic BNT162b2 against confirmed COVID-19 occurring from 14 days after the second dose in participants with and without evidence of infection before vaccination | In participants complying with the key protocol criteria (evaluable participants) at least 14 days after receipt of the second dose of study intervention: $100 \times (1 - IRR)$ [ratio of active vaccine to placebo] | COVID-19 incidence per 1000 person-years of follow-up based on central laboratory or locally confirmed NAAT |
| To evaluate the efficacy of prophylactic BNT162b2 against confirmed severe COVID-19 occurring from 7 days and from 14 days after the second dose in participants without evidence of infection before vaccination | In participants complying with the key protocol criteria (evaluable participants) <ul><li>at least 7 days</li></ul> and <ul><li>at least 14 days</li></ul> after receipt of the second dose of study intervention: $100 \times (1 - IRR)$ [ratio of active vaccine to placebo] | Confirmed severe COVID-19 incidence per 1000 person-years of follow-up in participants with no serological or virological evidence (up to 7 days and up to 14 days after receipt of the second dose) of past SARS-CoV-2 infection |
| To evaluate the efficacy of prophylactic BNT162b2 against confirmed severe COVID-19 occurring from 7 days and from 14 days after the second dose in participants with and without evidence of infection before vaccination | In participants complying with the key protocol criteria (evaluable participants) <ul><li>at least 7 days</li></ul> and <ul><li>at least 14 days</li></ul> after receipt of the second dose of study intervention: $100 \times (1 - IRR)$ [ratio of active vaccine to placebo] | Confirmed severe COVID-19 incidence per 1000 person-years of follow-up |
| To describe the efficacy of prophylactic BNT162b2 against confirmed COVID-19 (according to the CDC-defined symptoms) occurring from 7 days and from 14 days after the second dose in participants without evidence of infection before vaccination | In participants complying with the key protocol criteria (evaluable participants) <ul><li>at least 7 days</li></ul> and <ul><li>at least 14 days</li></ul> after receipt of the second dose of study intervention: $100 \times (1 - IRR)$ [ratio of active vaccine to placebo] | COVID-19 incidence per 1000 person-years of follow-up based on central laboratory or locally confirmed NAAT in participants with no serological or virological evidence (up to 7 days and up to 14 days after receipt of the second dose) of past SARS-CoV-2 infection |
| To describe the efficacy of prophylactic BNT162b2 against confirmed COVID-19 (according to the CDC-defined symptoms) occurring from 7 days and from 14 days after the second dose in participants with and without evidence of infection before vaccination | In participants complying with the key protocol criteria (evaluable participants) <ul><li>at least 7 days</li></ul> and <ul><li>at least 14 days</li></ul> after receipt of the second dose of study intervention: $100 \times (1 - IRR)$ [ratio of active vaccine to placebo] | COVID-19 incidence per 1000 person-years of follow-up based on central laboratory or locally confirmed NAAT |

PF-07302048 (BNT162 RNA-Based COVID-19 Vaccines)
Protocol C4591001

| Objectives[a] | Estimands | Endpoints |
|---|---|---|
| **Secondary Immunogenicity** | | |
| To demonstrate the noninferiority of the immune response to prophylactic BNT162b2 in participants 12 to 15 years of age compared to participants 16 to 25 years of age | GMR, estimated by the ratio of the geometric mean of SARS-CoV-2 neutralizing titers in the 2 age groups (12-15 years of age to 16-25 years of age) 1 month after completion of vaccination | SARS-CoV-2 neutralizing titers in participants with no serological or virological evidence (up to 1 month after receipt of the second dose) of past SARS-CoV-2 infection |
| **Exploratory** | | |
| To evaluate the immune response over time to prophylactic BNT162b2 and persistence of immune response in participants with and without serological or virological evidence of SARS-CoV-2 infection before vaccination | GMC/GMT, GMFR, and percentage of participants with titers greater than defined threshold(s), at baseline and 1, 6, 12, and 24 months after completion of vaccination | • S1-binding IgG levels and/or RBD-binding IgG levels <br> • SARS-CoV-2 neutralizing titers |
| To evaluate the immune response (non-S) to SARS-CoV-2 in participants with and without confirmed COVID-19 during the study | | • N-binding antibody |
| To describe the serological responses to the BNT vaccine candidate in cases of: <br> • Confirmed COVID-19 <br> • Confirmed severe COVID-19 <br> • SARS-CoV-2 infection without confirmed COVID-19 | | • S1-binding IgG levels and/or RBD-binding IgG levels <br> • SARS-CoV-2 neutralizing titers |
| To describe the safety, immunogenicity, and efficacy of prophylactic BNT162b2 in individuals with confirmed stable HIV disease | | • All safety, immunogenicity, and efficacy endpoints described above |
| To describe the safety and immunogenicity of prophylactic BNT162b2 in individuals 16 to 55 years of age vaccinated with study intervention produced by manufacturing "Process 1" or "Process 2"[b] | | • All safety endpoints described above <br> • SARS-CoV-2 neutralizing titers |

a.  HIV-positive participants in Phase 3 will not be included in analyses of the objectives, with the exception of the specific exploratory objective.
b.  See Section 6.1.1 for description of the manufacturing process.

This protocol will use a group of internal case reviewers to determine whether certain investigator-reported events meet the definition of disease-related efficacy endpoints, using predefined endpoint criteria.

For those AEs that are handled as disease-related efficacy endpoints (which may include death), a DMC will conduct unblinded reviews on a regular basis throughout the trial (see Section 9.6).

PF-07302048 (BNT162 RNA-Based COVID-19 Vaccines)
Protocol C4591001

Any AE that is determined by the internal case reviewers NOT to meet endpoint criteria is reported back to the investigator site of incidence. Refer to Section 8.3.1.1 for instructions on how to report any such AE that meets the criteria for seriousness to Pfizer Safety.

# 4. STUDY DESIGN

## 4.1. Overall Design

This is a multicenter, multinational, Phase 1/2/3, randomized, placebo-controlled, observer-blind, dose-finding, vaccine candidate–selection, and efficacy study in healthy individuals.

The study consists of 2 parts. Phase 1: to identify preferred vaccine candidate(s) and dose level(s); Phase 2/3: an expanded cohort and efficacy part. These parts, and the progression between them, are detailed in the schema (Section 1.2).

The study will evaluate the safety, tolerability, and immunogenicity of 2 different SARS-CoV-2 RNA vaccine candidates against COVID-19 and the efficacy of 1 candidate:

- As a 2-dose (separated by 21 days) schedule;

- At various different dose levels in Phase 1;

- In 3 age groups (Phase 1: 18 to 55 years of age, 65 to 85 years of age; Phase 2/3: ≥12 years of age [stratified as 12-15, 16-55, or >55 years of age]).

Dependent upon safety and/or immunogenicity data generated during the course of this study, or the BioNTech study conducted in Germany (BNT162-01), it is possible that groups in Phase 1 may be started at the next highest dose, groups may not be started, groups may be terminated early, and/or groups may be added with dose levels below the lowest stated dose or intermediate between the lowest and highest stated doses.

The study is observer-blinded, as the physical appearance of the investigational vaccine candidates and the placebo may differ. The participant, investigator, study coordinator, and other site staff will be blinded. At the study site, only the dispenser(s)/administrator(s) are unblinded.

To facilitate rapid review of data in real time, sponsor staff will be unblinded to vaccine allocation for the participants in Phase 1.

### 4.1.1. Phase 1

Each group (vaccine candidate/dose level/age group) will comprise 15 participants; 12 participants will be randomized to receive active vaccine and 3 to receive placebo.

For each vaccine candidate/dose level/age group, the following apply:

- Additional safety assessments (see Section 8.2)

PF-07302048 (BNT162 RNA-Based COVID-19 Vaccines)
Protocol C4591001

- Controlled enrollment (required only for the first candidate and/or dose level studied):

    - No more than 5 participants (4 active, 1 placebo) can be vaccinated on the first day

    - The first 5 participants must be observed by blinded site staff for at least 4 hours after vaccination for any acute reactions

    - Vaccination of the remaining participants will commence no sooner than 24 hours after the fifth participant received his or her vaccination

- Application of stopping rules

- IRC review of safety data to determine escalation to the next dose level in the 18- to 55-year age cohort:

    - Escalation between dose levels will be based on IRC review of at least 7-day post–Dose 1 safety data in this study and/or the BioNTech study conducted in Germany (BNT162-01)

    - Note that, since both candidates are based upon the same RNA platform, dose escalation for the second candidate studied may be based upon the safety profile of the first candidate studied being deemed acceptable at the same, or a higher, dose level by the IRC

Groups of participants 65 to 85 years of age will not be started until safety data for the RNA platform have been deemed acceptable at the same, or a higher, dose level in the 18- to 55-year age cohort by the IRC.

In this phase, 13 groups will be studied, corresponding to a total of 195 participants.

The IRC will select 1 vaccine candidate that, in Phase 1, has an established dose level per age group based on induction of a post–Dose 2 immune response, including neutralizing antibodies, which is expected to be associated with protection against COVID-19, for progression into Phase 2/3.

### 4.1.2. Phase 2/3

On the basis of safety and/or immunogenicity data generated during the course of this study, and/or the BioNTech study conducted in Germany (BNT162-01), 1 vaccine candidate was selected to proceed into Phase 2/3. Participants in this phase will be ≥12 years of age, stratified as follows: 12 to 15 years, 16 to 55 years, or >55 years. The 12- to 15-year stratum will comprise up to approximately 2000 participants enrolled at selected investigational sites. It is intended that a minimum of 40% of participants will be in the >55-year stratum. Commencement of each age stratum will be based upon satisfactory post–Dose 2 safety and immunogenicity data from the 18- to 55-year and 65- to 85-year age groups in Phase 1,

PF-07302048 (BNT162 RNA-Based COVID-19 Vaccines)
Protocol C4591001

respectively.  The vaccine candidate selected for Phase 2/3 evaluation is BNT162b2 at a dose of 30 μg.

Phase 2/3 is event-driven. Under the assumption of a true VE rate of ≥60%, after the second dose of investigational product,  a target of 164 primary-endpoint cases of confirmed COVID-19 due to SARS-CoV-2 occurring at least 7 days following the second dose of the primary series of the candidate vaccine will be sufficient to provide 90% power to conclude true VE >30% with high probability. The total number of participants enrolled in Phase 2/3 may vary depending on the incidence of COVID-19 at the time of the enrollment, the true underlying VE, and a potential early stop for efficacy or futility.

Assuming a COVID-19 attack rate of 1.3% per year in the placebo group, accrual of 164 first primary-endpoint cases within 6 months, an estimated 20% nonevaluable rate, and 1:1 randomization, the BNT162b2 vaccine candidate selected for Phase 2/3 is expected to comprise approximately 21,999 vaccine recipients.  This is the number of participants initially targeted for Phase 2/3 and may be adjusted based on advice from DMC analyses of case accumulation and the percentage of participants who are seropositive at baseline. Dependent upon the evolution of the pandemic, it is possible that the COVID-19 attack rate may be much higher, in which case accrual would be expected to be more rapid, enabling the study's primary endpoint to be evaluated much sooner.

The first 360 participants enrolled (180 to active vaccine and 180 to placebo, stratified equally between 18 to 55 years and >55 to 85 years) will comprise the "Phase 2" portion. Safety data through 7 days after Dose 2 and immunogenicity data through 1 month after Dose 2 from these 360 participants will be analyzed by the unblinded statistical team, reviewed by the DMC, and submitted to appropriate regulatory authorities for review. Enrollment may continue during this period and these participants would be included in the efficacy evaluation in the "Phase 3" portion of the study.

In Phase 3, up to approximately 2000 participants, enrolled at selected sites, are anticipated to be 12 to 15 years of age.  Noninferiority of immune response to prophylactic BNT162b2 in participants 12 to 15 years of age to response in participants 16 to 25 years of age will be assessed based on the GMR of SARS-CoV-2 neutralizing titers using a 1.5-fold margin.  A sample size of 200 evaluable participants (or 250 vaccine recipients) per age group will provide a power of 90.8% to declare the noninferiority in terms of GMR (lower limit of 95% CI for GMR >0.67).  A random sample of 250 participants from each of the 2 age groups (12 to 15 years and 16 to 25 years) will be selected as an immunogenicity subset for the noninferiority assessment.

The initial BNT162b2 was manufactured using "Process 1"; however, "Process 2" was developed to support an increased scale of manufacture.  In the study, each lot of "Process 2"-manufactured BNT162b2 will be administered to approximately 250 participants 16 to 55 years of age.  The safety and immunogenicity of prophylactic BNT162b2 in individuals 16 to 55 years of age vaccinated with "Process 1" and each lot of "Process 2" study intervention will be described.  A random sample of 250 participants from those

PF-07302048 (BNT162 RNA-Based COVID-19 Vaccines)
Protocol C4591001

vaccinated with study intervention produced by manufacturing "Process 1" will be selected for this descriptive analysis.

Participants are expected to participate for up to a maximum of approximately 26 months. The duration of study follow-up may be shorter among participants enrolled in Phase 1 dosing arms that are not evaluated in Phase 2/3.

## 4.2. Scientific Rationale for Study Design

Additional surveillance for COVID-19 will be conducted as part of the study, given the potential risk of disease enhancement. If a participant experiences symptoms, as detailed in Section 8.13, a COVID-19 illness and subsequent convalescent visit will occur. As part of these visits, samples (nasal [midturbinate] swab and blood) will be taken for antigen and antibody assessment as well as recording of COVID-19–related clinical and laboratory information (including local diagnosis).

Human reproductive safety data are not available for BNT162 RNA-based COVID-19 vaccines, but there is no suspicion of human teratogenicity based on the intended mechanism of action of the compound. Therefore, the use of a highly effective method of contraception is required (see Appendix 4).

## 4.3. Justification for Dose

Because of the requirement for a rapid response to the newly emerged COVID-19 pandemic, sufficient data were not available to experimentally validate the dose selection and initial starting dose. Therefore, the original planned starting dose of 10 μg (for both BNT162b1 and BNT162b2) in this study was based on nonclinical experience with the same RNAs encoding other viral antigens (such as influenza and HIV antigens). The general safety and effectiveness of uRNA and modRNA platforms have been demonstrated in oncological clinical trials with different administration routes (NCT02410733, NCT03871348). Doses of up to 400 μg total uRNA have been administered IV as RNA lipoplex (RNA-LPX) and doses of up to 1000 μg total naked modRNA have been administered intratumorally, both without signs of unpredictable overstimulation of the immune system.

Based on nonclinical data of the RNA components, with other liposomes or in conjunction with the lipid nanoparticles as will be tested clinically in this study, it was expected that doses in the 1- to 5-μg range would be immunogenic and induce neutralizing antibodies; however, it was anticipated that 3- to 10-fold higher doses would likely be required to elicit a stronger antibody response. Based on previous clinical and nonclinical experience, it was expected that doses of up to 100 μg would be well tolerated.

Update as part of protocol amendment 2: preliminary experience in this study and the BioNTech study conducted in Germany (BNT162-01) suggests that, for vaccine candidates based on the modRNA platform, a dose level between 30 μg and 100 μg warrants consideration. Therefore, a 50-μg dose level is formally included for BNT162b1 and BNT162b2.

PF-07302048 (BNT162 RNA-Based COVID-19 Vaccines)
Protocol C4591001

---

Update as part of protocol amendment 3: as data have become available from this study and the BNT162-01 study in Germany, it was decided:

- To not study the BNT162a1 and BNT162c2 vaccine candidates at this time, so these candidates have been removed from the protocol; and

- That lower dose levels of BNT162b1 and BNT162b2 warrant consideration. Therefore, a 20-μg dose level is formally included for both candidates.

Update as part of protocol amendment 4: the 50-μg dose level for BNT162b1 and BNT162b2 is removed and the 100-μg dose level for BNT162b2 is removed; similar dose levels of BNT162b3 may be studied as for BNT162b1 and BNT162b2.

Update as part of protocol amendment 5: the vaccine candidate selected for Phase 2/3 evaluation is BNT162b2 at a dose of 30 μg.  BNT162b3 will not be studied.

## 4.4. End of Study Definition

A participant is considered to have completed the study if he/she has completed all phases of the study, including the last visit.  Note that participants enrolled in Phase 1 in groups that do not proceed to Phase 2/3 may be followed for fewer than 24 months (but no less than 6 months after the last vaccination).

The end of the study is defined as the date of last visit of the last participant in the study.

## 5. STUDY POPULATION

This study can fulfill its objectives only if appropriate participants are enrolled.  The following eligibility criteria are designed to select participants for whom participation in the study is considered appropriate.  All relevant medical and nonmedical conditions should be taken into consideration when deciding whether a particular participant is suitable for this protocol.

Prospective approval of protocol deviations to recruitment and enrollment criteria, also known as protocol waivers or exemptions, is not permitted.

## 5.1. Inclusion Criteria

Participants are eligible to be included in the study only if all of the following criteria apply:

**Age and Sex:**

1. Male or female participants between the ages of 18 and 55 years, inclusive, and 65 and 85 years, inclusive (Phase 1), or ≥12 years (Phase 2/3), at randomization. Note that participants <18 years of age cannot be enrolled in the EU.

- Refer to Appendix 4 for reproductive criteria for male (Section 10.4.1) and female (Section 10.4.2) participants.

PF-07302048 (BNT162 RNA-Based COVID-19 Vaccines)
Protocol C4591001

**Type of Participant and Disease Characteristics:**

2.  Participants who are willing and able to comply with all scheduled visits, vaccination plan, laboratory tests, lifestyle considerations, and other study procedures.

3.  Healthy participants who are determined by medical history, physical examination (if required), and clinical judgment of the investigator to be eligible for inclusion in the study.

    **Note**: Healthy participants with preexisting stable disease, defined as disease not requiring significant change in therapy or hospitalization for worsening disease during the 6 weeks before enrollment, can be included. Specific criteria for Phase 3 participants with known stable infection with human immunodeficiency virus (HIV), hepatitis C virus (HCV), or hepatitis B virus (HBV) can be found in Section 10.8.

4.  **Phase 2/3 only:** Participants who, in the judgment of the investigator, are at higher risk for acquiring COVID-19 (including, but not limited to, use of mass transportation, relevant demographics, and frontline essential workers).

**Informed Consent:**

5.  Capable of giving personal signed informed consent/have parent(s)/legal guardian capable of giving signed informed consent as described in Appendix 1, which includes compliance with the requirements and restrictions listed in the ICD and in this protocol.

**5.2. Exclusion Criteria**

Participants are excluded from the study if any of the following criteria apply:

**Medical Conditions:**

1.  Other medical or psychiatric condition including recent (within the past year) or active suicidal ideation/behavior or laboratory abnormality that may increase the risk of study participation or, in the investigator's judgment, make the participant inappropriate for the study.

2.  **Phases 1 and 2 only:** Known infection with human immunodeficiency virus (HIV), hepatitis C virus (HCV), or hepatitis B virus (HBV).

3.  History of severe adverse reaction associated with a vaccine and/or severe allergic reaction (eg, anaphylaxis) to any component of the study intervention(s).

4.  Receipt of medications intended to prevent COVID-19.

5.  Previous clinical (based on COVID-19 symptoms/signs alone, if a SARS-CoV-2 NAAT result was not available) or microbiological (based on COVID-19 symptoms/signs and a positive SARS-CoV-2 NAAT result) diagnosis of COVID-19.

PF-07302048 (BNT162 RNA-Based COVID-19 Vaccines)
Protocol C4591001

6. **Phase 1 only:** Individuals at high risk for severe COVID-19, including those with any of the following risk factors:

- Hypertension
- Diabetes mellitus
- Chronic pulmonary disease
- Asthma
- Current vaping or smoking
- History of chronic smoking within the prior year
- Chronic liver disease
- Stage 3 or worse chronic kidney disease (glomerular filtration rate <60 mL/min/1.73 m$^2$)
- Resident in a long-term facility
- BMI >30 kg/m$^2$
- Anticipating the need for immunosuppressive treatment within the next 6 months

7. **Phase 1 only:** Individuals currently working in occupations with high risk of exposure to SARS-CoV-2 (eg, healthcare worker, emergency response personnel).

8. Immunocompromised individuals with known or suspected immunodeficiency, as determined by history and/or laboratory/physical examination.

9. **Phase 1 only:** Individuals with a history of autoimmune disease or an active autoimmune disease requiring therapeutic intervention, including but not limited to: systemic or cutaneous lupus erythematosus, autoimmune arthritis/rheumatoid arthritis, Guillain-Barré syndrome, multiple sclerosis, Sjögren's syndrome, idiopathic thrombocytopenia purpura, glomerulonephritis, autoimmune thyroiditis, giant cell arteritis (temporal arteritis), psoriasis, and insulin-dependent diabetes mellitus (type 1).

10. Bleeding diathesis or condition associated with prolonged bleeding that would, in the opinion of the investigator, contraindicate intramuscular injection.

11. Women who are pregnant or breastfeeding.

**Prior/Concomitant Therapy:**

12. Previous vaccination with any coronavirus vaccine.

13. Individuals who receive treatment with immunosuppressive therapy, including cytotoxic agents or systemic corticosteroids, eg, for cancer or an autoimmune disease, or planned receipt throughout the study. If systemic corticosteroids have been administered short term (<14 days) for treatment of an acute illness, participants should not be enrolled into

PF-07302048 (BNT162 RNA-Based COVID-19 Vaccines)
Protocol C4591001

the study until corticosteroid therapy has been discontinued for at least 28 days before study intervention administration.  Inhaled/nebulized (except for participants in Phase 1 – see exclusion criterion 14), intra-articular, intrabursal, or topical (skin or eyes) corticosteroids are permitted.

14. **Phase 1 only:** Regular receipt of inhaled/nebulized corticosteroids.

15. Receipt of blood/plasma products or immunoglobulin, from 60 days before study intervention administration or planned receipt throughout the study.

**Prior/Concurrent Clinical Study Experience:**

16. Participation in other studies involving study intervention within 28 days prior to study entry and/or during study participation.

17. Previous participation in other studies involving study intervention containing lipid nanoparticles.

**Diagnostic Assessments:**

18. **Phase 1 only:** Positive serological test for SARS-CoV-2 IgM and/or IgG antibodies at the screening visit.

19. **Phase 1 only:** Any screening hematology and/or blood chemistry laboratory value that meets the definition of a ≥ Grade 1 abnormality.

    **Note:** With the exception of bilirubin, participants with any stable Grade 1 abnormalities (according to the toxicity grading scale) may be considered eligible at the discretion of the investigator.  (Note: A "stable" Grade 1 laboratory abnormality is defined as a report of Grade 1 on an initial blood sample that remains ≤ Grade 1 upon repeat testing on a second sample from the same participant.)

20. **Phase 1 only:** Positive test for HIV, hepatitis B surface antigen (HBsAg), hepatitis B core antibodies (HBc Abs), or hepatitis C virus antibodies (HCV Abs) at the screening visit.

21. **Phase 1 only:** SARS-CoV-2 NAAT-positive nasal swab within 24 hours before receipt of study intervention.

**Other Exclusions:**

22. Investigator site staff or Pfizer/BioNTech employees directly involved in the conduct of the study, site staff otherwise supervised by the investigator, and their respective family members.

PF-07302048 (BNT162 RNA-Based COVID-19 Vaccines)
Protocol C4591001

## 5.3. Lifestyle Considerations

### 5.3.1. Contraception

The investigator or his or her designee, in consultation with the participant, will confirm that the participant has selected an appropriate method of contraception for the individual participant and his or her partner(s) from the permitted list of contraception methods (see Appendix 4, Section 10.4.4) and will confirm that the participant has been instructed in its consistent and correct use.  At time points indicated in the SoA, the investigator or designee will inform the participant of the need to use highly effective contraception consistently and correctly and document the conversation and the participant's affirmation in the participant's chart (participants need to affirm their consistent and correct use of at least 1 of the selected methods of contraception).  In addition, the investigator or designee will instruct the participant to call immediately if the selected contraception method is discontinued or if pregnancy is known or suspected in the participant or partner.

### 5.4. Screen Failures

Screen failures are defined as participants who consent to participate in the clinical study but are not subsequently randomly assigned to study intervention.  A minimal set of screen failure information is required to ensure transparent reporting of screen failure participants to meet the CONSORT publishing requirements and to respond to queries from regulatory authorities.  Minimal information includes demography, screen failure details, eligibility criteria, and any SAE.

Individuals who do not meet the criteria for participation in this study (screen failure) may be rescreened under a different participant number.

### 5.5. Criteria for Temporarily Delaying Enrollment/Randomization/Study Intervention Administration

The following conditions are temporary or self-limiting and a participant may be vaccinated once the condition(s) has/have resolved and no other exclusion criteria are met.

1. Current febrile illness (body temperature ≥100.4°F [≥38°C]) or other acute illness within 48 hours before study intervention administration. This includes current symptoms that could represent a potential COVID-19 illness:

   - New or increased cough;

   - New or increased shortness of breath;

   - Chills;

   - New or increased muscle pain;

   - New loss of taste/smell;

   - Sore throat;

PF-07302048 (BNT162 RNA-Based COVID-19 Vaccines)
Protocol C4591001

- Diarrhea;

- Vomiting.

2. Receipt of any seasonal or pandemic influenza vaccine within 14 days, or any other nonstudy vaccine within 28 days, before study intervention administration.

3. Anticipated receipt of any seasonal or pandemic influenza vaccine within 14 days, or any other nonstudy vaccine within 28 days, after study intervention administration.

4. Receipt of short-term (<14 days) systemic corticosteroids. Study intervention administration should be delayed until systemic corticosteroid use has been discontinued for at least 28 days. Inhaled/nebulized, intra-articular, intrabursal, or topical (skin or eyes) corticosteroids are permitted.

# 6. STUDY INTERVENTION

Study intervention is defined as any investigational intervention(s), marketed product(s), placebo, medical device(s), or study procedure(s) intended to be administered to a study participant according to the study protocol.

The study will evaluate a 2-dose (separated by 21 days) schedule of various different dose levels of 2 investigational RNA vaccine candidates for active immunization against COVID-19 in 3 age groups (18 to 55 years of age, 65 to 85 years of age, and ≥12 years of age [stratified as 12-15, 16-55, or >55 years of age]).

These 2 investigational RNA vaccine candidates, with the addition of saline placebo, are the 3 potential study interventions that may be administered to a study participant:

- BNT162b1 (BNT162 RNA-LNP vaccine utilizing modRNA and encoding the RBD): 10 μg, 20 μg, 30 μg, 100 μg

- BNT162b2 (BNT162 RNA-LNP vaccine utilizing modRNA and encoding the P2 S): 10 μg, 20 μg, 30 μg

- Normal saline (0.9% sodium chloride solution for injection)

The vaccine candidate selected for Phase 2/3 evaluation is BNT162b2 at a dose of 30 μg.

PF-07302048 (BNT162 RNA-Based COVID-19 Vaccines)
Protocol C4591001

## 6.1. Study Intervention(s) Administered

| Intervention Name | BNT162b1 (BNT162 RNA-LNP vaccine utilizing modRNA) | BNT162b2 (BNT162 RNA-LNP vaccine utilizing modRNA) | Saline Placebo |
|---|---|---|---|
| Type | Vaccine | Vaccine | Placebo |
| Dose Formulation | modRNA | modRNA | Normal saline (0.9% sodium chloride solution for injection) |
| Unit Dose Strength(s) | 250 µg/0.5 mL | 250 µg/0.5 mL | N/A |
| Dosage Level(s)[a] | 10-, 20-, 30-, 100-µg | 10-, 20-, 30-µg | N/A |
| Route of Administration | Intramuscular injection | Intramuscular injection | Intramuscular injection |
| Use | Experimental | Experimental | Placebo |
| IMP or NIMP | IMP | IMP | IMP |
| Sourcing | Provided centrally by the sponsor | Provided centrally by the sponsor | Provided centrally by the sponsor |
| Packaging and Labeling | Study intervention will be provided in a glass vial as open-label supply. Each vial will be labeled as required per country requirement | Study intervention will be provided in a glass vial as open-label supply. Each vial will be labeled as required per country requirement | Study intervention will be provided in a glass or plastic vial as open-label supply. Each vial will be labeled as required per country requirement |

a.   Dependent upon safety and/or immunogenicity data generated during the course of this study, or the BioNTech study conducted in Germany (BNT162-01), it is possible that groups may be started at the next highest dose, groups may not be started, groups may be terminated early, and/or groups may be added with dose levels below the lowest stated dose or intermediate between the lowest and highest stated doses.

The vaccine candidate selected for Phase 2/3 evaluation is BNT162b2 at a dose of 30 µg.

### 6.1.1. Manufacturing Process

The scale of the BNT162b2 manufacturing has been increased to support future supply. BNT162b2 generated using the manufacturing process supporting an increased supply ("Process 2") will be administered to approximately 250 participants 16 to 55 years of age, per lot, in the study.  The safety and immunogenicity of prophylactic BNT162b2 in individuals 16 to 55 years of age vaccinated with material generated using the existing manufacturing process "Process 1," and with material from lots generated using the manufacturing process supporting increased supply, "Process 2," will be described.

In brief, the process changes relate to the method of production for the DNA template that RNA drug substance is transcribed from, and the RNA drug substance purification method. The BNT162b2 drug product is then produced using a scaled-up LNP manufacturing process.

### 6.1.2. Administration

Participants will receive 1 dose of study intervention as randomized at each vaccination visit (Visits 1 and 4 for Phase 1 participants, Visits 1 and 2 for Phase 2/3 participants) in accordance with the study's SoA.  The volume to be administered may vary by vaccine candidate and dose level; full details are described in the IP manual.

PF-07302048 (BNT162 RNA-Based COVID-19 Vaccines)
Protocol C4591001

Study intervention should be administered intramuscularly into the deltoid muscle, preferably of the nondominant arm, by an **unblinded** administrator.

Standard vaccination practices must be observed and vaccine must not be injected into blood vessels. Appropriate medication and other supportive measures for management of an acute hypersensitivity reaction should be available in accordance with local guidelines for standard immunization practices.

Administration of study interventions should be performed by an appropriately qualified, GCP-trained, and vaccine-experienced member of the study staff (eg, physician, nurse, physician's assistant, nurse practitioner, pharmacist, or medical assistant) as allowed by local, state, and institutional guidance.

Study intervention administration details will be recorded on the CRF.

## 6.2. Preparation/Handling/Storage/Accountability

1.  The investigator or designee must confirm appropriate temperature conditions have been maintained during transit for all study interventions received and any discrepancies are reported and resolved before use of the study intervention.

2.  Only participants enrolled in the study may receive study intervention and only authorized site staff may supply or administer study intervention. All study interventions must be stored in a secure, environmentally controlled, and monitored (manual or automated recording) area in accordance with the labeled storage conditions with access limited to the investigator and authorized site staff. At a minimum, daily minimum and maximum temperatures for all site storage locations must be documented and available upon request. Data for nonworking days must indicate the minimum and maximum temperatures since previously documented for all site storage locations upon return to business.

3.  Any excursions from the study intervention label storage conditions should be reported to Pfizer upon discovery along with any actions taken. The site should actively pursue options for returning the study intervention to the storage conditions described in the labeling, as soon as possible. Once an excursion is identified, the study intervention must be quarantined and not used until Pfizer provides permission to use the study intervention. Specific details regarding the definition of an excursion and information the site should report for each excursion will be provided to the site in the IP manual.

4.  Any storage conditions stated in the SRSD will be superseded by the storage conditions stated on the label.

5.  Study interventions should be stored in their original containers.

6.  See the IP manual for storage conditions of the study intervention.

PF-07302048 (BNT162 RNA-Based COVID-19 Vaccines)
Protocol C4591001

7. The investigator, institution, or the head of the medical institution (where applicable) is responsible for study intervention accountability, reconciliation, and record maintenance (ie, receipt, reconciliation, and final disposition records), such as the IPAL or sponsor-approved equivalent.  All study interventions will be accounted for using a study intervention accountability form/record.

8. Further guidance and information for the final disposition of unused study interventions are provided in the IP manual.  All destruction must be adequately documented.  If destruction is authorized to take place at the investigator site, the investigator must ensure that the materials are destroyed in compliance with applicable environmental regulations, institutional policy, and any special instructions provided by Pfizer.

Upon identification of a product complaint, notify the sponsor within 1 business day of discovery as described in the IP manual.

### 6.2.1. Preparation and Dispensing

See the IP manual for instructions on how to prepare the study intervention for administration.  Study intervention should be prepared and dispensed by an appropriately qualified and experienced member of the study staff (eg, physician, nurse, physician's assistant, nurse practitioner, pharmacy assistant/technician, or pharmacist) as allowed by local, state, and institutional guidance.  A second staff member will verify the dispensing.

Study intervention and placebo will be prepared by qualified unblinded site personnel according to the IP manual.  The study intervention will be administered in such a way to ensure the participants remain blinded.

### 6.3. Measures to Minimize Bias: Randomization and Blinding

### 6.3.1. Allocation to Study Intervention

Allocation (randomization) of participants to vaccine groups will proceed through the use of an IRT system (IWR).  The site personnel (study coordinator or specified designee) will be required to enter or select information including but not limited to the user's ID and password, the protocol number, and the participant number.  The site personnel will then be provided with a vaccine assignment and randomization number.  The IRT system will provide a confirmation report containing the participant number, randomization number, and study intervention allocation assigned.  The confirmation report must be stored in the site's files.

The study-specific IRT reference manual and IP manual will provide the contact information and further details on the use of the IRT system.

### 6.3.2. Blinding of Site Personnel

In this observer blinded study, the study staff receiving, storing, dispensing, preparing, and administering the study interventions will be unblinded.  All other study and site personnel, including the investigator, investigator staff, and participants, will be blinded to study

PF-07302048 (BNT162 RNA-Based COVID-19 Vaccines)
Protocol C4591001

intervention assignments.  In particular, the individuals who evaluate participant safety will be blinded.  Because the BNT162 RNA-based COVID-19 vaccine candidates and placebo are different in physical appearance, the study intervention syringes will be administered in a manner that prevents the study participants from identifying the study intervention type based on its appearance.

The responsibility of the unblinded dispenser and administrator must be assigned to an individual or individuals who will not participate in the evaluation of any study participants. Contact between the unblinded dispenser and study participants and unblinded administrator and study participants should be kept to a minimum.  The remaining site personnel must not know study intervention assignments.

### 6.3.3. Blinding of the Sponsor

To facilitate rapid review of data in real time, sponsor staff will be unblinded to study intervention allocation for the participants in Phase 1.  The majority of sponsor staff will be blinded to study intervention allocation in Phase 2/3.  All laboratory testing personnel performing serology assays will remain blinded to study intervention assigned/received throughout the study.  The following sponsor staff, who will have no part in the blinded conduct of the study, will be unblinded in Phase 2/3 (further details will be provided in a data blinding plan):

- Those study team members who are involved in ensuring that protocol requirements for study intervention preparation, handling, allocation, and administration are fulfilled at the site will be unblinded for the duration of the study (eg, unblinded study manager, unblinded clinical research associate).

- Unblinded clinician(s), who are not direct members of the study team and will not participate in any other study-related activities, will review unblinded protocol deviations.

- An unblinded team supporting interactions with, and analyses for, the DMC (see Section 9.6).  This will comprise a statistician, programmer(s), a clinical scientist, and a medical monitor who will review cases of severe COVID-19 as they are received, and will review AEs at least weekly for additional potential cases of severe COVID-19 (see Section 8.2.3).

- An unblinded submissions team will be responsible for preparing unblinded analyses and documents to support regulatory activities that may be required while the study is ongoing.  This team will only be unblinded at the group level and not have access to individual participant assignments.  The programs that produce the summary tables will be developed and validated by the blinded study team, and these programs will be run by the unblinded DMC team.  The submissions team will not have access to unblinded COVID-19 cases unless efficacy is achieved in either an interim analysis or the final analysis, as determined by the DMC.

PF-07302048 (BNT162 RNA-Based COVID-19 Vaccines)
Protocol C4591001

## 6.3.4. Breaking the Blind

The IRT will be programmed with blind-breaking instructions. In case of an emergency, the investigator has the sole responsibility for determining if unblinding of a participant's study intervention assignment is warranted. Participant safety must always be the first consideration in making such a determination. If the investigator decides that unblinding is warranted, the investigator should make every effort to contact the sponsor prior to unblinding a participant's vaccine assignment unless this could delay further management of the participant. If a participant's vaccine assignment is unblinded, the sponsor must be notified within 24 hours after breaking the blind. The date and reason that the blind was broken must be recorded in the source documentation and CRF.

The study-specific IRT reference manual and IP manual will provide the contact information and further details on the use of the IRT system.

## 6.4. Study Intervention Compliance

When participants are dosed at the site, they will receive study intervention directly from the investigator or designee, under medical supervision. The date and time of each dose administered in the clinic will be recorded in the source documents and recorded in the CRF. The dose of study intervention and study participant identification will be confirmed at the time of dosing by a member of the study site staff other than the person administering the study intervention.

## 6.5. Concomitant Therapy

The following concomitant medications and vaccinations will be recorded in the CRF:

- All vaccinations received from 28 days prior to study enrollment until the 6-month follow-up visit (Visit 8 for Phase 1 participants, and Visit 4 for Phase 2/3 participants).

- Prohibited medications listed in Section 6.5.1 will be recorded, to include start and stop dates, name of the medication, dose, unit, route, and frequency.

- In addition, for participants enrolled in Phase 1, all current medication at baseline will be recorded, to include start date, name of the medication, dose, unit, route, and frequency.

## 6.5.1. Prohibited During the Study

Receipt of the following vaccines and medications during the time periods listed below may exclude a participant from the per-protocol analysis from that point onwards, and may require vaccinations to be discontinued in that participant; however, it is anticipated that the participant would not be withdrawn from the study (see Section 7). Medications should not be withheld if required for a participant's medical care.

Unless considered medically necessary, no vaccines other than study intervention should be administered within 28 days before and 28 days after each study vaccination. One exception

PF-07302048 (BNT162 RNA-Based COVID-19 Vaccines)
Protocol C4591001

to this is that seasonal and pandemic influenza vaccine can be given at least 14 days after, or at least 14 days prior to, the administration of study intervention.

Receipt of chronic systemic treatment with known immunosuppressant medications, or radiotherapy, within 60 days before enrollment through conclusion of the study.

Receipt of systemic corticosteroids (≥20 mg/day of prednisone or equivalent) for ≥14 days is prohibited from 28 days prior to enrollment to Visit 7 for Phase 1 participants, and Visit 3 for Phase 2/3 participants).

Receipt of inhaled/nebulized corticosteroids from 28 days prior to enrollment to Visit 7 (1-month follow-up visit) for Phase 1 participants.

Receipt of blood/plasma products or immunoglobulins within 60 days before enrollment through conclusion of the study.

Receipt of any other (nonstudy) coronavirus vaccine at any time prior to or during study participation is prohibited.

Prophylactic antipyretics and other pain medication to <u>prevent</u> symptoms associated with study intervention administration are not permitted.  However, if a participant is taking a medication for another condition, even if it may have antipyretic or pain-relieving properties, it should not be withheld prior to study vaccination.

### 6.5.2. Permitted During the Study

The use of antipyretics and other pain medication to <u>treat</u> symptoms associated with study intervention administration or ongoing conditions is permitted.

Medication other than that described as prohibited in Section 6.5.1 required for treatment of preexisting stable conditions is permitted.

Inhaled (except in Phase 1 participants – see Section 6.5.1), topical, or localized injections of corticosteroids (eg, intra-articular or intrabursal administration) are permitted.

### 6.6. Dose Modification

This protocol allows some alteration of vaccine dose for individual participants and/or dose groups from the currently outlined dosing schedule.  For reasons of reactogenicity, tolerability, or safety, the IRC may recommend to reduce the second dose of study intervention and/or increase the interval between doses.

If, due to a medication error, a participant receives 1 dose of BNT162b2 at Visit 1 and 1 dose of placebo at Visit 2 (or vice versa), the participant should be offered the possibility to receive a second dose of BNT162b2 at an unscheduled visit. In this situation:

- Obtain informed consent for administration of the additional dose.

PF-07302048 (BNT162 RNA-Based COVID-19 Vaccines)
Protocol C4591001

- Measure the participant's body temperature.

- Perform urine pregnancy test on WOCBP as described in Section 8.2.6.

- Discuss contraceptive use as described in Section 10.4.

- Ensure that the participant meets none of the temporary delay criteria as described in Section 5.5.

- Unblinded site staff member(s) will dispense/administer 1 dose of study intervention into the deltoid muscle of the preferably nondominant arm.  Please refer to the IP manual for further instruction on this process.

- Blinded site staff must observe the participant for at least 30 minutes after study intervention administration for any acute reactions.  Record any acute reactions (including time of onset) in the participant's source documents and on the AE page of the CRF, and on an SAE form as applicable.

- The participant should continue to adhere to the normal visit schedule but must be followed for nonserious AEs for 1 month and SAEs for 6 months after the second dose of BNT162b2.  This will require AEs to be elicited either by unscheduled telephone contact(s) and/or in-person visit(s).

## 6.7. Intervention After the End of the Study

No intervention will be provided to study participants at the end of the study.

## 7. DISCONTINUATION OF STUDY INTERVENTION AND PARTICIPANT DISCONTINUATION/WITHDRAWAL

### 7.1. Discontinuation of Study Intervention

In rare instances, it may be necessary for a participant to permanently discontinue study intervention (definitive discontinuation).  Reasons for definitive discontinuation of study intervention may include the following: AEs; participant request; investigator request; pregnancy; protocol deviation (including no longer meeting all the inclusion criteria, or meeting 1 or more exclusion criteria). In general, unless the investigator considers it unsafe to administer the second dose, or the participant does not wish to receive it, it is preferred that the second dose be administered. Note that a positive SARS-CoV-2 NAAT result without symptoms does not meet exclusion criterion 5 and should not result in discontinuation of study intervention, whereas a COVID-19 diagnosis does meet exclusion criterion 5 and should result in discontinuation of study intervention (see Section 8.15).

Note that discontinuation of study intervention does not represent withdrawal from the study. Per the study estimands, if study intervention is definitively discontinued, the participant will remain in the study to be evaluated for safety, immunogenicity, and efficacy.  See the SoA for data to be collected at the time of discontinuation of study intervention and follow-up for any further evaluations that need to be completed.

PF-07302048 (BNT162 RNA-Based COVID-19 Vaccines)
Protocol C4591001

In the event of discontinuation of study intervention, it must be documented on the appropriate CRF/in the medical records whether the participant is discontinuing further receipt of study intervention or also from study procedures, posttreatment study follow-up, and/or future collection of additional information.

## 7.2. Participant Discontinuation/Withdrawal From the Study

A participant may withdraw from the study at any time at his/her own request. Reasons for discontinuation from the study may include the following:

- Refused further follow-up;
- Lost to follow-up;
- Death;
- Study terminated by sponsor;
- AEs;
- Participant request;
- Investigator request;
- Protocol deviation.

If a participant does not return for a scheduled visit, every effort should be made to contact the participant. All attempts to contact the participant and information received during contact attempts must be documented in the participant's source document. In any circumstance, every effort should be made to document participant outcome, if possible.

The investigator or his or her designee should capture the reason for withdrawal in the CRF for all participants.

If a participant withdraws from the study, he/she may request destruction of any remaining samples taken and not tested, and the investigator must document any such requests in the site study records and notify the sponsor accordingly.

If the participant withdraws from the study and also withdraws consent (see Section 7.2.1) for disclosure of future information, no further evaluations should be performed and no additional data should be collected. The sponsor may retain and continue to use any data collected before such withdrawal of consent.

Lack of completion of all or any of the withdrawal/early termination procedures will not be viewed as protocol deviations so long as the participant's safety was preserved.

## 7.2.1. Withdrawal of Consent

Participants who request to discontinue receipt of study intervention will remain in the study and must continue to be followed for protocol-specified follow-up procedures. The only exception to this is when a participant specifically withdraws consent for any further contact

PF-07302048 (BNT162 RNA-Based COVID-19 Vaccines)
Protocol C4591001

with him or her or persons previously authorized by the participant to provide this information. Participants should notify the investigator in writing of the decision to withdraw consent from future follow-up, whenever possible. The withdrawal of consent should be explained in detail in the medical records by the investigator, as to whether the withdrawal is only from further receipt of study intervention or also from study procedures and/or posttreatment study follow-up, and entered on the appropriate CRF page. In the event that vital status (whether the participant is alive or dead) is being measured, publicly available information should be used to determine vital status only as appropriately directed in accordance with local law.

### 7.3. Lost to Follow-up

A participant will be considered lost to follow-up if he or she repeatedly fails to return for scheduled visits and is unable to be contacted by the study site.

The following actions must be taken if a participant fails to attend a required study visit:

- The site must attempt to contact the participant and reschedule the missed visit as soon as possible and counsel the participant on the importance of maintaining the assigned visit schedule and ascertain whether or not the participant wishes to and/or should continue in the study;

- Before a participant is deemed lost to follow-up, the investigator or designee must make every effort to regain contact with the participant (where possible, 3 telephone calls and, if necessary, a certified letter to the participant's last known mailing address or local equivalent methods). These contact attempts should be documented in the participant's medical record;

- Should the participant continue to be unreachable, he/she will be considered to have withdrawn from the study.

### 8. STUDY ASSESSMENTS AND PROCEDURES

The investigator (or an appropriate delegate at the investigator site) must obtain a signed and dated ICD before performing any study-specific procedures.

The full date of birth will be collected to critically evaluate the immune response and safety profile by age.

Study procedures and their timing are summarized in the SoA. Protocol waivers or exemptions are not allowed.

Safety issues should be discussed with the sponsor immediately upon occurrence or awareness to determine whether the participant should continue or discontinue study intervention.

Adherence to the study design requirements, including those specified in the SoA, is essential and required for study conduct.